# No. 25-30108

# IN THE
# UNITED STATES COURT OF APPEALS
# FOR THE FIFTH CIRCUIT

---

Cyril E. Vetter; Vetter Communications Corporation,

Plaintiffs - Appellees

v.

Robert Resnik; Resnik Music Group,

Defendants - Appellants

---

## On Appeal from
United States District Court for the Middle District of Louisiana

3:23-CV-1369

---

## BRIEF OF APPELLANTS ROBERT RESNIK AND RESNIK MUSIC GROUP

SUBMITTED BY:

Robert W. Clarida
Reitler Kailas & Rosenblatt LLP
885 Third Avenue
New York, NY 10022

Edgar Dean Gankendorff
Provosty & Gankendorff, L.L.C.
650 Poydras Street
New Orleans, LA 70130

# CERTIFICATE OF INTERESTED PERSONS

The undersigned counsel of record certifies that the following listed persons and entities as described in the fourth sentence of 5th CIR Rule 28.2.1 have an interest in the outcome of this case. These representations are made in order that the judges of this court may evaluate possible disqualification or recusal.

| Appellees: | Counsel for Appellees: |
|---|---|
| Cyril Vetter | Timothy Kappel of Wells & Kappel, L.L.P. New Orleans, LA |
| Vetter Communications Corporation | Timothy Kappel of Wells & Kappel, L.L.P. New Orleans, LA |

| Appellants: | Counsel for Appellants: |
|---|---|
| Robert Resnik | Robert W. Clarida of Reitler Kailas & Rosenblatt LLP, New York, NY |
| Robert Resnik | Brian D. Caplan of Reitler Kailas & Rosenblatt LLP, New York, NY |
| Resnik Music Group | Robert W. Clarida of Reitler Kailas & Rosenblatt LLP, New York, NY |
| Resnik Music Group | Brian D. Caplan of Reitler Kailas & Rosenblatt LLP, New York, NY |
| Robert Resnik | Edgar Gankendorff of Provosty & Gankendorff, L.L.C. New Orleans, LA |
| Robert Resnik | Christophe Szapary of Provosty & Gankendorff, L.L.C. New Orleans, LA |
| Resnik Music Group | Edgar Gankendorff of Provosty & Gankendorff, L.L.C. New Orleans, LA |
| Resnik Music Group | Christophe Szapary of Provosty & Gankendorff, L.L.C. New Orleans, LA |

| Other Interested Parties: | Counsel for Interested Parties: |
|---|---|
| None | N/A |

S/Robert W. Clarida
Attorney of Record for Appellants

## STATEMENT REGARDING ORAL ARGUMENT

Appellants respectfully request oral argument.  The appeal raises significant issues of first impression in this Circuit, and the decisional process would be significantly aided by oral argument.

# TABLE OF CONTENTS

Contents                                       Page(s)

CERTIFICATE OF INTERESTED PERSONS ...................................................... iii

STATEMENT REGARDING ORAL ARGUMENT ............................................... v

TABLE OF CONTENTS .......................................................................................... vi

TABLE OF AUTHORITIES ................................................................................... vii

JURISDICTIONAL STATEMENT ......................................................................... xi

STATEMENT OF THE ISSUES .............................................................................. 1

STATEMENT OF THE CASE .................................................................................. 2

SUMMARY OF THE ARGUMENT ....................................................................... 4

ARGUMENT ............................................................................................................. 6

CONCLUSION ....................................................................................................... 38

CERTIFICATE OF SERVICE .............................................................................. 39

CERTIFICATE OF COMPLIANCE .................................................................... 40

# TABLE OF AUTHORITIES

**Cases**

*Abdallah v. Mesa Air Grp., Inc.*,
    83 F.4th 1006 (5th Cir. 2023) ................................................................5

*American Well Works Co. v. Layne & Bowler Co.*,
    241 U.S. 257 (1916)............................................................................16

*Anderson v. Valdez*,
    845 F.3d 580 (5th Cir. 2016) .............................................................10

*Ashcroft v. Iqbal*,
    556 U.S. 662 (2009)............................................................................10

*Baldwin v. EMI Feist Catalog, Inc.*,
    805 F.3d 18 (2d Cir. 2015) .................................................................14

*Brumley v. Albert E. Brumley & Sons, Inc.*,
    822 F.3d 926 (6th Cir. 2016) .............................................................14

*Clancy v. Jack Ryan Enterprises, Ltd.*,
    2021 WL 488683 (D. Md. 2021) ........................................................13

*Conn. Nat'l Bank v. Germain*,
    503 U.S. 249 (1992)..............................................................................9

*Corcovado Music Corp. v. Hollis Music, Inc.*,
    981 F.2d 679 (2d Cir.1993) ................................................................18

*DeBartolo Corp. v. Fla. Gulf Coast Bldg. & Constr.*,
    485 U.S. 568 (1988).............................................................................23

*ESAB Group, Inc. v. Zurich Ins. PLC*,
    685 F.3d 376 (4th Cir. 2012) .............................................................24

*Fred Ahlert Music Corp. v. Warner Chappell Music, Inc.*,
    155 F.3d 17 (2d Cir. 1998) .................................................................13

*G. Ricordi & Co. v. Paramount Pictures, Inc.*,
    189 F.2d 469 (2d Cir. 1951) ...............................................................31

*Geophysical Service, Inc. v. TGS-NOPEC Geophysical Co.*,
    850 F.3d 785 (5th Cir. 2017) ........................................................... 12, 26

*Goodman v. Lee*,
    815 F.2d 1030 (5th Cir. 1987) ............................................................. 16

*Harville v. City of Houston*,
    945 F.3d 870 (5th Cir. 2019) ............................................................... 5

*Horror, Inc. v. Miller*,
    15 F. 4th 232 (2d Cir. 2021) ............................................................... 14

*Itar-Tass Russian News Agency v. Russian Kurier, Inc.*,
    155 F.3d 82 (2d Cir. 1998) ................................................................. 22

*Kim Ho Ma v. Ashcroft*,
    257 F.3d 1095 (9th Cir. 2001) ............................................................. 24

*Kirtsaeng v. John Wiley & Sons*,
    568 U.S. 519 (2013) ........................................................................... 15

*Kofa v. U.S. INS*,
    60 F.3d 1084 (4th Cir.1995) ............................................................... 24

*Lamie v. United States Trustee*,
    540 U.S. 526 (2004) ............................................................................ 9

*Larson v. Warner Bros. Entertainment, Inc.*,
    540 Fed. App'x 630 (9th Cir. 2016) ..................................................... 14

*Life Receivables Trust v. Syndicate 102 at Lloyd's of London*,
    549 F.3d 210 (2d Cir. 2008) ................................................................. 9

*Los Angeles News Serv. v. Reuters Tv. Intern.*,
    340 F.3d 926 (9th Cir. 2003) ............................................................... 12

*Mills Music, Inc. v. Snyder*,
    469 U.S. 153 (1985) ........................................................................... 14

*Murray v. Schooner Charming Betsy,* 6 U.S. (2 Cranch) 64, 118 (1804) ............... 23

*Oetjen v. Cent. Leather Co.*,
    246 U.S. 297 (1918) ........................................................................... 25

*Pavelic & LeFlore v. Marvel Entertainment Group, Div. of Cadence Industries Corp.*,
  493 U.S. 120 (1989) ............................................................7

*Rohauer v. Killiam Shows, Inc.*,
  379 F. Supp. 723 (S.D.N.Y. 1974), *rev'd on other grounds*, 551 F.2d 484 (2d Cir. 1977) .........................................................20

*Siegel v. Warner Bros. Entertainment Inc.,*
  542 F. Supp. 2d 1098 (C.D. Cal. 2008) ..............................13

*Stewart v. Abend,*
  495 U.S. 207 (1990) ..........................................................30

*Subafilms, Ltd. v. MGM-Pathe Commc'ns Co.,*
  24 F.3d 1088 (9th Cir. 1994) ...........................................25

*T.B. Harms Co. v. Eliscu,*
  339 F.2d 823 (2d Cir. 1964) .............................................16

*U.S. v. Locke*,
  471 U.S. 84 (1985) ..............................................................9

*Vimar Seguros y Reaseguros, S.A. v. M/V Sky Reefer*, 515 U.S. 528 (1995) ..........24

*Weinberger v. Rossi,*
  456 U.S. 25 (1982) ............................................................23

*West Virginia Univ. Hospitals, Inc. v. Casey*,
  499 U.S. 83 (1991) ..............................................................7

**Other Authorities**

Berne Convention Implementation Act of 1988, Pub. L. No. 100-568, 102 Stat. 2853–2861 (Oct. 31, 1988) ...............................................26

*British Reversionary Right* in Lisa Alter, "Protecting Your Musical Copyrights," https://akbllp.com/wp-content/uploads/Protecting-Your-Musical-Copyrights.pdf ................................................................................19

Eaton S. Drone, *A Treatise on the Law of Property in Intellectual Creations in Great Britain and the United States* 326 (1879) ..............................32

Jon A. Baumgarten, *Primer on the Principles of International Copyright,* in <u>Fourth Annual U.S. Copyright Office Speaks: Contemporary Copyright and Intellectual Property Issues</u>, 470 (Prentice-Hall Law & Business)(1992) .............................19

<u>Supplementary Report of the Register of Copyrights on the General Revision of the U.S. Copyright Law</u> (House Committee Print, 89th Congress, 1st Sess.) .........8

The Berne Convention for the Protection of Literary and Artistic Works, July 24, 1971, as amended, September 28, 1979 ("Berne"), 25 U.S.T. 1341, 1161 U.N.T.S. 30, available at https:////www.wipo.int/treaties/en/ip/berne/ ...............17

*The Charming Betsy Canon and Separation of Powers: Rethinking the Interpretive Role of International Law,* 86 Geo. L.J. 479 (1998)............................................24

*The Charming Betsy Canon, Separation of Powers, and Customary International Law,* 121 Harv. L. Rev. 1215 (2008) .................................................................23

U.S. Copyright Office, https://copyright/.gov/international-issues/........................27

W. Patry, 7 PATRY ON COPYRIGHT § 25:69 ....................................................21

# JURISDICTIONAL STATEMENT

A.    Basis of the District Court's Subject Matter Jurisdiction.

The District Court had subject matter jurisdiction over this matter pursuant to 28 U.S.C. §§ 1331 and 1338(a) because this is an action for declaratory judgment brought under 28 U.S.C. §§ 2201(a), 2202.

B.    Basis of Court of Appeals Jurisdiction.

The Court of Appeals has subject matter jurisdiction over the final decision rendered by the District Court pursuant to 28 U.S.C. §1291. The Order (ROA.523) and Judgment (ROA.531) from which Appellants (collectively "Resnik") appeal, entered January 29, 2025, was a final order resolving all parties' claims. The Notice of Appeal (ROA.535) was timely filed by Appellants on February 25, 2025.

# STATEMENT OF THE ISSUES

1.     Whether the Court below erred in finding that Appellee Cyril Vetter acquired international copyright rights in the musical work at issue ("Song") when he exercised his U.S. copyright termination right under 17 U.S.C. § 304. (ROA.529).

2.     Whether the Court below erred in finding that Appellee Vetter Communications Corporation acquired international copyright rights in the Song when it purchased the U.S. copyright renewal interest that had reverted to the heirs of co-author Don Smith when he died before the U.S. renewal interest vested. (ROA.529).

# STATEMENT OF THE CASE

The factual allegations of the Complaint, together with the documents attached thereto and referenced therein, allege that Plaintiff-Appellee Cyril Vetter ("Mr. Vetter") and his friend Don Smith created the song Double Shot (of My Baby's Love) ("Song") in the summer of 1962, Complaint, (ROA.18), ¶¶ 51-53, and the two co-authors assigned all worldwide rights in it to Windsong Music under an agreement between Windsong Music, on the one hand, and Mr. Smith and Mr. Vetter, on the other hand, ("1963 Assignment"). (ROA.18-19), ¶¶ 57-58. The 1963 Assignment, at paragraph 1, conveyed to Windsong all rights in the Song, including "the exclusive right to secure copyright therein throughout the entire world." (ROA.30) at ¶ 1. In 1966, Windsong obtained a U.S. copyright registration for the Song. (ROA.19), ¶63. Mr. Smith died in 1972. Id. ¶65. Mr. Vetter, together with Mr. Smith's statutory successors, obtained a renewal of the U.S. copyright in the Song in 1994, resulting in a copyright renewal certificate dated Nov. 28, 1994. (ROA.20), ¶73. Mr. Vetter's company, Vetter Communications Corp., then acquired the Smith heirs' rights ("Smith Interest") in the spring of 1996. Id. ¶76.

Later in 1996, Windsong Music executed and recorded the 1996 Assignment, which purports to "reduce to writing" a transfer of Mr. Vetter's rights to Windsong in a September 27, 1996 assignment by and between Mr. Vetter and Windsong Music Publishers, Inc. ("1996 Assignment) (ROA.21), ¶¶77-78. Mr. Vetter disputed

the validity of that assignment. Id. ¶79. Mr. Vetter subsequently served and recorded a termination notice under 17 U.S.C. § 304, dated March 20, 2019, from counsel for Mr. Vetter to Windsong Music and Lyresong Music, Inc. ("Termination Notice"). Id. ¶¶84-85. The Termination Notice claimed May 3, 2022 as the effective termination date of Windsong's rights in the Song under the 1963 Assignment. Id. ¶85. Plaintiffs-Appellees (collectively "Vetter") allege that Mr. Vetter "retook ownership of his authorship share" of the Song ("Vetter Interest") once the termination became effective, (ROA.22), ¶92, and allege further that Resnik's counsel did not dispute the Termination Notice. (ROA.23), ¶102. Resnik's counsel did, however, communicate to Mr. Vetter's counsel that under U.S. copyright law "a termination of transfer notice only terminates a transfer in the United States. All rights outside the United States do not revert, so [Resnik] retain[s] the copyright to [the Song] outside of the United States for the life of the copyright." (ROA.24), ¶105. Litigation commenced with the filing of the Complaint on September 27, 2023.

Resnik moved to dismiss the Complaint under Rule 12(b)(6) on December 15, 2023 (ROA.97). On July 12, 2024 this Court denied Resnik's motion to dismiss. (ROA.245) ("Dismissal Ruling"), finding Vetter's legal position to be "plausible." Dismissal Ruling (ROA.283). Vetter then moved for summary judgment on July 23, 2024 (ROA.406), and the following day Resnik submitted a motion to amend the

3

Dismissal Ruling to certify it for interlocutory appeal under 28 U.S.C. 1292(b)(ROA.410).

The Court denied Resnik's motion to amend for certification on November 13, 2024 (ROA.489), on the grounds that certification for interlocutory appeal would not materially advance the litigation, id. at 4.  The Court took no position on the merits of either party's legal arguments, id. at 5, n.34, and ordered a schedule for the submission of briefs on the motion for summary judgment. (ROA.497). On January 29, 2025, the Court granted Vetter's motion for summary judgment. (ROA.523). The ruling presented for review is the Court's January 29, 2025 order granting summary judgment to Vetter (ROA.523) ("Order"), and the judgment entered that same day (ROA.531).

## SUMMARY OF THE ARGUMENT

The decision below rests upon a faulty interpretation of international copyright law, adopting Vetter's "novel" theory that all copyright protection flows from a singular, "unitary" copyright determined by the law of country having the "closest relationship" to the work.  This is, in fact, the inverse of universally accepted copyright doctrine, which recognizes that copyright is territorial and arises separately under the laws of each nation. This misunderstanding of copyright led the District Court, below, to commit two errors of law: (1) Holding, contrary to the plain

language of the Copyright Act as well as well-settled caselaw and scholarly authority, that U.S. statutory termination of a copyright grant under 17 U.S.C. § 304(c) affects ownership of rights in the work outside of the United States. No court had ever previously so held. (2) Holding that U.S. statutory reversion of a deceased author's rights in a work protected under the 1909 Copyright Act under the doctrine of *Stewart v. Abend*, 495 U.S. 207 (1990) also causes reversion of rights in the work outside of the United States. No court had ever previously so held. Accordingly, the decision below should be reversed.

## STANDARD OF REVIEW

The Fifth Circuit reviews a grant of summary judgment *de novo*. *See, e.g. Harville v. City of Houston*, 945 F.3d 870, 874 (5th Cir. 2019)("We review a . . . summary judgment de novo, viewing all facts and drawing all inferences in a light most favorable to the non-moving party"). Summary judgment is appropriate if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). A genuine dispute of material fact exists when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Abdallah v. Mesa Air Grp., Inc.*, 83 F.4th 1006, 1012 (5th Cir. 2023) (quotation marks and citation omitted).

# ARGUMENT

## I.    The District Court Erred By Ruling That Statutory Termination Under 17 U.S.C. § 304(c) Reverts Worldwide Copyright Rights.

Copyright protection is granted territory-by-territory; there is no single, worldwide copyright law. Authors who write books in the U.S. have a U.S. copyright; but they *also* have a Canadian copyright, a French copyright, a Japanese copyright, an Egyptian copyright, etc. Those are all separate and distinct rights, each with their own scope, exceptions, and duration. And the rights in each territory arise under that territory's domestic copyright law. Congress, in enacting the 1976 Act, had the same understanding and accordingly *wrote that understanding into the law*.

The District Court reasoned otherwise: it held that copyright rights of a U.S.-produced work in foreign territories nonetheless arise under U.S. law, rather than the domestic laws of each foreign territory. This error led to its incorrect and unprecedented conclusion that termination of a copyright grant in the U.S. under 17 U.S.C. § 304(c) effected termination in foreign countries as well. Instead, this Court should hold—as the statute and precedent demand—that rights in a U.S. produced work in foreign territories arise under the laws of those foreign territories. From that correct premise will then flow the ineluctable conclusions that neither termination under 17 U.S.C. § 304(c) nor recapture of rights under the doctrine of *Stewart v. Abend*, 495 U.S. 207 (1990), has extraterritorial effect.

**A. The District Court's Decision Ignores the Plain Language of the Statute.**

By its terms, termination of a copyright grant under 17 U.S.C. § 304(c) "affects only those rights covered by the grant that arise under this title, and in no way affects rights arising under any other Federal, State, or foreign laws." *See id.,* § 304(c)(6)(E). Mr. Vetter served a termination notice under § 304(c). Therefore, the plain language of the statute compels the conclusion that Mr. Vetter's Termination Notice does not affect foreign rights. The District Court erred by accepting Vetter's admittedly "novel" contention to the contrary. (ROA.250).

As the Supreme Court has frequently held, "Congress' intent is found in the words it has chosen to use." *See, e.g., West Virginia Univ. Hospitals, Inc. v. Casey*, 499 U.S. 83, 98 (1991) ("The best evidence of [Congress'] purpose is the statutory text adopted by both Houses of Congress and submitted to the President."). Simply put, "our task is to apply the text, not to improve upon it." *Pavelic & LeFlore v. Marvel Entertainment Group, Div. of Cadence Industries Corp.*, 493 U.S. 120, 126 (1989).

When enacting § 304(c) and its companion provision, § 203(a),[1] Congress explicitly understood that the language regarding rights "arising under . . . foreign

---

[1] *See Milne v. Stephen Slesinger*, Inc. 430 F.3d 1036 (9th Cir. 2005) ("To the extent that the legislative record references section 304(c)(5)'s counterpart provision under

laws" would preclude the result reached by the District Court here.  In the 1965

<u>Supplementary Report of the Register of Copyrights on the General Revision of the</u>

<u>U.S. Copyright Law</u> (House Committee Print, 89th Congress, 1st Sess.)("1965

Report"), prepared at the request of Congress and issued by the House Judiciary

Committee in connection with the legislative process that led ultimately to the 1976

Copyright Act,  then-Register of Copyrights Abraham Kaminstein explained to

Congress that this "foreign laws" language – which is identical in § 304 and § 203 –

was to ensure that "termination affects only those rights *arising under* the U.S.

copyright statute and has no effect, for example, *on foreign rights that are covered*

*by the same contract*" (*id.* at 75, emphasis added).[2]  That is exactly the factual

---

section 203(a)(5), we find that history instructive given Congress's use of identical language in both provisions. *See Gustafson v. Alloyd Co.*, 513 U.S. 561, 570, 115 S. Ct. 1061, 131 L. Ed. 2d 1 (1995) (recognizing that "'identical words used in different parts of the same act are intended to have the same meaning'" under the "'normal rule of statutory construction'" (quoting *Dep't of Revenue v. ACF Indus., Inc.*, 510 U.S. 332, 342, 114 S. Ct. 843, 127 L. Ed. 2d 165 (1994))); *see also Batjac Prods., Inc. v. Goodtimes Home Video Corp.*, 160 F.3d 1223, 1228 (9th Cir. 1998) (supporting the "'basic canon of statutory construction that identical terms within an Act bear the same meaning'" (quoting *Estate of Cowart v. Nicklos Drilling Co.*, 505 U.S. 469, 479, 112 S. Ct. 2589, 120 L. Ed. 2d 379 (1992))).

[2] The quoted passage refers to this language by its then-current section number, 203(b)(4).  The identical language is now found in sections 203(b)(5) and 304(c)(6)(E), except that "shall affect only" was edited to read "affects only" in the final statutory text. *See Appendices* to 1965 Report, *supra*, at 228, 246.

scenario presented here, *i.e.,* domestic and foreign rights were covered by the same contract.   Therefore, the foreign rights are not affected by the termination.

The Court's interpretation of Section 304(c) effectively re-writes the statutory text to make it say the opposite of what Congress in fact provided.  This is reversible error.  *See Lamie v. United States Trustee*, 540 U.S. 526, 537 (2004) ("there is a basic difference between filling a gap left by Congress' silence and rewriting rules that Congress has affirmatively and specifically enacted");  *U.S. v. Locke*, 471 U.S. 84, 92-93 (1985) ("[T]he plain language of the statute simply cannot sustain the gloss appellees would put on it.... [A] literal reading of Congress' words is generally the *only* proper reading of those words.")(emphasis added).   Congress gave no indication of ever considering the Court's "novel" interpretation, and the language Congress *did* actually use cannot be squared with it.  *See Life Receivables Trust v. Syndicate 102 at Lloyd's of London,* 549 F.3d 210, 216 (2d Cir. 2008):

> [W]e must interpret a statute as it is, not as it might be, since "courts must presume that a legislature says in a statute what it means and means in a statute what it says...." *Conn. Nat'l Bank v. Germain,* 503 U.S. 249, 253-54, 112 S. Ct. 1146, 117 L.Ed.2d 391 (1992). A statute's clear language does not morph into something more just because courts think it makes sense for it to do so.

Neither does a statute's clear language morph into something else because the District Court thought Vetter's novel reading was "plausible," as the Court concluded in denying Resnik's motion to dismiss. (ROA.279). Plausibility is not the correct standard for resolving an issue of law, in a motion to dismiss or at any other

stage of a litigation. Plausibility is only a proper standard for weighing factual allegations, not for determining questions of law.[3] The Court's subsequent rulings, up to and including the summary judgment Order that is the subject of this appeal, never elaborated further as to how Vetter's tortured statutory reading made the leap from "plausible" legal argument on a motion to dismiss to a conclusion of law in the Order. See (ROA.529)("The Court adopts by reference in full the explanation and legal analysis of this dispute as set forth in its prior Ruling denying Defendant's Motion to Dismiss, as it represents the Court's conclusion on the application of the law to the facts of this case").

Here the statutory language and legislative history confirm that the District Court got it wrong. Section 304(c)(6)(E) of the Copyright Act cannot be read to allow for the termination of a grant of non-U.S. rights in a work.

### B. The District Court's Decision Contradicts All Prior Judicial and Scholarly Authority As to the Effect of 17 U.S.C. § 304(c) on Foreign Rights.

The Court's interpretation of the statute contradicts that of every other court that has addressed the effect of statutory termination on foreign rights. In *Siegel v. Warner Bros. Entertainment, Inc.,* 542 F. Supp. 2d 1098 (C.D. Cal. 2008), *rev'd on*

---

[3] *See, e.g., Anderson v. Valdez,* 845 F.3d 580, 589 (5th Cir. 2016)(plaintiff must plead "*factual* content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged" (emphasis added)(quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)).

*other grounds*, 504 Fed. App'x 586 (9th Cir. 2013),  for example, the Central District of California held as a matter of law that the statutory termination of a copyright grant in the Superman comic character did *not* result in the recapture of any foreign rights.  The court began by holding that "the statutory text could not be any clearer on this subject," and then continued:

> Through this section [304(c)(6)(E)], Congress expressly limited the reach of what was *gained* by the terminating party through exercise of the termination right; specifically, the terminating party only recaptured the *domestic* rights (that is, the rights arising under title 17 to the United States Code) of the grant to the copyright in question. Left expressly intact and undisturbed were any of the rights the original grantee or its successors in interest had gained over the years from the copyright through other sources of law, notably the right to exploit the work abroad that would be governed by the copyright laws of foreign nations. Thus, the statute explains that termination "in no way affects rights" the grantee or its successors gained "under foreign laws."

*Siegel* at 1140 (emphasis original).

The *Siegel* court cited the leading copyright treatises in support:

> Professor Nimmer states: A grant of copyright "throughout the world" is terminable only with respect to uses within the geographic limits of the United States. Because copyright has no extraterritorial operation, arguably American law is precluded from causing the termination of rights based upon foreign copyright laws. A response to this argument is that the nonextraterritoriality of copyright is irrelevant because the question here is one of contract law, not copyright law, in that it concerns the effect of a contract granting certain rights. The contract law of one nation may be applicable in another nation under the latter's conflict-of-laws rule. The conclusive answer to this problem lies in the text of the termination provisions of the Copyright Act, which expressly provide that statutory termination "in no way affects rights arising under ... foreign laws"—that is, under foreign copyright (not contract) laws. Thus, even if the conflicts rule of a foreign nation were to call for application of the American termination rule as a rule of contract law, that rule by its own terms excepts from termination the grant of those rights arising under foreign copyright laws.

*Siegel* at 1140-1141, quoting M. Nimmer & D. Nimmer, 3 NIMMER ON COPYRIGHT § 11.02[B][2] at 11–19.

*Siegel* also cited to Professor Patry's treatise:

> Accordingly, where a U.S. author conveys worldwide rights and terminates under either section [203 or 304], grants in all other countries remain valid according to their terms or provisions in other countries' laws.

*Id.*, quoting W. Patry, 7 PATRY ON COPYRIGHT § 25:74.

The *Siegel* court forcefully rejected the argument, adopted by the District Court here, that copyright termination allowed a copyright owner to recapture foreign rights:

> This argument misses the fact that all plaintiffs have gained from the termination right is a recapturing of the *domestic* copyright in the Superman material published in *Action Comics,* Vol. 1. Defendants continue to hold, unaffected, separate rights to that copyright arising under *foreign* copyright laws.

*Id.* (emphasis original).

The *Siegel* court recognized that "such an open effort to extend the reach of U.S. copyright law overseas, as plaintiffs' reading of the statute avows, would be in direct contradiction to not only the plain terms of the statute" but would stand "in stark juxtaposition to the longstanding rule 'that the copyright laws [of this country] have no application beyond the U.S. border.'" *Id.* (citing *Los Angeles News Serv. v. Reuters Tv. Intern.*, 340 F.3d 926, 931 (9th Cir. 2003)); *accord, Geophysical Service, Inc. v. TGS-NOPEC Geophysical Co.*, 850 F.3d 785, 797 (5th Cir. 2017)(Copyright Act "does not apply extraterritorially"). The *Siegel* court concluded by stating:

Accordingly, the Court holds that the termination notice affects only the *domestic* portion of Siegel's and Shuster's 1938 worldwide grant ("all rights") to Detective Comics of the copyright in the Superman material contained in *Action Comics,* Vol. 1. The termination notice is *not* effective as to the remainder of the grant, that is, defendants' exploitation of the work abroad under the aegis of foreign copyright laws.

*Id.* (emphasis original).

The other courts that have addressed the issue have reached the same conclusion as the *Siegel* court.   The Second Circuit in *Fred Ahlert Music Corp. v. Warner Chappell Music, Inc.*, 155 F.3d 17 (2d Cir. 1998), for example, recognized that the statutory termination of rights in a musical composition used in the film *Sleepless in Seattle* only resulted in the recapture of the "domestic rights in the Song." *Id.* at 20.

Similarly, in *Clancy v. Jack Ryan Enterprises, Ltd.,* 2021 WL 488683 (D. Md. 2021), which involved termination rights in the Tom Clancy novel *The Hunt for Red October*, the District of Maryland quoted extensively from *Siegel* as it emphasized the limits that Congress placed on the scope of statutory termination rights:

Congress placed certain limitations on what authors (or their heirs) could gain from exercising the termination right. *See Siegel v. Warner Bros. Entertainment Inc.,* 542 F. Supp. 2d 1098, 1140 (C.D. Cal. 2008). The "termination of a grant under this section affects only those rights covered by the grants that arise under this title [*i.e.*, U.S. copyright law], and in no way affects rights arising under...foreign laws." 17 U.S.C. § 203(b)(5).

Therefore, the worldwide grant of copyright is only subject to termination insofar as its U.S. component is concerned, but not subject to termination in the rest of the world. *See* [*Siegel at* 1144] (holding that a termination notice for Superman "affects only the *domestic* portion of [the] worldwide grant," but "*not* effective as to the remainder of the grant, that is, defendants'

exploitation of the work abroad under the aegis of foreign copyright laws.") (emphasis in original); *see also* 3 NIMMER ON COPYRIGHT § 11.02(B)(2) (A grant of copyright "throughout the world" is terminable only with respect to uses within the geographic limits of the United States.).

Therefore, the purported effect of plaintiff's Termination Notice can only apply to the domestic copyright in *Hunt*, not its foreign copyrights.

*Id.* at *46.

Accordingly, as a matter of statutory interpretation, the Court below erred in holding that Vetter's statutory Termination Notice recaptured both domestic *and foreign* rights in the Song. No prior court has ever made this error. The termination provisions of the Copyright Act have been the subject of extensive litigation for over forty years, and no court has *ever* previously held, or even suggested, that termination has extra-territorial effect.[4]

---

[4] *See, e.g., Mills Music, Inc. v. Snyder*, 469 U.S. 153 (1985); *Horror, Inc. v. Miller,* 15 F. 4th 232 (2d Cir. 2021); *Brumley v. Albert E. Brumley & Sons, Inc.,* 822 F.3d 926 (6th Cir. 2016); *Larson v. Warner Bros. Entertainment, Inc.,* 540 Fed. App'x 630 (9th Cir. 2016); *Baldwin v. EMI Feist Catalog, Inc.*, 805 F.3d 18 (2d Cir. 2015); *Ray Charles Fdn. v. Robinson*, 795 F.3d 1109 (9th Cir. 2015); *Gary Friedrich Enters. LLC v. Marvel Characters, Inc.*, 716 F.3d 302 (2d Cir. 2013); *DC Comics v. Pacific Pictures Corp.*, 545 Fed. Appx. 678 (9th Cir. 2013); *Marvel Characters, Inc. v. Kirby*, 726 F.3d 119 (2d Cir. 2013); *Penguin Group v. Steinbeck,* 537 F.3d 193 (2d Cir. 2008); *Classic Media, Inc. v. Mewborn*, 532 F.3d 978 (9th Cir. 2008); *Milne v. Stephen Slesinger, Inc.*, 430 F.3d 1036 (9th Cir. 2005); *Marvel Characters, Inc. v. Simon*, 310 F.3d 280 (2d Cir. 2002); *Woods v. Bourne*, 60 F.3d 978 (2d Cir. 1995); *Stone v. Williams*, 970 F.2d 1043 (2d Cir. 1992); *Larry Spier, Inc. v. Bourne Co.*, 953 F.2d 774 (2d Cir. 1992); *Burroughs v. Metro-Goldwyn-Mayer, Inc.,* 683 F.2d 610 (2d Cir. 1982).

The only caselaw referenced below in support of the Court's statutory reading, *Kirtsaeng v. John Wiley & Sons*, 568 U.S. 519 (2013), is completely inapposite, as even the District Court appeared to recognize. *See* ROA.275-280.   Vetter argued below that the U.S. Supreme Court's interpretation of the phrase "*lawfully made under this title*" as used in 17 U.S.C. 109(a) in *Kirtsaeng* was determinative of the geographical meaning of the phrase "*arise under* this title" as used in 17 U.S.C. 304(c).  To state the obvious, this argument ignores the difference between the words "arise under" in Section 304(c) and the words "lawfully made under" in Section 109(a).   Section 304(c) addresses the termination of rights that "arise under this title," while Section 109(a) creates a defense for re-selling physical copies that were "lawfully made under this title."[5]

The Court below correctly rejected Vetter's argument that the words "under this title," in isolation, lack geographic significance, and noted that *Kirtsaeng* "did not have occasion to address the meaning of '*arise* under this title' under §304(c)(6)(E)." (ROA.280)(emphasis original).   However, the Court's own cursory effort to interpret the phrase "arising under this title" suffers from the same weakness.  The Court, *id.*, merely stated that "[o]ne of the dictionary definitions of 'arise' is 'to originate from a source,'" citing Merriam-Webster, and then opined in

---

[5] *Kirtsaeng* held that this defense was available to an alleged infringer who acquired licensed textbooks in foreign countries.

conclusory terms, without authority, that "in the Court's view, both domestic and foreign rights to exploit the Song originated from the United States Copyright Act; once the United States copyright was obtained, the owner of that copyright had the ability to exploit the Song abroad." *Id.* There are two significant errors in the Court's brief analysis.

First, the Court applied a vague, general dictionary definition of the word "arise" – not the statutory phrase "arise under" – and ignored the legal definition established over a century ago by Justice Holmes: "A suit arises under the law that creates the cause of action." *American Well Works Co. v. Layne & Bowler Co.*, 241 U.S. 257, 260 (1916).

In the copyright context, the courts have consistently so held. In *T.B. Harms Co. v. Eliscu,* 339 F.2d 823, 824 (2d Cir. 1964) (Friendly, *J.*), the Second Circuit established a landmark test for determining when a claim "arises under" the Copyright Act. *See also Goodman v. Lee*, 815 F.2d 1030, 1031 (5th Cir. 1987) (adopting *T.B. Harms* test)(emphasis added).[6] The Court below ignored this

---

[6] Under *T.B. Harms* a claim "arises under" the Copyright Act: "if and only if the complaint is for a remedy expressly granted by the Act, *e.g.*, a suit for infringement or for the statutory royalties for record reproduction [citation omitted] or asserts a claim requiring construction of the Act, as in De Sylva, or, at the very least and perhaps more doubtfully, presents a case where a distinctive policy of the Act requires that federal principles control the disposition of the claim. The general interest that copyrights, like all other forms of property, should be enjoyed by their true owner is not enough to meet this last test." *Id.*

well-settled caselaw and incorrectly based its legal conclusion on a general, nebulous

dictionary definition of "arise" rather than the controlling legal definition of "arise

under."  As a matter of law, this was the wrong analysis of the statutory phrase "arise

under."

The District Court's interpretation is basically the inverse of the well-

understood workings of international copyright protection under the Berne

Convention[7] and the Universal Copyright Convention,[8] the two leading international

copyright agreements to which the U.S. is a signatory.  Under Berne and the UCC,

each country grants authors copyright protection under its own domestic law, and

grants that same protection to works that have a country of origin with whom it has

a reciprocal treaty relationship. While some countries may apply their own choice

of law principles to determine in particular cases that *initial* ownership of a foreign

work should be determined by the law of the country of origin, all other aspects of

copyright – what types of works are protected or not, for how long, with what

---

[7] The Berne Convention for the Protection of Literary and Artistic Works, July 24, 1971, as amended, September 28, 1979 ("Berne"), 25 U.S.T. 1341, 1161 U.N.T.S. 30, available at https:////www.wipo.int/treaties/en/ip/berne/ (last visited April 21, 2025).

[8] Universal Copyright Convention as Revised at Paris, July 24, 1971, 973 U.N.T.S. 178 ("UCC"), available at https://www.unesco.org/en/legal-affairs/universal-copyright-convention-revised-24-july-1971-appendix-declaration-relating-article-xvii-and (last visited April 21, 2025).

reservations/exceptions – are determined solely with reference to the non-originating country's domestic laws.[9]

For example, if a French author writes a book in France, French domestic law *grants* to that author the right to prevent anyone else from exploiting that work in France without authorization. That's a French copyright.  If a U.S. author writes a book in the U.S., and wants to stop others from exploiting that work in France, *French* domestic law—not U.S. law—will *grant* him or her that same right, because the governments of France and the U.S. have agreed that they will do so for each others' authors.  Just like the French author, the U.S. author has a French copyright – the right to exclude others from engaging in certain conduct in France.  It arises under the *grant* made by French domestic law; it does not arise under U.S. law, in the sense of "arise under" as defined by Justice Holmes and *T.B. Harms*, which is the sense in which the enacting Congress will have understood the terms "arising under" when they were drafting the legislation. They were not consulting a 21st-century online dictionary.

As Jon A. Baumgarten, former General Counsel to the U.S. Copyright Office has explained, "[t]he term 'international copyright' is something of a misnomer, for neither a single code governing copyright protection across national borders, nor a

---

[9] *See, e.g. Corcovado Music Corp. v. Hollis Music, Inc.*, 981 F.2d 679, 684 (2d Cir.1993)(court applied U.S. law to determine ownership of renewal rights in Brazilian song).

unitary multi-national property right, exists.   What does exist is a complex of copyright *relations* among sovereign states, each having its own copyright law applicable to acts within its territory." *Primer on the Principles of International Copyright,* in <u>Fourth Annual U.S. Copyright Office Speaks: Contemporary Copyright and Intellectual Property Issues</u>, 470, 471 (Prentice-Hall Law & Business)(1992) (emphasis original).

Accordingly, the District Court's conclusory effort to interpret the statutory language of "arise under" in § 304(c)(6)(E) reached the wrong conclusion because it applied the wrong definition and asked the wrong question.   The Court's "unitary copyright" theory would lead to absurd results.   For example, if a work's country of origin dictates ownership in every other country of the world, then songs by the Beatles would be subject to the "master copyright" of the UK, under the District Court's reasoning.   But the law of the UK provides for certain reversionary rights, which differ materially from the U.S. termination right, but accomplish a similar result, *i.e.* the return of rights to the author after some period of years.[10] These UK reversionary rights are *not* applicable under U.S. law,[11]  even though UK copyrights

---

[10] *See* generally, *British Reversionary Right* in Lisa Alter, "Protecting Your Musical Copyrights," https://akbllp.com/wp-content/uploads/Protecting-Your-Musical-Copyrights.pdf (last visited April 21, 2025).

[11] *See Rohauer v. Killiam Shows, Inc.*, 379 F. Supp. 723 (S.D.N.Y. 1974), *rev'd on other grounds*, 551 F.2d 484 (2d Cir. 1977).

may certainly be protected here under domestic U.S. law.  If the U.S. does not apply the UK reversionary rights – which it does not – by what *legal* mechanism should the UK, or any other country, apply the termination rules of the U.S. Copyright Act? The District Court provides no answer.

The result of the District Court's "master copyright" theory would be chaos, with copyright in each work dependent on its country of origin, rather than the orderly system that the nations of the world have in fact developed over more than a century, in which the applicable law is the law of the place "where protection is claimed." *See* Art. 5, § 2 of Berne.

Imposing U.S. termination rules worldwide would violate the principle of territoriality, on which both Berne and the UCC are based.  For a simple example of territoriality, assume the copyright in a 1909 Act U.S. work expires 95 years after publication, which is the longest possible term under current U.S. law, at a time when the author has been dead for 25 years. In the U.S. the work is no longer under copyright.  In many other countries, however, copyright protection lasts for the life of the author plus 70 years. In those countries, the same work may still be under copyright for another 45 years. The expiration of the U.S. term of protection does *not* universally re-set the term for any other country.  *Id.*  Similarly, if no renewal was made at all in the 28th year of a U.S. copyright, the work would enter the public

domain in the U.S., but would *not* necessarily be in the public domain in other countries.

Some countries may, in their own domestic laws, choose to take account of the copyright laws of a work's source country, such as under the so-called "rule of the shorter term" ("RST").  Under the RST, if country A is the source country of a work, country B may elect to cut off protection of that work prematurely in country B once it is no longer protected in country A. *See generally* W. Patry, 7 PATRY ON COPYRIGHT § 25:69.

But that is a policy choice to be made, or not, by country B.  See Berne, Art. 7(8)("the term [of copyright] shall be governed by the legislation of the country where protection is claimed; however, *unless the legislation of that country otherwise provides*, the term shall not exceed the term fixed in the country of origin of the work.")(emphasis added.)   There is no mechanism by which other nations are forced to follow U.S. copyright law, in that respect or any other. The District Court asserted that the U.S. renewal copyright interest "extends worldwide," (ROA.249), but it failed to identify any actual *law* that effectuates this purported worldwide extension.  The very fact that some countries legislate the RST into their copyright law and some do not refutes the Court's conclusion that the law of a work's source country applies worldwide.  The District Court seemed to assume that copyright ownership is somehow different from copyright duration, scope of protection, and

other copyright attributes that are more clearly variable between and among countries, but it failed to identify any statute or treaty that creates such an exception. There is no such exception. Copyright *ownership* is created by the substantive statutory law of each nation, just as surely as duration, remedies, and scope of protection. *See*, *e.g.* 17 U.S.C. § 201 (section titled "Ownership of Copyright").[12]

The District Court's interpretation of "arise under" was also fatally flawed because it looked solely to whether a copyright owner can *exploit* its work abroad (ROA.281), rather than also asking whether it can *enforce* its rights against unauthorized uses abroad, and if so, what statute creates that foreign cause of action. This is the crucial inquiry because copyright is an *exclusive* right, a right to exclude, to prevent others from making certain uses of the work. See 17 U.S.C. § 106 ("[T]he owner of copyright under this title has the *exclusive* right to do any authorize any of the following…")(emphasis added). Without a grant of that right to exclude by the foreign nation, there is no protection for copyright in that nation. Accordingly, the Court erred by holding that non-U.S. rights in a work somehow "arise under" U.S. law.

---

[12] *Itar-Tass Russian News Agency v. Russian Kurier, Inc.,* 155 F.3d 82 (2d Cir. 1998), is not to the contrary. *Itar-Tass*, which concerned ownership of copyright in newspaper articles created and first published in the USSR, expressly limited its holding to questions of initial ownership, as the District Court recognized. ROA.266 (Order at 22 (quoting footnote 22 from *Itar-Tass*). The issue in this case does not concern initial ownership, therefore *Itar-Tass* is not apposite.

**C. The District Court's Decision Clashes With the International Treaty Obligations of the United States.**

The District Court's statutory interpretation must also be rejected because it would conflict with U.S. treaty obligations under Berne and the UCC. It is well-established that courts should interpret domestic statutes harmoniously with international obligations of the U.S. whenever possible. The Supreme Court recognized this principle over two hundred years ago, when Chief Justice Marshall wrote that "an act of Congress ought never to be construed to violate the law of nations, if any other possible construction remains." *Murray v. Schooner Charming Betsy,* 6 U.S. (2 Cranch) 64, 118 (1804)("*Charming Betsy*").

*Charming Betsy* remains an accepted "maxim of statutory construction." *Weinberger v. Rossi*, 456 U.S. 25, 32 (1982). *See also DeBartolo Corp. v. Fla. Gulf Coast Bldg. & Constr.*, 485 U.S. 568, 575 (1988) (canon's relevance "is beyond debate"); Note, *The Charming Betsy Canon, Separation of Powers, and Customary International Law,* 121 Harv. L. Rev. 1215, 1215 (2008) (*Charming Betsy* "has become deeply embedded in American jurisprudence").

Courts have "invoked the *Charming Betsy* canon in a variety of contexts." Curtis Bradley, *The Charming Betsy Canon and Separation of Powers: Rethinking the Interpretive Role of International Law,* 86 Geo. L.J. 479,488 (1998). The canon "presumably applies to all international obligations of the United States, regardless

of whether they are viewed as enforceable domestic law." *Id.* at 483.  *See, e.g., Kim Ho Ma v. Ashcroft*, 257 F.3d 1095, 1114 (9th Cir. 2001) (applying principle to interpret a domestic statute consistently with non-self-executing treaty to which U.S. was a party).  As the Restatement of Foreign Relations makes clear, "[w]here fairly possible, a United States statute is to be construed so as not to conflict with international law or with an international agreement of the United States." Restatement (Third) of the Foreign Relations of the United States § 114 (1987).[13]

*Charming Betsy* reflects sound policy considerations. The "conduct of foreign relations of our Government is committed by the Constitution to the Executive and Legislative – the 'political' – Departments of the Government." *Oetjen v. Cent. Leather Co.*, 246 U.S. 297, 302 (1918).  *See* U.S. Const. Art. II, § 2, cl. 2 (granting treaty power to the President with advice and consent of the Senate).  *Charming*

[13] See *ESAB Group, Inc. v. Zurich Ins. PLC*, 685 F.3d 376 (4th Cir. 2012): "Where a statute touches upon foreign relations and the United States' treaty obligations, we must proceed with particular care in undertaking this interpretive task. As the Supreme Court observed in considering a prior potential conflict between the Convention Act and a federal statute, '[i]f the United States is to be able to gain the benefits of international accords and have a role as a trusted partner in multilateral endeavors, its courts should be most cautious before interpreting its domestic legislation in such manner as to violate international agreements.' *Vimar Seguros y Reaseguros, S.A. v. M/V Sky Reefer*, 515 U.S. 528, 539 (1995). We seek, when possible, to 'construe ... statute [s] consistent with our obligations under international law.' *Kofa v. U.S. INS*, 60 F.3d 1084, 1090 (4th Cir.1995) (*en banc*) (citing *Murray v. Schooner Charming Betsy*, 6 U.S. (2 Cranch) 64, 118, 2 L.Ed. 208 (1804))."

24

*Betsy* provides a "means of both respecting the formal constitutional roles of Congress and the President and preserving a proper balance and harmonious working relationship among the three branches of the federal government." Bradley, *supra*, at 525.  It ensures that courts do not interpret statutes in a manner that undermines the foreign policy decisions of the political branches to enter into (and bind the country to) specific international agreements – and thereby unnecessarily impair the credibility of the Government in dealing with the international community.

*Charming Betsy* also has particular relevance to copyright law given "Congress' objective of achieving 'effective and harmonious' copyright laws among all nations," its "efforts to secure a more stable international intellectual property regime" and its concern with "strengthen[ing] the credibility of the U.S. position in trade negotiations with countries where piracy is not uncommon." *Subafilms, Ltd. v. MGM-Pathe Commc'ns Co.,* 24 F.3d 1088, 1097-98 (9th Cir. 1994) (*en banc*) (quoting. H.R. Rep. No. 100-609, at 20 & 4-5 (1998)).

Under *Charming Betsy*, the District Court's statutory interpretation must be rejected because it would place the U.S. in violation of its treaty obligations to honor the bedrock principles of territoriality and national treatment, which the U.S. and its treaty partners worldwide have recognized since the dawn of international copyright relations.

To summarize, the territoriality principle recognizes that copyright protection in one country does not extend to or affect protection in any other country, *see, e.g. Geophysical Service, Inc. v. TGS-NOPEC Geophysical Co.*, 850 F.3d 785, 797 (5th Cir. 2017)(Copyright Act "does not apply extraterritorially"), while the principle of national treatment requires each country, in applying its own laws, to treat authors of foreign nations the same as its own authors.

As noted above, these principles have been adopted through domestic law in the U.S. in conformity with two primary international copyright agreements, Berne and the UCC. The United States first joined the UCC in 1952. The Berne Convention dates back to the nineteenth century, and the most recent official version was signed in 1971 (and amended in 1979)[14] but was not joined by the United States until 1989.[15]

The Court below ignored the key fact that neither of these treaties is self-executing. Instead, the Copyright Act is the sole source of authority for the rights of authors in the United States, and to avoid any doubt on that point 17 U.S.C. §104(c) provides that "[n]o right or interest in a work eligible for protection under this title

---

[14] *See* Berne, *supra*.

[15] Berne Convention Implementation Act of 1988, Pub. L. No. 100-568, 102 Stat. 2853–2861 (Oct. 31, 1988), *codified at* 17 U.S.C. §101 *et seq.* (effective Mar. 1, 1989).

may be claimed by virtue of, or in reliance upon, the provisions of the Berne Convention, or the adherence of the United States thereto." Thus the U.S. Copyright Act, together with the implementing legislation of each other member country, creates multiple and separate copyright interests in each country, rather than a single overarching international master copyright that each country is required to honor.[16]

The District Court's contrary conclusion, *i.e.* that foreign rights in U.S. works "arise" from the U.S. Copyright Act, is therefore flatly wrong. Copyright protection arises from the domestic law of each country in which protection is claimed. *See, e.g.,* Article 36 of Berne:

> (1) Any country party to this Convention undertakes to *adopt,* in accordance with its constitution, *the measures necessary to ensure the application of this Convention.*
>
> (2) It is understood that, at the time a country becomes bound by this Convention, it will be in a position *under its domestic law* to give effect to the provisions of this Convention.

(Emphasis added).[17]

---

[16] Baumgarten, *supra, Primer on the Principles of International Copyright,* in <u>Fourth Annual U.S. Copyright Office Speaks: Contemporary Copyright and Intellectual Property Issues.</u>

[17] *See also* U.S. Copyright Office, https://copyright/.gov/international-issues/: "Original works of expression that are eligible for copyright protection are protected under national copyright laws. Protection against unauthorized use in a particular country depends on the national laws of that country; in other words, copyright protection depends on the national laws where protection is sought." (last visited April 21, 2025).

Consequently, copyright protection in a Berne or UCC member country arises under the *domestic* law of each member country. Berne Art. 5(1), (2) ("Authors shall enjoy, in respect of works for which they are protected under this Convention, in countries of the Union other than the country of origin, *the rights which their respective laws do now or may hereafter grant to their nationals*, as well as the rights specifically granted by this Convention. . . . [S]uch enjoyment and such exercise [of these rights] shall be *independent* of the existence of protection in the country of origin of the work." (emphasis added). The treaties merely establish certain requirements that the domestic laws must satisfy. Therefore, the language of the copyright termination provision in Section 304(c)(6)(E) really does mean what it says: "[t]ermination of a grant under this subsection affects only those rights covered by the grant that arise under this title[, Title 17 of the United States Code], and *in no way affects rights arising under any other Federal, State, or foreign laws.*" Because the foreign rights in the Song do not arise under Title 17 of the U.S. Code, but under the domestic laws of each member country, the termination of U.S. rights under Section 304 "in no way affects" those foreign rights.

If not reversed, the District Court's holding would also contradict the principle of national treatment under Art. 5, § 1 of Berne and Art. II of the UCC. Berne Art. 5 confirms in so many words that Berne member nations "*grant*" exclusive rights to

authors under "their *respective* laws," and also requires that the member nations

cannot provide lesser rights to authors from other signatory countries:

> [a]uthors shall enjoy … in [signatory countries] other than the country of origin, the rights which *their respective laws* do now or may hereafter *grant* to their nationals.

Berne Art. 5, § 1 (emphasis added).

At the time the 1976 Act was adopted, and thus at the time that Congress was

drafting the termination provisions in § 304(c), the relevant international copyright

treaty that Congress would have had in mind was the UCC, not the Berne

Convention, because as noted above the United States only joined Berne in 1989.

The UCC also requires, however, perhaps even more explicitly than Berne, that

signatories will extend their own *territorial* copyright protections to foreign

nationals.  Under Art. II, § 1 of the UCC, a Contracting State must grant to foreign

nationals "the same protection" as is granted to the Contracting State's own

nationals:

> Published works of nationals of any Contracting State and works first published in that State shall enjoy in each other Contracting State *the same protection* as that other State accords to works of its nationals first published in its own territory, as well as the protection specially granted by this Convention.

UCC, Paris text (July 14,1971)(emphasis added).

The District Court's ruling, if not reversed, would put the U.S. in violation of

its national treatment obligations under both Berne and the UCC, because it would

grant U.S. authors *greater* rights than the authors of other Berne and UCC members

are entitled to receive under U.S. law. That is, U.S. authors would have an opportunity to recapture their rights worldwide, under § 304(c), but the authors of those other countries would not be given any opportunity to do so, even in the U.S., because according to the District Court those authors' rights did not arise under U.S. law, as § 304(c) requires.

Accordingly, the District Court's interpretation of the termination provisions in § 304(c) must be reversed.

## II.     The District Court Erred By Ruling That Statutory Reversion Under *Stewart v. Abend* Affects Foreign Rights.

In addition to the District Court's erroneous statutory interpretation, the Court also erred in holding that Appellee Vetter Communications Corporation is the sole owner of all worldwide rights in the copyright interest in the Song previously held by its co-author, the late Don Smith. As noted in the above <u>Statement of the Case</u>, Mr. Smith died before the U.S. renewal term in the Song commenced twenty-eight years after publication, and thus under the Supreme Court's ruling in *Stewart v. Abend,* 495 U.S. 207 (1990), the grants of U.S. renewal-term rights previously made by Mr. Smith were not effective.

The District Court held, however, in an unprecedented expansion of *Stewart v. Abend,* that Mr. Smith's successors gained all *worldwide* rights in the Song after year twenty-eight. This was reversible error. Just as the plain statutory language of

Section 304 limits the effect of copyright termination to U.S. rights, see above, the recapture of previously-granted rights under *Stewart* is also limited to U.S. rights. Under *Stewart* (and its predecessor *Fred Fisher Music v. M. Witmark & Sons*)[18] the U.S. renewal right cannot be transferred by the author prior to the start of the renewal term because the renewal term is said to be a "new estate" in which the author has only a contingent expectancy to assign during the first term.[19] If the author is not living when the renewal period begins, the heirs take the renewal "clear of all rights, interests or licenses granted under the original copyright."[20]

The District Court (ROA.261) emphasized the language in *Stewart* that stated the original grantee "holds nothing" if the grantor dies before the start of the renewal term, citing *Stewart* at 220.  In context, however, that language was unambiguously saying that the grantee was left with "nothing" *vis-à-vis* the "bundle of rights" created by the U.S. Copyright Act, 17 U.S.C. § 106, see *Stewart* 495 U.S. 220 and n.3.  Moreover, the U.S. was the *only* country with such a bifurcated copyright term and that bifurcation was the foundation for the Supreme Court's holding.  In

---

[18] 318 U.S. 643 (1943).

[19] *Stewart*, 495 U.S. at 219–20.

[20] *Id*. at 218 (quoting *G. Ricordi & Co. v. Paramount Pictures, Inc.*, 189 F.2d 469, 471 (2d Cir. 1951)); *see also* 17 U.S.C. §304(a)(1)(C)(ii).

countries other than the U.S., the issue could not arise - because foreign laws do not create a "new estate" partway through the term, the author's original grant remains effective in those countries for the full term of copyright, regardless of the timing of the author's death relative the U.S. renewal term.[21]

Therefore, the initial assignee of U.S. rights always takes the U.S. renewal interest from the author subject to the risk that the author will die, the expectancy will not vest, and the heirs will instead be the owners of the new estate in the U.S. when it comes into being.   Significantly, the Supreme Court makes clear that the heirs' recapture of U.S. ownership after the author's death is not the result of the author's grant being voided, set aside, or superseded in any way, but simply the result of the contingent nature of the U.S. renewal rights held by the author during the first term:

> These results follow not because the author's assignment is invalid but *because he had only an expectancy to assign*; and his death, prior to the

---

[21] This bedrock principle of copyright law was well recognized at the time Congress adopted the 1909 Act, as explicated by the leading commentator of the nineteenth century. Eaton S. Drone, *A Treatise on the Law of Property in Intellectual Creations in Great Britain and the United States* 326 (1879) ("The question arises, whether an assignment of copyright made under [the Act of 1831] divests the author, or his widow and children, of the right to the second term of protection thus provided for, and whether the assignee becomes vested with that right. *This question cannot arise in England, because the statute of that country does not provide for such extension*." (emphasis added)).  *See also* https://en. wikipedia.org/wiki/List_of_copyright_duration_by_country#Table (table of copyright duration by country)(last visited April 21, 2025).

renewal period, terminates his interest in the renewal which by § 24 [of the 1909 Act, now § 304(a)(1)] vests in the named classes.[22]

For this reason, *Stewart* holds that an author's grant of *U.S.* renewal term rights will be of no value to the grantee unless the author survives past the start of the renewal term.

With respect to foreign rights, however, the above analysis does not apply. *See, e.g., Rohauer v. Killiam Shows, Inc.*,[23] which expressly recognizes that foreign rights do not revert to the author's estate under the principle articulated in *Stewart*. In *Rohauer*, the Southern District of New York observed that the heirs of an author had no rights in the United Kingdom, even though they held U.S. rights by virtue of the *Stewart* principle, after the author died prior to the commencement of the U.S. renewal term.[24] Thus, following the original grantor's death, "Rohauer was at that moment vested only with rights to the work in the United States" (at 735).

*Rohauer's* holding is correct.  The principle of territoriality under copyright law and the rationale of *Stewart* itself require the conclusion that the reversion of U.S. renewal-term rights to the author's estate under *Stewart* does not affect a

---

[22] *Stewart*, 495 U.S. at 219 (quoting *Miller Music v. Charles N. Daniels, Inc.,* 362 U.S. 373, 375 (1960))(emphasis added).
[23] 379 F. Supp. 723 (S.D.N.Y. 1974), *rev'd on other grounds*, 551 F.2d 484 (2d Cir. 1977).

[24] *Id*. at 734–35.

transferee's continued ownership of foreign rights, where the foreign country "made no provision for copyright renewal" in its own domestic law. *Rohauer* at 734. In other words, there was no bifurcated copyright term under UK law, thus there was no "new estate" in that country, thus the original grant remained in effect there notwithstanding the reversion of the "new estate" in the U.S.

The Court below disagreed and in the process misread *Rohauer*. (ROA.262-264). The District Court's own reading of the case flatly contradicts the Court's central argument that the U.S. copyright renewal somehow "extends worldwide." In the Order, *id.*, the Court summarized *Rohauer* as explaining that rights

> in some countries would not have reverted to the heir until three years after the heir's assignment to Rohauer, *according to the law of those countries*, and thus 'Rohauer was at that moment vested only with rights to the work in the United States; in other countries, the motion picture rights would not have reverted to [the author's heir] for at least three more years.'

(Emphasis added).

Of course the very idea that the laws of foreign countries would determine the reversion of rights in those countries is correct, but it is exactly the opposite of the Court's novel "master copyright" theory, under which the reversion of rights in a work's source country "extends worldwide." In *Rohauer*, the reversion of rights manifestly did not extend worldwide. If the *Rohauer* court had applied the "master copyright" reasoning of the District Court below, it could not have held, as it did,

that the domestic laws of the U.S. and the UK resulted in different parties owning rights in the same work, in those two different territories.

Under the explicit reasoning of *Stewart,* therefore, a grant by which an author assigns worldwide rights, including initial-term and renewal-term U.S. rights, is a valid grant when made and remains a valid grant even after the author's death during the initial U.S. term. As to the U.S. renewal term, however – and *only* as to the U.S. renewal term – *Stewart* holds that it is only a grant of an unfulfilled expectancy. As to all other rights conveyed by the author, *i.e.,* foreign rights in countries without a bifurcated copyright term, the effect of the grant remains unchanged, because the foreign rights granted are *not mere expectancies* but valid full-term rights under the copyright laws of other countries, fully vested in the author for their entire duration *ab initio*. Thus, as to these non-U.S. rights, as *Rohauer* recognized, the author has more than "only an expectancy to assign" at the time the assignment is made, and the result of *Stewart* will not extend beyond the "contingent" U.S. renewal rights. Only the U.S. renewal rights are "expectancies" and they are therefore the only rights that revert under the reasoning of *Stewart*, by the terms of *Stewart* itself.

Because the doctrine of *Stewart v. Abend* is an application of the terms of the 1909 Copyright Act, the views of the enacting Congress regarding international copyright should also be considered when interpreting the precedent.  At the time the 1909 Act was adopted, the U.S. was not yet a member of either Berne or the

UCC, but had entered into a number of bilateral treaties to secure copyright protection for foreign nationals.

In this context, the language of § 8 of the 1909 Act expressly indicated that the U.S. was granting foreign authors a U.S. territorial copyright in a work that was "made the subject of copyright *by this Act,*" *i.e.*, U.S. law itself, and that such copyright was, in turn, "secured by" the 1909 Act to the benefit of foreign authors:

> SEC. 8. That the author or proprietor of any work *made the subject of copyright by this Act*, or his executors, administrators, or assigns, shall have copyright for such work under the conditions and for the terms specified in this Act: Provided, however, That the copyright *secured by this Act* shall extend to the work of an author or proprietor who is a *citizen or subject of a foreign state or nation*, only:
>
> (a) When an alien author or proprietor shall be domiciled within the United States at the time of the first publication of his work; or
>
> (b) When the foreign state or nation of which such author or proprietor is a citizen or subject grants, either by treaty, convention, agreement, or law to citizens of the United States the benefit of copyright on substantially the same basis as to its own citizens, or copyright protection substantially equal to the protection secured to such foreign author under this Act or by treaty; or when such foreign state or nation is a party to an international agreement which provides for reciprocity in the granting of copyright, by the terms of which agreement the United States may, at its pleasure, become a party thereto. The existence of the reciprocal conditions aforesaid shall be determined by the President of the United States, by proclamation made from time to time, as the purposes of this Act may require.

(Emphasis added).

This statutory language confirms that copyright in the U.S. was "secured" for foreign authors *by* the U.S. Copyright Act, as opposed to a copyright arising under

foreign law that was somehow then "recognized" by U.S. law, as the District Court erroneously concluded.

Finally, the District Court's erroneous application of *Stewart v. Abend* would conflict with U.S. treaty obligations under Berne and the UCC, and therefore must be rejected under the doctrine of *Charming Betsy*, as discussed *supra*. With respect to territoriality, the Court's holding would violate the principle that U.S. copyright law has no extraterritorial application, because it would impose the downstream effects of the U.S. renewal system on every country in the world – requiring that foreign publishers surrender their rights in a U.S. work simply because the author happened to die too soon.

With respect to national treatment, the result under the Court's misreading of *Stewart v. Abend* is the same as with the Court's erroneous reading of the termination statute.  Non-U.S. authors would be disadvantaged because U.S. authors would have an opportunity to recapture their rights worldwide after year twenty-eight, but the authors in other countries would not be given that opportunity, either in the U.S. or elsewhere, because the laws of their countries do not create a contingent "new estate" partway through the copyright term.  The District Court's holding allowing worldwide recapture of rights under *Stewart v. Abend* should therefore be reversed.

# CONCLUSION

Based on the reasons and authorities set forth above, the Judgment of the

District court should be reversed in all respects and judgment entered for

Appellants.

SUBMITTED BY:

S/Robert W. Clarida
Reitler Kailas & Rosenblatt LLP
885 Third Avenue
New York, NY 10022

# CERTIFICATE OF SERVICE

I hereby certify that on April 22, 2025, I electronically filed the foregoing Brief of Appellants with the Clerk of the Court for the U.S. Court of Appeals for the Fifth Circuit by using the appellate CM/ECF system.  All case participants are registered CM/ECF users, and will be served by the appellate CM/ECF system.

*/s/ Robert W. Clarida*
Robert w. Clarida
Reitler Kailas & Rosenblatt LLP

*Attorney of Record for Appellants*

# CERTIFICATE OF COMPLIANCE

Undersigned counsel certifies that the attached brief complies with the type-volume limitations in Federal Rule of Appellate Procedure 29(a)(5) because this brief contains 10,901 words, less than the amount allowed for a party's principal brief under Federal Rule of Appellate Procedure 32(a)(7)(B)(i), excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(f) and Fifth Circuit Rule 32.2.

Undersigned counsel further certifies that this brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and Fifth Circuit Rule 32.1 and the type style requirements of Federal Rule of Appellate Procedure 32(a)(6), because this brief has been prepared in a proportionally spaced 14-point Times New Roman typeface using Microsoft Word.

*/s/ Robert W. Clarida*
Robert W. Clarida
Reitler Kailas & Rosenblatt LLP

*Attorney of Record for Appellants*