# United States Court of Appeals
## for the
# Fifth Circuit
— ◆❘◆ —

CYRIL E. VETTER; VETTER COMMUNICATIONS CORPORATION,

*Plaintiffs-Appellees,*

— v. —

ROBERT RESNIK; RESNIK MUSIC GROUP,

*Defendants-Appellants.*

———————————

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF LOUISIANA
NO. 3:23-CV-1369-SDD-EWD

---

**BRIEF FOR *AMICI CURIAE*
RECORDING INDUSTRY ASSOCIATION OF AMERICA,
NATIONAL MUSIC PUBLISHERS' ASSOCIATION, AND
AMERICAN ASSOCIATION OF INDEPENDENT MUSIC
IN SUPPORT OF DEFENDANT-APPELLANT**

---

Manuel Valle
SIDLEY AUSTIN LLP
1501 K Street, NW
Washington, DC 20005
(202) 736-8000

Rollin A. Ransom
  *Counsel of Record*
Collin P. Wedel
SIDLEY AUSTIN LLP
350 S. Grand Ave.
Los Angeles, CA 90071
(213) 896-6000
rransom@sidley.com

April 29, 2025

*Counsel for Amici Curiae*

# CERTIFICATE OF INTERESTED PERSONS

Undersigned counsel certifies that the following listed persons and entities as described in the fourth sentence of Fifth Circuit Rule 28.2.1 have an interest in the outcome of this case. These representations are made in order that the judges of this Court may evaluate possible disqualification or recusal.

**A.    Plaintiffs-Appellees**

> Cyril E. Vetter
> Vetter Communications Corporation

**B.    Attorneys for Plaintiffs-Appellees**

> Timothy R. W. Kappel
> WELLS & KAPPEL LLP

**C.    Defendants-Appellants**

> Robert Resnik
> Resnik Music Group

**D.    Attorneys for Defendants-Appellants**

> Robert W. Clarida
> Brian D. Caplan
> REITLER KAILAS & ROSENBLATT LLP
>
> Edgar D. Gankendorff
> Christophe Bela Szapary
> PROVOSTY & GANKENDORFF LLC

**E.    Amici Curiae**

Recording Industry Association of America
National Music Publishers' Association
American Association of Independent Music

**F.    Attorneys for Amici Curiae**

Rollin A. Ransom
Collin P. Wedel
Manuel Valle
SIDLEY AUSTIN LLP

**G.    Federal Rule of Appellate Procedure 26.1**

The Recording Industry Association of America, National Music Publishers' Association, and American Association of Independent Music are all nonprofit corporations that do not have parent corporations, are not owned in any part by a publicly held corporation, and are not government entities.

April 29, 2025                    */s/ Rollin A. Ransom*
                                       Rollin A. Ransom
                                       *Counsel for Amici Curiae*

**TABLE OF CONTENTS**

CERTIFICATE OF INTERESTED PERSONS ..........................................i

TABLE OF AUTHORITIES...................................................................iv

AMICI'S IDENTITY, INTEREST, AND AUTHORITY TO FILE.............1

SUMMARY OF ARGUMENT ...................................................................4

ARGUMENT .........................................................................................6

I.     The author of a creative work receives a bundle of national copyright interests, not a single international copyright................6

II.    The Berne Convention confirms that foreign copyright interests are separate and distinct creatures of foreign law. .........9

III.  The district court's holding that foreign exploitation rights can be terminated by Section 304(c) is incompatible with basic tenets of copyright law........................................................12

CONCLUSION ......................................................................................17

CERTIFICATE OF SERVICE

CERTIFICATE OF COMPLIANCE

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Alameda Films SA de CV v. Authors Rts. Restoration Corp.*,
    331 F.3d 472 (5th Cir. 2003) .................................................. 14

*Bacardi Corp. of Am. v. Domenech*,
    311 U.S. 150 (1940) .............................................................. 17

*Canadian Standards Ass'n v. P.S. Knight Co., Ltd.*,
    112 F.4th 298 (5th Cir. 2024) ............................................... 14

*Clancy v. Jack Ryan Enters.*,
    No. CV ELH-17-3371, 2021 WL 488683 (D. Md. Feb. 10, 2021) ....... 13

*Ennio Morricone Music Inc. v. Bixio Music Grp. Ltd.*,
    936 F.3d 69 (2d Cir. 2019) .................................................... 14

*Fred Ahlert Music Corp. v. Warner/Chappell Music, Inc.*,
    155 F.3d 17 (2d Cir. 1998) .................................................... 13

*Golan v. Holder*,
    565 U.S. 302 (2012) ................................................................ 9

*Griffin v. Oceanic Contractors, Inc.*,
    458 U.S. 564 (1982) .............................................................. 17

*Itar-Tass Russian News Agency v. Russian Kurier, Inc.*,
    153 F.3d 82 (2d Cir. 1998) .................................................... 14

*Siegel v. Warner Bros. Ent. Inc.*,
    542 F. Supp. 2d 1098 (C.D. Cal. 2008) ................................. 13

*Vetter v. Resnik*,
    No. CV 23-1369-SDD-EWD, 2024 WL 3405556 (M.D. La.
    July 12, 2024), *motion to certify appeal denied*,
    No. CV 23-1369-SDD-EWD, 2024 WL 4913616 (M.D. La.
    Nov. 13, 2024) ......................................... 4, 5, 9, 12, 15, 16

## Treaties, Statutes, and Rules

Berne Convention for the Protection of Literary and Artistic Works, Sept. 9, 1886, *as amended on* Sept. 28, 1979, S. Treaty Doc. No. 99-27 (1986)..........................................10

17 U.S.C. § 104 ..................................................................11

17 U.S.C. § 304 ......................................................... *passim*

Federal Rules of Appellate Procedure Rule 29(a)...................1

## Other Authorities

Richard Arnold & Jane C. Ginsburg, *Comment: Foreign Contracts and U.S. Copyright Termination Rights: What Law Applies?*, 43 Colum. J.L. & Arts 437 (2020) ......................12

Graeme W. Austin, *Social Policy Choices and Choice of Law for Copyright Infringement in Cyberspace*, 79 Or. L. Rev. 575 (2000).............................................................7

Curtis A. Bradley, *Territorial Intellectual Property Rights in an Age of Globalism*, 37 Va. J. Int'l L. 505 (1997) ..............10

Lorin Brennan, *Financing Intellectual Property Under Revised Article 9: National and International Conflicts*, 23 Hastings Comm. & Ent. L.J. 313 (2001) .......................7

Jeffrey P. Cunard & Brandon C. Gruner, *Statutory Termination Rights (Copyright)*, Practical Law Practice Note w-010-0835 (2024)...................................................13

2 Darraby on Art Law § 16.5 (2024) .......................................11

Graeme B. Dinwoodie, *International Copyright Law: The Introduction*, *in* 1 International Copyright Law and Practice (2024) ..................................... 6, 7, 10, 16

3 Entertainment Law 3d: Legal Concepts and Business Practices § 16:141 (2023) ....................................13

Jane C. Ginsburg, *Global Use/Territorial Rights: Private International Law Questions of the Global Information Infrastructure*, 42 J. Copyright Soc'y U.S.A. 318 (1995)..................... 6

Jane C. Ginsburg, *International Copyright: From a "Bundle" of National Copyright Laws to a Supranational Code,* 47 J. Copyright Soc'y U.S.A. 265 (2000)........................................ 8, 15

Jan Bernd Nordemann, *Internet Copyright Infringement: Remedies Against Intermediaries-the European Perspective on Host and Access Providers,* 59 J. Copyright Soc'y U.S.A. 773 (2012).............................................. 9

Axel Nordemann, *Berne and Beyond: Understanding International Conventions Relating to Copyright Law,* 59 J. Copyright Soc'y U.S.A. 263 (2012)............................................... 8

7 Patry on Copyright § 25:74 (2025) ...................................... 13

Eric Priest, *Acupressure: The Emerging Role of Market Ordering in Global Copyright Enforcement,* 68 SMU L. Rev. 169 (2015)................................................ 11

Gregory Swank, *Extending the Copyright Act Abroad: The Need for Courts to Reevaluate the Predicate-Act Doctrine,* 23 DePaul J. Art, Tech. & Intell. Prop. L. 237 (2012)......................... 7

# AMICI'S IDENTITY, INTEREST, AND AUTHORITY TO FILE[1]

The Recording Industry Association of America ("RIAA") is a non-profit trade organization that supports and promotes the creative and financial vitality of recorded music and the people and companies that create it in the United States. RIAA's several hundred members—ranging from major American music groups with global reach to artist-owned labels and small businesses—make up the world's most vibrant and innovative music community. RIAA members create, manufacture, and/or distribute the majority of all legitimate recorded music produced and sold in the United States. They also are the copyright owners of, or owners of exclusive rights with respect to, sound recordings embodying the performances of some of the most popular and successful recording artists of all time. In support of its members, RIAA works to protect the intellectual property rights of artists and music labels, and monitors and reviews state and federal laws, regulations, policies, and judicial decisions impacting those rights and regulations.

---

[1] All parties consented to the filing of this brief under Rule 29(a) of the Federal Rules of Appellate Procedure. No counsel for any party authored this brief in whole or in part, and no person or entity besides amici and their counsel funded the brief's preparation or submission.

The National Music Publishers' Association ("NMPA") is the principal trade association representing the United States music publishing and songwriting industry. Its mission is to protect, promote, and advance the interests of music's creators. Over the last one hundred years, NMPA has served as the leading voice representing American music publishers before Congress, in the courts, within the music, entertainment, and technology industries, and to the public. NMPA's membership includes "major" music publishers affiliated with large entertainment companies as well as independently owned and operated music publishers of all sizes representing musical works of all genres. Taken together, compositions owned or controlled by NMPA's hundreds of members account for the vast majority of musical compositions licensed for commercial use in the United States.

The American Association of Independent Music ("A2IM") is a not-for-profit organization that exists to support and strengthen the independent recorded music sector and the value of recorded music copyrights. Membership currently includes a broad coalition of hundreds of independently owned American music labels. A2IM represents these small and medium-sized enterprises' interests in the marketplace, in the

media, on Capitol Hill, and as part of the global music community. In doing so, it supports a key segment of America's creative class that represents America's diverse musical and cultural heritage. Billboard Magazine identified the independent music label sector as over 40% of the music industry's global recorded music revenue in 2020 based on copyright ownership.

The question presented in this case is vitally important to amici and their members. Participants in the recorded music and music publishing industries rely on settled norms and expectations with respect to the property rights associated with the use and distribution of sound recordings and musical compositions throughout the world. Here, the district court's decision unsettles the bedrock understanding of foreign exploitation rights against which tens of thousands of agreements respecting recorded music and music publishing copyrights have been drafted, negotiated, and executed. And it undermines the divisibility and alienability of copyright interests, thereby depriving copyright owners of essential (and, until now, unquestioned) power to control how their works are commercially exploited around the globe. The ability to license, assign, or otherwise transfer foreign exploitation rights—separate from U.S. copyright rights—is valuable from a

creative as well as a financial perspective. The district court's single-copyright theory, however, undermines such divisibility. The potential for termination of foreign exploitation rights under Section 304(c) suspends well-settled norms that form the basis of almost all economic copyright arrangements, and calls for correction by this Court.

## SUMMARY OF ARGUMENT

The district court fundamentally erred by holding that there is only a single copyright interest in a given creative work, rather than a bundle of national copyright interests that arise under the laws of separate nations.

In its order denying appellant's motion to dismiss, the district court made clear that it started from the mistaken premise that a U.S. work's foreign exploitation rights "flow from the United States copyright." *Vetter v. Resnik*, No. CV 23-1369-SDD-EWD, 2024 WL 3405556, at *17 (M.D. La. July 12, 2024), *motion to certify appeal denied,* No. CV 23-1369-SDD-EWD, 2024 WL 4913616 (M.D. La. Nov. 13, 2024). In other words, the court accepted appellees' premise that "there is only a single copyright interest in a given work, granted by the issuing country (here, the United States) and then conventionally 'recognized' and protected by other countries pursuant to the Berne Convention." *Id.* at *6; *see also id.* at *16 ("[T]he acquisition of the

4

United States copyright already gives the owner the ability to exploit the work in other Berne Convention countries."). This flawed premise—that a creative work generates only a *single* copyright interest—was the linchpin of the district court's conclusion that Section 304(c) authorizes termination of foreign exploitation rights.

The court's premise, however, is fundamentally inconsistent with how foreign copyright interests are understood in the sound recording and music publishing industries—and by copyright scholars and practitioners more generally. Indeed, the longtime understanding of international copyright has been that the author of a creative work receives a bundle of distinct national copyrights, each arising under and protected by the laws of each respective nation-state. The Berne Convention and its principle of national treatment likewise confirm the existence of a multiplicity of national copyrights. The existence of multiple national copyrights vitiates the district court's conclusion that foreign exploitation rights "arise under" the U.S. Copyright Act and its corresponding, erroneous holding that Section 304(c) permits the termination of foreign copyright interests. While both the district court and appellees purported to acknowledge that "there is no 'international copyright,'" *Vetter*, 2024 WL

3405556, at *6, an "international copyright" is exactly what the district court created. After all, if there is only a "single copyright" that dictates worldwide exploitation rights, that is, by definition, the very "international copyright" that appellees had disclaimed and a chorus of copyright scholars have soundly rejected.

Accordingly, this Court should reverse the judgment below.

## ARGUMENT

## I. The author of a creative work receives a bundle of national copyright interests, not a single international copyright.

It is universally understood in the sound recording and music publishing industries—and by copyright scholars more generally—that the "creation of a work results in a bundle of independent copyrights in all copyright-respecting nations." *See* Graeme B. Dinwoodie, *International Copyright Law: The Introduction* § 3[1], *in* 1 International Copyright Law and Practice (2024). Put differently, "there is no such thing as 'international copyright'; instead, there are a multiplicity of national copyright regimes," and a copyright owner is "at once, the proprietor of a French copyright, a U.S. copyright, a Mexican copyright, a Japanese copyright, and so on." Jane C. Ginsburg, *Global Use/Territorial Rights: Private International Law Questions of the Global Information Infrastructure*, 42 J. Copyright Soc'y U.S.A. 318, 330

(1995). Thus, while "there is only *one U.S.* copyright" for a given creative work, "there is *also* a separate national copyright in each protecting country where the copyright is recognized." Lorin Brennan, *Financing Intellectual Property Under Revised Article 9: National and International Conflicts*, 23 Hastings Comm. & Ent. L.J. 313, 389 (2001) (emphases added).

This understanding of foreign copyright interests is grounded on a fundamental premise of copyright law: the "premise of territoriality." Dinwoodie, *supra*, at *Introduction* § 1. This premise reflects that, "as a general matter, copyrights are territorial in nature and are created by national law, not by an international treaty." Gregory Swank, *Extending the Copyright Act Abroad: The Need for Courts to Reevaluate the Predicate-Act Doctrine*, 23 DePaul J. Art, Tech. & Intell. Prop. L. 237, 239 (2012). This "premise of territoriality" further dictates that an author will "receive a bundle of national copyrights, each conferring protection within a single nation-state." Dinwoodie, *supra*, at *Introduction* § 1; *see* Graeme W. Austin, *Social Policy Choices and Choice of Law for Copyright Infringement in Cyberspace*, 79 Or. L. Rev. 575, 576 (2000) ("The territoriality premise reflects the fact that there is no such thing as a domestically enforceable international copyright law: instead,

there is U.S. copyright law, German copyright law, Japanese copyright law, and so on . . . .").

The view that an author possesses a multiplicity of national copyrights has long been the consensus position among scholars, even if the increase in "supranational norms" has sometimes led scholars to speak in shorthand of "international" copyrights. *See, e.g.*, Jane C. Ginsburg, *International Copyright: From a "Bundle" of National Copyright Laws to a Supranational Code*, 47 J. Copyright Soc'y U.S.A. 265, 289 (2000) (explaining the distinction between "the traditional image of international copyright as essentially a bundle of national, territorially defined, rights" and the increase in "international copyright norms"). Nor is the existence of a multiplicity of national copyrights a view unique to copyright scholars in the United States. *See* Axel Nordemann, *Berne and Beyond: Understanding International Conventions Relating to Copyright Law*, 59 J. Copyright Soc'y U.S.A. 263, 286 (2012) (noting that the "prevailing opinion in Germany," for example, is that an author possesses "not just a single, internationally valid protection right whose characteristics vary from country to country, but rather he possesses a *bundle of national copyrights* which are basically independent of one another"); *see also* Jan

Bernd Nordemann, *Internet Copyright Infringement: Remedies Against Intermediaries-the European Perspective on Host and Access Providers*, 59 J. Copyright Soc'y U.S.A. 773, 774 (2012) ("European copyright law consists of a bundle of national copyrights.").

## II. The Berne Convention confirms that foreign copyright interests are separate and distinct creatures of foreign law.

The district court identified the Berne Convention as the mechanism by which a U.S. author's copyright interest is recognized by other nations. *Accord Golan v. Holder*, 565 U.S. 302, 306–07 (2012) (recognizing Berne Convention as "the principal accord governing international copyright relations"). But the district court critically misunderstood the Berne Convention and its principle of "national treatment" as somehow collapsing a collection of worldwide rights into one. *See Vetter*, 2024 WL 3405556, at *9. In fact, the Berne Convention confirms the precise opposite, *i.e.*, the existence of multiple, distinct national copyrights are independent of one another.

The key provisions of the Berne Convention that matter here are Article 5(1) and Article 5(2). Article 5(1) provides:

> Authors shall enjoy, in respect of works for which they are protected under this Convention, in countries of the Union other than the country of origin, the rights

which their respective laws do now or may hereafter grant to their nationals, as well as the rights specially granted by this Convention.

Berne Convention for the Protection of Literary and Artistic Works art. 5(1), Sept. 9, 1886, *as amended on* Sept. 28, 1979, S. Treaty Doc. No. 99-27 (1986).

In turn, Article 5(2) provides:

The enjoyment and the exercise of these rights shall not be subject to any formality; such enjoyment and such exercise shall be independent of the existence of protection in the country of origin of the work. Consequently, apart from the provisions of this Convention, the extent of protection, as well as the means of redress afforded to the author to protect his rights, shall be governed exclusively by the laws of the country where protection is claimed.

*Id.* art. 5(2).

In plain English, these provisions have long been understood to require countries participating in the Berne Convention to agree to "national treatment." That is, they agree that their own national copyright laws will "provide authors from, or works first published in, other signatory states, with protection as generous as that afforded domestic authors and works." Dinwoodie, *supra*, at *Introduction* § 2. "The national treatment principle is [thus] a rule of non-discrimination." Curtis A. Bradley, *Territorial Intellectual Property Rights in an Age of Globalism*, 37 Va. J.

Int'l L. 505, 547 (1997). "This does not mean, however, that the Berne Convention vests authors with an 'international copyright.'" Eric Priest, *Acupressure: The Emerging Role of Market Ordering in Global Copyright Enforcement*, 68 SMU L. Rev. 169, 176 (2015). On the contrary, the Berne Convention simply requires that separate sovereigns each "create[] separate rights in [their] multiple parallel national copyright regimes." *Id.*

In this way, the Berne Convention's rule of "national treatment" simply reinforces that copyright is territorial: "The national treatment principle is needed precisely because each nation's intellectual property laws are assumed not to apply extraterritorially." *See* Bradley, *supra*, at 547–48. Thus, "[t]he Berne Convention does not create or establish laws of or for the nations who are members of the Berne Union"; instead, "each member country accedes to [Berne] by enacting its own national laws" reflecting its "national treatment" obligation. 2 Darraby on Art Law § 16.5 (2024).

Section 104(c) of the U.S. Copyright Act reinforces that Congress shares this understanding regarding the operation of the Berne Convention. Section 104(c) specifies that the convention itself does not create any "right or interest in a work eligible for protection." 17 U.S.C. § 104(c).

Instead, the "right or interest" in a foreign-authored work in the United States must arise under U.S. law, just as the "right or interest" in a U.S.-authored work in a foreign country must arise under foreign law. This provision thus underscores that the district court erred in suggesting that the Berne Convention forces foreign countries to "recognize" rights arising under the U.S. Copyright Act, *Vetter*, 2024 WL 3405556, at *6, as opposed to relegating to each country (subject to certain minimum and non-discrimination requirements) the existence and scope of national copyright.

### III. The district court's holding that foreign exploitation rights can be terminated by Section 304(c) is incompatible with basic tenets of copyright law.

Recognizing that a U.S. author holds a bundle of national copyright interests undoes the district court's conclusion that termination under Section 304(c) effects termination of both U.S. and foreign exploitation rights.

To start, every authority interpreting the termination provisions of the Copyright Act has concluded that they exclude grants of foreign exploitation rights from termination because those rights "arise under" foreign law. *See, e.g.*, Richard Arnold & Jane C. Ginsburg, *Comment:*

*Foreign Contracts and U.S. Copyright Termination Rights: What Law Applies?*, 43 Colum. J.L. & Arts 437, 453 (2020) ("Termination of the grant of U.S. rights does not affect the ownership of rights granted for other territories."); 7 Patry on Copyright § 25:74 (2025) ("Accordingly, where a U.S. author conveys worldwide rights and terminates under either section, grants in all other countries remain valid according to their terms or provisions in other countries' laws."); 3 Entertainment Law 3d: Legal Concepts and Business Practices § 16:141 (2023) ("Foreign rights are not affected by termination."); Jeffrey P. Cunard & Brandon C. Gruner, *Statutory Termination Rights (Copyright)*, Practical Law Practice Note w-010-0835 (2024); ("Any termination only affects US copyrights. It has no effect on other federal, state, or non-US rights."); *see also Fred Ahlert Music Corp. v. Warner/Chappell Music, Inc.*, 155 F.3d 17, 20 (2d Cir. 1998) (assignee "retained the foreign rights to the copyright after termination"); *Clancy v. Jack Ryan Enters.*, No. CV ELH-17-3371, 2021 WL 488683, at *46 (D. Md. Feb. 10, 2021) ("[T]he worldwide grant of copyright is only subject to termination insofar as its U.S. component is concerned, but not subject to termination in the rest of the world."); *Siegel v. Warner Bros. Ent. Inc.*, 542 F. Supp. 2d 1098, 1141 (C.D. Cal. 2008)

(same), *rev'd on other grounds sub nom. Larson v. Warner Bros. Ent., Inc.*, 504 F. App'x 586 (9th Cir. 2013).

That conclusion is the only sensible one that can be squared with the statute. Even if the district court were right to look to U.S. law to determine the termination of foreign exploitation rights, U.S. law makes clear that a grant of foreign exploitation rights does not terminate simply because the grant of the U.S. copyright has terminated.[2] On the contrary, Section 304(c)(6)(E) provides that termination under Section 304(c) "affects only those rights covered by the grant that arise under this title, and in no way affects rights arising under any other Federal, State, or

---

[2] To be sure, not every question of copyright law is decided as a matter of each sovereign's separate laws. For example, judicial decisions in the United States typically look to the law of the country of origin to avoid conflicting rulings regarding the initial ownership (or, more narrowly, the authorship) of a work. *See Itar-Tass Russian News Agency v. Russian Kurier, Inc.*, 153 F.3d 82, 90 (2d Cir. 1998); *see also Canadian Standards Ass'n v. P.S. Knight Co., Ltd.*, 112 F.4th 298, 304 (5th Cir. 2024) (applying Canadian law to ownership of Canadian copyrights), *cert. denied*, 145 S. Ct. 1135 (2025). Such decisions, however, do not assume that only a single copyright exists in the country of origin. Rather, they take for granted that there may be discrete copyright interests existing in different nations. *See, e.g.*, *Ennio Morricone Music Inc. v. Bixio Music Grp. Ltd.*, 936 F.3d 69, 71 (2d Cir. 2019) (litigation involving foreign author's "U.S. copyrights"); *Alameda Films SA de CV v. Authors Rts. Restoration Corp.*, 331 F.3d 472, 478 (5th Cir. 2003) (considering the relationship between "U.S. copyrights" and "Mexican copyrights" in the same films).

foreign laws." 17 U.S.C. § 304(c)(6)(E). Read against the background understanding that a creative work is subject to a bundle of separate, national copyrights, the meaning of this provision is obvious: termination affects rights that "arise under" U.S. copyright law (*i.e.*, U.S. exploitation rights) and not rights that "arise[] under . . . foreign laws" (*i.e.*, foreign exploitation rights).[3]

The district court departed from the overwhelming scholarly consensus because it erroneously concluded that "there is only one copyright"—a copyright arising under U.S. law—"in the Song[,] which is recognized by other countries pursuant to the Berne Convention." *Vetter*, 2024 WL 3405556, at *17. Operating on the mistaken notion that a U.S. author's work has only a *single* copyright interest, such that any foreign exploitation rights likewise must "arise under" U.S. law and must terminate when a grant involving the U.S. copyright terminates, the district

---

[3] As noted above, the rise in supranational intellectual property norms recently has made it more common to speak—albeit loosely, at best—of international copyright. *See, e.g.*, Ginsburg, *supra*, 47 J. Copyright Soc'y U.S.A. at 289. But when Congress enacted Section 304(c) in 1976, it would have done so against the background understanding of foreign copyrights as creatures of foreign law. As originally understood, therefore, the phrase "rights arising under . . . foreign laws" unquestionably would have covered foreign exploitation rights.

court missed the obvious interpretation of the statutory language that has been adopted by every scholar and judicial authority to date.

Taking the district court's misguided framework to its logical conclusion underscores why its decision cannot be right. In the district court's view, the application of Section 304's termination provisions to foreign exploitation rights follows from its conclusion that "foreign rights to the Song in this case 'arise under' the United States Copyright Act, as opposed to the domestic laws of each individual country where the Song may be exploited." *Vetter*, 2024 WL 3405556, at *16. But if that were correct, foreign authors of *non*-U.S. works would *lack* any U.S. termination rights, because their rights in the United States would not arise under the U.S. Copyright Act, but instead would arise solely under *foreign* copyright law (subject to "recognition" in the United States pursuant to the Berne Convention).

In addition to contravening a half-century of settled industry norms, that reading would turn the Berne Convention's principle of reciprocity and non-discrimination on its head. The Berne Convention is meant to ensure that foreign works enjoy protection "as generous as that afforded domestic authors and works." Dinwoodie, *supra*, at *Introduction*

§ 2. It would defy logic to construe the Berne Convention to somehow *strip* foreign authors of the termination rights that are held by U.S. authors. *Cf. Griffin v. Oceanic Contractors, Inc.*, 458 U.S. 564, 575 (1982) ("[I]nterpretations of a statute which would produce absurd results are to be avoided if alternative interpretations consistent with the legislative purpose are available."); *Bacardi Corp. of Am. v. Domenech*, 311 U.S. 150, 163 (1940) (affirming "accepted canon" that treaties must be construed "liberally" to effectuate "the purpose[s] which animate[ ]" them). That is not and cannot be the law.

Once the district court's misunderstanding is corrected, the plain meaning of Section 304(c)(6)(E) is evident: grants of foreign exploitation rights are not terminable under Section 304(c).

## CONCLUSION

The Court should reverse the judgment below.

Respectfully submitted,

/s/ *Rollin A. Ransom*

Manuel Valle
SIDLEY AUSTIN LLP
1501 K Street, NW
Washington, DC 20005
(202) 736-8000

Rollin A. Ransom
  *Counsel of Record*
Collin P. Wedel
SIDLEY AUSTIN LLP
350 S. Grand Ave.
Los Angeles, CA 90071
(213) 896-6000
rransom@sidley.com

April 29, 2025

*Counsel for Amici Curiae*

# CERTIFICATE OF SERVICE

I certify that the foregoing was electronically filed with the Clerk of the Court for the United States Court of Appeals for the Fifth Circuit by using the appellate CM/ECF system. I further certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.


*/s/ Rollin A. Ransom*
Rollin A. Ransom

# CERTIFICATE OF COMPLIANCE

This brief complies with Rules 29(a)(5) and 32(a)(7)(B) of the Federal Rules of Appellate Procedure because it contains 3,435 words, excluding the parts of the document exempted by Federal Rule of Appellate Procedure 32(f).

The brief complies with the typeface and typestyle requirements of Rules 32(a)(5)–(6) of the Federal Rules of Appellate Procedure because it has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Century Schoolbook font.

*/s/ Rollin A. Ransom*
Rollin A. Ransom