# UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

CYRIL VETTER and VETTER COMMUNICATIONS CORPORATION

*Plaintiffs-Appellees,*

v.

ROBERT RESNIK and RESNIK MUSIC GROUP

*Defendants-Appellants,*

On Appeal from the United States District Court
for the Middle District of Louisiana
No. 23-1369-SDD-EWD
Hon. Shelly D. Dick

## BRIEF OF MOTION PICTURE ASSOCIATION, INC. AS *AMICUS CURIAE* IN SUPPORT OF APPELLANTS

JONATHAN HACKER
O'MELVENY & MYERS LLP
1625 Eye Street N.W.
Washington, D.C. 20006
(202) 383-5300

DANIEL M. PETROCELLI
MOLLY M. LENS
  *Counsel of Record*
DANIELLE R. FEUER
O'MELVENY & MYERS LLP
1999 Avenue of the Stars
8th Floor
Los Angeles, California 90067
(310) 553-6700

*Counsel for Amicus Curiae Motion Picture Association, Inc.*

# SUPPLEMENTAL STATEMENT OF INTERESTED PERSONS

## *No. 25-30108, Vetter v. Resnik*

The undersigned counsel of record certifies that, in addition to the persons and entities identified in Appellants' Certificate of Interested Persons, the following listed persons and entities as described in the fourth sentence of Fifth Circuit Rule 28.2.1 have an interest in the outcome of this case. These representations are made in order that the judges of this Court may evaluate possible disqualification or recusal.

- The Motion Picture Association, Inc. ("MPA")

- The MPA's counsel:

    o O'Melveny & Myers LLP, including:

        ▪ Daniel M. Petrocelli

        ▪ Molly M. Lens

        ▪ Jonathan Hacker

        ▪ Danielle R. Feuer

*/s/ Molly M. Lens*
Molly M. Lens

*Attorney of Record for Amicus Curiae Motion Picture Association, Inc.*

# TABLE OF CONTENTS

SUPPLEMENTAL STATEMENT OF INTERESTED PERSONS ......................... i

STATEMENT OF INTEREST OF *AMICUS CURIAE*.............................................1

INTRODUCTION .................................................................................................2

ARGUMENT ........................................................................................................3

I.  U.S. COPYRIGHT TERMINATION DOES NOT APPLY
INTERNATIONALLY .................................................................................3

    A.  The Plain Language Of The Termination Provision Conclusively Shows
Copyright Termination Does Not Affect Foreign Rights ..................................4

    B.  The Legislative History Confirms Copyright Termination Does Not
Affect Foreign Copyright Rights ....................................................................12

    C.  The District Court's Decision Hinges On An Erroneous "One
Copyright" Theory ...........................................................................................16

II.  THE U.S. RENEWAL COPYRIGHT INTEREST THAT REVERTS
WHEN AN AUTHOR PREDECEASES VESTING ENCOMPASSES ONLY
U.S. COPYRIGHT RIGHTS ...................................................................21

III.  THE DISTRICT COURT'S OUTLIER DECISION INJECTS
CONFUSION AND UNCERTAINTY INTO COPYRIGHT RIGHTS DEALS
AND EXPLOITATIONS......................................................................26

CONCLUSION ..................................................................................................32

CERTIFICATE OF COMPLIANCE ..................................................................34

# TABLE OF AUTHORITIES

**Cases**

*Chappell & Co. Ltd. v. Redwood Music Ltd.*,
  [1981] R.P.C. 337.................................................................... 27, 29

*Clancy v. Jack Ryan Enterprises, Ltd.*,
  2021 WL 488683 (D. Md. Feb. 10, 2021) ...........................................11

*Connecticut Nat'l Bank v. Germain*,
  503 U.S. 249 (1992) ......................................................................4

*Fahmy v. Jay-Z*,
  908 F.3d 383 (9th Cir. 2018)................................................... 5, 8, 18

*Fred Ahlert Music Corp. v. Warner/Chappell Music, Inc.*,
  155 F.3d 17 (2d Cir. 1998).............................................................11

*Geophysical Serv., Inc. v. TGS-NOPEC Geophysical Co.*,
  850 F.3d 785 (5th Cir. 2017)........................................................5, 6

*Henson v. Santander Consumer USA Inc.*,
  582 U.S. 79 (2017) .....................................................................15

*IMAPizza, LLC v. At Pizza Ltd.*,
  965 F.3d 871 (D.C. Cir. 2020) ......................................................4, 6

*Impression Prods., Inc. v. Lexmark Int'l, Inc.*,
  581 U.S. 360 (2017) ......................................................................5

*Kousnsky v. Amazon.Com, Inc.*,
  631 F. App'x 22 (2d Cir. 2015) .....................................................17

*Mills Music, Inc. v. Snyder*,
  469 U.S. 153 (1985) ................................................................ 12, 15

*Murray v. The Schooner Charming Betsy*,
  6 U.S. 64 (1804) ........................................................................10

*Nat'l Ass'n of Mfrs. v. Dep't of Def.*,
  583 U.S. 109 (2018)..................................................................4, 10

*Peer Int'l Corp. v. Termidor Music Publishers Ltd.*,
  [2006] EWHC 2883 (Ch) ......................................................... 27, 29

*Peretti v. Authentic Brands Grp. LLC*,
  33 F.4th 131 (2d Cir. 2022)............................................................15

*Redwood Music Ltd. v. B. Feldman & Co. Ltd.*,
   [1979] R.P.C. 1 .................................................................28

*Rohauer v. Killiam Shows, Inc.*,
   379 F. Supp. 723 (S.D.N.Y. 1974), *rev'd on other grounds*, 551 F.2d 484 (2d
   Cir. 1977) ................................................................25

*Siegel v. Warner Bros. Entertainment Inc.*,
   542 F. Supp. 2d 1098 (C.D. Cal. 2008), *rev'd in part on other grounds*, 504 F.
   App'x 586 (9th Cir. 2013).................................................11

*Stewart v. Abend*,
   495 U.S. 207 (1990).......................................................24

*Subafilms, Ltd. v. MGM-Pathe Commc'ns Co.*,
   24 F.3d 1088 (9th Cir. 1994) (en banc) ...................................4

*Sybersound Recs., Inc. v. UAV Corp.*,
   517 F.3d 1137 (9th Cir. 2008) ...........................................17

*Tanzin v. Tanvir*,
   592 U.S. 43 (2020).........................................................8

*Unicolors, Inc. v. H&M Hennes & Mauritz, L.P.*,
   52 F.4th 1054 (9th Cir. 2022) ............................................9

*United States v. Suerte*,
   291 F.3d 366 (5th Cir. 2002)............................................10

*Vetter v. Resnik*,
   2024 WL 3405556 (M.D. La. July 12, 2024) ........................ passim

*Vimar Seguros y Reaseguros, S.A. v. M/V Sky Reefer*,
   515 U.S. 528 (1995)......................................................10

**Statutes**

17 U.S.C. § 106 ..............................................................5, 17

17 U.S.C. § 203(b) ......................................................... 12, 16

17 U.S.C. § 304(c) .......................................................... passim

17 U.S.C. § 501(a) ..............................................................6

U.K. Copyright Act 1911 § 5(2)................................................28

**Treaties**

Berne Convention, art. 5…………………………………………9, 10, 17

Berne Convention, art. 7…………………………………………..21

**Other Authorities**

3 Nimmer on Copyright § 11.02[B][2] ....................................................................11

5 Nimmer on Copyright § 17.10[B][2]…………………………………………..22, 23

7 Patry on Copyright § 25:18…………………………………………..7, 19, 23, 27

7 Patry on Copyright § 25:74…………………………………………………..11

Goldstein on Copyright § 5.4.1.3…………………………………………………… 11

H.R. Rep. 94-1476 (1976).................................................................... 13, 15, 16, 23

Jane C. Ginsburg, International Copyright: From a "Bundle" of National Copyright Laws to a Supranational Code?, 47 J. Copyright Soc'y U.S.A. 265 (2000) .......19

Supplementary Report of Register of Copyrights on General Revision of U.S. Copyright Law: 1965 Revision Bill, 89th Cong., 1st Sess. (H. Judiciary Comm. Print 1965)………………………………………………………...…passim

U.S. Copyright Office, Circular 38A: International Copyright Relations of the United States (Jan. 2025), accessible at https://copyright.gov/circs/circ38a.pdf ..............................................................20

U.S. Copyright Office, International Issues (last visited April 11, 2025), https://www.copyright.gov/international-issues/#:~:text=International% 20copyright%20conventions%20and%20treaties,copyright%20protection%20in %20particular%20countries ..................................................................................20

**STATEMENT OF INTEREST OF *AMICUS CURIAE***

*Amicus* Motion Picture Association, Inc. ("MPA") is a not-for-profit trade association founded in 1922. The MPA serves as the voice and advocate of the film and television industry, advancing the business and art of storytelling, protecting the creative and artistic freedoms of storytellers, and bringing entertainment and inspiration to audiences worldwide. The MPA has a particular interest in the proper interpretation of the Copyright Act, as a fair, balanced, and predictable copyright system is essential to its mission and to the ability of its members to finance, produce, and distribute compelling entertainment. It regularly participates as *amicus* in copyright cases of national and international importance.

The MPA's members are Amazon Studios LLC, Netflix Studios, LLC, Paramount Pictures Corporation, Sony Pictures Entertainment Inc., Universal City Studios LLC, Walt Disney Studios Motion Pictures, and Warner Bros. Entertainment Inc. These entities and their affiliates are the leading producers and distributors in the theatrical, television, and home-entertainment markets in the United States and abroad.

This case concerns an issue of fundamental importance to the MPA's members: the territorial nature of copyright itself, as reflected in the well-established contours of copyright terminations and copyright renewal reversions under U.S. law. Until the decision below, these issues were considered settled,

uncontroversial points of law: both copyright termination and copyright renewal reversion under U.S. law are limited to U.S. copyright rights and do not affect the foreign copyright rights in the same work. The decision below takes the opposite position—departing from the settled domestic and international consensus regarding the territorial nature of copyright. If left uncorrected, the decision below could reopen questions of who owns which rights in an untold number of works, disturb long-established rights deals and ongoing creative projects, and require both studios and authors to operate amid considerable legal uncertainty.

The MPA submits this *amicus* brief to highlight the significance of the errors in the decision below and to assist the Court in better understanding the correct legal framework for these issues. This *amicus* filing is authorized by Federal Rule of Appellate Procedure 29, because all parties have consented.[1]

## INTRODUCTION

This case presents basic questions driven by the territoriality of U.S. copyright law: whether the Copyright Act's copyright termination provisions and the copyright renewal reversion regime under the 1909 Copyright Act apply beyond this nation's borders to govern foreign copyright rights. The long-settled

[1] No party or party's counsel authored this brief in whole or in part or contributed money to fund its preparation or submission, nor did any other person apart from the MPA and its members and counsel.

answer is no.  That answer aligns with the statutory language, legislative history, and every U.S. and foreign authority that has addressed the subject.

Rejecting that consensus, the decision below adopts the plaintiffs' concededly "novel theory of recovery" and wrongly extends U.S. copyright law beyond its lawful territorial limits.  *Vetter v. Resnik*, 2024 WL 3405556, at *3, *11, *18 (M.D. La. July 12, 2024).  The decision has injected uncertainty on matters of copyright law previously considered uncontroversial, placed a cloud of confusion over rights negotiations in the industry, and threatened to upset expectations embedded in existing contracts.  This case, in short, has broad consequences beyond the specific parties before the Court.

This Court should reverse the decision below and restore the broad consensus that U.S. copyright termination and reversion laws govern only U.S. copyright rights.

## ARGUMENT

## I.   U.S. COPYRIGHT TERMINATION DOES NOT APPLY INTERNATIONALLY

Copyright rights are fundamentally territorial.  They are creatures of national laws of purely domestic application, woven together by multilateral treaties to create a complex yet functional system for works with international appeal.  In keeping with this basic premise, "[t]he [U.S.] Copyright Act, like most laws, governs domestically but does not rule the world."  *IMAPizza, LLC v. At Pizza*

3

*Ltd.*, 965 F.3d 871, 876 (D.C. Cir. 2020) (internal quotation marks omitted); *see also Subafilms, Ltd. v. MGM-Pathe Commc'ns Co.*, 24 F.3d 1088, 1095 (9th Cir. 1994) (en banc) (citing "over eighty years of consistent jurisprudence" that the Copyright Act does not have extraterritorial reach).  But the decision below runs afoul of that basic premise by subsuming foreign copyright rights within U.S. copyright law and the U.S. statutory termination scheme.  This core error led the district court to reach exactly the wrong conclusions.

### A. The Plain Language Of The Termination Provision Conclusively Shows Copyright Termination Does Not Affect Foreign Rights

At the heart of this appeal is a straightforward question of statutory interpretation: whether the termination of a grant of U.S. copyright rights under 17 U.S.C. § 304(c) also extinguishes the grantee's rights worldwide, notwithstanding the statute's express admonition that it "in no way affects rights arising under any . . . foreign laws."  The answer is no.

Statutory interpretation "begins with the statutory text," and when the text is unambiguous, it "ends there as well."  *Nat'l Ass'n of Mfrs. v. Dep't of Def.*, 583 U.S. 109, 127 (2018).  After all, "courts must presume that a legislature says in a statute what it means and means in a statute what it says there."  *Connecticut Nat'l Bank v. Germain*, 503 U.S. 249, 253-54 (1992).

Here, the statute's plain language could not be clearer: "Termination of a grant under this subsection affects only those rights covered by the grant that arise

4

under this title [Title 17, Copyrights], and in no way affects rights arising under any other Federal, State, or foreign laws." 17 U.S.C. § 304(c)(6)(E). Thus, copyright termination terminates the original grantee's U.S. copyright rights in the subject work,[2] but leaves intact those grants of copyright rights that arise under the laws of jurisdictions outside the United States.

The first clause explains that copyright termination does not extinguish an entire grant, but rather only those constituent rights that arise under U.S. copyright law. And U.S. copyright law does "not have any extraterritorial operation." *Impression Prods., Inc. v. Lexmark Int'l, Inc.*, 581 U.S. 360, 379 (2017); *see also Geophysical Serv., Inc. v. TGS-NOPEC Geophysical Co.*, 850 F.3d 785, 797 (5th Cir. 2017) (Copyright Act "does not apply extraterritorially"). It necessarily follows that the rights that "arise under" Title 17—such as the rights of reproduction, distribution, performance, and display, 17 U.S.C. § 106—are rights to exclusively exploit a work *in the United States*.[3]

That the rights conferred by the U.S. Copyright Act are solely domestic

---

[2] Subject to a carve-out for preexisting derivative works. 17 U.S.C. § 304(c)(6)(A).

[3] As discussed *infra* at Section I.C., the bundle of rights accorded to copyright-holders under the Berne Convention and its predecessor regime varies based on the location of the relevant exploitation, not the location where the original copyright was secured. *See Fahmy v. Jay-Z*, 908 F.3d 383, 391 (9th Cir. 2018).

rights is reinforced by the well-settled principle that the Copyright Act does not apply to acts of extraterritorial copyright infringement. As this Court has held, "an essential element of a copyright infringement plaintiff's claim" is that the "infringing conduct be domestic." *Geophysical Serv., Inc*., 850 F.3d at 791; *see IMAPizza, LLC*, 965 F.3d at 879 ("We decline, as have other courts, to extend the Copyright Act beyond its territorial limits lest U.S. law be used to sanction what might be lawful conduct in another country."). There is an inherent parallelism between the conduct treated as "infringement" under the Copyright Act and the substantive rights conferred by the Act. Under the Copyright Act, conduct qualifies as infringement if it "violates any of the exclusive rights of the copyright owner as provided by sections 106 through 122." 17 U.S.C. § 501(a). If reproducing a U.S. copyrighted work abroad without authorization does *not* constitute infringement under the Copyright Act, it must be because the unauthorized foreign reproduction does not "violate any of the exclusive rights of the copyright owner" under Section 106.

The second clause of Section 304(c)(6)(E) reinforces the first, eliminating any doubt that copyright termination does not extend to any rights other than federal copyright rights that may be found in the same grant. It expressly states that copyright termination "in no way affects" rights under other federal laws (e.g.,

U.S. trademark rights);[4] rights under state laws (e.g., standard contractual rights; common-law trademark rights); and rights under foreign laws (e.g., foreign copyright rights), even if such rights were conveyed in the same instrument as the grant of federal copyright rights that is subject to termination.

The court below erroneously read this second clause as a "qualification" of the first. 2024 WL 3405556, at *15. It is actually a *clarification*. As preeminent copyright scholar William Patry has explained:

> This passage is not a "qualification" on the first, but rather gives illustrative examples of the principle stated in the first passage. The express inclusion of foreign laws is an example of the type of laws that are NOT affected by termination in as clear a statement as one can draft.

7 Patry on Copyright § 25:18. Patry even added a personal note of color: "This author wrote copyright laws for seven years as a legislative branch counsel and does not see how the statute could make it any more clear that termination affects only the grant of U.S. copyrights." *Id.*

The decision below strained the statutory text beyond its snapping point, effectively writing the foreign-laws exclusion out of the statute altogether. According to the decision, *foreign* copyright rights in a work of U.S. origin

_____

[4] Plaintiffs accuse this interpretation of "ignor[ing] the word 'other,'" 2024 WL 3405556, at *15, but it does no such thing. "Other" distinguishes between the Copyright Act (one federal law) and "other" federal laws, i.e., those that do not concern copyright.

actually arise *under U.S. law*, not under the foreign law that created the rights. 2024 WL 3405556, at *16. To state the argument is to refute it. The rights to exploit a copyrighted work and to exclude others from exploiting that work necessarily arise under the laws of the country that creates those rights. Thus, for example, in *Fahmy*, the author of a work created in Egypt could not claim the particular form of "moral rights" in his musical arrangement in the United States, even though Egypt indisputably recognized such rights: "Since our federal law does not accord protection of moral rights to American copyright holders as to non-visual art, neither does it recognize Fahmy's claim to moral rights." 908 F.3d at 391. The correct principle is straightforward and intuitive: *U.S.* copyright rights arise under *U.S.* copyright law, and *foreign* copyright rights arise under *foreign* laws.

The district court's analysis also overlooks the background principles against which the termination provisions were enacted in 1976. Statutory interpretation looks to "the phrase's plain meaning at the time of enactment." *Tanzin v. Tanvir*, 592 U.S. 43, 48 (2020). The 1909 Copyright Act was in force at the time, and it provided explicitly that "the copyright secured by this Act shall extend to the work of an author or proprietor who is a citizen or subject of a foreign state or nation" that offers reciprocal protections to U.S. citizens. Copyright Act of 1909, § 8; *see also id.* (referencing international agreements "which provide[] for reciprocity in

the *granting of copyright*" (emphasis added)).  In other words, the 1909 Copyright Act treated copyright protections in the United States for works by foreign nationals as "copyright secured by this Act"—not as rights secured by the foreign law under which the work was created.  By parity of reasoning, the inverse is true as well, i.e., any rights to a work of U.S. origin that exist in a foreign country would arise under *that* country's laws, not under U.S. law.

Further still, the district court's interpretation would bring the copyright termination provisions into conflict with the United States' obligations under the Berne Convention.  As the court below acknowledged, the Berne Convention requires the United States "to afford foreign copyright holders the same protection as holders of domestic copyrights."  2024 WL 3405556, at *10 (quoting *Unicolors, Inc. v. H&M Hennes & Mauritz, L.P.*, 52 F.4th 1054, 1078 (9th Cir. 2022)) (emphasis removed).  But if the district court were correct that copyright rights throughout the world "arise under" only the laws of the country of origin, and copyright termination applies only to those rights that "arise under" Title 17 and not to those rights that "aris[e] under . . . foreign laws," 17 U.S.C. § 304(c)(6)(E), then only U.S. authors and heirs could claim copyright termination rights, to the exclusion of foreign authors.  That result would flout the United States' obligation under the Berne Convention to provide authors from member states with the same rights that the United States grants to its own nationals.  Berne Convention, art.

5(1).  Courts must be "most cautious before interpreting [] domestic legislation in such manner as to violate international agreements," lest the United States lose its status "as a trusted partner in multilateral endeavors."  *Vimar Seguros y Reaseguros, S.A. v. M/V Sky Reefer*, 515 U.S. 528, 539 (1995); *see also Murray v. The Schooner Charming Betsy*, 6 U.S. 64, 118 (1804) ("an act of Congress ought never to be construed to violate the law of nations if any other possible construction remains"); *United States v. Suerte*, 291 F.3d 366, 373-74 (5th Cir. 2002) (describing *Charming Betsy* doctrine as a "well-established canon of construction").

In sum, the statutory text is plain and unambiguous, and it should be the beginning and the end of this Court's analysis on this question.  *See Nat'l Ass'n of Mfrs.*, 583 U.S. at 127.  With statutory language this clear, it comes as no surprise that *every other court* to address the territorial scope of copyright termination has held the opposite of the decision below:

- In *Siegel v. Warner Bros. Entertainment Inc*., the Central District of California reasoned: "[T]he statutory text [of Section 304(c)(6)(E)] could not be any clearer . . . . [T]he terminating party only recaptured the *domestic* rights . . . of the grant to the copyright in question.  Left expressly intact and undisturbed were any of the rights the original grantee or its successors in interest had gained over the years from the copyright through other sources

10

of law, notably the right to exploit the work abroad that would be governed by the copyright laws of foreign nations."  542 F. Supp. 2d 1098, 1140 (2008), *rev'd in part on other grounds*, 504 F. App'x 586 (9th Cir. 2013).

- Likewise, in *Clancy v. Jack Ryan Enterprises, Ltd*., the District of Maryland held "the worldwide grant of copyright is only subject to termination insofar as its U.S. component is concerned, but not subject to termination in the rest of the world."  2021 WL 488683, at *46 (Feb. 10, 2021).

- And in *Fred Ahlert Music Corp. v. Warner/Chappell Music, Inc*., the Second Circuit held that, upon a Section 304(c) termination, "Warner's domestic rights in the Song reverted to Dixon's heirs," but "Warner retained the foreign rights to the copyright after termination."  155 F.3d 17, 20 (1998).

The three leading copyright treatises concur.  *See* 3 Nimmer on Copyright § 11.02[B][2] ("A grant of copyright 'throughout the world' is terminable only with respect to uses within the geographic limits of the United States."); 7 Patry on Copyright § 25:74 ("[W]here a U.S. author conveys worldwide rights and terminates under either section [203 or 304], grants in all other countries remain valid according to their terms or provisions in other countries' laws."); Goldstein on Copyright § 5.4.1.3 ("[T]he grantee of an author's worldwide rights in a copyrighted work faces statutory termination under section 203 only of its rights in

11

the United States and not in other countries."). There is no sound basis to break from this broad consensus.

### B.    The Legislative History Confirms Copyright Termination Does Not Affect Foreign Copyright Rights

The unambiguous statutory text of the copyright termination provisions is controlling, but the plain meaning of those provisions is in any event confirmed by the history of their enactment. As the Register of Copyrights explained in his report to Congress on the copyright law revision that would become the 1976 Act: "Section 203(b)(4)[5] [analogue to Section 304(c)(6)(E)[6]] also makes clear that termination *affects only those rights arising under the U.S. copyright statute* and has *no effect*, for example, *on foreign rights that may be covered by the same contract*." Supplementary Report of the Register of Copyrights on the General Revision of the U.S. Copyright Law: 1965 Revision Bill, 89th Cong., 1st Sess., at 75 (H. Judiciary Comm. Print 1965) [hereinafter "Supplementary Report"] (emphasis added). This statement speaks to the exact question presented here, and

_____

[5] This Section is now codified at 17 U.S.C. § 203(b)(5).

[6] Both sub-sections use the same language: "Termination of a grant . . . affects only those rights covered by the grants that arise under this title, and in no way affects rights arising under any other Federal, State, or foreign laws." 17 U.S.C. §§ 203(b)(5), 304(c)(6)(E). Where the two termination provisions overlap, courts routinely rely on the legislative history discussing Section 203 to interpret Section 304. *See, e.g.*, *Mills Music, Inc. v. Snyder*, 469 U.S. 153, 170-76 & nn.39-42 (1985).

it confirms that only U.S. copyrights—not foreign rights—are affected by a

copyright termination.

The decision below misconstrues the legislative history just as it does the

statutory text.  The decision does not cite the Supplementary Report at all, but

instead relies on language in the House Report dealing not with the territorial scope

of termination, but with who reaps the benefit of the termination interest.  2024

WL 3405556, at *16 (quoting H.R. Rep. 94-1476, at 127 (1976)).  The decision

quotes from the following passage:

> Under the bill, termination means that ownership of the rights covered
> by the terminated grant reverts to everyone who owns termination
> interests on the date the notice of termination was served, whether they
> joined in signing the notice or not.  In other words, if a person could
> have signed the notice, that person is bound by the action of the
> majority who did . . . .

H.R. Rep. 94-1476, at 127.

That passage on its face has nothing to do with Section 304(c)(6)(E) or its

counterpart in Section 203.  The decision below nevertheless seizes on its reference

to a "terminated grant" to conclude that the scope of the grant necessarily mirrors

the scope of a termination.  2024 WL 3405556, at *16.  The decision reasons that,

where the "terminated grant" is a grant of "worldwide rights," "[i]t plausibly and

logically follows that a termination of a worldwide grant results in the recapture of

worldwide rights; in other words, worldwide rights were covered by the terminated

13

grant, so worldwide rights revert upon termination." *Id.*[7] But the text of the statute itself and the Supplementary Report both confirm that a grant is *not* treated as an inseverable whole for purposes of copyright termination. The statute expressly cabins its scope to "only those rights covered by the grant *that arise under this title*," which necessarily *excludes* those rights covered by the grant that do *not* arise under Title 17. 17 U.S.C. § 304(c)(6)(E) (emphasis added). And the Supplementary Report confirms in even plainer language that copyright termination "has no effect" on "foreign rights that may be covered by the same contract" as U.S. copyright rights. Supplementary Report at 75.

The decision below also errs in citing "the Congressional intent to provide the author a second chance to enjoy the benefits of his work and to mitigate the effects of early unremunerative transfers" to justify its interpretation. 2024 WL 3405556, at *16. First, courts cannot rewrite the law to better accomplish its statutory purposes. As the Supreme Court has admonished, "it is quite mistaken to assume . . . that whatever might appear to further the statute's primary objective must be the law." *Henson v. Santander Consumer USA Inc.*, 582 U.S. 79, 89

---

[7] Nonetheless, even the court below recognized a grant could not be treated *entirely* as a unitary whole; no one disputed, for example, that copyright termination would not affect state-law contract rights conveyed in the same instrument.

(2017) (cleaned up). Thus, even though termination rights were "intended to benefit authors and their heirs, it does not follow that such purpose requires interpreting every provision relating to termination rights in whatever way would best favor the interests of heirs, regardless of the clarity of statutory language to the contrary." *Peretti v. Authentic Brands Grp. LLC*, 33 F.4th 131, 142 (2d Cir. 2022).

Second, the statement of legislative purpose cited by the decision below is incomplete. The termination provisions were not intended *solely* to benefit authors and their heirs, but were intended to effectuate a "compromise" that "would be of practical benefit to authors and their families without being unfair to publishers, film producers, and other users." Supplementary Report at 72; *see also, e.g.*, H.R. Rep. 94-1476, at 124 ("Section 203 [analogue to Section 304] reflects a practical compromise that will further the objectives of the copyright law while recognizing the problems and legitimate needs of all interests involved."). As the Supreme Court has emphasized, "Congress intended the termination provisions to produce an accommodation and a balancing among various interests." *Mills Music*, 469 U.S. at 174 n.41. The limited scope of copyright termination—including its exclusion of non-copyright rights and foreign rights—is part of this careful legislative "compromise," and courts cannot rewrite the termination provisions into a one-sided boon for authors and heirs no matter the cost to other stakeholders.

The termination provisions were designed to facilitate bringing the original grantor and grantee back to the negotiating table as the presumptive parties to a new rights deal upon service of a termination notice. For that reason, the termination provisions incorporate what the legislative history describes as a "right of 'first refusal'" for the terminated grantee, whereby the terminating party is permitted to make a deal *only* with that grantee during the notice period before the termination takes effect. Supplementary Report at XXI, 76; H.R. Rep. 94-1476, at 127. And each party is invested with a subset of rights that the other wants—at minimum, the terminating party has a future interest in the U.S. copyright rights in the underlying work, and the terminated grantee has the foreign rights, certain non-copyright-based contractual rights, and the rights to utilize any preexisting derivative works, 17 U.S.C. §§ 203(b), 304(c)(6)—further making them the natural parties to an additional rights deal and incentivizing them to reach one during their statutory exclusive-negotiation period. Thus, the territorial limitation on copyright termination does not undermine the legislative purpose of the termination provisions, but promotes it.

## C.    The District Court's Decision Hinges On An Erroneous "One Copyright" Theory

The decision below also rests on an erroneous theory that there is one master international copyright in a work that is recognized by other countries pursuant to the Berne Convention, rather than a multiplicity of national copyrights under each

16

member country's laws.  2024 WL 3405556, at *17.  This incorrect premise leads to the decision's wrong conclusion that termination of a grant of copyright in a work of U.S. origin under 17 U.S.C. § 304(c) actually causes an *international* reversion of rights.  *Id.* at *11-18.  When that faulty premise falls, so does the decision's faulty conclusion from it.

Under the Berne Convention, authors "enjoy, in respect of works for which they are protected under this Convention, in countries of the Union other than the country of origin, the rights which their respective laws do now or may hereafter grant to their nationals."  Berne Convention, art. 5(1).  Member countries give effect to the Berne Convention under their domestic laws, treating foreign authors under their domestic laws as favorably as domestic ones.  *Id.*, art. 5(3).

In the United States, a "copyright consists of a bundle of six statutorily created rights, currently codified at 17 U.S.C. § 106."  *Sybersound Recs., Inc. v. UAV Corp.*, 517 F.3d 1137, 1145 n.3 (9th Cir. 2008); *see Kousnsky v. Amazon.Com, Inc.*, 631 F. App'x 22, 24 (2d Cir. 2015) **(**"[C]opyright ownership is a bundle of discrete rights regarding the owner's ability to use his property.").  This bundle includes the exclusive rights of reproduction, derivative works, distribution, performance, and display.  17 U.S.C. § 106.  That bundle of rights is, collectively, a U.S. copyright, which is accorded to authors of qualifying works, *domestic and foreign*, by operation of U.S. statutory law.

Just as these statutory rights apply equally to U.S. holders of copyright and to foreign holders of copyright as to U.S. exploitations of a work under the Berne Convention's principle of national treatment, a different bundle of rights may apply to holders of copyright as to extraterritorial exploitations based on the local law of the foreign territory. Returning to the *Fahmy* case, an Egyptian author enjoyed moral rights in his composition in Egypt, but possessed no such rights in the composition in the United States; rather, he was limited to the bundle of rights conferred by Section 106 of the U.S. Copyright Act in the United States. *Fahmy*, 908 F.3d at 391; *see id.* ("parties to the Convention, such as the U.S., are not required to grant foreign copyright holders rights which are not granted to its domestic copyright holders"). Much the same way, the author of a U.S. work would enjoy moral rights in the work in Egypt, even though these moral rights would not be included in his U.S. copyright bundle. *See id.*

The decision below attempts to tease apart a "copyright" separate from the bundle of rights created by each country's own copyright laws, but that distinction is illusory. There is no freestanding "copyright" without these exclusive rights, because these exclusive rights are entirely created by national laws. In other words, when a work possesses "worldwide" copyright rights, those statutory rights are actually a bundle of U.S. rights (the U.S. copyright), a bundle of U.K. rights

(the U.K. copyright), a bundle of French rights (the French copyright), and so forth throughout the world.  There is no single copyright, enforceable worldwide.

The decision below was so outside the norm that the Patry treatise has already been updated to include the following criticism:

> Aside from being contrary to the accepted territorial nature of copyright, the conclusion that the domestic law of each country will govern claims in that country, while correct, is inconsistent with the court's own conclusion that there is a single copyright arising in the country of origin.  If copyright is accorded protection according to domestic laws, then there are multiple copyrights, and not a single copyright.

7 Patry on Copyright § 25:18.

Other scholars have likewise eschewed the district court's "one copyright" theory.  As Professor Jane Ginsburg aptly described the international copyright landscape post-Berne: "[A]t present we have a system of interlocking *national* copyrights, woven together by the principle of national treatment."  Jane C. Ginsburg, International Copyright: From a "Bundle" of National Copyright Laws to a Supranational Code?, 47 J. Copyright Soc'y U.S.A. 265, 266 (2000) (emphasis in original).

The U.S. Copyright Office agrees.  Copyright Circular 38A explains:

> There is no such thing as an "international copyright" that will automatically protect an author's writings throughout the world. Protection against unauthorized use in a particular country depends on the national laws of that country.

U.S. Copyright Office, Circular 38A: International Copyright Relations of the United States (Jan. 2025), accessible at https://copyright.gov/circs/circ38a.pdf; *see also* U.S. Copyright Office, International Issues (last visited April 11, 2025), https://www.copyright.gov/international-issues/#:~:text=International%20copyright%20conventions%20and%20treaties,copyright%20protection%20in%20particular%20countries ("Original works of expression that are eligible for copyright protection are protected under national copyright laws.  Protection against unauthorized use in a particular country depends on the national laws of that country; in other words, copyright protection depends on the national laws where protection is sought.").

The district court's "one copyright" theory also makes no practical sense.  For one, as noted above, the natural extension of the court's reasoning is that foreign authors have no copyright termination right under U.S. law because all their rights arise under foreign laws (i.e., the domestic laws of the countries where they created the work) and thus fall outside the U.S. termination regime.  But that result directly clashes with the Berne Convention's mandate that foreign authors be accorded the same rights as domestic authors.

Another problem for the district court's rationale is the term of copyright.  If the court were correct that there is only one copyright in a work—a copyright in the country of origin—then when a work enters the public domain in its country of

origin, that one master copyright would cease to exist and the work would enter the

public domain worldwide.  But that is not the law.  To the contrary, the Berne

Convention memorializes the Rule of the Shorter Term, which provides that "the

term [of copyright] shall be governed by the legislation of the country where

protection is claimed; however, unless the legislation of that country otherwise

provides, the term shall not exceed the term fixed in the country of origin of the

work."  Berne Convention, art. 7(8).  Stated more simply, the term of copyright for

foreign works would be the shorter of the term in the country of origin and the

term in the country of protection—unless a country legislated greater protections,

as several have in fact done.  The Rule of the Shorter Term would not exist were

the district court's "one copyright" theory correct.  The district court's "one

copyright" theory does not square with the Berne Convention, just as it does not

square with U.S. copyright law and practice.

## II.   THE U.S. RENEWAL COPYRIGHT INTEREST THAT REVERTS WHEN AN AUTHOR PREDECEASES VESTING ENCOMPASSES ONLY U.S. COPYRIGHT RIGHTS

The decision below also erred in holding that, when the U.S. renewal

copyright interest under the 1909 Act reverted to an author's heirs because the

author predeceased the renewal period, that interest encompassed domestic *and*

foreign copyright rights alike.  That holding runs afoul of all other authority,

misinterprets the scant case law it does cite, and again defies the territorial nature of copyright.

Just like the U.S. copyright termination interest, the U.S. renewal copyright interest under the 1909 Act is tied to the *domestic* rights in a work, not foreign rights. No other country shared the copyright renewal structure in place in the United States under the 1909 Act, and its idiosyncratic rules do not divest transferees of *foreign rights* by operation of *U.S. law*. When a transfer of the U.S. renewal interest fails because the author did not survive vesting, the U.S. copyright rights in the work revert to the author's heirs but the transfer of any foreign rights that were part of the same grant is unaffected. This is because the original grant was for the *entire* term of copyright, which, in the rest of the world, is a single term, not bifurcated like the U.S. term under the 1909 Act. The domestic nature of such reversion is a natural corollary of the fact that U.S. copyright law lacks extraterritorial application.

Nimmer's leading copyright treatise tackles this question head-on. It posits a perpetual grant of worldwide rights by a U.S. author to a publisher, including the original and renewal terms, where the author predeceases the renewal vesting. 5 Nimmer on Copyright § 17.10[B][2]. Nimmer's treatise asks: "does the publisher also cease to have the right to exploit the work outside of the United States?" *Id.* It answers that question firmly in the negative:

> [T]he issue here under consideration arises not under contract law, but instead as a matter of legal rights under copyright. In the U.S., the publisher's rights lapsed not because the contract so provided; after all, that contract itself purported to grant renewal rights. Rather, the publisher's rights ceased by operation of the copyright law in that the author, by not surviving to renewal vesting, possessed no copyright in the renewal term that he was able to grant by contract. Given that copyright laws exert no extraterritorial impact, it is no more appropriate to apply the renewal aspect of U.S. copyright law in other jurisdictions than it is to apply any other aspect of U.S. law abroad.

*Id.*; *see also* 7 Patry on Copyright § 25:18 (explaining errors in the decision below).

Nimmer's treatise proceeds to illustrate why a contrary rule makes no practical sense:

> [L]et us imagine that the author entered into a number of separate contracts, one for U.S. rights, another for Congolese rights, another for Ceylonese rights, and a fourth for Czech rights, etc. Under those circumstances, the contracts conveying Congolese or Czech rights would in no way affect, or be affected by, the American renewal provisions. There is no reason to alter this result simply because all of the rights in question happened to be granted in a single instrument.

5 Nimmer on Copyright § 17.10[B][2].

This result also logically follows from the foregoing discussion as to the copyright termination provisions. The copyright termination provisions were drafted to serve as a "substitute" for the copyright renewal architecture under the Copyright Act of 1909; they were designed to achieve the same goals as the predecessor regime, but without the pitfalls that had arisen from the renewal section's "complex[ity] and poor draw[ing]." H.R. Rep. 94-1476, at 124; *see also*

Supplementary Report at XXI, 71.  The termination provisions clarified and expressly codified the status quo as to the renewal regime: reversions do not affect other rights covered by the same contract, whether foreign copyright rights or other domestic rights such as trademark.

The district court's contrary rationale is unsupported by any on-point authority.  As with the termination right, the decision below falls apart with its novel "one copyright" theory, which cannot pass muster for the reasons stated in the previous section.  This alone is dispositive.

But the district court's rationale is premised on other errors too.  Most significantly, its decision relies heavily on inapposite language from *Stewart v. Abend*, 495 U.S. 207 (1990), namely, that an assignee "holds nothing" if the author did not survive the start of the renewal period.  2024 WL 3405556, at *6-7, *11.  That *Abend* passage addresses a conveyance *of the U.S. renewal interest* in particular.  It is explaining that, when an author predeceases the renewal period, his assignees hold none of the U.S. copyright rights conferred by 17 U.S.C. § 106; those decidedly domestic rights are the "nothing" to which *Abend* refers.  495 U.S. at 220 & n.3.  In fact, the territorial nature of U.S. copyright interests has been so well understood for so long that one would not *expect* the Supreme Court to have opined on foreign rights in the work, as those rights were not in question.  *Abend* thus cannot bear the weight the district court places on it.

The district court also cast aside the Southern District of New York's decision in *Rohauer v. Killiam Shows, Inc.*, 379 F. Supp. 723 (S.D.N.Y. 1974), *rev'd on other grounds*, 551 F.2d 484 (2d Cir. 1977), which concluded that one who holds the copyright renewal interest by virtue of the author predeceasing the renewal period is "at that moment vested only with rights to the work in the United States." 379 F. Supp. at 735. But the district court overlooked that, in applying the U.S. copyright renewal reversion to a foreign author, *Rohauer* inherently rebutted the "one copyright" theory, because under that theory there would have been no U.S. copyright to revert in the first place (only a U.K. copyright). *See id.* at 725. In fact, *Rohauer* recognized that reversion of rights would happen at different times in the United States and the United Kingdom, given the United Kingdom's separate reversion statute that returned rights to an author's heirs 25 years after the author's death. This is why the *Rohauer* court noted that the reversion of U.S. rights would precede the reversion of comparable rights "in other countries," and why the *Rohauer* decision is incompatible with a unitary copyright theory: multiple successive reversions of copyright in different countries as to a single work *presupposes* a multiplicity of copyrights across those jurisdictions. *Id.* at 735. The district court's decision is again unmoored from all applicable authority.

**III.   THE DISTRICT COURT'S OUTLIER DECISION INJECTS CONFUSION AND UNCERTAINTY INTO COPYRIGHT RIGHTS DEALS AND EXPLOITATIONS.**

The decision below has sown confusion in the industry, as copyright grantors and grantees alike try to figure out what to make of this outlier decision against the backdrop of a preexisting contrary consensus.  The decision assumes the rare role of *un*settling previously uncontroversial principles about the territoriality of copyright and the scope of U.S. termination and renewal rights.  It threatens to displace settled contractual expectations in previous rights deals and hinder new ones.  This is not a tenable landscape for anyone to operate in—not studios, not authors, not heirs, not anyone dealing in copyright rights anywhere in the world.  It must be corrected.

The plaintiffs in this case remarkably insist "that their view would enhance predictability and certainty of copyright ownership," 2024 WL 3405556, at *15, but that could not be further from reality.  The decision below creates a conflict of authority where none existed and puts all stakeholders in a precarious position when trying to deal in or otherwise exploit copyright rights abroad.  Its result is an *un*predictable departure from the clear statutory framework.  Worse yet, the decision would put U.S. law on a collision course with foreign courts and foreign law.

The decision below announces new rules for the foreign rights in works of U.S. origin.  But for the most part, it will be foreign courts that will be put up to the task of adjudicating claims of foreign infringement, because as the plaintiffs acknowledge, foreign infringement claims are brought under the laws of the country of infringement, not the country of origin of the work.  Yet foreign courts are not bound to follow a U.S. court decision about the operation of foreign copyright rights—much less an outlier decision that departs from all other authority on the subject.  As the Patry treatise puts it: "A U.S. court can opine that there are not foreign rights after termination, but that's meaningless in that foreign country, where a foreign court would surely ignore it as a serious breach of comity, and simply incorrect."  7 Patry on Copyright § 25:18.

One prominent illustration is U.K. law, which is contrary to the decision below at every turn.  First, U.K. decisions consistently adhere to a territorial notion of copyright (the consensus view apart from the decision below), whereby there is, for any given work, a U.K. copyright and a U.S. copyright and a French copyright and so forth, rather than a single master copyright worldwide.  *See, e.g.*, *Peer Int'l Corp. v. Termidor Music Publishers Ltd.* [2006] EWHC 2883 (Ch) (discussing status of "English copyright" in songs composed by Cuban nationals, notwithstanding Cuban law that voided disposition as to Cuban copyright in songs); *Chappell & Co. Ltd. v. Redwood Music Ltd.* [1981] R.P.C. 337 (discussing

scope of assignment of renewal interest in U.S. work, and differentiating "U.S.A. copyright in the song" from "U.K. copyright" in it); *Redwood Music Ltd. v. B. Feldman & Co. Ltd.* [1979] R.P.C. 1 (discussing "English copyright" in joint work of U.S. authors, and applying U.K. copyright reversion scheme to their U.S. work).

Second, U.K. law would not give effect to a purported termination of a grant of that U.K. copyright by virtue of the U.S. termination scheme embodied in Section 203 or Section 304. At the outset, foreign courts are not bound by U.S. precedents,[8] and the rationale of the court below conflicts both with the termination provisions' textual exclusion of foreign rights and with other courts' territorial conception of copyright. Indeed, U.K. courts limit the U.K.'s since-repealed reversionary right to the U.K. copyright in a work—even without the aid of the clear limiting language that appears in the U.S. termination provisions, *cf.* U.K. Copyright Act 1911 § 5(2)—and confer that right *within the U.K.* equally on domestic and foreign authors and heirs. *See Redwood Music Ltd.* [1979] R.P.C. 1. But even if the district court's rationale were sound, U.K. courts would reject any such termination by U.S. law of the grantee's U.K. copyright. That result is apparent from the case of *Peer International*, wherein U.K. courts refused to give

---

[8] Subject to estoppel and related principles that may apply on the facts of specific cases.

effect to Cuban Law 860 (which otherwise would have voided Peer's copyright grants) as to the *English copyright* in the subject songs; it was found "expropriatory without compensation and on that account such as not to have taken effect so far as concerned English copyright." [2006] EWHC 2883 (Ch), at 54.

Third, U.K. courts would not void a transfer of U.K. copyright where the renewal interest under U.S. law reverted to an author's heirs because the author did not survive the vesting of the renewal. That interpretation is premised on the "one copyright" theory to which U.K. courts do not subscribe; it runs into the same *Peer International* problem as the termination issue; and it is contrary to U.K. courts' understanding of the renewal interest as one that concerns the *U.S.* copyright and not the U.K. copyright in a work. *See, e.g.*, *Chappell & Co. Ltd.* [1981] R.P.C. 337, at 349-50.

So what happens when, say, an heir has terminated a grant of copyright rights in a U.S. work to a studio under Section 203 or Section 304, and the studio stops its domestic exploitation of the rights but continues to exploit the rights in the U.K. under settled pre-*Vetter* law? By the logic of the decision below, the heir actually recaptured worldwide rights, and the studio's U.K. exploitation is infringing. But if the heir brought an infringement action in the U.K., or the studio sought a declaration of rights there, the U.K. court would reach the opposite conclusion and permit the studio to continue its U.K. exploitation.

And what if the heir conveyed the rights under the terminated grant to a competing studio, which then exploited the rights in the U.K. in line with the decision below?  The original studio could bring a successful infringement action against the competing studio in the U.K., notwithstanding that the district court here would consider the competing studio to own the rights throughout the world by virtue of the termination interest.

The same holds for the renewal interest.  Consider the situation where an author granted a studio his worldwide copyright rights in a U.S. work, including the original and renewal terms of copyright, but died before the renewal interest vested, making the transfer of the renewal interest ineffective.  And consider that the author's heir granted the renewal rights to a competing studio.  It is clear that the original studio lacks the U.S. copyright rights in the work, which now belong to the competing studio.  But what if the original studio continues to exploit the work—or even just its preexisting derivative works based on it—in the U.K., as it is permitted to do under existing, established law?  According to the court below, the renewal interest actually comprised both U.S. and foreign copyright rights, and the original studio's U.K. exploitation is infringing.  But if the heir brought an infringement action in the U.K., or the studio sought a declaration of rights there, the U.K. court would conclude the opposite.  And if the competing studio exploited

the work in the U.K. using the logic of the decision below, the original studio could successfully sue it for infringement in a U.K. court.

And what of the movie theaters and merchandisers caught up in the fray? Will a movie theater in the U.K. risk showing either studio's film, knowing that a U.S. court might consider it infringing to display the original studio's film, while a U.K. court would consider it infringing to display the competing studio's film? Will licensed merchandisers be willing to make or sell toys or posters based on either film there?

As these permutations demonstrate, the decision below creates conflicts not only among U.S. authorities, but also with foreign sovereigns. And it yields a legal landscape that is fundamentally unworkable—even setting aside that it is flatly wrong as a matter of law.

Meanwhile, with its focus on domestic authors and heirs, the court below overlooked the devasting impact of its holdings on foreign authors and heirs, who have long been understood to enjoy the same copyright termination and renewal reversion rights in the United States as their U.S.-based counterparts. The decision below would obliterate that once-settled entitlement. That outcome not only would run afoul of the United States' treaty obligations, but it also would undercut those stakeholders' previous rights deals and freeze new ones in their tracks.

This Court should reverse the decision below, reaffirm the long-settled territorial operation of the copyright termination and renewal reversion schemes, and return stability and legal clarity to the industry for the sake of all its stakeholders.

## CONCLUSION

The MPA respectfully requests that the Court reverse the judgment below.

Dated: April 29, 2025                    Respectfully submitted,


                                         By:  */s/ Molly M. Lens*


JONATHAN HACKER                          DANIEL M. PETROCELLI
O'MELVENY & MYERS LLP                    MOLLY M. LENS
1625 Eye Street N.W.                     DANIELLE R. FEUER
Washington, D.C. 20006                   O'MELVENY & MYERS LLP
(202) 383-5300                           1999 Avenue of the Stars
                                         8th Floor
                                         Los Angeles, California 90067
                                         (310) 553-6700

                                         *Counsel for Amicus Curiae*
                                         *Motion Picture Association, Inc.*

# CERTIFICATE OF COMPLIANCE

Undersigned counsel certifies that the attached brief complies with the type-volume limitations in Federal Rule of Appellate Procedure 29(a)(5) because this brief contains 7,470 words, less than half the amount allowed for a party's principal brief under Federal Rule of Appellate Procedure 32(a)(7)(B)(i), excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(f) and Fifth Circuit Rule 32.2.

Undersigned counsel further certifies that this brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and Fifth Circuit Rule 32.1 and the type style requirements of Federal Rule of Appellate Procedure 32(a)(6), because this brief has been prepared in a proportionally spaced 14-point Times New Roman typeface using Microsoft Word.

*/s/ Molly M. Lens*
Molly M. Lens

*Attorney of Record for Amicus Curiae
Motion Picture Association, Inc.*

**CERTIFICATE OF SERVICE**

I hereby certify that on April 29, 2025, I electronically filed the foregoing

Brief of Motion Picture Association as *Amicus Curiae* in Support of Appellants

with the Clerk of the Court for the U.S. Court of Appeals for the Fifth Circuit by

using the appellate CM/ECF system. All case participants are registered CM/ECF

users, and will be served by the appellate CM/ECF system.


*/s/ Molly M. Lens*
Molly M. Lens

*Attorney of Record for Amicus Curiae*
*Motion Picture Association, Inc.*