**25-30108**

---

**IN THE
UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT**

---

Cyril E. Vetter and Vetter Communications Corporation
*Plaintiffs – Appellees*

versus

Robert Resnik and Resnik Music Group
*Defendants – Appellants*

---

On Appeal from the United States District Court
for the Middle District of Louisiana
3:23-cv-1369-SDD-EWD

---

**BRIEF OF APPELLEES CYRIL E. VETTER AND
VETTER COMMUNICATIONS CORPORATION**

---

Timothy R.W. Kappel
**WELLS & KAPPEL LLP**
1615 Poydras Street, Suite 900
New Orleans, Louisiana 70112
(504) 905-2012
tkappel@wellskappel.com

*Counsel for Plaintiffs – Appellees*

## <u>CERTIFICATE OF INTERESTED PERSONS</u>

The undersigned counsel of record certifies that the following listed persons and entities as described in the fourth sentence of Fifth Circuit Rule 28.2.1 have an interest in the outcome of this case. These representations are made in order that the judges of this Court may evaluate possible disqualification or recusal.

| Appellees: | Counsel for Appellees: |
| --- | --- |
| Cyril Vetter | Timothy Kappel |
| Vetter Communications Corp. | Wells & Kappel, L.L.P. New Orleans, LA |

| Appellants: | Counsel for Appellants: |
| --- | --- |
| Robert Resnik | Edgar Gankendorff and Christophe Szapary PROVOSTY & GANKENDORFF, L.L.C. New Orleans, LA |
| | Robert Clarida and Brian Caplan REITLER KAILAS & ROSENBLATT, L.L.P. New York, NY |
| Resnik Music Group | Edgar Gankendorff and Christophe Szapary PROVOSTY & GANKENDORFF, L.L.C. New Orleans, LA |
| | Robert Clarida and Brian Caplan REITLER KAILAS & ROSENBLATT, L.L.P. New York, NY |

| Other Interested Parties: | Counsel for Interested Parties: |
|---|---|
| American Association of Independent Music | Collin Wedel and Rollin Ransom<br>SIDLEY AUSTIN, L.L.P.<br>Los Angeles, CA |
| | Manuel Valle<br>SIDLEY AUSTIN, L.L.P.<br>Washington, D.C. |
| Motion Picture Association, Incorporated | Jonathan Hacker<br>O'MELVENY & MYERS, L.L.P.<br>Washington, D.C. |
| | Danielle Feuer<br>O'MELVENY & MYERS, L.L.P.<br>New York, NY |
| | Daniel Petrocelli and Molly Lens<br>O'MELVENY & MYERS, L.L.P.<br>Los Angeles, CA |
| National Music Publishers Association, Incorporated | Collin Wedel and Rollin Ransom<br>SIDLEY AUSTIN, L.L.P.<br>Los Angeles, CA |
| | Manuel Valle<br>SIDLEY AUSTIN, L.L.P.<br>Washington, D.C. |
| Recording Industry Association of America | Collin Wedel and Rollin Ransom<br>SIDLEY AUSTIN, L.L.P.<br>Los Angeles, CA |
| | Manuel Valle<br>SIDLEY AUSTIN, L.L.P.<br>Washington, D.C. |

/s/ Timothy R.W. Kappel
*Counsel of Record for the Appellees*

## STATEMENT REGARDING ORAL ARGUMENT

In accordance with Fifth Circuit Rule 28.2.3 and Rule 34(a)(1) of the Federal Rules of Appellate Procedure, the Appellees respectfully request oral argument in this matter. In support of their request, the Appellees note that the issues presented in this appeal are immensely important matters of first impression which require further elaboration beyond what is presented in the briefs and record. In that regard, the Appellees submit that oral argument will aid the decisional process by allowing the parties to address any questions this Court may have and to clarify the implications of the issues to be decided.

# TABLE OF CONTENTS

CERTIFICATE OF INTERESTED PERSONS ...................................................... i

STATEMENT REGARDING ORAL ARGUMENT ............................................. iii

TABLE OF CONTENTS ................................................................................. iv

TABLE OF AUTHORITIES............................................................................... v

ISSUES PRESENTED ................................................................................- 1 -

STATEMENT OF THE CASE ......................................................................- 3 -

SUMMARY OF THE ARGUMENT ...........................................................- 10 -

ARGUMENT ...........................................................................................- 13 -

I. THE DISTRICT COURT CORRECTLY REJECTED THE APPELLANTS' OVERBROAD AND UNSUPPORTED DEFINITION OF THE "PRINCIPLE OF TERRITORIALITY."............................................................................- 13 -

II. THE DISTRICT COURT CORRECTLY DETERMINED THAT THE RENEWAL COPYRIGHT VESTED IN MR. SMITH'S HEIRS FREE AND CLEAR OF ANY CLAIM BASED UPON THE ASSIGNMENT. .........................................- 34 -

III. THE DISTRICT COURT CORRECTLY DETERMINED THAT TERMINATION OF THE COPYRIGHT GRANT IN THE ASSIGNMENT RETURNED ALL RIGHTS TO EXPLOIT THE SONG TO MR. VETTER. ..........................- 43 -

IV. THE DISTRICT COURT'S JUDGMENT DOES NOT VIOLATE INTERNATIONAL TREATIES. ............................................................- 72 -

CONCLUSION .......................................................................................- 78 -

CERTIFICATE OF SERVICE ....................................................................- 80 -

CERTIFICATE OF COMPLIANCE ...........................................................- 81 -

<u>**TABLE OF AUTHORITIES**</u>

CASES

*Abitron Austria GmbH v. Hetronic Int'l, Inc.*
   600 U.S. 412 (2023)...................................................25, 26, 31

*Af-Cap Inc. v. Republic of Congo*
   383 F.3d 361 (5th Cir. 2004). ..................................... 33

*Auto. Data Sols., Inc. v. Directed Elecs. Canada, Inc.*
   2018 WL 4742289 (C.D. Cal. 2018).......................... 31

*Bartok v. Boosey & Hawkes, Inc.*
   523 F.2d 941 (2d Cir. 1975). .............................. 51, 72

*Bascuñán v. Elsaca*
   874 F.3d 806 (2d Cir. 2017). ..................................... 20

*Bostock v. Clayton Cnty., Georgia*
   590 U.S. 644 (2020)................................................... 52

*Bouchat v. Champion Prod., Inc.*
   327 F. Supp. 2d 537 (D. Md. 2003). ......................... 59

*Bridgeman Art Libr., Ltd. v. Corel Corp.*
   25 F. Supp. 2d 421 (S.D.N.Y. 1998). ........................ 30

*Bridgeman Art Library v. Corel Corp.*
   36 F. Supp. 2d 191 (S.D.N.Y. 1999). ........................ 59

*Brown v. Gardner*
   513 U.S. 115 (1994).................................................. 47

*California v. Rooney*
   483 U.S. 307 (1987).................................................. 33

*Canadian Standards Ass'n v. P.S. Knight Co., Ltd.*
   112 F.4th 298 (5th Cir. 2024). ..................21, 30, 39, 69

*Capture Eleven LLC v. Otter Prod., LLC*
   2022 WL 5192763, (D. Colo. Oct. 5, 2022). ............. 57

*City of New York v. Chevron Corp.*
   993 F.3d 81, 101-03 (2d Cir. 2021). ......................... 18

*Clancy v. Jack Ryan Enterprises, Ltd.*
   2021 WL 488683 (D. Md. Feb. 10, 2021)................... 58

v

*Classic Media, Inc. v. Mewborn*
  532 F.3d 978 (9th Cir. 2008). .................................................. 55
*Cmty. for Creative Non-Violence v. Reid*
  490 U.S. 730 (1989). .............................................................. 56
*Connecticut Nat. Bank v. Germain*
  503 U.S. 249 (1992). .............................................................. 56
*Consumer Prod. Safety Comm'n v. GTE Sylvania, Inc.*
  447 U.S. 102 (1980). .............................................................. 35
*Corbello v. DeVito*
  844 F. Supp.2d 1136 (D. Nev. 2012). ............................... 22, 64
*Corcovado Music Corp. v. Hollis Music, Inc.*
  981 F.2d 679 (2d Cir. 1993). ............................................ 42, 76
*Creazioni Artistiche Musicali, S.r.l. v. Carlin Am., Inc.*
  2016 WL 7507757 (S.D.N.Y. Dec. 30, 2016). ............... 65, 66, 67
*Deanda v. Becerra*
  96 F.4th 750 (5th Cir. 2024). .................................................. 52
*Deepsouth Packing Co. v. Laitram Corp.*
  406 U.S. 518 (1972). .............................................................. 32
*Demby v. Schweicker*
  671 F.2d 507 (D.C.Cir.1981). ................................................. 51
*Di Angelo Publications, Inc. v. Kelley*
  9 F.4th 256 (5th Cir. 2021) .................................................... 49
*E.E.O.C. v. Arabian Am. Oil Co.*
  499 U.S. 244 (1991). .............................................................. 41
*Ecee, Inc. v. FERC*
  645 F.2d 339 (5th Cir. 1981) .................................................. 51
*Edmark Indus. SDN. BHD. v. S. Asia Int'l (H.K.) Ltd.*
  89 F. Supp. 2d 840 (E.D. Tex. 2000). ..................................... 22
*Environmental Defense Fund, Inc. v. Massey*
  986 F.2d 528 (D.C. Cir. 1993). ............................................... 70
*Epic Sys. Corp. v. Lewis*
  584 U.S. 497 (2018). .............................................................. 54
*Exxon Mobil Corp. v. Allapattah Servs., Inc.*
  545 U.S. 546 (2005) (cleaned up). ......................................... 52

*Fame Pub. Co. v. Alabama Custom Tape, Inc.*
507 F.2d 667 (5th Cir. 1975). .......................................................54, 60, 72

*Foley Bros. v. Filardo*
336 U.S. 281 (1949). ................................................................................ 13

*Fred Ahlert Music Corp. v. Warner/Chappell Music, Inc.*
155 F.3d 17 (2d Cir. 1998). ....................................................................... 60

*Fred Fisher Music Co. v. M. Witmark & Sons*
318 U.S. 643 (1943) ............................................................................... 4, 7

*Fuji Photo Film Co. v. Shinohara Shoji Kabushiki Kaisha*
754 F.2d 591 (5th Cir. 1985). .................................................................... 25

*G. Ricordi & Co. v. Paramount Pictures, Inc.*
189 F.2d 469 (2d Cir. 1951). ..................................................................... 36

*Games Workshop Ltd. v. Chapterhouse Studios, LLC*
2012 WL 5949105 (N.D. Ill. Nov. 27, 2012). ............................................. 21

*Geophysical Serv., Inc. v. TGS-NOPEC Geophysical Co.*
850 F.3d 785 (5th Cir. 2017). .......................................................14, 17, 28

*Glass Egg Dig. Media v. Gameloft, Inc.*
2018 WL 3659259 (N.D. Cal. Aug. 2, 2018) ............................................. 21

*Gloucester Place Music Ltd. v. Le Bon*
(2016) EWHC (Ch) 3091 (Eng). ................................................................ 77

*Golan v. Holder*
565 U.S. 302 (2012). ..........................................................................10, 74

*Goodman v. Lee*
1994 WL 710738 (E.D. La. Dec. 20, 1994). .............................................. 42

*Goodman v. Lee*
815 F.2d 1030 (5th Cir. 1987). ................................................................. 48

*Griffin v. Oceanic Contractors, Inc.*
458 U.S. 564 (1982). ................................................................................ 61

*Hackett v. Feeney*
2011 WL 4007531 (D. Nev. Sept. 8, 2011) ............................................... 57

*Hanover Star Milling Co. v. Allen & Wheeler Co.*
208 F. 513 (7th Cir. 1913). ....................................................................... 25

*Harper & Row Publishers, Inc. v. Nation Enters.*
471 U.S. 539 (1985). .................................................................................. 4

*Harris v. Coca-Cola Co.*
  73 F.2d 370 (5th Cir. 1934). ....................................................................... 3

*Impression Prods., Inc. v. Lexmark Int'l*, Inc.
  581 U.S. 360 (2017). ................................................................................. 17

*In re Maxwell Commc'n Corp.*
  93 F.3d 1036 (2d Cir. 1996). .................................................................... 77

*In re Nortel Networks, Inc.*
  532 B.R. 494 (Bankr. D. Del. 2015). ........................................................ 25

*Itar-Tass Russian News Agency v. Russian Kurier, Inc.*
  153 F.3d 82 (2d Cir. 1998)................................... 20, 39, 59, 63, 68, 75, 76

*Kiobel v. Royal Dutch Petro. Co.*
  569 U.S. 108 (2013). ................................................................................. 14

*Kirtsaeng v. John Wiley & Sons, Inc.*
  568 U.S. 519 (2013). ................... 15, 16, 18, 46, 47, 48, 50, 54, 56, 60, 73

*Korman v. HBC Fla., Inc.*
  182 F.3d 1291 (11th Cir. 1999). ............................................................... 72

*Levi Strauss & Co. v. AmericanJeans.com, Inc.*
  2011 WL 1361574 (N.D. Cal. Apr. 11, 2011). ......................................... 25

*London Film Prods. Ltd. v. Intercontinental Commc'ns, Inc.*
  580 F. Supp. 47 (S.D.N.Y. 1984). ...........................................26, 32, 71, 72

*Mapp v. UMG Recordings, Inc.*
  208 F. Supp. 3d 776 (M.D. La. 2016). .........................................59, 64, 65

*McClatchey v. Associated Press*
  2007 WL 1720080 (W.D. Pa. June 8, 2007). ........................................... 59

*Microsoft Corp. v. AT & T Corp.*
  550 U.S. 437 (2007). ...................................................................14, 25, 32

*Miller Music Corp. v. Charles N. Daniels, Inc.*
  362 U.S. 373 (1960) ..................................................................................... 4

*Mills Music, Inc. v. Snyder*
  469 U.S. 153 (1985)........................................................5, 11, 49, 60, 72

*Milne ex rel. Coyne v. Stephen Slesinger, Inc.*
  430 F.3d 1036 (9th Cir. 2005) .................................................................. 59

*Morrison v. Nat'l Australia Bank Ltd.*
  561 U.S. 247 (2010)...........................................................................15, 17

*MPD Accessories B.V. v. Urb. Outfitters*
  2014 WL 2440683 (S.D.N.Y. 2014). ......................................................... 31

*Nautilus, Inc. v. Icon Health & Fitness, Inc.*
  304 F. Supp. 3d 552 (W.D. Tex. 2018). .................................................. 25

*New Look Party Ltd. v. Louise Paris Ltd.*
  2012 WL 251976 (S.D.N.Y. Jan. 11, 2012). ........................................... 21

*New Name, Inc. v. Walt Disney Co.*
  2007 WL 5061697 (C.D. Cal. Dec. 3, 2007). .......................................... 25

*PaySys Int'l, Inc. v. Atos Se*
  226 F. Supp. 3d 206 (S.D.N.Y. 2016). .................................................... 31

*Quality King Distributors, Inc. v. L'anza Rsch. Int'l, Inc.*
  523 U.S. 135 (1998). ................................................................................ 16

*RCTV Int'l Corp. v. Rosenfeld*
  2016 WL 6818955 (S.D. Fla. Sept. 30, 2016). ....................................... 21

*RJR Nabisco v. Eur. Cmty.*
  579 U.S. 325 (2016). ........................................................ 14, 15, 16, 17

*Rodrigue v. Rodrigue*
  218 F.3d 432 (5th Cir. 2000). ................................................................ 29

*Rohauer v. Killiam Shows, Inc.*
  379 F. Supp. 723 (S.D.N.Y. 1974). ........................................................ 37

*Rudnicki v. WPNA 1490 AM*
  2009 WL 4800030 (N.D. Ill. Dec. 10, 2009). ........................................ 21

*Saregama India Ltd., v. Mosley*
  635 F.3d 1284 (11th Cir. 2011). ............................................................ 21

*Say It Visually, Inc. v. Trade World Corp.*
  2024 WL 3831411 (W.D. Tex. July 26, 2024). ....................................... 25

*Samantar v. Yousuf*
  560 U.S. 305 (2010). ............................................................................... 53

*Siegel v. Warner Bros. Entertainment, Inc.*
  542 F. Supp. 2d 1098 (C.D. Cal. 2008). ........................................ 59, 60

*Star Athletica, L.L.C. v. Varsity Brands, Inc.*
  580 U.S. 405 (2017). ............................................................................... 46

*Stewart v. Abend*
  495 U.S. 207 (1990) ................................................ 4, 36, 41, 53

*Subafilms, Ltd. v. MGM-Pathe Commc'ns Co.*
  24 F.3d 1088 (9th Cir. 1994). ................................................ 74

*T.B. Harms Co. v. Eliscu*
  339 F.2d 823 (2d Cir. 1964). ................................................ 48

*Tabacalera Severiano Jorge, S. A. v. Standard Cigar Co.*
  392 F.2d 706 (5th Cir. 1968). ................................................ 22

*Tasini v. N.Y. Times Co.*
  206 F.3d 161 (2d Cir. 2000). ................................................ 60

*Twentieth Century Music Corp. v. Aiken*
  422 U.S. 151 (1975). ................................................ 3

*Unicolors, Inc. v. H&M Hennes & Mauritz, L.P.*
  52 F.4th 1054 (9th Cir. 2022). ................................................ 30

*United States v. Rayo-Valdez*
  302 F.3d 314 (5th Cir. 2002). ................................................ 47

*Update Art, Inc. v. Modiin Pub., Ltd.*
  843 F.2d 67 (2d Cir. 1988) ................................................ 17

*Vasquez v. Bridgestone/Firestone, Inc.*
  325 F.3d 665 (5th Cir. 2003). ................................................ 20

*Vergara Hermosilla v. The Coca-Cola Co.*
  717 F. Supp. 2d 1297 (S.D. Fla. 2010). ................................................ 31

*Vielma v. Eureka Co.*
  218 F.3d 458 (5th Cir. 2000). ................................................ 45

*Walthal v. Rusk*
  1998 WL 42469 (N.D. Ill. Jan. 28, 1998). ................................................ 57, 71

*WesternGeco L.L.C. v. Ion Geophysical Corp.*
  776 F. Supp. 2d 342 (S.D. Tex. 2011) ................................................ 25

*WesternGeco LLC v. ION Geophysical Corp.*
  585 U.S. 407 (2018). ................................................ 16

*Weyerhaeuser Co. v. U.S. Fish & Wildlife Serv.*
  139 S. Ct. 361 (2018). ................................................ 57

*Yegiazaryan v. Smagin*
  599 U.S. 533 (2023). ................................................ 14

*Yesh Music v. Lakewood Church*
    2012 WL 524187, at *9 (S.D. Tex. Feb. 14, 2012) ................................... 17

## STATUTES

15 U.S.C. § 1126. ................................................................................... 27
15 U.S.C. §§ 1051-96 ............................................................................. 25
17 U.S.C. § 101. ..................................................................................... 56
17 U.S.C. § 104. ..................................................................................... 28
17 U.S.C. § 109. ..................................................................................... 15
17 U.S.C. § 203. .......................................................................... 5, 61, 67
17 U.S.C. § 24. ....................................................................................... 35
17 U.S.C. § 302. ....................................................................................... 5
17 U.S.C. § 304 ............................................................................ 5, 43, 44, 61
17 U.S.C. § 501. ..................................................................................... 75
35 U.S.C. § 154. ..................................................................................... 28
35 U.S.C. §§ 101-35 ............................................................................... 25

## OTHER AUTHORITIES

7 Patry on Copyright § 25:18 (2025) .................................................. 23, 33

Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal
    Texts* § 19 (2012). ........................................................................... 57

Arpad Bogsch, *Copyright Law Revision: Study No. 32: Protection of Works of
    Foreign Origin*, U.S. Sen., 86th Cong., 121 (1958). ................................... 39

Barbara A. Ringer, *Copyright Law Revision: Study No. 31: Renewal of
    Copyright*, U.S. Sen., 86th Cong., 121, 124, n.128 (1958) ....................... 36

Berne Convention for the Protection of Literary and Artistic Works, Sept. 9,
    1886, as revised at Paris on July 24, 1971, and amended in 1979 ........... 10

Brief for the Motion Picture Association of America, Inc. and the Recording Industry Association of America as Amici Curiae, *Kirtsaeng v. John Wiley & Sons, Inc.*, 2012 WL 3945857. ........................................................... 24, 46

Goldstein & Hugehholtz, *International Copyright: Principles, Law, and Practice* 236 (2019). ................................................................... 68

H.R. Rep. No. 94-1476, at 124 (1976) .................................... 5, 6, 34, 51, 53

Howard B. Abrams and Tyler T. Ochoa, *Foreign Copyright Claims in American Courts—Choice of Law*, 2 The Law of Copyright § 19:30 (2024). ............. 24

Larry Kramer, *Vestiges of Beale: Extraterritorial Application of American Law*, 1991 Sup. Ct. Rev. 179. ............................................................ 22

Paris Convention for the Protection of Industrial Property, July 14, 1967, 21 U.S.T. 1583, T.I.A.S. No. 6923. .......................................... 28, 29

Restatement (First) of Property (1936). ...................................... 69

Restatement (Second) Conflicts of Laws § 188 (1971). ............................ 66

United States Copyright Office, *Circular 15A, Duration of Copyright* ........... 29

William Patry, *Choice of Law and International Copyright*, 48 Am. J. Comp. L. 383 (2000). ................................................................... 23, 29

## ISSUES PRESENTED

1.      Under the terms of the 1909 Copyright Act, authors are entitled to an "original term" of copyright of 28 years and a right to renew the copyright for an additional 28-year "renewal term." This contingent renewal right remained with the author of the copyright, even if the author assigned the rights in the original copyright term to a publisher. However, historically, authors could, and often did, assign their contingent rights in the renewal term to third parties prior to the expiration of the original term of copyright. But if the author died before the renewal term began, the renewal rights vested in the author's heirs, notwithstanding the prior assignment. The first issue presented in this appeal is whether, upon securing a renewal copyright for the author's work, the author's heirs only recapture the right to exploit the work in the United States leaving the prior transferee with the right to control the use and enjoyment of the work everywhere else.

2.      In the 1976 Copyright Act, Congress replaced renewal rights with a reversionary termination right. By complying with certain statutory formalities, an author or an author's heirs are permitted to terminate a prior transfer of copyright notwithstanding any agreement to the contrary. The second issue presented in this appeal is whether, upon terminating a transfer

of copyright that included the right to exploit the work throughout the world, the author only recaptures the right to exploit the work in the United States leaving the prior transferee with the right to control the use and enjoyment of the work everywhere else.

* * *

# STATEMENT OF THE CASE

As aptly stated by the Fifth Circuit nearly a century ago, "[t]he great purpose of a copyright is to secure to authors and artists the financial fruits of their own mental labors." *Harris v. Coca-Cola Co.*, 73 F.2d 370, 371 (5th Cir. 1934). It is the author's pursuit of financial reward which provides incentive to create and publish, thereby supporting copyright law's ultimate aim: the "broad public availability of literature, music, and the other arts." *Twentieth Century Music Corp. v. Aiken*, 422 U.S. 151, 156 (1975). In their quest to reach the masses, however, economic realities have historically forced authors to transfer away their copyrights to industry intermediaries. In many cases, the deals between authors and industry prove to be ill-advised and unremunerative. Recognizing this, Congress has always provided authors with the right to recapture their copyrights—relieving them of the consequences of the transfer and giving them a second chance to control and benefit from the fruits of their labor. This appeal is about the scope of that second chance and whether authors can be forever burdened by the consequences Congress sought to relieve.

## I.    History of Copyright Recapture

There are two ways Congress has provided authors with an opportunity to recapture copyrights previously transferred away. From the first Copyright Act of 1790 until the passage of the 1976 Act, Congress split copyright protection into two separate terms. Congress reserved the "renewal" term for the author even if the original term had been transferred away. The history and purpose of renewal rights have been explained in detail by the Supreme Court in a trio of cases—*Fred Fisher Music Co. v. M. Witmark & Sons*, 318 U.S. 643 (1943), *Miller Music Corp. v. Charles N. Daniels, Inc.*, 362 U.S. 373 (1960), and *Stewart v. Abend*, 495 U.S. 207 (1990). The impact of those cases on the specific issues in this appeal is discussed elsewhere. For now, suffice it to say that renewal rights provide authors (or their heirs) with **absolutely new title** in the copyright property interest **free of any claim** founded upon the original assignment. *Stewart,* 495 U.S. at 218-19.

The 1976 Act was a major reexamination of domestic copyright doctrine. *Harper & Row Publishers, Inc. v. Nation Enters.*, 471 U.S. 539, 552 (1985). Among other revisions, it changed the basic calculation of copyright duration. Although the 1976 Act maintained the dual-term renewal structure for works created prior to January 1, 1978, for works created thereafter,

Congress set the duration of copyright to a unitary term based on the life of the author.[1] With the elimination of the renewal term, Congress devised a new way to protect authors from perpetual assignments to industry intermediaries. *See Mills Music, Inc. v. Snyder*, 469 U.S. 153, 172-73 (1985). Specifically, the 1976 Act provides authors and their heirs with an **inalienable** right to terminate an author's copyright transfer or license after 35 years.[2] For new works, this termination right served as a replacement for the reversionary right to renew.[3] Congress also afforded these termination rights to existing works protected under the 1909 Act.[4] For those works, Congress lengthened the duration of protection for an additional 19 years, but allowed authors to recapture and control the copyright during that term.[5] In fact, the 1976 House Report notes that the "arguments for granting rights of termination are even more persuasive" for these works because "the extended term represents a completely new property right, and there are strong reasons for giving [it to] the author, who is the fundamental beneficiary of copyright

---

[1] 17 U.S.C. § 302.

[2] 17 U.S.C. § 203.

[3] H.R. Rep. No. 94-1476, at 124 (1976) (hereafter, "1976 House Report").

[4] 17 U.S.C. § 304(c).

[5] *Id.* at § 304(a), (c).

under the Constitution."[6] Like renewal rights, termination rights reflect a steadfast commitment to "safeguarding authors against unremunerative transfers."[7]

## II.   "Double Shot (Of My Baby's Love)"

In the summer of 1962, Appellee Cyril Vetter and Don Smith convened around a piano to write a song. ROA.523. The result was "Double Shot (of My Baby's Love)" (the "Song"). *Id*. In 1963, Mr. Vetter and Mr. Smith entered into an assignment agreement (the "Assignment") with Windsong Music Publishers, Inc. ("Windsong"), in which they sold their respective copyright interests in the Song *for one dollar*. ROA.523-24. The transfer included all worldwide rights in the Song for the entire duration of copyright protection, including any renewals thereof. ROA.524. In 1966, Windsong filed for copyright registration of the Song, thereby securing federal copyright protection for an initial 28 years. *Id.* Mr. Smith died unexpectedly in 1972. *Id.*

In 1994, at the conclusion of the original term, Mr. Vetter, along with Mr. Smith's heirs, obtained a renewal copyright for the Song. *Id*. Because Mr. Vetter was alive when the renewal period commenced, in accordance with the

---

[6] 1976 House Report, at 124.

[7] *Id*.

Supreme Court's decision in *Fred Fisher Music Co.*,[8] his promise to assign the renewal copyright to Windsong was enforceable. Conversely, because Mr. Smith was deceased, his heirs took his renewal copyright interest free and clear of any rights claimed by Windsong. In 1996, Appellee Vetter Communications Corporation acquired Mr. Smith's copyright interest in the Song from his heirs. ROA.525. In 2019, Appellant Robert Resnik acquired Windsong's interest in the Song. *Id*.

On May 3, 2022, nearly 60 years after assigning the Song to Windsong, Mr. Vetter exercised the inalienable termination rights granted to him in the 1976 Act and recaptured his rights. *Id*. The celebration was short-lived, unfortunately, as it quickly became clear that the Appellants did not intend to relinquish claim to the Song. *Id*. Specifically, the Appellants took the position that the Appellees' termination had domestic effect only, and thus, following termination, the Appellees could only exploit the Song within the strict confines of the United States. *Id.* As to the other 180 countries with which the United States has copyright relations, the Appellants asserted that the Appellees had no right to control or exploit the Song in any of them. In other

---

[8] The Supreme Court held that an assignment of renewal rights by an author made before the original copyright expires is valid against the world if the author is alive at the commencement of the renewal period. *Fred Fisher Music Co.*, 318 U.S. at 657-58.

words, any licensing or exploitation opportunity which is not geographically limited to the United States would require the Appellant's continued consent and financial participation.

### III.  <u>The District Court Proceedings</u>

On September 27, 2023, the Appellees filed a declaratory judgment action in the District Court for the Middle District of Louisiana asking the court to declare them the sole owners of the Song's copyright. *See generally* ROA.10-45. Without answering the complaint, the Appellants filed a motion to dismiss, insisting that the district court dispose of the claim as "unsustainable as a matter of law" pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure. ROA.97-117. On July 12, 2024, the district court issued a thorough and reasoned 40-page ruling denying the motion, finding that the Appellees' claims were, in fact, supported by the history, text, and purpose of the Copyright Act. ROA.245-84. Given the purely legal nature of the dispute, the Appellees moved for summary judgment on July 23, 2024. ROA.285-350. The district court granted the motion for summary judgment in a ruling dated January 29, 2025, which incorporated and reaffirmed the court's legal conclusions previously reached in the earlier ruling on the motion to dismiss. ROA.523-530. The court's Judgment in favor of the

Appellees declares them the sole owners of the Song's copyright throughout the world. ROA.530. The Appellants timely appealed.[9]

\* \* \*

---

[9] Doc. 1.

## SUMMARY OF THE ARGUMENT

At its core, this appeal calls upon this Court to resolve competing theories of statutory interpretation regarding the renewal provisions of the 1909 Act and the termination provisions of the 1976 Act. It would be hard to overstate the significance of the issues presented. The United States currently has copyright relations with 180 different countries through a handful of international treaties and conventions, including the Berne Convention,[10] which remains "the principal accord governing international copyright relations." *Golan v. Holder*, 565 U.S. 302, 306-07 (2012). The opportunities from the global music industry are vast and place authors in a better position now than at any time in history to reap the rewards of their intellectual labor. The Appellants seek to deny the Appellees the benefits of the global marketplace. Even more troubling, given the predominantly digital nature of modern media consumption, and the fact that the internet largely ignores geographic boundaries, it is impractical (if not impossible) to limit the most common exploitations of copyright to the United States alone. As such, the Appellants' refusal to relinquish rights to the Song internationally critically

---

[10] Berne Convention for the Protection of Literary and Artistic Works, Sept. 9, 1886, as revised at Paris on July 24, 1971, and amended in 1979 (hereafter, the "Berne Convention").

hobbles the exploitation opportunities available to the Appellees. Simply put, the Appellants' interpretation of renewal and termination rights fails to "relieve authors of the consequences of ill-advised and unremunerative grants made before the author had a fair opportunity to appreciate the true value of his work product." *Mills Music*, 469 U.S. at 172–73 (cleaned up).

The district court was right to reject the Appellants' position, and the Judgment should be affirmed for three reasons. First, the Appellants' international copyright theories are purely conjectural and, if accepted, would require courts in this country to apply renewal and termination rights to the obvious detriment of American authors—the very group Congress sought to protect by such rights. Second, the renewal provisions of the 1909 Act impose no geographical limitation on the scope of rights obtained by Mr. Smith's heirs. In fact, relevant Supreme Court precedent confirms that the renewal copyright interest acquired by Mr. Smith's heirs represents a new property estate free and clear of ***any*** rights previously granted away, including those currently claimed by the Appellants. Third, to truly alleviate the consequences of the Assignment as Congress intended, the termination provisions of the 1976 Act must return to Mr. Vetter ***all*** rights to the Song's copyright which were previously granted away, including those claimed by

the Appellants. As succinctly stated by the district court, "worldwide rights were covered by the terminated grant, so worldwide rights revert upon termination." ROA.280.

Contrary to the arguments advanced by the Appellants and their Amici, it makes no difference whether countries afford renewal and termination rights to their own authors. The United States is the country of origin of, and the only country with a significant relationship to, the Song. Therefore, the laws of the United States must determine who can claim copyright ownership thereof. It cannot be what Congress intended, as the Appellants argue, that what Mr. Vetter and Mr. Smith transferred away in 1963 for a dollar can *never* be fully recaptured. As noted by the district court, and as further outlined below, the Appellants' position is impossible to square with the policy underlying recapture rights—to relieve authors from the consequences of permanent copyright assignments.

\* \* \*

<u>**ARGUMENT**</u>

The district court correctly interpreted the text of the renewal provisions of the 1909 Act and the termination provisions of the 1976 Act to declare the Appellees the sole owners of the Song's copyright. ROA.245-84, 523-530. The court's legal conclusion was further supported by the history and purpose of those provisions as well as relevant Supreme Court precedent. Prior to reaching the issues directly, however, the district court had to first address the Appellants' argument that the "principle of territoriality" prevented the Appellees from recapturing any right to exploit the Song outside of the United States. In this appeal, the Appellants continue to push an overbroad and conjectural interpretation of territoriality. Because that interpretation pervades the remainder of their arguments, the Appellees begin there before turning to renewal and termination rights directly.

I. **THE DISTRICT COURT CORRECTLY REJECTED THE APPELLANTS' OVERBROAD AND UNSUPPORTED DEFINITION OF THE "PRINCIPLE OF TERRITORIALITY."**

There is a longstanding principle that, "unless a contrary intent appears, [legislation of Congress] is meant to apply only within the territorial jurisdiction of the United States." *Foley Bros. v. Filardo*, 336 U.S. 281, 285 (1949). The basic premise that "United States law governs domestically but

does not rule the world" is expressed through a canon of statutory construction known as the "presumption against extraterritoriality." *See Microsoft Corp. v. AT & T Corp.*, 550 U.S. 437, 454–55 (2007). The Supreme Court has identified several reasons for this presumption. First, and "[m]ost notably, it serves to avoid the international discord that can result when U.S. law is applied to conduct in foreign countries." *RJR Nabisco v. Eur. Cmty.*, 579 U.S. 325, 335 (2016). Second, and more generally, it is assumed that, when crafting legislation, Congress is primarily concerned with domestic conditions. *Yegiazaryan v. Smagin*, 599 U.S. 533, 541 (2023). Lastly, the presumption "helps ensure that the Judiciary does not erroneously adopt an interpretation of U.S. law that carries foreign policy consequences not clearly intended by the political branches." *Kiobel v. Royal Dutch Petro. Co.*, 569 U.S. 108, 116 (2013).

To be clear, this "principle of territoriality" represents a canon of statutory construction, or a rebuttable presumption about a statute's meaning, and does not limit Congress's power to legislate.[11] *Morrison v. Nat'l*

---

[11] Nor is it a limitation on a court's ability to adjudicate a claim. *See Geophysical Serv., Inc. v. TGS-NOPEC Geophysical Co.*, 850 F.3d 785, 791 (5th Cir. 2017) (noting that the territorial reach of the Copyright Act goes to the merits of the claim, not the jurisdiction of the court).

*Australia Bank Ltd.*, 561 U.S. 247, 255 (2010). When Congress gives a clear indication that a statute should apply extraterritorially, courts must apply the law as intended. *RJR Nabisco*, 579 U.S. at 337. Or, relevant here, if Congress intends for a statute to apply without regard to geography, there should be no geographical restrictions imposed. For example, in *Kirtsaeng v. John Wiley & Sons, Inc.*, the central issue was whether the "first sale" provisions[12] in the 1976 Act, which allow the resale of lawfully made copies without the copyright owner's permission, should apply to textbooks manufactured under license in Asia and then imported into the United States. 568 U.S. 519, 528-29 (2013). The Supreme Court determined that the language, context, and common-law history of the Copyright Act's "first sale" provisions favored a non-geographical interpretation of the statute. *Id.* at 530. Specifically, regarding the common-law history, the majority traced the "first sale" doctrine back to its common-law roots and found that no geographic distinctions were made. *Id.* at 538-39. This finding triggered another canon of construction—that is, "when a statute covers an issue previously governed by the common law, we must presume that Congress intended to retain the substance of the common law." *Id.* at 538 (citations and quotations omitted).

---

[12] 17 U.S.C. § 109.

The common law presumption, coupled with geographically neutral text, was enough for the Supreme Court to conclude that a non-geographical (i.e., both territorial and extraterritorial) reading of the Copyright Act made better sense.

Absent a clear indication of intended extraterritoriality or absence of geographical limitation, the question becomes whether the conduct, parties, or interests that the statute seeks to regulate, protect, or vindicate (*i.e.*, the statute's "focus") are domestic or foreign. *WesternGeco LLC v. ION Geophysical Corp.*, 585 U.S. 407, 416 (2018) (*citing Morrison*, 561 U.S. at 267). "If the conduct relevant to the statute's focus occurred in the United States, then the case involves a permissible domestic application even if other conduct occurred abroad." *RJR Nabisco*, 579 U.S. at 337. Put another way, a claim is not considered impermissibly "extraterritorial" simply because it involves foreign acts, events, rights, or parties.[13]

A.   The Appellants Generally Overstate the Effect of the Presumption Against Extraterritoriality.

Against that general backdrop, it is evident that the Appellants and their Amici continue to overstate the effect of the presumption against

_____

[13] *See, e.g., Kirtsaeng*, 568 U.S. 519 (2013); *Quality King Distributors, Inc. v. L'anza Rsch. Int'l, Inc.*, 523 U.S. 135 (1998).

extraterritoriality in relation to United States copyright law. To begin with, the Copyright Act contains no express territorial limits. *Geophysical Serv., Inc. v. TGS-NOPEC Geophysical Co.*, 850 F.3d 785, 791 (5th Cir. 2017). Any territorial limitation placed on a provision of the Copyright Act comes only by way of the general presumption against extraterritoriality. *Id.* In that regard, it is well established that (with some exception)[14] the protections against infringement afforded by the Copyright Act do not have any extraterritorial operation. *Impression Prods., Inc. v. Lexmark Int'l*, Inc., 581 U.S. 360, 379 (2017). The presumption against extraterritoriality is, after all, primarily concerned with preventing application of domestic law to foreign conduct by foreign nationals. *RJR Nabisco*, 579 U.S. at 335. It seems obvious that in such cases the presumption's role as a "watchdog" is most critical. *See Morrison*, 561 U.S. at 266. Therefore, to allow the exclusive rights enumerated in the Copyright Act to provide a remedy for infringing conduct occurring entirely elsewhere would directly and inexorably conflict with the desire to avoid the "international discord" identified in *RJR Nabisco*. 579 U.S. at 335. This case,

---

[14] *See Update Art, Inc. v. Modiin Pub., Ltd.*, 843 F.2d 67, 73 (2d Cir. 1988) (noting the "predicate act" exception); *Yesh Music v. Lakewood Church*, 2012 WL 524187, at *9 (S.D. Tex. Feb. 14, 2012) ("[A] distinction should be drawn between purely extraterritorial conduct, which is itself nonactionable, and conduct that crosses borders, so that at least a part of the offense takes place within the United States.").

however, is not about infringement, but, rather, **ownership** of an intangible property asset. The general role of the presumption in disputes over domestic property ownership is far less obvious—particularly in cases like this where the property dispute is between American citizens and stems from a contract governed by the laws of the state of New York.[15] In any event, it is reasonable to conclude that, to the extent that the presumption plays a role in this appeal, it does not carry the same weight as it would in a case involving the application of domestic law to foreign parties engaged in foreign conduct.

That is certainly not the way that the Appellants see it. As they argue, the presumption operates with equal blunt force across the entire Copyright Act, without any real consideration paid to the parties or interests that a specific provision regulates, protects, or vindicates. Such an indiscriminate approach overlooks the Supreme Court's admonition that "the principle that copyright laws do not have any extraterritorial operation **requires some qualification**." *Kirtsaeng,* 568 U.S. at 532 (emphasis added) (citations omitted). Rather than acknowledging any nuance or room for qualification, the Appellants reprise their self-minted definition of the presumption in

---

[15] It has been observed that the relationship between the presumption and common law legal doctrine is unsettled. *See City of New York v. Chevron Corp.*, 993 F.3d 81, 101-03 (2d Cir. 2021).

relation to the Copyright Act, asserting (as they did in the district court) that, the "territoriality principle recognizes that copyright protection in one country does not extend to or affect protection in any other country."[16] Armed with their own definition, the Appellants next claim (without citation) that if a domestic application of the Copyright Act would impose "downstream effects" in foreign countries, such an application would be impermissibly extraterritorial.[17] At a minimum, this seemingly boundless statement ignores that the relevant question is not whether application of a domestic statute will have foreign "downstream effects." It is whether the acts, events, rights, or parties most relevant to the focus of the statute are domestic (permissible) or foreign (impermissible).

B.    Copyright Ownership Disputes Are Better Resolved Using a Choice of Law Analysis.

Like the presumption against extraterritoriality, this Court has recognized that a choice of law analysis can achieve the proper

---

[16] Doc. 21, at 37. Although the Appellants nominally cite this Court's opinion in *Geophysical Serv., Inc.* as support for such a broad proposition, respectfully, the citation cannot support the load the Appellants seek to have it carry. In context, this Court's statement regarding the territorial reach of the Copyright Act is far narrower: "[w]here a copyright plaintiff claims contributory infringement predicated on direct infringement that occurred entirely extraterritorially, the plaintiff has stated no claim." *Geophysical Serv., Inc.*, 850 F.3d at 799.
[17] Doc. 21, at 48.

accommodation of foreign interests in domestic litigation. *Vasquez v. Bridgestone/Firestone, Inc.*, 325 F.3d 665, 674 (5th Cir. 2003).[18] The Appellants' approach to the extraterritoriality issue ignores that courts generally resolve questions of copyright ownership through a choice of laws analysis. The seminal case on this issue is *Itar-Tass Russian News Agency v. Russian Kurier, Inc.*, in which the Second Circuit stated that "[c]opyright is a form of property, and the usual rule is that the interests of the parties in property are determined by the law of the state with the most significant relationship to the property and the parties." 153 F.3d 82, 90 (2d Cir. 1998). To determine the "most significant relationship" to the property at issue (a Russian copyright), the court turned to § 222 of the Second Restatement of Conflict of Laws. Guided by the Restatement, the court noted that usually the state with the "most significant relationship" to the copyright will be its "country of origin." *Itar-Tass Russian News Agency*, 153 F.3d at 90. After resolving antecedent questions of ownership, by contrast, infringement issues will usually be determined by *lex loci delicti*—the country where the infringement occurred. *Id.* at 91. Relevant here, the *Itar-Tass* framework has

---

[18] *See also Bascuñán v. Elsaca*, 874 F.3d 806, 822 (2d Cir. 2017) (observing that a choice of laws analysis "mirror[s] the concerns underlying the presumption against extraterritoriality.")

been embraced by the Fifth Circuit—most recently in *Canadian Standards Ass'n v. P.S. Knight Co., Ltd.*, where this Court counseled that the "ownership and essential nature" of a copyright should be determined by the "law where the copyright is held." 112 F.4th 298, 303 (5th Cir. 2024) (cleaned up).[19]

Naturally, most reported cases that employ the *Itar-Tass* framework involve domestic infringement of a foreign copyright. In those cases, the courts have applied the law of the copyright's country of origin to answer the antecedent question of copyright ownership before turning to the Copyright Act on the question of infringement.[20] However, there are examples of courts applying *Itar-Tass* to decide the antecedent question of ownership under the Copyright Act before looking to the laws of a foreign jurisdiction on the question of infringement. For example, in *Corbello v. DeVito*, the district court adopted the *Itar-Tass* framework to apply domestic law on the issue of copyright ownership before applying foreign law to determine infringement under the laws of the United Kingdom, Canada, and Australia. 844 F. Supp.2d

---

[19] *Cert. denied*, 145 S. Ct. 1135 (2025).

[20] *See, e.g., Saregama India Ltd., v. Mosley*, 635 F.3d 1284 (11th Cir. 2011); *Glass Egg Dig. Media v. Gameloft, Inc.*, 2018 WL 3659259 (N.D. Cal. Aug. 2, 2018); *RCTV Int'l Corp. v. Rosenfeld*, 2016 WL 6818955 (S.D. Fla. Sept. 30, 2016); *Games Workshop Ltd. v. Chapterhouse Studios, LLC*, 2012 WL 5949105 (N.D. Ill. Nov. 27, 2012); *New Look Party Ltd. v. Louise Paris Ltd.*, 2012 WL 251976 (S.D.N.Y. Jan. 11, 2012); *Rudnicki v. WPNA 1490 AM*, 2009 WL 4800030 (N.D. Ill. Dec. 10, 2009).

1136, 1157 (D. Nev. 2012).[21] Like the court in *Corbello*, here, the district court properly applied the *Itar-Tass* choice of law approach to a domestic copyright. As quite simply stated by the district court: "ownership is determined by the law of the country in which the work is created but infringement is governed by the law where the infringement took place." ROA.266.[22]

C. The Presumption Against Extraterritoriality Does Not Create "Territorial" Property Assets.

Given the evolution of the presumption against extraterritoriality over the last century[23] and that determining "[t]he situs of intangible property is about as intangible a concept as is known to the law," *Tabacalera Severiano Jorge, S. A. v. Standard Cigar Co.*, 392 F.2d 706, 714–15 (5th Cir. 1968), the Appellees freely acknowledge that, on many of these issues, reasonable minds can disagree. That said, even with room for disagreement, the Appellants' attempt to use a statutory canon of construction to muscle into existence a theory of international copyright relations is remarkable, to say the least. Unbowed from the district court's well-reasoned analysis, the Appellants

---

[21] *Rev'd on other grounds* 777 F.3d 1058 (9th Cir. 2015).

[22] *Citing Edmark Indus. SDN. BHD. v. S. Asia Int'l (H.K.) Ltd.*, 89 F. Supp. 2d 840, 843 (E.D. Tex. 2000).

[23] *See generally* Larry Kramer, *Vestiges of Beale: Extraterritorial Application of American Law*, 1991 Sup. Ct. Rev. 179.

continue to insist repeatedly and vociferously that there are 181 "multiple" and "separate" copyright property interests throughout the Berne Convention countries for a single work of United States origin. They go as far as to say that such multiplicity is a universally accepted copyright doctrine.[24] Anyone who betrays their orthodoxy just "doesn't get" how copyright works.[25] Given this assuredness, one might be surprised to know that there are copyright

---

[24] Doc. 21, at 15, 17, 38.

[25] One example of this intemperance is from the respected copyright scholar, William Patry. Unfortunately, Professor Patry has not taken the rejection by the district court of some of his views with the thoughtfulness a scholar of his prominence would hopefully display. As pointed out by one of the Appellants' amici (Doc. 37, at 25), Professor Patry has updated his treatise to rant against the district court's opinion with what is, at best, an unbefitting callous tone towards Chief Judge Dick—accusing her of an evident "lack of understanding of international copyright law" and prophesying that a California-based "jurist well experienced in copyright law" would have *surely* seen things his way. 7 Patry on Copyright § 25:18 (2025). Professor Patry's absolutism is undercut both by other sections of his treatise that have not been updated and his prior writings on this subject. For example, although he now insists that "there must be multiple copyrights," the immediately preceding section of his treatise is titled "How Many Copyrights Are There" and acknowledges differing views on the subject. Even more bizarre, some of Professor Patry's previous scholarship states the **opposite** of the new "territorialist" approach he now claims to be irrefutable. For example, in an article published in the American Journal of Comparative Law he states, "[i]f one contrasts the nature of copyright with the nature of patents and trademarks, and examines the different approaches to 'territoriality' found in the Berne Convention (governing copyrights) and in the Paris Convention for the Protection of Industrial Property (governing patents and trademarks), **copyright does not appear to be territorially dependent**." William Patry, *Choice of Law and International Copyright*, 48 Am. J. Comp. L. 383, 394 (2000) (emphasis added). He goes on to say that a copyright "may properly be said to vest initially in one country, and then to be recognized in others according to treaty obligations," (*id.* at 395) and that the "territorial approach" he now advocates for "is hard to defend on policy grounds" (*id.* at 399).

scholars who do not subscribe to the Appellants' orthodoxy.[26] One might also be surprised to read the Appellants' brief (as well as their Amici's) cover to cover without ever encountering a judicial citation that explicitly recognizes their multiplicity of copyrights theory. Instead, they rely exclusively on handpicked academic sources and then scrummage for their supremacy. A closer look, however, reveals that the Appellants are advancing their argument with greater force than substance.[27]

Undoubtedly, outside of copyright, in patent and trademark law, not only are the laws governing protection subject to the presumption against extraterritoriality, but the **subject matter** of the protection itself is often referred to as being "territorial." In other words, the very existence (and thus, any right to protection) of a trademark or patent must be independently

---

[26] Howard B. Abrams and Tyler T. Ochoa, *Foreign Copyright Claims in American Courts— Choice of Law*, 2 The Law of Copyright § 19:30 (2024) ("More generally, there is a philosophical question whether an author who creates a work receives multiple copyrights (one arising in each country), or whether there is a single copyright that arises in the country of origin and is simply enforced in other countries pursuant to their domestic law. The former is the model followed by patents and trademarks, while the latter is more consistent with the ruling in the *Itar-Tass* case.").

[27] An even closer look reveals that *many* of the arguments made by the Appellants' amici were likewise made, and rejected, in *Kirtsaeng*. *See* Brief for the Motion Picture Association of America, Inc. and the Recording Industry Association of America as Amici Curiae in Support of Respondent*, Kirtsaeng v. John Wiley & Sons, Inc.*, 2012 WL 3945857.

established in each country where protection is sought.[28] Although semantically similar, the "territorial" nature of patents and trademarks is not derived from the presumption against extraterritoriality. Instead, it is because patents and trademarks generally arise out of an administrative act by the government of the granting country[29] and "exist in each country solely according to that country's statutory scheme." *Levi Strauss & Co. v. AmericanJeans.com, Inc.*, 2011 WL 1361574, at *3 (N.D. Cal. Apr. 11, 2011). The same cannot be said for copyrights because, "[u]nlike foreign patent or trademark claims, which often implicate passing judgment on the actions of foreign governmental authorities, copyright laws, by and large, do not incorporate administrative formalities which must be satisfied to create or perfect a copyright." *Say It Visually, Inc. v. Trade World Corp*., 2024 WL 3831411, at *4 (W.D. Tex. July 26, 2024) (cleaned up).[30]

---

[28] *See, e.g., Abitron Austria GmbH v. Hetronic Int'l, Inc*, 600 U.S. 412, 426 (2023); *Microsoft Corp.*, 550 U.S. at 441; *Fuji Photo Film Co. v. Shinohara Shoji Kabushiki Kaisha*, 754 F.2d 591, 599 (5th Cir. 1985); *Voda v. Cordis Corp.*, 476 F.3d 887, 901 (Fed. Cir. 2007); *Hanover Star Milling Co. v. Allen & Wheeler Co.*, 208 F. 513, 521 (7th Cir. 1913); *Nautilus, Inc. v. Icon Health & Fitness, Inc.*, 304 F. Supp. 3d 552, 561 (W.D. Tex. 2018); *WesternGeco L.L.C. v. Ion Geophysical Corp.*, 776 F. Supp. 2d 342, 365 (S.D. Tex. 2011); *In re Nortel Networks, Inc.*, 532 B.R. 494, 538 (Bankr. D. Del. 2015).

[29] *See, e.g.*, 35 U.S.C. §§ 101-35 (requirements for obtaining a patent); 15 U.S.C. §§ 1051-96 (requirements for obtaining a trademark).

[30] *Citing New Name, Inc. v. Walt Disney Co.*, 2007 WL 5061697, at *5 (C.D. Cal. Dec. 3, 2007), *London Film Prods. Ltd. v. Intercontinental Commc'ns, Inc.*, 580 F. Supp. 47, 49

Of course, the "territorial" nature of a trademark or patent may carry importance in the extraterritoriality analysis. For example, in *Abitron Austria GmbH v. Hetronic Int'l, Inc*, the Supreme Court noted the heightened risk of international discord if it were to apply the infringement provisions of the Lanham Act extraterritorially: "Because of the territorial nature of trademarks, the probability of incompatibility with the applicable laws of other counties [*sic*] is so obvious that if Congress intended such foreign application it would have addressed the subject of conflicts with foreign laws and procedures." 600 U.S. 412, 427 (2023) (quotation and citation omitted). Throughout their briefs, the Appellants and their Amici seek to collapse the general presumption against extraterritoriality and the "territorial" nature of a property interest into the same inquiry. In other words, they argue that the presumption against territoriality dictates a "territorial" nature of the copyright property interest. The reason is obvious. If they can convince this Court of what they could not convince the district court—that the Song has a multiplicity of territorially distinct copyrights—the Appellants can then argue that the recapture of the "United States copyright" through renewal and

---

(S.D.N.Y. 1984); *Report and recommendation adopted,* 2024 WL 3831202 (W.D. Tex. Aug. 13, 2024).

termination rights does not yield the return of any of the Song's "foreign copyrights." But the Supreme Court's decision in *Abitron*—which viewed the territorial nature of an intellectual property asset ***as a factor*** to be considered in the general extraterritoriality analysis—clearly illustrates that the two inquiries are distinct and cannot be collapsed into one. Accordingly, if the Appellants are to establish their multiplicity theory, they need to identify another source of that conclusion. Unfortunately for the Appellants, their multiplicity theory of copyright finds no such support in the Copyright Act, the Berne Convention, or the judicial opinions interpreting either.

### i.     The Copyright Act

To begin, the United States Congress knows how to make clear that separate, independent, and geographically limited rights exist for intellectual property. For example, the Lanham Act explicitly states that the registration of a foreign mark in the United States "shall be independent of the registration in the country of origin and the duration, validity, or transfer in the United States of such registration shall be governed by the provisions of this chapter."[31] Likewise, the Patent Act expressly recognizes the geographical

---

[31] 15 U.S.C. § 1126(f).

limits of a domestic patent, stating that "every patent shall grant to the patentee the right to exclude others from making, using, offering for sale, or selling the invention throughout the United States."[32] By contrast, there is no such geographical limitation in the Copyright Act. *See Geophysical Serv., Inc.*, 850 F.3d at 791 ("The Copyright Act does not express its limit on territorial reach."). The total lack of textual support (together with the Patent Act and Lanham Act's explicit declarations) calls the Appellants' multiplicity of copyrights theory into obvious doubt.

### ii.    *The Berne Convention*

Even though the Berne Convention does not have the force of law,[33] it is worth noting that when the nations of the world come together to craft intellectual property policy through the World Intellectual Property Organization, they too know how to explicitly recognize "multiple" and "separate" intellectual property interests in each country. For example, the Paris Convention for the Protection of Industrial Property[34] governing international patent and trademark relations, states in no uncertain terms:

---

[32] 35 U.S.C. § 154 (cleaned up).

[33] 17 U.S.C. § 104(c).

[34] Paris Convention for the Protection of Industrial Property, July 14, 1967, 21 U.S.T. 1583, T.I.A.S. No. 6923 (hereafter, the "Paris Convention").

"Patents applied for in the various countries of the Union by nationals of countries of the Union shall be independent of patents obtained for the same invention in other countries, whether members of the Union or not."[35] Regarding trademarks, the Paris Convention states: "A mark duly registered in a country of the Union shall be regarded as independent of marks registered in the other countries of the Union, including the country of origin."[36] By contrast, the Berne Convention "makes no reference to the existence of independent copyrights."[37]

### iii.    Judicial Interpretation

Turning back to the Copyright Act, this Court's opinions alone are enough to expose the inherent weakness of the defendant's theory of the case. For example, this Court has recognized that, in the United States, copyright vests in (*i.e.*, originates with) the author at the time of creation of the work. *Rodrigue v. Rodrigue*, 218 F.3d 432, 434 (5th Cir. 2000) (citing 17 U.S.C. § 201(a).[38] Fifth Circuit precedent also indicates that, following the initial

---

[35] *Id*. at Article 4*bis*. (emphasis added).

[36] *Id*. at Article 6*bis* (emphasis added).

[37] Patry, *supra* note 25, 48 Am. J. Comp. L. at 395.

[38] Under the Copyright Act of 1909, the Song's "federal copyright was secured on the date … of registration." *See* United States Copyright Office, *Circular 15A, Duration of Copyright* (2024), *available at* https://www.copyright.gov/circs/circ15a.pdf.

vesting, the copyright is "held" as a domestic asset in the United States (as its country of origin) regardless of where an infringement action is pursued. *See Canadian Standards Ass'n.*, 112 F.4th at 303. This precedent is impossible to square with the Appellants' supposition that the Song has multiple and separate copyrights that "originated" from the domestic laws of, and are "held" in, every Berne Convention country throughout the world.

Outside of the Fifth Circuit, the Appellants fare no better. For example, in *Unicolors, Inc. v. H&M Hennes & Mauritz, L.P.,* the Ninth Circuit observed that "[b]ecause the United States joined the Berne Convention, it is required to **afford foreign copyright holders** the same protection as holders of domestic copyrights." 52 F.4th 1054, 1078 (9th Cir. 2022) (cleaned up; emphasis added). Likewise, in *Bridgeman Art Libr., Ltd. v. Corel Corp.*, a district court in the Southern District of New York stated that, following the United States' accession to the Berne Convention, a foreign national of a Berne member state "may seek copyright protection under the Copyright Act **although the source of its rights lies abroad**." 25 F. Supp. 2d 421, 425 (S.D.N.Y. 1998) (emphasis added). And, eight years later, in *PaySys Int'l, Inc. v. Atos Se*, a court in the same District noted while adjudicating a claim involving a domestic copyright allegedly infringed in China: "[the plaintiff's]

domestic copyright registrations form the basis for its foreign copyright claims." 226 F. Supp. 3d 206, 213 (S.D.N.Y. 2016). There are other examples, of course.[39] But a simple comparison of these opinions against patent and trademark decisions tells one all there is to know about the viability of the Appellants' theory. As previously noted, in *Abitron*, the Supreme Court expressly recognized the "multiple" and "separate" nature of trademarks, stating "trademark is recognized as having a separate existence in each sovereign territory in which it is registered or legally recognized as a mark." *Abitron Austria GmbH*, 600 U.S. at 426 (quotation omitted). Likewise, in *Deepsouth Packing Co. v. Laitram Corp.*, the Supreme Court observed that, "[t]o the degree that the inventor needs protection in markets other than those of this country, [the inventor must] seek it abroad through patents secured in countries where his goods are being used." 406 U.S. 518, 531

---

[39] *See, e.g., Vergara Hermosilla v. The Coca-Cola Co*., 717 F. Supp. 2d 1297, 1303 (S.D. Fla. 2010) ("[Plaintiff's] Mexican copyright then became enforceable in the United States no later than when his lyrics were published in [treaty partner] Mexico."); *Auto. Data Sols., Inc. v. Directed Elecs. Canada, Inc.*, 2018 WL 4742289, at *6 (C.D. Cal. 2018) ("[O]wners of a foreign copyright under the Berne Convention can enforce protections guaranteed under United States copyright law."); *MPD Accessories B.V. v. Urb. Outfitters*, 2014 WL 2440683, at *5 (S.D.N.Y. 2014) ("The Berne Convention Implementation Act allows owners of unregistered foreign copyrights from Berne Convention signatory nations to bring claims of copyright infringement in United States courts.").

(1972).[40] There is simply no analogous "territorial" language in judicial decisions concerning copyright.

The statutory language of the Lanham Act and the Patent Act (as well as the caselaw interpreting both) clearly demonstrates that the Appellants' "multiple" and "separate" interests theory, although at home in connection with patents and trademarks, is **not** similarly reflected in the Copyright Act (or its interpreting caselaw). This forces the Appellants to rely exclusively on academic commentary. Seeing that flank exposed, the Appellants and their Amici repeatedly advance an academic "consensus position" that is far more selective than they lead on.[41] For their part, the Appellees are willing to acknowledge that determining the situs of a copyright "poses a special problem because this property is intangible in nature." *Af-Cap Inc. v. Republic*

---

[40] *See also Microsoft Corp.*, 550 U.S. at 456 ("If AT & T desires to prevent copying in foreign countries, its remedy today lies in obtaining and enforcing foreign patents.").

[41] This "consensus position" leaves open plenty of questions that the proponents have yet to answer. For example, with respect to the so-called "Egyptian copyright" in the Song referenced by the Appellants (Doc. 21, at 17), when and how was that property interest created? In 1977 when Egypt joined the Berne Convention? Where does the Berne Convention say it creates property rights? If Egypt leaves the treaty tomorrow, does the Song's "Egyptian copyright" simply vanish? What other property estate behaves in that manner? The regime makes far more logical sense when inferring that domestic *protection* is merely extended to works of foreign origin rather than a separate and distinct property interest. *Cf. London Film Prods. Ltd.*, 580 F. Supp. at 49 ("Chile's adherence to the Berne Convention in 1970 automatically conferred **copyright protection** on these films in Chile.") (emphasis added).

*of Congo*, 383 F.3d 361, 371 (5th Cir. 2004). They further acknowledge that given the largely *res nova* nature of this case, both parties must rely heavily on dicta, analogy, inference, and academic commentary to advance their respective positions. Nevertheless, the Appellees firmly believe: first, that the analogies and inferences that can be reasonably drawn on this issue favor the Appellees' view; and, second, that before adopting a legal position that eviscerates the copyright recapture protections afforded to authors by Congress since 1790, this Court should require the Appellants to come forward with something more than a hunch. The district court was correct on these points. Whether or not this Court views that issue, like the district court did, as "largely determinative" of the outcome, is another matter altogether.[42]

\* \* \*

Ultimately, the Appellants' rigid interpretation of extraterritoriality disregards the nuanced balance between domestic and international interests inherent in copyright law. It mistakenly treats the mere existence of foreign "downstream effects" as determinative of impermissible extraterritorial

---

[42] *See California v. Rooney*, 483 U.S. 307, 311 (1987) ("This Court reviews judgments, not statements in opinions.") (quotations and citations omitted). Professor Patry has stated that, even if one adopts a multiplicity approach, "the forum law may have choice-of-law provisions which dictate application of foreign [or domestic] law in particular circumstances." Patry, *supra* note 25, at § 25:17.

application, even when domestic questions of copyright ownership are at the heart of the matter. The *relentless* invocation of the "principle of territoriality" by the Appellants and their Amici should be considered with the overbreadth of their interpretation of that principle in mind.

## II. THE DISTRICT COURT CORRECTLY DETERMINED THAT THE RENEWAL COPYRIGHT VESTED IN MR. SMITH'S HEIRS FREE AND CLEAR OF ANY CLAIM BASED UPON THE ASSIGNMENT.

With this proper framing of the "principle of territoriality," the geographical scope of recapture rights can be properly determined. The Appellees begin with renewal rights under the 1909 Act because they represent the statutory and spiritual predecessor of termination rights in the 1976 Act.[43] The district court held that the renewal copyright interest obtained by Mr. Smith's heirs and later acquired by Vetter Communications Corp. represents a completely new estate clear of *any rights* that Mr. Smith granted to Windsong during the original copyright term.[44] The district court's conclusion is supported by the text of the renewal provisions of the 1909 Act

---

[43] 1976 House Report, at 124 "[Rights of termination] are based on the premise that the reversionary provisions of the present section on copyright renewal [in the 1909 Act] should be eliminated, and that the proposed law should substitute for them a provision safeguarding authors against unremunerative transfers."

[44] ROA.270.

as well as all Supreme Court precedent interpreting such provisions. It should be affirmed.

A.    <u>The Plain Language of the Renewal Provisions Leaves the Appellants With Nothing</u>.

It is a common legal axiom that "the starting point for interpreting a statute is the language of the statute itself. Absent a clearly expressed legislative intention to the contrary, that language must ordinarily be regarded as conclusive." *See Consumer Prod. Safety Comm'n v. GTE Sylvania, Inc.*, 447 U.S. 102, 108 (1980). The renewal provision of the 1909 Act states as follows:

> [T]he author of such work, if still living, or the widow, widower, or children of the author, if the author be not living, or if such author, widow, widower, or children be not living, then the author's executors, or in the absence of a will, his next of kin shall be entitled to a renewal and extension of the copyright in such work for a further term of twenty-eight years when application for such renewal and extension shall have been made to the copyright office and duly registered therein within one year prior to the expiration of the original term of copyright.

17 U.S.C. § 24 (1909). The right to obtain a renewal copyright is absolute and unrestricted in the text of the 1909 Act. Unsurprisingly, the judicial decisions in the half-century following the enactment of the 1909 Act were

clear in their regard for the renewal copyright as an entirely new **property** estate that cut off **all** rights of the original copyright owner.[45]

The Supreme Court's decision in *Stewart v. Abend* provides the most in-depth treatment of the history, purpose, and nature of renewal rights. *Stewart* confirms that even when an author like Mr. Smith agrees to assign rights in the renewal term to someone like Windsong, if the author dies before the commencement of the renewal period as Mr. Smith did, the author's heirs "obtain the renewal copyright ***free of any claim*** founded upon an assignment made by the author in his lifetime." *Stewart*, 495 U.S. at 218 (emphasis added). The Supreme Court further confirmed that renewal rights are meant to give the authors and their heirs a "second chance to control" their works. *Id.* at 218. The only way to ensure this control is if, following renewal, the prior assignee "**holds nothing**." *Id.* at 220 (emphasis added).[46] Here, it is indisputable that the Appellants' "claim" to foreign exploitation rights relative to Mr. Smith's share of the Song is "founded upon" the worldwide grant in

---

[45] Barbara A. Ringer, *Copyright Law Revision: Studies Prepared for the Subcomm. on Patents, Trademarks, and Copyrights of the Comm. on the Judiciary: Study No. 31: Renewal of Copyright*, U.S. Sen., 86th Cong., 121, 124, n.128 (1958) (citing cases).

[46] Of course, this assumes that the author did not previously assign the renewal copyright, *see G. Ricordi & Co. v. Paramount Pictures, Inc.*, 189 F.2d 469, 471 (2d Cir. 1951), or, if like in *Stewart* the renewal copyright was assigned, that the author predeceased the renewal period.

the Assignment made by Mr. Smith "during his lifetime." *Stewart* therefore counsels that Windsong's rights in Mr. Smith's interest in the Song were extinguished in their entirety upon renewal. The Appellants desperately try to read into *Stewart* statements, principles, and holdings that do not exist. For reasons untold, the Appellants presume that the *Stewart* majority subscribed to the multiplicity of copyrights theory, such that renewal of the copyright in the United States did not affect Windsong's rights in the Song's many "foreign copyright" property assets. To be clear, there is **nothing** in the *Stewart* decision that supports this presumption. The district court was correct not to assume so much from silence. Instead, the district court correctly followed the literal meaning of the words chosen by the Supreme Court, and rejected the Appellants' reading of "holds nothing" as "holds exclusive rights to the Song in all countries other than the United States." ROA.270.

In addition to *Stewart*, the Appellants continue to place a heavy burden on *Rohauer v. Killiam Shows, Inc.*, 379 F. Supp. 723 (S.D.N.Y. 1974). The Appellants cite the *Rohauer* opinion for the sweeping proposition that foreign rights are not part of the renewal estate obtained by Mr. Smith's heirs.[47] To be sure, the *Rohauer* opinion contains a brief passage which may imply that the

---

[47] Doc. 21, at 44-46.

renewal of copyright in the United States only yields the right to exploit the work in the United States. The district court previously explained in detail why reliance on *Rohauer* was misplaced. ROA.262-64. Stated succinctly, however, the *Rohauer* opinion is inapposite and of little persuasive value for at least the following reasons. First, the part of the district court opinion excerpted by the Appellants is clearly dicta (in response to an affirmative defense) which lacks anything close to a full analysis of the geographical scope of renewal rights. Second, to state the obvious, to the extent that there is an inconsistency between *Rohauer* and *Stewart*, *Rohauer* must yield. Third, on substance, the Appellants ignore that the author of the work at issue, Judith Hull, was a British citizen and that the United States was not her work's country of origin. With that context, it is not at all surprising that any renewal right afforded to this British work under United States law would properly be viewed as having no effect elsewhere. Such a view would, in fact, be entirely consistent with Appellees' position in this case. Finally, at the time of initial vesting and renewal of Hill's work, the United States was not a member of the Berne Convention (or even the Universal Copyright Convention) and still required foreign copyright owners to follow all administrative formalities

under the 1909 Act in order to receive protection in the United States.[48] Simply put, drawing broad conclusions in this proceeding from a single district court opinion's dicta addressing issues involving a foreign work owned by a foreign citizen under a more primitive international regime is not appropriate.[49]

By contrast, the Appellees' position is far more consistent with relevant precedent. For example, *Itar-Tass* supports the treatment of the Song's copyright as a "form of property" that initially arose in 1966 (the original copyright) and again as a new estate in 1994 (the renewal copyright) under the laws of the United States. *See Itar-Tass Russian News Agency*, 153 F.3d at 90. In turn, the current ownership dispute in the renewal copyright and who has the ability—at least as far as the courts of the United States are concerned—to enforce those rights should be resolved using the laws of this country as it has the "most significant relationship" to the work. In other words, where the Song's copyright is "held." *See Canadian Standards Ass'n.*, 112 F.4th at 303.

---

[48] Arpad Bogsch, *Copyright Law Revision: Studies Prepared for the Subcomm. on Patents, Trademarks, and Copyrights of the Comm. on the Judiciary: Study No. 32: Protection of Works of Foreign Origin*, U.S. Sen., 86th Cong., 121 (1958), at 3.

[49] ROA.264 (noting that the Appellants' two-sentence presentation of *Rohauer* is a significant oversimplification and does not provide persuasive authority).

Under the Restatement, there can be no legitimate dispute as to which country has the "most significant relationship" to the Song. It was written in the United States by American citizens. It was assigned to an American corporation pursuant to an agreement executed in the United States and governed by New York law.[50] The notion that the "ownership and essential nature" of the Song's copyright would be determined by a United States court using anything other than United States law is baffling. To accept the Appellants' position means that this Court must either ignore *Itar-Tass* altogether or apply a different choice of laws analysis for renewal copyright ownership than is used for original copyright ownership. Yet, neither the Appellants nor their Amici have proffered a principled reason to do so. Respectfully, there is none, and the district court was right to apply *Itar-Tass* and to resolve questions of ownership in the Song pursuant to the laws of the United States alone.

B.  <u>Treating Renewal Rights as Non-geographic Does Not Offend the Presumption Against Extraterritoriality</u>.

Finally, testing the district court's Judgment against the presumption of extraterritoriality, there is a strong case that the renewal provisions of the

---

[50] *See* ROA.31, ¶16 (noting New York law will govern).

1909 Act are inherently non-geographical.[51] Moreover, given that the district court's Judgment only affects domestic parties and conditions, the presumption is arguably inapplicable in the first instance. *E.E.O.C. v. Arabian Am. Oil Co.*, 499 U.S. 244, 248 (1991) (*citing Foley Bros.*, 366 U.S. at 285). Even if the presumption applies, the district court's Judgment in favor of the Appellees reflects a permissible domestic application of the renewal provisions in the 1909 Act. First, the focus of the statute is to protect and vindicate authors by providing them with the right to recapture their copyrights; to give them a second chance to control and benefit from the fruits of their labor. *Stewart*, 495 U.S. at 217-19. Further, the activities, and conduct relevant to that focus—the Assignment, the copyright renewal, the Appellants' refusal to relinquish all claim to the Song, and the Appellants' attempt to continue licensing the Song—all occurred in the United States. Lastly, the district court's Judgment regulates domestic concerns—the conduct of American citizens acting in the United States. Accordingly, even if

---

[51] The Supreme Court's decision in *Kirtsaeng* bolsters this conclusion. As previously articulated, the *Kirtsaeng* majority found the geographically neutral text coupled with the "first sale" doctrine's common-law roots to be significant in declaring those provisions of the Copyright Act to be non-geographical. Similarly, the renewal provisions of the 1909 Act are geographically neutral and have been recognized as contingent estates. *Fred Fisher Music Co.*, 318 U.S. at 651. This was a property classification recognized at common law. *See* Lewis Roberts, *Statutory and Common Law Definitions of Contingent Remainders*, 30 Ky. L.J. 61 (1941), https://uknowledge.uky.edu/klj/vol30/iss1/2.

the presumption of extraterritoriality applies, this case involves a permissible domestic application of the statute even though it may have "downstream effects" abroad. After all, "[e]ven where significant effects of the regulated conduct are felt outside U.S. borders, the statute itself does not present a problem of extraterritoriality, so long as the conduct which Congress seeks to regulate occurs largely within the United States." *Goodman v. Lee*, 1994 WL 710738, at *10 (E.D. La. Dec. 20, 1994).

* * *

Summarily, renewal rights "reflect a vital policy of United States copyright law." *Corcovado Music Corp. v. Hollis Music, Inc.*, 981 F.2d 679, 685 (2d Cir. 1993). Yet, the Appellants' interpretation of the 1909 Act's renewal provisions severely restrains the enjoyment of those rights and undermines the policy itself. There is no reason to believe that Congress intended to countenance such restraint. To the contrary, to fully realize Congress's goal of relieving authors from the consequences of ill-advised and unremunerative transfers, renewal rights simply cannot be constricted or limited to the geographic confines of the United States. Accordingly, the district court correctly held that Appellee Vetter Communications Corp. should have the

unrestricted right to exploit the Song throughout the world without interference from the Appellants. The Judgment should be affirmed.

### III. THE DISTRICT COURT CORRECTLY DETERMINED THAT TERMINATION OF THE COPYRIGHT GRANT IN THE ASSIGNMENT RETURNED ALL RIGHTS TO EXPLOIT THE SONG TO MR. VETTER.

The district court held that Mr. Vetter's termination of the copyright grant in the Assignment pursuant to Section 304(c) of the 1976 Act was not geographically limited. ROA.529. The district court's conclusion is supported by the text of the 1976 Act and consistent with the history, purpose, and policy underlying termination rights. Beginning with the text of Section 304(c), it provides in relevant part that:

> In the case of any copyright subsisting in either its first or renewal term on January 1, 1978, other than a copyright in a work made for hire, the exclusive or nonexclusive grant of a transfer or license of the renewal copyright or any right under it, executed before January 1, 1978 is subject to termination.[52]

The parties have never been in disagreement regarding the general effect of the foregoing. Where the parties depart in their view of the text is regarding

---

[52] 17 U.S.C. § 304(c) (cleaned up). Given the lack of substantive differences, the Appellees do not distinguish between Sections 203 and 304(c) unless meaningful to do so.

one of the six enumerated limitations on termination rights identified in the 1976 Act. Specifically, Section 304(c)(6)(E) provides that "[t]ermination of a grant under this subsection affects only those rights covered by the grant that arise under this title, and in no way affects rights arising under any other Federal, State, or foreign laws."[53] According to the Appellants, their Amici, a cadre of academics, and a handful of district courts outside of this Circuit, there are two reasons that the foregoing should be viewed as a limitation on the geographic scope of the rights returned to Mr. Vetter. First, the Appellants argue that the phrase "arise under this title" necessarily means only the specific rights enumerated in the 1976 Act (*i.e.,* 17 U.S.C. § 106).[54] Since those rights cannot provide for a remedy for purely foreign conduct, the Appellants insist that termination rights must be similarly cabined to the United States. Second, the Appellants read the absence of effect on "other Federal, State, or foreign laws" as an indication that Congress intended to restrict recapture to the geographic boundaries of the United States.[55] The district court rejected the Appellants' interpretation of the statute in both

---

[53] 17 U.S.C. § 304(c)(6)(E). Identical language is found in Section 203(b)(3).

[54] R. Doc. 21, at 39.

[55] *Id.*

respects. ROA.280-81. For the reasons below, the Appellees respectfully urge this Court to do the same.

A.    Rights That "Arise Under This Title" Has No Inherent Geographical Limitation

As an initial matter, despite the Appellants' continued professions of clarity, the text of Section 304(c)(6)(E) is not totally free from ambiguity. At the very least, the phrase "under this title" has been deemed ambiguous in connection with the 1976 Act. In *Kirtsaeng,* the Supreme Court observed that the word "under" evades a uniform, consistent meaning. 568 U.S. at 531. In fact, "under" is a "chameleon with many dictionary definitions and must draw its meaning from its context." *Id.* Consequently, with respect to Section 304(c)(6)(E), both the rights covered by the grant that "**arise *under* this title**," which are subject to termination, and the rights that "**aris[e] *under* any other Federal, State, or foreign laws**" which are not subject to termination, present issues of facial ambiguity. The meaning must be drawn from context, and in such instances, it is proper to employ interpretive canons of construction. *See Vielma v. Eureka Co.*, 218 F.3d 458, 464 (5th Cir. 2000). To that end, the text of the limitation in Section 304(c)(6)(E) must be given its ordinary, contemporary, and common meaning. *Star Athletica, L.L.C. v.*

*Varsity Brands, Inc.*, 580 U.S. 405, 408 (2017). However, this Court need not isolate its consideration of the subject limitation to the single sentence of text that comprises Section 304(c)(6)(E). Instead, this Court may "look to the provisions of the whole law" to determine its meaning. *Id.*

Although the Appellants label it "completely inapposite,"[56] *Kirtsaeng* offers the most relevant and recent look as to the Supreme Court's view of what "under this title" means as used in the 1976 Act. The central issue in *Kirtsaeng* was whether the words "lawfully made under this title" restrict the geographic scope of the Copyright Act's "first sale" doctrine. *Kirtsaeng*, 568 U.S. at 528. Against much protest from the dissenters in that case (and several of the Amici in this one)[57] regarding the "extraterritorial" reach of domestic copyright law, the majority held that "under this title" did not have any geographical significance in this context. *Id.* at 530. Instead, "under this title" simply meant "in accordance with" or "in compliance with" the Copyright Act. *Id.* As such, copies manufactured abroad under license from the copyright owner in the United States were considered "lawfully made under this title" despite their creation in a foreign country.

---

[56] Doc. 21, at 26.

[57] *See* Brief for the Motion Picture Association of America, Inc. and the Recording Industry Association of America, *supra* note 27.

Stipulating that the "first sale" provisions at issue in *Kirtsaeng* and the termination provisions at issue here are not identical, in the absence of controlling precedent, it is natural and proper to reason by analogy through consideration of "similar language in other contexts." *United States v. Rayo-Valdez*, 302 F.3d 314, 316 (5th Cir. 2002). Moreover, "there is a presumption that a given term is used to mean the same thing throughout a statute." *Brown v. Gardner*, 513 U.S. 115, 118 (1994). Because *Kirtsaeng* held that the phrase "under this title" lacks geographic significance in the context of the 1976 Act's "first sale" provisions, it is impossible to presume, as the Appellants do with force, that the phrase "arise under this title" in Section 304(c)(6)(E) imposes an **inherent** geographical limitation. To the contrary, following *Kirtsaeng*, there is a presumption that "under this title" **lacks** geographical significance when used in the Copyright Act.

The district court was right to reject the Appellants' attempt to "import[] geography into a statutory provision that says nothing explicitly about it." *Kirtsaeng*, 568 U.S. at 531. The district court observed, and the Appellants do not deny, that one definition of "arise" is "to originate from a source." Taken with the non-geographical meaning of "under this title" as recognized in *Kirtsaeng*, one can appropriately interpret the phrase "rights

that arise under this title" as used in Section 304(c)(6)(E) to reference ownership rights that originated in the United States by "me[eting] the requirements of American copyright law." *See Kirtsaeng*, 568 U.S. at 530. In fact, the *Kirtsaeng* majority explicitly stated that the phrase "owner of copyright under this title" as used in Section 106 of the 1976 Act also has no geographical significance. *Id.* at 537-38. This statement further supports the Appellees' argument that the provisions in the 1976 Act that permit **termination** of copyright ownership are non-geographical by their nature.

Resisting the natural weight of *Kirtsaeng,* the Appellants cite several cases involving federal subject matter jurisdiction to argue that the Appellees' ownership claims do not "arise under" the Copyright Act—principally the Second Circuit's opinion in *T.B. Harms Co. v. Eliscu,* 339 F.2d 823 (2d Cir. 1964). The Fifth Circuit has recognized *T.B. Harms* for the proposition that,

> an action "arises under" the Copyright Act if and only if the complaint is for a remedy expressly granted by the Act, asserts a claim requiring constructing of the Act, or, at the very least and perhaps more doubtfully, presents a case where a distinctive policy of the Act requires that federal principles control the disposition of the claim.

*Goodman v. Lee*, 815 F.2d 1030, 1031 (5th Cir. 1987) (cleaned up). Contrary to the Appellants' suggestion, nothing in *T.B. Harms* or *Goodman* casts doubt

on the conclusions reached by the district court. In fact, they support it. First, the ownership of rights claims presented in this appeal evidently "require construction" of the Copyright Act—specifically, Section 304(c) thereof.[58] Moreover, termination rights—and the second chance to control and benefit from a work provided by those rights—undoubtedly reflect a "distinctive policy" of the Copyright Act that requires domestic principles to control the determination of the Song's ownership. As noted in *Mills Music*:

> [T]he termination right was expressly intended to relieve authors of the consequences of ill-advised and unremunerative grants … That general purpose is plainly defined in the legislative history and, indeed, is fairly inferable from the text of § 304 itself.

*Mills Music, Inc.*, 469 U.S. at 172–73. Accordingly, even under the Appellants' own *T.B. Harms* construction, Mr. Vetter's termination should return all rights that "reflect a distinctive policy of the Act." The right to control and benefit from the copyright without interference following termination is clearly one of those distinctive policies. One can, therefore, legitimately view the phrase "arise under this title" as distinguishing between the ownership rights

---

[58] *Cf. Di Angelo Publications, Inc. v. Kelley*, 9 F.4th 256, 260–61 (5th Cir. 2021) (noting that even though claims of ownership in a copyright do not invariably arise under the Copyright Act, they clearly do when those claims "involve[] the application and interpretation of the copyright ownership provisions" therein).

inherent in or attendant to the copyright that were transferred by the author—and must be returned upon termination—and everything else.

B.   "Rights Arising Under Other Federal, State, or Foreign Laws" Do Not Include Copyright Rights.

Turning next to "everything else." The second part of the limitation in Section 304(c)(6)(E) provides that termination does not "affect[] rights arising under any other Federal, State, or foreign laws." This section demands a contextual analysis for the same reasons the first half of Section 304(c)(6)(E) does. Principally, the word "under" evades a uniform, consistent meaning and must draw meaning from its context. *Kirtsaeng*, 568 U.S. at 531. According to the Appellants, the "plain language of the statute compels the conclusion that Mr. Vetter's Termination Notice does not affect foreign rights."[59] But that is essentially where their textual analysis starts and ends. Despite a brief endorsement of a textualist approach, the Appellants quickly urge this Court towards extra-textual considerations. Specifically, in addition to academic literature, the Appellants parade a single statement **made in 1965** by the then-Register of Copyrights in a Supplementary Report to the House Judiciary Committee, which, admittedly, supports placing geographic

---

[59] Doc. 21, at 18.

restrictions on termination rights.[60] But this is far from being the "smoking gun" they portray it to be.

To begin with, "the Copyright Office has no authority to give opinions or define legal terms." *Bartok v. Boosey & Hawkes, Inc.*, 523 F.2d 941, 946 (2d Cir. 1975). Moreover, for those who find legislative history instructive, the committee report is generally regarded as the most persuasive evidence of congressional intent after the statutory text itself. *Demby v. Schweicker*, 671 F.2d 507, 510 (D.C.Cir.1981).[61] In that regard, although the 1976 House Report did not expand upon what "other laws" Congress had in mind, **never once** does it disclose or even suggest an appreciation by the Committee members that they intended termination rights to return a geographically feeble shell of the copyright that was initially transferred away by the author. Instead, it speaks of a need to "safeguard authors against unremunerative transfers caused by the unequal bargaining position of authors"[62]—a need which the Appellants' view leaves unmet.

---

[60] *Id.* at 18-19.

[61] *See also Ecee, Inc. v. FERC*, 645 F.2d 339, 359 (5th Cir. 1981) (stating that although the "Committee Report is useful and persuasive evidence of congressional intent, it is not conclusive.")

[62] 1976 House Report, *supra* note 3, at 124 (cleaned up).

But more to the point, "it is ultimately the provisions of [the] legislative commands rather than the principal concerns of our legislators by which we are governed." *Bostock v. Clayton Cnty., Georgia*, 590 U.S. 644, 674 (2020). For good reason. Legislative history is "generally of dubious value in statutory interpretation." *Deanda v. Becerra*, 96 F.4th 750, 763 (5th Cir. 2024). As noted by the Supreme Court:

> [L]egislative history in particular is vulnerable to two serious criticisms. First, legislative history is itself often murky, ambiguous, and contradictory. Judicial investigation of legislative history has a tendency to become an exercise in looking over a crowd and picking out your friends. Second, judicial reliance on legislative materials like committee reports, which are not themselves subject to the requirements of Article I, may give unrepresentative committee members—or, worse yet, unelected staffers and lobbyists—both the power and the incentive to attempt strategic manipulations of legislative history to secure results they were unable to achieve through the statutory text.

*Exxon Mobil Corp. v. Allapattah Servs., Inc.*, 545 U.S. 546, 568 (2005) (cleaned up). These vulnerabilities are especially relevant here. It has been observed that much of the legislative history in connection with the 1976 Act is not particularly reliable. *Stewart*, 495 U.S. at 226 (*citing* Jessica D. Litman,

*Copyright, Compromise, and Legislative History*, 72 Cornell L. Rev. 857, 868 (1987)). This is particularly true for termination rights because "there is no evidence whatsoever of what members of Congress believed the language to mean." *Id.* Although the Appellants declare that "Congress explicitly understood" the language in Section 304(c)(6)(E), they offer *no* evidence that a single member of Congress who voted on the 1976 Act did so with the 1965 Register of Copyrights statement in mind. As with all legislative reports, there is no reason to believe that the Register's remarks were "read (much less approved) by the Senate—or, indeed, by the Members of the House who were not on the Committee—or even, for that matter, by the members of the Committee." *See Samantar v. Yousuf*, 560 U.S. 305, 328 (2010) (Scalia, J., concurring).

Moreover, when it comes to legislative history, the Appellees have "friends in the crowd" too. The 1976 House Report states unequivocally and without qualification that, "[u]nder the bill, termination means that ownership of the ***rights covered by the terminated grant*** reverts to everyone who owns termination interests on the date the notice of termination was served."[63] Noting this text from the House Report, the district court concluded

---

[63] 1976 House Report, *supra* note 3, at 127.

that a "termination of a worldwide grant results in the recapture of worldwide rights; in other words, worldwide rights were covered by the terminated grant, so worldwide rights revert upon termination." ROA.280. But neither the district court's conclusion nor the Appellees' position on appeal rests on the legislative history alone. After all, legislative history should not be confused with the law. *Epic Sys. Corp. v. Lewis*, 584 U.S. 497, 523 (2018).

As previously stated, properly construed, the text of the limitation in Section 304(c)(6)(E) should be read to distinguish between, on the one hand, copyright ownership and the rights and privileges attendant thereto (without regard to geography), and, on the other hand, all *other* rights vested with the transferee in the initial assignment that come by way of "Federal, State, or foreign law." In addition to the 1976 House Report, *Kirtsaeng* supports this reading of the text because, as detailed below, it is simple, supports a traditional copyright objective, and makes word-by-word linguistic sense. *See Kirtsaeng*, 568 U.S. at 530. Further, this reading reflects a narrow interpretation of the Section 304(c)(6)(E) limitation that leaves the stated purpose of termination rights intact. *Cf. Fame Pub. Co. v. Alabama Custom Tape, Inc.*, 507 F.2d 667, 670 (5th Cir. 1975) (noting that an exception to rights afforded by the Copyright Act must be construed narrowly).

First, the Appellees' reading is simple. All rights under copyright law that the grantee received must be returned to the author through termination. There is no need for authors (or courts) to apprehend the intricacies and limitations of other countries' copyright laws to determine the geographical implications and effects of the initial transfer or the scope of the termination.

Second, it promotes traditional copyright objectives. Termination rights were and continue to be in furtherance of giving the ***author*** a second chance, not to give the industry intermediaries perpetual rewards. *See Classic Media, Inc. v. Mewborn*, 532 F.3d 978, 983 (9th Cir. 2008) (termination rights are meant to award the author, not the assignee). If the goal of Section 304(c) is to ameliorate the effect of unremunerative transfers, and the right returns to the author the ability to exploit the reverted work in only ***one*** of the 181 countries in the Berne Convention, Section 304(c) simply does not achieve that goal. Accepting the Appellants' interpretation would allow a scorned, absent, or merely dilatory grantee to prevent or purposefully block the author or the author's heirs from any exploitation opportunity that is not strictly confined to the United States. The very notion of the grantee retaining such an ability is entirely inconsistent with the goal of termination rights. *See Kirtsaeng*, 568 U.S. at 545 ("[A] copyright law that can work in practice only

- 55 -

First, the Appellees' reading is simple. All rights under copyright law that the grantee received must be returned to the author through termination. There is no need for authors (or courts) to apprehend the intricacies and limitations of other countries' copyright laws to determine the geographical implications and effects of the initial transfer or the scope of the termination.

Second, it promotes traditional copyright objectives. Termination rights were and continue to be in furtherance of giving the ***author*** a second chance, not to give the industry intermediaries perpetual rewards. *See Classic Media, Inc. v. Mewborn*, 532 F.3d 978, 983 (9th Cir. 2008) (termination rights are meant to award the author, not the assignee). If the goal of Section 304(c) is to ameliorate the effect of unremunerative transfers, and the right returns to the author the ability to exploit the reverted work in only ***one*** of the 181 countries in the Berne Convention, Section 304(c) simply does not achieve that goal. Accepting the Appellants' interpretation would allow a scorned, absent, or merely dilatory grantee to prevent or purposefully block the author or the author's heirs from any exploitation opportunity that is not strictly confined to the United States. The very notion of the grantee retaining such an ability is entirely inconsistent with the goal of termination rights. *See Kirtsaeng*, 568 U.S. at 545 ("[A] copyright law that can work in practice only

if unenforced is not a sound copyright law."). Moreover, completely removing the grantee from decisions regarding the author's recaptured right to exploit the work enhances the predictability and certainty of copyright ownership—a major goal of the 1976 Act. *See Cmty. for Creative Non-Violence v. Reid*, 490 U.S. 730, 749 (1989).

Third, the district court's reading of the statute makes word-by-word linguistic sense. As stated in *Kirtsaeng*, the phrase "copyright owner under this title" as used in Section 106 of the 1976 Act has no geographical implications. *Kirtsaeng*, 568 U.S. at 537–38. Further, a "transfer of copyright ownership" is defined in Section 101 of the 1976 Act as being without regard to "place of effect."[64] Therefore, a termination of a "transfer of copyright ownership" should be equally regarded as being non-geographical and without regard to place of effect. Additionally, a non-geographic reading gives meaning to every word in the sentence.[65] By contrast, if, as the Appellants urge, rights that "arise under this title" means only the rights "arising under title 17 [of] the United States Code,"[66] what need would there be to include

---

[64] 17 U.S.C. § 101.

[65] Without question, courts should disfavor interpretations of statutes that render any part of the language superfluous. *Connecticut Nat. Bank v. Germain*, 503 U.S. 249, 253 (1992).

[66] Doc. 21, at 39

the qualification that all rights under "other Federal, State, and foreign laws" remain unaffected? In other words, under the Appellants' reading, the phrase "arise under this title" already tells one all that needs to be known about the rights that revert. Any right that is not specifically enumerated in the 1976 Act would be inherently excluded from the scope. There is no need to qualify further. But, of course, Congress **did** provide further qualification, making the Appellants' interpretation difficult to defend. Moreover, the word "other" appearing before "Federal, State, and foreign laws," makes clear that none of the foregoing should be given unqualified breadth. To do so would ignore the "ordinary understanding of how adjectives work." *See Weyerhaeuser Co. v. U.S. Fish & Wildlife Serv.*, 139 S. Ct. 361, 368 (2018). "Adjectives modify nouns— they pick out a subset of a category that possesses a certain quality." *Id.* When a modifier such as "other" precedes a list of nouns separated by commas, it is presumed that the modifier applies to them all.[67] When "other" applies to the entire series, the district court's reading of the limitation as a distinction between categories of "rights" (e.g., copyright and contract rights) [68] rather

---

[67] *See* Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* § 19, at 147 (2012) (observing the "series-qualifier canon").

[68] *See, e.g.*, *Walthal v. Rusk*, 172 F.3d 481, 485 (7th Cir. 1999) (common law contract rights unaffected); *Capture Eleven LLC v. Otter Prod., LLC*, 2022 WL 5192763, at *2 (D. Colo. Oct. 5, 2022) (same); *Hackett v. Feeney*, 2011 WL 4007531, at *9 n.3 (D. Nev. Sept. 8, 2011) (same).

than territories makes solid linguistic sense. By contrast, if, as the Appellants argue, "foreign law" is a reference to copyright rights or protections in foreign territories, the grouping does not represent a subset of rights that possess a certain quality. In other words, there are no "other" Federal copyrights to exclude from termination, and any "State" law copyrights would be outside of the scope of the Copyright Act by definition. As such, in addition to its other flaws, the Appellants' reading of Section 304(c)(6)(E) is at odds with grammatical reality.

Significantly, no part of this exercise in statutory construction was addressed in *Siegel v. Warner Bros. Entertainment, Inc.*[69] which provides the principal support for the Appellants' position in this appeal. *Siegel* and the line of cases it birthed[70] view the limitation in Section 304(c)(6)(E) as a geographic restriction that precludes the author or the author's heirs from ever recapturing the right to exploit the author's work outside of the United States.[71] The district court in *Siegel* was convinced that "under this title"

---

[69] 542 F. Supp. 2d 1098 (C.D. Cal. 2008).

[70] *See, e.g., Clancy v. Jack Ryan Enterprises, Ltd.*, 2021 WL 488683 (D. Md. Feb. 10, 2021). The district court in *Clancy* relied exclusively on *Siegel* without any broader considerations. *Clancy*, 2021 WL 488683 at *46.

[71] Notably, the district court's opinion in *Seigel* is largely devoid of citation to judicial authority on this point. Instead, the district court relied exclusively on the opinions of two highly respected copyright scholars, Professors Nimmer and Patry. Of course, while the

inherently limited the geographic scope of the rights returned to those specifically enumerated in the Copyright Act. *Siegel*, 542 F. Supp. 2d at 1140. Suffice it to say, that the interpretation of "under this title" in *Siegel* is entirely inconsistent with the Supreme Court's decision in *Kirtsaeng* five years later. Additionally, the district court in *Siegel* viewed the "right to exploit the work abroad" as being governed by copyright laws of foreign nations. *Id.* Yet, the right to exploit a work is inherent to the owner of the copyright. In view of *Itar-Tass* and its progeny, ownership of a domestic copyright is governed, not by the laws of a foreign nation, but by the laws of the United States.[72]

The *Siegel* decision makes other interpretive mistakes as well. For example, the district court stated:

> If Congress contemplated the ability to attach or otherwise force the accounting of foreign profits to which the original grantee or its successors are legally entitled under the copyright laws of other nations

---

credentials of Professors Nimmer and Patry are unassailable, their opinions are not. *See, e.g., Milne ex rel. Coyne v. Stephen Slesinger, Inc.*, 430 F.3d 1036, 1047 (9th Cir. 2005); *Itar-Tass Russian News Agency*, 153 F.3d at 89; *Mapp v. UMG Recordings, Inc.*, 208 F. Supp. 3d 776, 793–94 (M.D. La. 2016); *McClatchey v. Associated Press*, 2007 WL 1720080, at *1 (W.D. Pa. June 8, 2007); *Bouchat v. Champion Prod., Inc.*, 327 F. Supp. 2d 537, 553 (D. Md. 2003); *Bridgeman Art Library v. Corel Corp.*, 36 F. Supp. 2d 191, 193 (S.D.N.Y. 1999).

[72] To make matters worse, in discussing what is unaffected by termination, the district court omitted the word "other" from the "other Federal, State, and foreign rights" grouping. *Siegel*, 542 F. Supp. 2d at 1140. As previously mentioned, this omission changes the entire meaning of the limitation by giving "foreign laws" unqualified breadth. For these reasons alone, *Siegel* stands on obviously shaky ground.

through the backdoor of applying state law tenant in
common principles, one would have expected such an
intention to have been made expressly.

*Id.* This passage can be criticized on multiple grounds. Most objectionably,

however, given that Section 304(c)(6)(E) is a limitation on an otherwise

broadly applicable termination right, it should have been construed more

narrowly so as to not frustrate the purpose of such right. *Fame Pub. Co.* 507

F.2d at 670.[73] The unquestioned purpose of termination rights is to "relieve

authors of the consequences of ill-advised and unremunerative grants that

had been made before the author had a fair opportunity to appreciate the true

value of his work product." *Mills Music*, 469 U.S. at 172–73. Yet, the sweeping

geographic interpretation of Section 304(c)(6)(E) adopted by *Siegel* and

urged here by the Appellants' and their Amici would significantly burden and

frustrate the Appellees' full enjoyment of the recaptured rights.[74]

---

[73] *See also Tasini v. N.Y. Times Co.*, 206 F.3d 161, 168 (2d Cir. 2000) (noting that where the Copyright Act sets forth exceptions to a general rule, the exceptions should be construed narrowly in order to preserve the primary operation of the provision.)

[74] Lastly, it is not surprising that a district court within the Ninth Circuit viewed this matter through an "extraterritorial" lens. Indeed, prior to the Supreme Court's decision in *Kirtsaeng*, the Second and Ninth Circuits interpreted the ordinary meaning of the phrase "under this title" to naturally restrict geographic scope when used in the 1976 Act. *See Kirtsaeng*, 568 U.S. at 528. This likely explains why the Second Circuit has also stated (in dicta) that exercising termination rights only results in a return of the "domestic copyright interests." *Fred Ahlert Music Corp. v. Warner/Chappell Music, Inc.*, 155 F.3d 17, 18 (2d Cir. 1998). Given that these decisions predate *Kirtsaeng* and are from the Circuits that "lost"

This leads to one last interpretive canon of construction that is relevant here. That is, any interpretation of a statute that would lead to absurd results should be discarded. *See Griffin v. Oceanic Contractors, Inc.*, 458 U.S. 564, 575 (1982). The *Seigel* interpretation urged by the Appellants and their Amici would do just that. For example, the Congressional guardrails around the creation of new derivative works following termination[75] would be paper thin; the Appellants would be free to make or authorize the creation of as many new derivative versions of the Song as they want in any or all of the other 180 countries in the Berne Convention. Copies of these derivatives could be legally sold by the Appellants' or their affiliates overseas and redistributed within the United States without the Appellees' consent or control. Additionally, if the Appellants are correct, they could cripple (out of spite or otherwise) the Appellees' ability to exploit the Song by denying any use that cannot be strictly geo-locked to the United States, such as the worldwide "synchronization" license that led to this dispute. ROA.248. Or the Appellants could use their retained rights to simply hold the Appellees financially hostage, effectively stripping termination rights of their most

_____

in that case, they would seem to have little persuasive value to support the Appellants' argument here.

[75] *See* 17 U.S.C. §§ 203(b)(1), 304(c)(6)(A).

fundamental intent. For example, demanding 99.5% of the revenue generated by a worldwide use of the Song on the grounds that the Appellees should only receive 1/181st of the monies paid. Even worse, the Appellants could actually *sue the Appellees* for simply posting the Song on YouTube or some other digital channel that may be accessible outside the United States—meaning that, under the Appellants' interpretation, Congress drafted the termination statute in a way that defeats its own purpose and allows it to be used as a sword against the very group it was meant to protect.[76]

Under the Appellants' view of termination rights, in order to prevent these absurd results, Mr. Vetter and Mr. Smith would have had to be experts in foreign copyright law in order to mitigate the effects of their Assignment in 1963. Likewise, authors today would need to be aware of the copyright laws of 181 other countries and a handful of international treaties just to appreciate the extent of termination rights on their future interests. This is an unreasonable expectation, and it fails to align with Congress's intent to relieve authors of the consequences of agreements divesting them of their rights. On this basis alone, the district court was justified in declining to follow the reasoning of *Seigel* to these illogical and absurd results.

---

[76] These same absurdities are produced under the Appellants' view of renewal rights.

C.  The *Itar-Tass* Framework Should Apply to All Ownership Disputes, Including Those Involving Assignments.

As previously mentioned, had the *Seigel* court analyzed the issues there under *Itar-Tass*, it seems the result would have been very different. Unsurprisingly, the Appellants and their Amici resist the force of *Itar-Tass*, labeling it inapplicable and relegating it to a footnote.[77] Specifically, they argue that *Itar-Tass* applies to **initial** ownership questions only.[78] Further, because the current dispute does not involve initial ownership, the Appellants say *Itar-Tass* has no place here. While it is true that the *Itar-Tass* opinion considers only initial ownership,[79] there are certainly examples of courts applying the *Itar-Tass* framework to answer questions regarding copyright licenses and ownership through assignment using the laws of the country with the most significant relationship to the work concerned.

For example, in *Corbello*, the court assessed the validity of a license by using principles of common law property ownership. "[A] license in copyright is an analogous usufructory interest in intellectual property. The determination of such a property interest is properly determined under the

---

[77] Doc. 21, at 33, n.12; Doc. 33, at 21, n.2.

[78] *Id.*

[79] *Itar-Tass Russian News Agency,* 153 F.3d at 91, n.11.

law of the place ***where the interest arose***. Here, that place is the United States." *Corbello*, 844 F. Supp. 2d at 1157 (emphasis added).

Closer to home, in *Mapp v. UMG Recordings, Inc.*, the district court refused to apply foreign law to the license of a domestic copyright. 208 F. Supp. 3d 776 (M.D. La. 2016).[80] In *Mapp*, the plaintiff was a co-author of a domestic work who had not consented to a license agreed to by another co-author. The plaintiff did not dispute that, in the United States, a co-owner may grant a non-exclusive license to a third party without the consent of other co-owners. Instead, he insisted that the validity of the license for use of the work outside of the United States should be governed by the laws of the foreign countries concerned. *Id.* at 793. Further, the plaintiff argued that, under the law of foreign jurisdictions, a license would not be valid unless all joint owners are party to it. *Id.* The district court declined to apply foreign law to the domestic license. *Id.* While this opinion did not explicitly cite *Itar-Tass*, it can be fairly read as rejecting the use of foreign law to resolve a domestic dispute regarding the right to exploit a domestic copyright internationally, even when that dispute does not involve initial ownership.

---

[80] *Order vacated in part on other grounds*, 2017 WL 3675419 (M.D. La. May 3, 2017).

Most relevant here, however, is the district court opinion in *Creazioni Artistiche Musicali, S.r.l. v. Carlin Am., Inc.*[81] In *Creazioni* the district court was tasked with resolving antecedent questions of copyright ownership regarding an Italian work allegedly infringed in the United States. 2016 WL 7507757 at *3. In 1966, the plaintiff entered into a written agreement with the Italian composer, Piero Umiliani, which transferred "all rights to use the music that [Umiliani] composed, from the time of its creation to [Plaintiff] for the entire world." *Creazioni Artistiche Musicali, S.r.l.*, 2016 WL 7507757, at *1. The parties disputed the scope of Umiliani's transfer, so the question became, whether Italian or United States law should determine the existence and contours of the ownership by assignment. The district court employed an approach that, like the Second Circuit in *Itar-Tass*, relied heavily on the Second Restatement of Conflicts of Law. The district court observed that determining the country with the "most significant relationship" to the copyright with respect to "issues of assignment would appear to be more analogous to ownership than infringement." *Id*. Nevertheless, to identify the country with the "most significant relationship," the court took guidance from Section 188 of the Second Restatement on Conflicts of Laws, which provides

---

[81] 2016 WL 7507757 (S.D.N.Y. Dec. 30, 2016), *aff'd*, 747 F. App'x 3 (2d Cir. 2018).

that "the rights and duties of the parties with respect to an issue in contract are determined by the local law of the state which, with respect to that issue, has the most significant relationship to the transaction and the parties."[82] In the absence of an effective choice of law by the parties, the Restatement provides the following five contacts to be taken into account:

> (1) the place of contracting, (2) the place of negotiation of the contract, (3) the place of performance, (4) the location of the subject matter of the contract, as well as (5) the domicile, residence, nationality, place of incorporation and place of business of the parties.[83]

The court noted that these factors help ensure the "protection of the justified expectations of the parties with respect to conflicts involving property and the legal consequences that ensue from a given transaction." *Creazioni Artistiche Musicali, S.r.l.*, 2016 WL 7507757, at *4 (cleaned up). Applying these factors, the court noted that Italy was the place of contracting, where the subject work was created, where all parties to the assignment were domiciled, and where all parties had consented to jurisdiction for any dispute arising between them

---

[82] Restatement (Second) Conflicts of Laws § 188 (1971).

[83] *Id.*

under the assignment. *Id.* Accordingly, the court concluded that Italian law would govern the assignment on issues of copyright ownership. *Id.* at *5.

Here, taking those factors into account with respect to the Assignment, the result is obvious: (1) the place of contracting is the United States, (2) the place of negation is the United States, (3) the place of performance is the United States, (4) the location of the subject matter (i.e., the Song) is the United States, and (5) the domicile of the parties is the United States. If that were not enough, the parties expressly selected New York law to govern the Assignment. There can be no debate as to whether the United States has the "most significant relationship" to the Assignment and the parties thereto. Clearly, it does. On this basis, it seems odd to argue, as the Appellants do, that American copyright law and the termination rights it provides should be ignored in the ownership dispute between the parties.

Of course, in reality, the wholehearted embrace of *Itar-Tass* for initial ownership by the Appellants' amici is nakedly transparent. Industry intermediaries in the United States rely on the Copyright Act's work-made-for-hire provisions to vest them with initial ownership. Among other reasons, if a work is "made for hire," the termination provisions at issue here simply do not apply. *See* 17 U.S.C. §§ 203(a), 304(c). Moreover, outside of the United

States, the laws greatly restrict the ability of an industry intermediary to strip authorship from the creator using "work made for hire" principles. For example, "[c]ivil law countries generally start from the premise that copyright in works created in the course of employment vests in the employee-author, rather than in the employer, so that a transfer from the employee will be required for the employer to obtain copyright."[84] If courts in the United States were to apply foreign initial ownership laws to domestic "works made for hire," the results would be intensely destabilizing for industry intermediaries who rely on predictability and certainty of copyright ownership in the global exploitation of creative works. *See Cmty. for Creative Non-Violence*, 490 U.S. at 749. This result is avoided by applying domestic laws to initial ownership of domestic works. Yet, the Appellants and their Amici seek to impose on *authors* what is—for all practical purposes—insurmountable uncertainty on ownership following termination by making unprincipled distinctions regarding the applicability of *Itar-Tass*. In their view, following termination of a transfer, authors must bring legal action in 180 different foreign countries simply to resolve the question of recognition of the termination in a given

---

[84] Goldstein & Hugehholtz, *International Copyright: Principles, Law, and Practice* 236 (2019); *see also Itar-Tass Russian News Agency*, 153 F.3d at 85 (noting differences between United States and Russian laws on work-for-hire issues).

sovereign. That cannot be what Congress had in mind when seeking to relieve authors of the consequences of ill-advised and unremunerative transfers. By contrast, the Appellees' view, which the district court shared, presents a far simpler proposition: whether by way of initial vesting or assignment, renewal, transfer, or termination of transfer, questions of ownership should be answered in accordance with the principles reflected in *Itar-Tass* and its progeny. Applied here, questions regarding the present "ownership and essential nature" of the Song's copyright must be determined by the laws of the United States, where the copyright is held. *Canadian Standards Ass'n.*, 112 F.4th at 303.

> D.     <u>Returning *All* Rights in the Song to Mr. Vetter Does Not Offend the Presumption Against Extraterritoriality.</u>

Under the *Itar-Tass* framework, the district court's Judgment does not risk "international discord" even though it declares the Appellees the sole owners of the Song throughout the world. But this Court need not rely solely on *Itar-Tass* to reach this conclusion. To begin, there is a strong argument that termination rights, properly construed in view of common law analogs,[85]

---

[85] Restatement (First) of Property §§ 154 (discussing "reverter"), 155 (discussing "power of termination") (1936).

reflect a geographically neutral right similar to the common law doctrine of exhaustion in *Kirtsaeng*. Moreover, given that geographically limiting the scope of termination rights would greatly impair the Congressionally protected interests of American authors, the presumption should yield. *See Environmental Defense Fund, Inc. v. Massey*, 986 F.2d 528, 531 (D.C. Cir. 1993) ("[T]he presumption is generally not applied where the failure to extend the scope of the statute to a foreign setting will result in adverse effects within the United States."). However, even if the presumption applies, for the same reasons articulated with respect to renewal rights, application of the termination provisions to the current ownership dispute is a permissible domestic application of the statute.[86] The focus of the statute is to protect and vindicate authors. Here, the parties, activities, conduct, and interests relevant to that focus all occurred or exist in the United States.

Importantly, given this broad focus, one can at least entertain the Appellants' multiplicity of copyrights theory and nevertheless reach the district court's conclusion as to the scope of the rights returned to Mr. Vetter. That is to say, even if there are 181 different copyrights in the Song, given that termination rights reflect a "distinct policy" of the 1976 Act "to protect

---

[86] *See supra* at 40-41.

authors, given their unequal bargaining posture," *Walthal v. Rusk*, 1998 WL 42469, at *4 (N.D. Ill. Jan. 28, 1998), the district court was free to impose that policy against the Appellants without regard to whether a foreign court would do the same. Indeed, because of the prohibition on copyright formalities, even assuming (as the Appellants argue) that the district court effectively adjudicated ownership over the "foreign copyrights" in the Song, such adjudication does not call any "act of state" into question. *See London Film Prods. Ltd.*, 580 F. Supp. at 49. Moreover, because of the ordinary jurisdictional limits of the district court's authority, there is no danger that foreign courts will be forced to accept the Judgment nor that the Judgment would create "an unseemly conflict with the judgment of another country." *Id.* To state the obvious, a foreign court is as free today as it ever was to reject the district court's legal conclusions on the nature of international copyright and the effect of renewal and termination rights within their respective sovereign jurisdictions. The reality is, whether one copyright or many, the interests at stake here are purely domestic: an American citizen's right to claim ownership of copyright from an American jurisdiction. This is an entirely domestic question. The district court correctly declared that the Appellees have that right. No more, no less.

The basic debate between the parties around the termination provisions of the 1976 Act can be boiled down to this: given two reasonable interpretations of the termination provisions in the 1976 Act, should those provisions be construed to the aid of authors, as the group expressly favored by the provisions? *See Mills Music, Inc.*, 469 U.S. at 172 ("The principal purpose of [termination rights is] to provide added benefits to authors."). Or should they be construed in favor of industry intermediaries, who have always been expressly disfavored by recapture rights? *See Korman v. HBC Fla., Inc.*, 182 F.3d 1291, 1296 (11th Cir. 1999) ("[T]he purpose of [termination rights is] to help authors, not publishers or broadcasters or others who benefit from the work of authors."). Words in a statute should be construed to further, rather than frustrate, the legislative intent or purpose. *Bartok*, 523 F.2d at 947. In that regard, the district court's reading of those provisions is eminently reasonable. It should be affirmed, "lest the exception destroy, rather than prove, the rule." *Fame Pub. Co.*, 507 F.2d at 670.

## IV. THE DISTRICT COURT'S JUDGMENT DOES NOT VIOLATE INTERNATIONAL TREATIES.

Lastly, the Appellants make two related last-ditch arguments regarding the international impact of the district court's Judgment. First, along with

their Amici, the Appellants decry the potential for "market chaos" from the result below.[87] This Court need not dwell long on this issue, since statutory construction clearly cannot turn on industry customs derived from the industry's own self-interested interpretation.[88] But it is worth noting that these exact cries have been heard before and the market "chaos" portended clearly did not come to pass.[89] There are certainly reasonable arguments to be made in favor of the Appellants' position in this appeal. "We've always done it this way," "no one has challenged this practice before," and similar "calf-path"[90] arguments, however, should be given no deference. Second, the Appellants hypothesize about fact patterns and legal issues not presented in this appeal to conclude that the district court's Judgement violates the "national treatment" obligations owed by the United States to foreign authors

---

[87] *See* Doc. 21, at 31; Doc 33, at 10-11; Doc. 37, at 32-37

[88] The fact that Section 304(c)(6)(E) has been long viewed by some as restricted in geographic effect is of no great moment. *Kirtsaeng* itself noted that federal courts had been interpreting Section 109 to have a geographic restriction for nearly 30 years prior. *Kirtsaeng*, 568 U.S. at 543.

[89] *See* Brief for The Motion Picture Association of America, Inc. and the Recording Industry Association of America, *supra* note 27; Brief for The Recording Industry Association of America *et al.* as Amici Curiae in Support of Respondent, *Quality King Distributors, Inc. v. L'Anza Intern., Inc.*, 1997 WL 588827.

[90] S.W. Foss, The Calf-Path, in *Poems by S.W. Foss* 47 (1895), *available at* https://poets.org/poem/calf-path.

under the Berne Convention.[91] As was the case in the district court, the Appellees continue to view these issues as nonjusticiable pondering. Nevertheless, for the sake of completeness, the Appellees will address the Appellants' national treatment "chaos" argument head-on.

The principle of national treatment is the central thrust of multilateral treaties, including the Berne Convention. *Subafilms, Ltd. v. MGM-Pathe Commc'ns Co.*, 24 F.3d 1088, 1097 (9th Cir. 1994). Pursuant to this principle, "[m]embers of the Berne Union agree to treat authors from other member countries as well as they treat their own." *Golan*, 565 U.S. at 308. The Appellants and their amici broadly speculate that accepting the plaintiffs' position would mean that works of foreign origin are ineligible for recapture through termination.[92] This, according to the Appellants, places the United States in violation of its Berne Convention obligation to treat domestic and foreign authors alike.[93]

As an initial matter, it is ironic that the Appellants and their Amici ask this Court to reject the district court's interpretation of United States copyright law—an interpretation that *greatly* benefits American authors—out

---

[91] Doc. 21, at 34-41.
[92] Doc. 21, at 40, Doc. 33, at 23, Doc. 37, at 37
[93] *Id.*

of an ostensible concern for foreign authors. After all, the United States Congress does not generally legislate for the benefit of foreign nationals, especially at the expense of Americans. But in any case, the prevailing view of national treatment "simply assures that if the law of the country of infringement applies to the scope of substantive copyright protection, that law will be applied uniformly to foreign and domestic authors." *Itar-Tass Russian News Agency*, 153 F.3d at 89. Given that renewal and termination rights do not pertain to the *scope* of protection, but rather *who* is entitled to enforce that protection, it is not at all clear that national treatment obligations are even relevant to the issues in this appeal. If nothing else, *Itar-Tass* and its progeny make clear that a United States court has full authority to determine who the owner of a foreign copyright is for purposes of enforcement standing in the United States.[94] In other words, in an infringement action concerning a foreign copyright, a court with proper jurisdiction can freely decide who should receive the protections of the Copyright Act without ever implicating national treatment concerns. *Itar-Tass Russian News Agency*, 153 F.3d at 90, n.8. ("Whether U.S. copyright law directs U.S. courts to look to foreign or

---

[94] 17 U.S.C. § 501 ("The legal or beneficial owner of an exclusive right under a copyright is entitled to institute an action for any infringement of that particular right committed while he or she is the owner of it.") (cleaned up).

domestic law as to certain issues is irrelevant to national treatment, so long as the scope of protection would be extended equally to foreign and domestic authors.").

That said, contrary to the Appellants' supposition, the Appellees' position and the district court's statutory interpretation do nothing to inherently exclude foreign authors from United States renewal or termination rights. The Second Circuit's decision in *Corcovado Music Corp. v. Hollis Music, Inc.* may offer a preview of how future courts might address these issues. 981 F.2d 679 (2d Cir. 1993). *Corvocado* involved a dispute as to the right to exploit a Brazilian work within the United States. The Second Circuit affirmed the Brazilian author's renewal rights within the United States even though no such rights existed for the work under Brazilian law. The court did so not because of any national treatment obligations, but because "United States renewal copyrights reflect a vital policy of United States copyright law." *Id.* at 685. That policy—to provide authors a second opportunity to obtain remuneration for their works—is equally reflected in the 1976 Act's termination provisions. Given this, there is no obvious basis to conclude that the Judgment will impair the future recognition of renewal and termination rights for foreign authors in the United States.

But even if a foreign author's termination rights are recognized within the United States, that author might still face contractual consequences outside of the United States if the original transfer is governed by foreign law.[95] Those consequences, unfortunate as they may be, are beyond the reach of United States law to address. [96] To the extent that foreign authors desire to have worldwide, consequence-free termination rights, that is a matter for them to address through their own legislative process, not the United States Congress. Here, Mr. Vetter is a United States citizen who assigned his United States copyright to a United States corporation pursuant to an agreement governed by United States law. In this light, questions regarding the scope of national treatment owed to foreign authors are simply a nonjusticiable distraction, more appropriately reserved for future resolution.

---

[95] For example, the musical group Duran Duran was recently found by an English court to be in breach of their English publishing contract following their attempted invocation of United States termination rights. *See Gloucester Place Music Ltd. v. Le Bon* (2016) EWHC (Ch) 3091 (Eng).

[96] The Appellants' citation to the *Charming Betsy* principle is simply a sideshow. The principle of "international comity" reflected in *Charming Betsy* is a separate consideration from the presumption against extraterritoriality. *In re Maxwell Commc'n Corp.*, 93 F.3d 1036, 1047 (2d Cir. 1996). The invocation of *Charming Betsy* is all the more bizarre given that providing foreign authors with recapture rights in the United States—the rights the Appellants ostensibly desire to protect—is the true affront to foreign laws that do not provide any such recapture rights.

Lastly, the Appellants claim that the district court's Judgment has granted domestic authors greater rights in foreign countries than the native authors of those countries are entitled to receive under their own domestic laws.[97] As previously noted, a foreign court is under no obligation to reach the same result as the district court. Nor is there any evidence that the Judgment in any way violates the natural, ordinary limits of the district court's jurisdiction. Simply put, the district court had personal jurisdiction over the Appellants and subject matter jurisdiction over the controversy. As such, the district court was free to decide what the "law" is as it relates to the Appellants' ability to assert adverse ownership claims in its jurisdiction.

* * *

## CONCLUSION

As this Court no doubt appreciates, the issues presented in this case are of vital importance to Mr. Vetter, but also to all American authors and their heirs who deserve the full protection and relief afforded by recapture rights and a *true* second chance to control the fruits of their intellectual labor. If this Court were to reverse the district court's well-reasoned decision, the adverse impacts and absurd results to be inflicted on the Appellees (and the creative

---

[97] Doc. 21, at 40-41

class generally—those on which the copyright industries rely) are easy to imagine. The only true way to achieve the intended purpose of renewal and termination rights is to ensure that authors like Mr. Smith and Mr. Vetter are able to recapture *exactly* what they signed away. Nothing less. That is what the district court did for the Appellees in this case. Such a result is not only just, but is, in fact, squarely consistent with the fundamental purpose of renewal and termination rights. Accordingly, the Appellees respectfully request that this Court affirm the district court's Judgment on all claims.

Respectfully submitted,

/s/ Timothy R.W. Kappel
Timothy R.W. Kappel
**WELLS & KAPPEL LLP**
1615 Poydras Street, Suite 900
New Orleans, Louisiana 70112
(504) 905-2012
tkappel@wellskappel.com

*Counsel for Plaintiffs – Appellees*

## CERTIFICATE OF SERVICE

I hereby certify that on June 12, 2025, a copy of the foregoing was filed electronically with the Clerk of Court using the CM/ECF system. Notice of this filing will be served upon all counsel of record by operation of the Court's electronic filing system.

/s/ Timothy R.W. Kappel

## CERTIFICATE OF COMPLIANCE

I hereby certify that that the Appellees' principal brief complies with the type-volume limitations in Rule 29(a)(5) of the Federal Rules of Appellate Procedure because, excluding the parts of the document exempted by Rule 32(f), and Fifth Circuit Rule 32.1, this brief contains 17,591 words, which although in excess of the amount allowed for a party's principal brief under Rule 32(a)(7)(B)(i), is less than the number of words authorized by the Clerk's Order of June 3, 2025 (Doc. 58).

I hereby further certify that this brief complies with the typeface requirements of Rule 32(a)(5) of the Federal Rules of Appellate Procedure and Fifth Circuit Rule 32.1 and the type-style requirements of Rule 32(a)(6), because this brief has been prepared in a proportionally spaced 14-point Charter typeface in Microsoft Word.

/s/ Timothy R.W. Kappel