# United States Court of Appeals for the Fifth Circuit

❖◀━━◖❙◗━━▶❖

CYRIL VETTER and VETTER COMMUNICATIONS CORPORATION

*Plaintiffs-Appellees,*

*v.*

ROBERT RESNIK and RESNIK MUSIC GROUP

*Defendants-Appellants*

_____

On Appeal from the United States District Court
for the Middle District of Louisiana
No. 23-1369-Sdd-Ewd
Hon. Shelly D. Dick

BRIEF OF *AMICI CURIAE* ARTIST RIGHTS INSTITUTE, ABBY NORTH,

BLAKE MORGAN AND ANGELA ROSE WHITE IN SUPPORT OF APPELLEES

CHRISTIAN L. CASTLE
 *Counsel of Record*
9600 Great Hills Trail, Suite 150W
Austin, Texas 78759
Telephone: +1 (512) 502-3070
Facsimile: +1 (512) 519-2529
email: clclaw@christiancastle.com

*Counsel for Amici Curiae Artist Rights Institute,
Abby North, Blake Morgan and Angela Rose White*

CERTIFICATE OF INTERESTED PERSONS

*No. 25-30108, Vetter v. Resnik*

The undersigned counsel of record certifies that, in addition to the persons and entities identified in Appellees' Certificate of Interested Persons, the following listed persons and entities as described in the fourth sentence of Fifth Circuit Rule 28.2.1 have an interest in the outcome of this case. However, none of the following listed persons and entities or their counsel have any direct financial interest in the outcome of this case. Their interest is in the legal principles governing authors' rights under the Copyright Act.

These representations are made in order that the judges of this Court may

evaluate possible disqualification or recusal.

| Artist Rights Institute | David C. Lowery |
|---|---|
| Nikki L. Rowling | North Music Group LLC |
| Blake Morgan | Abby North |
| Angela Rose White | Counsel for *Amici Curiae*, \| Christian L. Castle |

/s/ *Christian L. Castle*

Christian L. Castle
9600 Great Hills Trail, Suite 150W
Austin, Texas 78759
Telephone: (512) 502-3070
Facsimile: (512) 519-2529

*Counsel for Amici Curiae Artist Rights Institute,
Abby North, Blake Morgan and Angela Rose White*

# TABLE OF CONTENTS

CERTIFICATE OF INTERESTED PERSONS ........................................... i

TABLE OF CONTENTS.. ......................................................................... iii

TABLE OF AUTHORITIES…………………………………….......iv

I.        INTEREST OF *AMICI CURIAE* .......................................................1

II.       INTRODUCTION ..........................................................................4

III.      ARGUMENT ................................................................................10

   A.     Congress's corrective reforms in the 1976 Act—aimed at protecting songwriters and authors—were soon blunted by post-enactment industry practices. ...................................................................................10

      1.    The Controlled Compositions Clawback.........................................12

      2.    The Work Made for Hire "Technical Amendment" and Repeal Launches the Artist Rights Movement ...................................................15

      3.    The Frozen Mechanicals Clawback...................................................16

   B.    The Music Publishing Industry Routinely Accommodates Contractual Transfers of Foreign Rights ...............................................................19

      1.    Rights Transfers are a routine feature of rights management that the publishing industry is well-equipped to handle. .....................................19

      2.    The District Court's holding is consistent with established industry norms regarding administration of contractual rights. ...........................20

   C.     Excluding Foreign Rights from Termination Is Contrary to Congressional Intent ...............................................................................21

      1.    Neither Congress nor the Copyright Office give any guidance supporting the imposition of a "springing" statutory split-territory termination. ............................................................................................21

      2.    Industry Acquisition Agreements Already Contemplate Termination Risk and Can Be Structured Accordingly ...............................................23

IV.      CONCLUSION ...........................................................................24

CERTIFICATE OF COMPLIANCE ...........................................................27

CERTIFICATE OF SERVICE ...................................................................28

# TABLE OF AUTHORITIES

**Cases**

*FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120 (2000) ............21

*Marvel Characters, Inc. v. Simon,* 310 F.3d 280 (2d Cir. 2002) ...................5

*McCartney v. Sony/ATV Music Publ'g LLC*, No. 17-cv-363 (S.D.N.Y. Jan. 18, 2017) ...............................................................................................8

**Statutes**

17 U.S.C. § 115(c)(1) ...................................................................................14

17 U.S.C. § 203(a)(5) ....................................................................................9

17 U.S.C. § 801(b)(7)(A) .............................................................................19

17 U.S.C. §§ 101–810 (2024) ..................................................11, 17, 24, 26

17 U.S.C. §101 .............................................................................................16

17 U.S.C. §203 ......................................................................................5, 6, 11

17 U.S.C. §304 ......................................................................................5, 6, 11

1976 Act 17 U.S.C. §115(c)(2). ...................................................................13

Copyright Act of 1909 § 1(e), Pub. L. No. 60-349, 35 Stat. 1075, 1075–76 (1909) (repealed 1976). .............................................................................13

Copyright Act of 1976, Pub. L. No. 94-553, 90 Stat. 2541 .................. passim

Intellectual Property and Communications Omnibus Reform Act of 1999 Pub. L. No. 106–113, Title I, § 1011(d), 113 Stat. 1501A–521 (1999) .....16

Music Modernization Act, Pub. L. No. 115-264, 132 Stat. 3676 (2018) ...25

Work Made for Hire and Copyright Corrections Act of 2000 (Public Law 106-379) ...............................................................................................17

**Other Authorities**

Copyright Royalty Board, Determination of Royalty Rates and Terms for Making and Distributing Phonorecords (Phonorecords IV), Docket No. 21-CRB-0001-PR, 87 Fed. Reg. 33093 (proposed June 1, 2022); 87 Fed. Reg. 78320 (final Dec. 30, 2022; corrected Mar. 18, 2024). ......................13

Determination of Royalty Rates and Terms for Making and Distributing Phonorecords (Phonorecords IV), 87 Fed. Reg. 76,937 (Dec. 16, 2022) ..18

Donald Passman, *All You Need to Know About the Music Business* ..7, 13, 20

Graham Greene, *Our Man in Havana* ........................................................3, 4

H.R. REP. NO. 94-1476 (1976) ....................................................5

International Confederation of Societies of Authors and Composers (CISAC), Common Works Registration (CWR) .......................................20

International Confederation of Societies of Authors and Composers (CISAC), ISWC – The International Standard Musical Work Code .........20

Jeff Brabec & Todd Brabec, *Music, Money, and Success* ........................7, 13

Joshua Yuvaraj, Rebecca Giblin, Daniel Russo-Batterham & Genevieve Grant, U.S. Copyright Termination Notices 1977–2020: Introducing New Datasets, 19 J. Empirical Legal Stud. 250 (2022). ...........9

Peter S. Menell & David Nimmer, Sound Recordings, Works for Hire, and the Termination-of-Transfers Time Bomb, 49 J. Copyright Soc'y U.S.A. 387 (2001) ....................................................15

Phonorecords IV, Docket No. 21-CRB-0001-PR (2023–2027)....................16

The Future of What, Episode #199: The Impact of the CRB Royalty Rate Increase (Sept. 20, 2022) ...........................................................17

U.S. Copyright Office, *Copyright Law Revision Studies Nos. 1–35*, prepared for the Senate Subcommittee on Patents, Trademarks, and Copyrights, 86th Cong., 1st Sess. (1956–1961) ............................................11

U.S. Copyright Office, *General Guide to the Copyright Act of 1976* (1977) 6, 23

William Hochberg, How a Louisiana Copyright Ruling Could Stir Up the Global Music Biz, Forbes (Aug. 6, 2024)..................................................26

Withdrawal of Proposed Rule, Determination of Royalty Rates and Terms for Making and Distributing Phonorecords (Phonorecords IV), 87 Fed. Reg. 18,342 (Copyright Royalty Bd. Mar. 30, 2022) ..........................17, 18

**Regulations**

37 C.F.R. § 201.10 ....................................................................23

37 C.F.R. Part 385....................................................................17

37 C.F.R. pt. 385, subpt. B (2023)................................................13

## I.  INTEREST OF *AMICI CURIAE*

*Amicus* Artist Rights Institute is a Texas 501(c)(3) organization based in Austin, Texas `that was founded in 2023 by Dr. David C. Lowery, Nikki L. Rowling and Christian L. Castle, counsel for *Amici Curiae*.  The Institute advocates on behalf of the rights of artists, particularly artists in the music industry including songwriters and hosts the Artist Rights Symposium, now in its fifth year, among other educational events.[1]  The Institute has filed submissions in the AI Action Plan consultation by the U.S. Government, the artificial intelligence consultation by the UK Intellectual Property Office, the U.S. Copyright Office inquiry regarding performing rights organizations and the Copyright Office redesignation of the Mechanical Licensing Collective.  The Institute also conducts artist financial education seminars and produces The Artist Rights Watch blog and audio podcast.

Dr. Lowery teaches the Music Business Program at the University of Georgia at Athens Terry College of Business and is a founder of the bands Camper Van Beethoven and Cracker.  He edits TheTrichordist blog.

---

[1] The Artist Rights Institute's website is http://www.artistrightsinstitute.org.

Ms. Rowling is a founder of the Austin Music Foundation and consultant in the music industry, producing the 2017 Austin Music Census and other economic development projects for the music industry.

Christian Castle is a long-time music attorney representing a variety of creatives and music-tech startups, a former record company executive at A&M Records in Los Angeles, a frequent commenter on policy matters concerning the music industry and the editor of the MusicTechPolicy blog.  Before law school, he was a professional songwriter and musician and member of Local 47, American Federation of Musicians.

*Amicus* Abby North is President of North Music Group LLC and co-founder of Unchained Melody Publishing LLC based in Los Angeles. She began as a songwriter before shifting to rights management when given the opportunity to handle the catalog of her late father-in-law, composer Alex North, whose works include *Unchained Melody* and scores for *Spartacus*, *Cleopatra*, and *A Streetcar Named Desire*.  North's daily work involves global music licensing and publishing, especially for *Unchained Melody*, which has been recorded in over 25 languages by thousands of artists. She has developed expertise in navigating foreign CMOs, correcting metadata errors, tracking misallocated royalties, and designing proprietary registration and income-tracking tools.

*Amicus* Blake Morgan is a New York-based artist, songwriter, label owner, music publisher, and the leader of the #IRespectMusic campaign[2] which supports fair payment for creators across all mediums and platforms including the American Music Fairness Act.[3]  Mr. Morgan lectures on artists' rights at music, business, and law schools across the United States.

*Amicus* Angela Rose White is the daughter of the late Emmy award winning composer, conductor, and Music Director David Rose.  Mr. Rose is known for composing *Holiday for Strings* and *The Stripper*, composing score for 21 years of *The Red Skelton Show* and serving as the show's Music Director, composing score for some 300 episodes of *Bonanza*, some 200 episodes of *Little House on the Prairie* and many other television programs.

*Amici Curiae* address only whether a terminating author recaptures rights solely in the U.S., leaving the transferee control elsewhere—effectively creating a split-territory regime with no statutory guidance on administration.

Drawing on their experience as advocates, academics, consultants, songwriters, publishers, or heirs, *Amici Curiae* offer this brief to help inform the

---

[2] See #IRespectMusic campaign, available at https://www.irespectmusic.org.
[3] See Reps. Issa, Deutch Introduce Bill to Ensure Artists Receive Fair Pay for FM/AM Radio Airplay (June 21, 2021).

Court of practical realities in independent music publishing and songwriting relevant to resolving the issues presented in this case.

This amicus filing is authorized by Federal Rule of Appellate Procedure 29, because all parties have consented.[4]

## II.    INTRODUCTION

As Graham Greene taught us, systemic unequal bargaining positions produce what his timeless character Captain Segura called a "torturable class" by "mutual agreement."  Graham Greene, *Our Man in Havana* (1958) at 217[5].  In the world of copyright, such "mutual agreements" often involve authors contributing their creative labor, while music users contribute capital, royalties and access to production, distribution, and commercial channels, receiving a transfer of rights in return.

Greene's "mutual agreement" in the authorship context relates to this case because authors often take what is genteelly referred to as an "unremunerative transfer" where the leverage is always on the other side. Authors often enter a one-sided agreement with "standard" industry terms with the expectation and aspiration

---

[4] No party or party's counsel authored this brief in whole or in part or contributed money to fund its preparation or submission, nor did any other person apart from the Artist Rights Institute.

[5] "[Captain Segura said]  Dear Mr. Wormold, surely you realize there are people who expect to be tortured and others who would be outraged by the idea. One never tortures except by a kind of mutual agreement.".

that somewhere down the line the author or the author's heirs can renegotiate for better terms.

Renegotiations in the music industry often require major success just to begin a conversation. Even then, improved terms depend on how bad the original deal was and how "success" is defined. For songwriters like Mr. Vetter, "standard" terms often fall short of what Congress intended.

In fact, that renegotiation may never occur. Accordingly, Congress mandated termination rights in the Copyright Act of 1976, Pub. L. No. 94-553, 90 Stat. 2541 (1976) [hereinafter "1976 Act"] so that eventually an author or an author's heirs can terminate the "mutual agreement" and recover their works—and their negotiating leverage--based on an unwaivable[6] statutory termination in 17 U.S.C. §203 and 17 U.S.C. §304. It is often only then that the author can hopefully recapture the value of their work and their labor.[7]

---

[6] See *Marvel Characters, Inc. v. Simon*, 310 F.3d 280, 290 (2d Cir. 2002) ("[T]he clear Congressional purpose behind § 304(c) was to prevent authors from waiving their termination right by contract.")

[7] Statutory terminations were apparently decided in 1965 as part of the stakeholder negotiations for the 1976 Act. The Copyright Office tells us an historical fact in the 1976 Guide at 6:1: "In *1965* representatives of publishers and authors met and agreed on a proposal which became, in essence, section 203 of the new law. This agreement essentially *ended debate* on the subject." (Emphasis added).

It seems clear that Congress intended to return the parties to a transfer to their original bargaining positions as stated in the House Report, H.R. Rep. No. 94-1476 (1976), [hereinafter "House Report] at 124[8]:

> A provision of this sort [referencing 17 U.S.C. §203] is needed because of the unequal bargaining position of authors, resulting in part from the impossibility of determining a work's value until it has been exploited. Section 203 reflects a practical compromise that will further the objectives of the copyright law while recognizing the problems and legitimate needs of all interests involved.

Congress's intentions in 17 U.S.C. §203 and 17 U.S.C. §304 are often expressed as granting to authors "a second bite at the apple." Congress never said that its policy was a second bite at *half* the apple.[9] Denying terminating authors the full return of a worldwide grant leaves them with only half the apple—the opposite of Congressional intent.

Indeed, the Copyright Office's contemporary guidance to the termination provisions of the 1976 Act states "All rights revert to those with a right to terminate…."[10] U.S. Copyright Office, *General Guide to the Copyright Act of*

---

[8] See also House Report at 140 regarding 17 U.S.C. §304 ("The arguments for granting rights of termination are even more persuasive under section 304 than they are under section 203; the extended term represents a completely new property right, and there are strong reasons for giving the author, who is the fundamental beneficiary of copyright under the Constitution, an opportunity to share in it.")

[9] It is customary in the music business for U.S. companies to claim "rest of world" as one-half of global income however misguided that division may be.

[10] See 1976 Guide, identical language in explanation of "Effect of Termination" of Sec. 203 at 6:4 and of Sec. 304(c) at 6:5. ("What is the effect of termination? *All rights revert* to those with a right to terminate except that derivative works prepared before termination may continue to be utilized under the terms of the grant. No new derivative works may be prepared after the effective date of termination. Termination rights vest on the date the notice is served." (emphasis added).)

*1976* (1977) at 6:1 [hereinafter "1976 Guide"]. Not some rights, not the U.S. rights only, but rather "all rights."

The District Court's ruling is the only way to return both authors and capital to their original bargaining position. It is the only way to restore fairness from an unremunerative transfer. It is the only way to terminate Captain Segura's "mutual agreement."

Songwriters with some leverage may negotiate a *contractual* reversion in voluntary music publishing agreements, the analog to a statutory termination.[11] Signally, a return of *all rights* is common in contractual reversions. The fact that songwriters routinely fight for and may obtain[12] a contractual reversion of all rights in an original grant stands in stark contrast to Appellant's arguments against both Mr. Vetter and the District Court that somehow Congress intended that statutory terminations should be radically different than the industry standard by providing a partial reversion.

---

[11] Asking for a contractual reversion of rights is a common and prudent practice in negotiating music publishing agreements, particularly for songwriters contracting with more powerful music publishers. Such reversion clauses may be triggered by various conditions, including the publisher's failure to commercially release the work within a specified time frame, failure to exploit the work (e.g., through licensing or placement), or upon the recoupment of any advance paid to the author. See Donald S. Passman, *All You Need to Know About the Music Business* 655–61 (Apple Books ed. 11th ed. 2023) (discussing typical contract terms including reversion provisions); see also Jeff Brabec & Todd Brabec, *Music, Money, and Success* 112–15 (9th ed. 2022) (Apple Books e-book) (noting that reversions can be based on inactivity, non-release, or full recoupment, and are regularly requested by artist representatives in publishing negotiations).

[12] See, e.g., Passman at 655 ("Smile whenever you hear the words reversion of copyright, because this will always be good for you (unless you're a publisher, in which case you can scowl).")

It may seem implausible that multinational media companies would uniformly exploit legal loopholes at scale. But for authors bound by Captain Segura's "mutual agreement," it's *entirely* believable. When multinational media corporations wield overwhelming negotiating power, even statutory termination rights can be distorted—splitting the apple to cushion the impact of terminations on transferees. The next move is to keep courts from scrutinizing these deals and vindicating Congress's intent. That's done through leverage, tough business policies, and early settlements—before a judge like the District Court can weigh in.[13] With luck, transferees can delay their day of reckoning.

But this time luck ran out. Leverage is not genius,[14] leverage is not law, and Segura's "mutual agreement" is not binding authority. Still, for those who control the leverage, it may as well be. And for deep-pocketed transferees, private agreements can function like law—precisely what Congress aimed to *prevent* by making termination rights unwaivable in 17 U.S.C. § 203(a)(5) and 17 U.S.C. § 304(c)(5).

---

[13] Or even attempting to deny termination rights altogether as in Sir Paul McCartney's declaratory relief action against Sony/ATV Music Publishing LLC.  Sony sent the clear message" to encourage the others":  if they will do it to a Beatle, they will do it to anyone.  However, the case settled and was voluntarily dismissed in record time.  See Complaint for Declaratory Judgment, *McCartney v. Sony/ATV Music Publ'g LLC*, No. 17-cv-363 (S.D.N.Y. Jan. 18, 2017), dismissed (June 30, 2017).
[14] Steve Eisman, "They Mistook Leverage for Genius", EFN Ekonomikanalen (May–June 2016), YouTube (Aug. 2016), archived at https://youtu.be/NJodqhzqPKQ ("Between 1997 and 2007, the leverage of the firms was going up every single year… they mistook leveraged for genius.")

*Amici* observe that media companies rarely fabricate legal rules outright. Instead, they impose policy interpretations—clawbacks—that lack solid statutory or judicial foundation but provide just enough of a fig leaf to justify an immovable "policy." These are applied to what Captain Segura might call the "torturable class" of authors.

Once practices are adopted industry-wide, that parallelism ossifies into "standard terms" treated as *de facto* law without a vote being cast. Only when an artist like Mr. Vetter fights the "standard terms"—risking being labeled "difficult" which can end a career—is a court likely to examine the legality of the "standard terms." Otherwise, "standard terms" are unreviewable.

It may be hard to believe these practices are pervasive, yet thousands of terminations[15] have produced only a handful of cases raising the territory issues raised here. Why? As we will see anecdotally, many authors accept transferees' territorial restrictions simply because they can't afford to challenge them.

---

[15] See Joshua Yuvaraj, Rebecca Giblin, Daniel Russo-Batterham & Genevieve Grant, *U.S. Copyright Termination Notices 1977–2020: Introducing New Datasets*, 19 J. Empirical Legal Stud. 250 (2022). ("[T]he Copyright Office's database is elderly and frail, making it difficult to extract, arrange, and analyze the data it contains. As a result, it has long been challenging to address empirical research questions about copyright's operation.")

*Amici* will further show how transferees have elevated business practices over law in three other contexts: controlled composition clauses, works made for hire, and "frozen mechanicals."

*Amici* intend no criticism of Appellant or its counsel. Rather, this case has illuminated a critical area of the 1976 Act that affects the lives and livelihoods of authors across America. This appeal presents yet another high-stakes contest over fairness—nothing personal. *Amici* respectfully urge this Court to bring Mr. Vetter's contest to a just conclusion by affirming the District Court's well-reasoned decision.

## III.   ARGUMENT

### A.   Congress's Corrective Reforms in the 1976 Act—aimed at protecting songwriters and authors—were soon blunted by post-enactment industry practices.

One of the Copyright Act's key features is its allowance for statutory rights to be modified by contract—so long as the agreement is voluntary. Some music users have developed sophisticated strategies to reclaim creators' legislative gains by embedding those gains within so-called "voluntary agreements." The termination rights under 17 U.S.C. §203 and 17 U.S.C. §304 are the only non-waivable protections granted to authors. Yet even statutory rights are not fully

immune from the clawback: industry practices often blunt their effect through contractual pressure and unilateral "standard terms." The pattern is familiar—when Congress establishes a new right for creators, users with market leverage adopt business policies to diminish its practical value and effect. Then they portray "upgrading" to basic statutory compliance as a generous concession reserved to the elite.

While Appellee's case concerns a single song, the Court will likely hear from a broad cross-section of music users, many if not all of whom will claim that the District Court got it wrong and should be reversed. This dedicated group of likeminded companies with leverage have all concluded that the clawback of foreign rights in terminations in this case should be given legal effect as to all authors in any copyright category. They have convinced themselves that Congress intended to impose on Americans a compulsory post-termination split-territory arrangement derived from an author's prior worldwide grant in the U.S. by a U.S. author arising under U.S. law. Creators are grateful to the District Court for seeing past the clawback and reaching the correct result.

Congress tried. The "First Branch" devoted many laborious sessions of Congress to the 1976 Act. Congress commissioned studies on all aspects of copyright, directed the Copyright Office to investigate broadly the business of copyright, held hearings and consulted with many stakeholders, scholars, and

jurists.  See U.S. Copyright Office, *Copyright Law Revision Studies Nos. 1–35*,
prepared for the Senate Subcommittee on Patents, Trademarks, and Copyrights,
86th Cong., 1st Sess. (1956–1961).  At the end of this twenty-odd year process,
Congress righted many wrongs done to authors by producing a nuanced copyright
law befitting the U.S. economy.

### 1.  The Controlled Compositions Clawback

More precisely, Congress righted wrongs *for a while*.  Fairness that balanced
the interests of music users with songwriters and their heirs was one driving force
behind Congress's noble effort.  Congress's effort at fairness-making can be seen
in several key provisions of the 1976 Act such as increasing the 2¢ statutory
mechanical royalty rate[16] that had been frozen for 68 years; excluding sound
recordings from the definition of works made for hire; and most notably for this
case, establishing the statutory termination provisions.

Yet practically as soon as the ink was dry on the 1976 Act, the clawback
began by the record companies, music publishers and others under voluntary
agreements.  For example, Congress mandated in the 1976 Act that the now-
unfrozen 2¢ mechanical royalty rate begin a gradual escalation that started with an
increase from 2¢ to 2.75¢ with a new concept of the "long song" rate of 0.5 cent

---

[16] Copyright Act of 1909 § 1(e), Pub. L. No. 60-349, 35 Stat. 1075, 1075–76 (1909) (repealed 1976).

per minute of playing time or fraction thereof if greater than 2.75¢ effective January 1, 1978. 1976 Act 17 U.S.C. §115(c)(2).

Then the clawback began. Mechanical royalties earned by artists recording their own songs were suddenly subject to a take-it-or-leave-it "controlled compositions" clause in recording artist agreements that imposed a contractual license rate of three-fourths of the otherwise applicable *minimum* statutory rate regardless of playing time, which reduced the real payable mechanical rate back down to 2.0625¢ despite the best efforts of Congress.[17] The *minimum* statutory rate set by Congress thus became the *maximum* statutory rate paid by music users.

But even that discount wasn't enough. The controlled compositions clause also mandated a ten times ¾ rate cap per album (or 20.625¢ per album), even lower (or free) rates on other configurations and price points, and a "rate fixing date" that *froze in perpetuity* the statutory rate at the rate in effect on delivery to dodge future rate escalations planned by Congress on units "made and distributed"[18] (the current rate today being 12.7¢).[19] And, of course, record

---

[17] The cited rates are only applicable to physical carriers and permanent downloads, i.e., not streaming which has an entirely different calculation. See, e.g., 37 C.F.R. pt. 385, subpt. B (2023); Copyright Royalty Board, Determination of Royalty Rates and Terms for Making and Distributing Phonorecords (Phonorecords IV), Docket No. 21-CRB-0001-PR, 87 Fed. Reg. 33093 (proposed June 1, 2022); 87 Fed. Reg. 78320 (final Dec. 30, 2022; corrected Mar. 18, 2024).

[18] 17 U.S.C. § 115(c)(1) (2022) ("[R]oyalty payments under the compulsory license shall be made for every phonorecord made and distributed under the license.").

[19] Cost of Living Adjustment to Royalty Rates and Terms for Making and Distributing Phonorecords, 89 Fed. Reg. 93,477 (Nov. 27, 2024); see also The Brabecs at 167 and Passman at 248.

companies try to impose the "controlled rate" on non-controlled co-writers entitled to the full statutory rate by imposing the right to offset any "overage" paid to non-controlled co-writers against the artist's mechanical royalties, or if necessary, to be recouped from the controlled writer's *artist* royalties, i.e., cross-collateralized. That expresses the true meaning of "controlled."

The controlled composition clawback was a substantial loss in the value that Congress tried to pass to songwriters. The true effect of the clause has too many variables to graph, but the per-unit rate reduction alone tells the story as reflected in this illustration. As Tom Waits might say,[20] Congress giveth with bold print; the industry taketh away with boilerplate.



---

[20] Cf. *Tom Waits, Step Right Up*, on *Small Change* (Asylum Records 1976) ("The large print giveth and the small print taketh away.").

### 2. The Work Made for Hire "Technical Amendment" and Repeal Launches the Artist Rights Movement

No discussion of clawbacks would be complete without the disastrous attempt by record companies to quietly amend 17 U.S.C. §101 to include sound recordings in the definition of "work made for hire." The "midnight amendment" aimed to deny recording artists their termination rights, ensuring labels—not artists—retained ownership and control of each artist's recordings, thus blocking artists from reclaiming rights.

Congress regrettably adopted this clawback without prior hearings or extensive debate as part of a package of "technical amendments" in the Intellectual Property and Communications Omnibus Reform Act of 1999 Pub. L. No. 106–113, Title I, § 1011(d), 113 Stat. 1501A–521 (1999). As Professors Peter Menell and David Nimmer noted, the "technical amendment" was "stealthily added" and had "no connection" to the subject matter of the bill.[21]

Shortly after the "technical amendment" passed, artists not only became aware that the Copyright Act had radically changed, but they also became aware of *how* it was changed. This led to furious anger among artists and the formation of the Recording Artist Coalition by Don Henley, Sheryl Crow, and many other

---

[21] Peter S. Menell & David Nimmer**,** *Sound Recordings, Works for Hire, and the Termination-of-Transfers Time Bomb,* 49 J. Copyright Soc'y U.S.A. 387 (2001) at 391.

artists, to campaign against the change.[22]  The artists' campaign persuaded Congress to enact the Work Made for Hire and Copyright Corrections Act of 2000 (Public Law 106-379), which repealed the "midnight amendment."  But it was a close-run thing.  Congress giveth with bold print; the industry taketh away with boilerplate.

### 3.    The Frozen Mechanicals Clawback

In Phonorecords IV, Docket No. 21-CRB-0001-PR (2023–2027), the Copyright Royalty Judges ("CRJs") addressed the statutory rates for mechanical royalties including royalties payable under Subpart B of 37 C.F.R. Part 385, which governs physical formats (such as the CD and vinyl configurations) and permanent downloads.

The "frozen mechanicals" controversy centered on a proposed voluntary settlement submitted to the CRJs by the National Music Publishers Association, the Nashville Songwriters Association International and the Recording Industry Association of America to extend the then-existing rate of 9.1¢ per composition for yet another five-year rate period—"frozen" since 2006 due to prior uncontested voluntary settlements. This proposal became known as the "frozen mechanicals"

---

[22] See Eric Boehlert, *Four Little Words: How the Record Industry Used a Tiny Legislative Amendment to Try to Steal Recording Copyrights from Artists - Forever,* Salon.com, Aug. 28, 2000 ("'It was very sinister at its root,' says former Eagles leader Don Henley. 'We never should have had to go through this.  But the RIAA thought they had enough clout in Congress to make it stick. And they almost did.")

policy[23] and was sharply criticized by independent songwriters including *Amici* David Lowery, Abby North, Blake Morgan and counsel to *Amici Curiae*, among others, who argued in comments to the CRJs that the settlement failed to reflect inflation or fair market value and that independent songwriters were not well represented in the proceeding.  See Withdrawal of Proposed Rule, Determination of Royalty Rates and Terms for Making and Distributing Phonorecords (Phonorecords IV)*, 87 Fed. Reg. 18,342, 18,349 (CMar. 30, 2022); see also id. at 18,344 ("Synopsis of Related Non-Participant and Moving Parties' Comments").

In March 2022, the CRJs *rejected* the initial settlement under 17 U.S.C. § 801(b)(7)(A), finding it lacked a "reasonable basis for setting statutory rates and terms."  Withdrawal of Proposed Rule at 18349.  The rejection was significant, marking the first time *Amici* are aware of that the CRJs had declined to adopt a mechanical royalty settlement agreed to by the NMPA and RIAA.  As the CRJs noted, many commenters questioned how representative these two organizations are of the broader songwriter community, which the Court may also wish to consider.

A revised settlement was later adopted with support from *Amici* and other independents, which significantly increased the Subpart B rate to 12¢ and

---

[23] See Withdrawal of Proposed Rule at 18344 ("Rate 'Freeze'"); The Future of What**, Episode #199*: The Impact of the CRB Royalty Rate Increase* (Sept. 20, 2022), featuring Colin Rushing, available at *The Future of What* on Apple Podcasts.

introduced an annual cost-of-living adjustment (COLA) beginning in 2023 which unfortunately was not applied to streaming in a separate settlement. The CRJs accepted this revised settlement. See Determination of Royalty Rates and Terms for Making and Distributing Phonorecords (Phonorecords IV), 87 Fed. Reg. 76,937 (Dec. 16, 2022) (approving increased Subpart B mechanical rate under revised settlement).

This debate over "frozen mechanicals" underscores another version of the clawback—big media companies or their intermediaries tried to convince a court to adopt what turned out to be an objectionable proposition once the songwriter community had their say. *Amici* would argue that the main reason that the insider "frozen mechanicals" settlement was rejected by the CRJs is because independent songwriters similarly situated to Mr. Vetter asked the CRB to intervene during the required comment period. Their meritorious arguments were heard by the Judges, as Mr. Vetter's meritorious argument was heard by the District Court. But this, too, was a close-run thing. And as usual, Congress giveth with bold print; the industry taketh away with boilerplate.

**B.      The Music Publishing Industry Routinely Accommodates Contractual Transfers of Foreign Rights**

**1.      Rights Transfers are a routine feature of rights management that the publishing industry is well-equipped to handle.**

The music publishing industry routinely manages rights changes, including those from statutory termination. *Amici* confirm that restructuring song administration, even across foreign territories, is a normal and manageable part of catalog sales—not disruptive, but standard business practice.  One might even say a garden variety business practice.

Modern rights administration systems are specifically designed for this purpose. International societies under International Confederation of Societies of Authors and Composers (CISAC), and metadata tools like Common Works Registration (CWR),[24] International Standard Musical Work Code (ISWC)[25] records and digital supply chain tools, routinely process these updates. Foreign sub-publishers are regularly replaced, and income streams redirected, through non-exclusive arrangements that mirror the post-termination rights environment. Recognizing the global effect of termination is no more complex than replacing a

---

[24] See International Confederation of Societies of Authors and Composers (CISAC), *Common Works Registration (CWR)*, https://www.cisac.org/What-We-Do/Information-Systems/CWR (last visited June 14, 2025).
[25] See International Confederation of Societies of Authors and Composers (CISAC), *ISWC – The International Standard Musical Work Code*, https://www.cisac.org/What-We-Do/Information-Systems/ISWC (last visited June 14, 2025).

sub-publisher or executing a buy-back—events that occur regularly without legal controversy in *Amici*'s experience.

### 2. The District Court's holding is consistent with established industry norms regarding administration of contractual rights.

The District Court's decision is fully consistent with these industry norms. If an original grant was worldwide (or "universewide" in the vernacular[26]), a *contractual* reversion is similarly worldwide. If a transferee attempted in a negotiation to limit a reversion to U.S. rights alone, that ploy would likely be seen by practitioners as a bluff at best.

Appellant's theory regarding termination rights, by contrast, imposes a novel statutory joint administration structure that few—if any—commercial parties would ever bargain for in an analogous contractual reversion. It could grant transferees a veto power over digital, synchronization, and other worldwide licenses, undercutting the very autonomy Congress sought to restore through termination.

The better result is the one adopted by the District Court: a clean reversion aligning with commercial reality and restoring the author to their pre-grant

---

[26] Which leaves questions open about what "foreign" actually means. See Passman at 156 ("In fact, the territory [in a recording agreement] is usually defined as "the universe," because some backroom lawyer worried that an artist might argue satellites weren't covered by a contract that only said "the world.")

position—without bestowing leverage on the very transferee Congress empowered the author to terminate. Not only is the District Court's interpretation consistent with Congressional intent, but it also has the benefit of common sense, an important element of statutory interpretation as the Supreme Court stated in *FDA v. Brown & Williamson Tobacco Corp.,* 529 U.S. 120 , 133 (2000):

> It is a "fundamental canon of statutory construction that the words of a statute must be read in their context and with a view to their place in the overall statutory scheme." [Citation omitted.] A court must therefore interpret the statute "as a symmetrical and coherent regulatory scheme," and "fit, if possible, all parts into an harmonious whole," [Citations omitted]. Similarly, the meaning of one statute may be affected by other Acts, particularly where Congress has spoken subsequently and more specifically to the topic at hand. [Citations omitted.] *In addition, we must be guided to a degree by common sense as to the manner in which Congress is likely to delegate a policy decision of such economic and political magnitude to an administrative agency.*

## C.   Excluding Foreign Rights from Termination Is Contrary to Congressional Intent

### 1.   Neither Congress nor the Copyright Office give any guidance supporting the imposition of a "springing" statutory split-territory termination.

Congress crafted termination as a corrective measure for unfair transfers. Allowing  transferees to retain "foreign" rights (a vague term) under worldwide grants defeats that purpose and arguably creates a statutory split-territory arrangement triggered by the termination notice. If Congress intended terminations to apply only to U.S. rights, one would expect detailed statutory provisions

enabling split-territory licensing, administration, or blocking rights consistent with other provisions of the 1976 Act—yet no such framework exists. Split-territory administration is both well-trodden ground in contracts but also a complicated arrangement to leave to silence in statutes, particularly when there is so much detail from Congress on other topics in the 1976 Act and the many intervening amendments to the Copyright Act from 1976 to the present day. With copyright, Congress does not say "oh, let them go figure it out."

Although termination disputes have likely arisen in the thousands of terminations filed with the Copyright Office, Congress—despite repeated, detailed amendments to the Copyright Act since 1976 at the urging of music industry stakeholders (including some amici supporting Appellant's case)—has *never* expressly mandated a split-territory termination regime. Nor has the Copyright Office promulgated regulations to that effect, which would have triggered an opportunity for public comment long ago.

This lack of detail on split-territory arrangements reinforces the reasonableness of the District Court's decision and is explained by the common sense context that Congress did not mandate details on administering split territories because they did not authorize a split-territory deal in the first place. One need only look to the Music Modernization Act, Pub. L. No. 115-264, 132 Stat. 3676 (2018)—heavily lobbied for by some of Appellant's amici--to see the

level of precision Congress can impose when it intends to impose a comprehensive—and *compulsory*—legal framework.

Indeed, the absence of split-territory rules and regulations suggests Congress never intended such a division. The Copyright Office's official termination form under 37 C.F.R. § 201.10--the only regulation on terminations--makes no provision for partial terminations. Unsurprisingly, the Office's 1976 Guide plainly states that "all rights revert," and its regulations reflect that expectation.

### 2. Industry Acquisition Agreements Already Contemplate Termination Risk and Can Be Structured Accordingly

Catalog acquisitions routinely include songs subject to statutory termination or contractual reversion. Buyers review termination eligibility, adjust pricing, or structure deals accordingly in the normal course.

Post-termination arrangements to protect buyers may include renegotiation windows, matching rights, or conditional royalty incentives—so long as they are supported by new consideration and executed after the author or heirs are free from the original grant. Such provisions respect the statutory right of termination without violating the prohibitions in 17 U.S.C. § 203(a)(5) and 17 U.S.C. § 304(c)(5) against agreements to the contrary.

Termination of "foreign" rights is not commercially disruptive in general or to catalog acquisitions in particular. It merely requires identifying those rights

during diligence and pricing them appropriately. The District Court's decision supports a fair and practical result, consistent with both industry due diligence practice in rights transfers and Congressional intent.

## IV. CONCLUSION

The District Court properly began its analysis with congressional intent, applying settled principles of statutory construction. That inquiry is critical because the termination provisions are not merely procedural—they are remedial and purpose-driven.

Congress enacted termination rights to give authors a second chance: a genuine opportunity to reclaim their works and reenter the market on fairer terms. That protection was not meant to be partial, illusory, or confined by arbitrary territorial lines.

Reading the termination to exclude foreign rights restores leverage to the very transferees Congress intended to displace. It frustrates the Copyright Act's purpose, fragments ownership, weakens the author's bargaining position, and leaves Captain Segura's "mutual agreement" largely intact. Music attorney Bill Hochberg describes the typical call and response with a publisher when negotiating a potential termination, leading to the unsurprising conclusion that no actual

termination occurs—in potentially thousands of statutory terminations--due to the transferee's leverage derived from the business policy on foreign rights:

> So the playbook play for lawyers representing copyright creators and heirs has been to wait for applicable rights to arise under the Act and then to threaten (in a very nice tone of voice) companies that licensed those copyrights with a termination of their rights. *Then the executive on the other side of the table replies (also in a gentle tone) that the termination or reversion only applies in the US. So they evaluate US rights versus rest-of-world*, go back and forth, do-si-do, and finally end the dance with a better deal for the creator or the heirs going forward ... *but no terminations*.[27]

And, therefore, neither is there a moment of freedom as contemplated by Congress. It is easy to understand why music users would make the Appellant's argument—because it profits them to do so. If they can bootstrap it into the law, all the better. In the words of Austin songwriter and occasional Supreme Court amicus[28] Guy Forsyth, "Americans are freedom loving people and nothing says freedom like getting away with it."[29]

Congress may have acted with a paternalistic aim, but it did not intend to offer half a remedy. The termination right was meant to restore meaningful

---

[27] William Hochberg, *How a Louisiana Copyright Ruling Could Stir Up the Global Music Biz*, Forbes (Aug. 6, 2024) (emphasis added), https://www.forbes.com/sites/williamhochberg/2024/08/06/how-a-louisiana-copyright-ruling-could-stir-up-the-global-music-biz/.

[28] Brief for Amici Curiae David Lowery, Raymond J. Pepperell, Blake Morgan & Guy Forsyth in Support of Petitioners, *Frank v. Gaos*, No. 17-961 (U.S. Jan. 22, 2019).

[29] "Long Long Time," on *Love Songs: For and Against*, Guy Forsyth (Monkey King Music, 2005)

control—not to leave authors with less than they could have had through negotiating an ordinary contractual reversion.

*Amici Curiae* respectfully ask that the Court affirm the District Court's well-reasoned and common-sense ruling.

Dated: June 20, 2025

<div style="margin-left:40%">

Respectfully submitted,

/s/ *Christian L. Castle*
Christian L. Castle
9600 Great Hills Trail, Suite 150W
Austin, Texas 78759
Telephone: (512) 502-3070
Facsimile:  (512) 519-2529

*Counsel for Amici Curiae*
*Artist Rights Institute, Abby North,*
*Blake Morgan and Angela Rose White*

</div>

**CERTIFICATE OF COMPLIANCE**

This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because it contains 5,096 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f).  This brief also complies with the typeface requirements of Fed. R. App. P. 32(a)(5)(A) and the type style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word in Times New Roman font size 14.

<u>/s/ *Christian L. Castle*</u>

Christian L. Castle

*Counsel for Amici Curiae*
*Artist  Rights Institute,*
*Abby North, Blake Morgan and*
*Angela Rose White*

**CERTIFICATE OF SERVICE**

I certify that I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Fifth Circuit by using the appellate CM/ECF system. I further certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

/s/ *Christian L. Castle*

Christian L. Castle

*Counsel for Amici Curiae*
*Artist Rights Institute,*
*Abby North, Blake Morgan and*
*Angela Rose White*