# IN THE UNITED STATES COURT OF APPEALS
# FOR THE FIFTH CIRCUIT

CYRIL E. VETTER and VETTER COMMUNICATIONS CORPORATION

*Plaintiffs-Appellees,*

*v.*

ROBERT RESNIK and RESNIK MUSIC GROUP

*Defendants-Appellants.*

On Appeal from the United States District Court
for the Middle District of Louisiana
No. 23-1369-SD-EWD

## BRIEF OF *AMICI CURIAE*
## MUSIC ARTISTS COALITION, BLACK MUSIC ACTION COALITION, ARTISTS RIGHTS ALLIANCE, SONGWRITERS OF NORTH AMERICA, AND SCREEN ACTORS GUILD-AMERICAN FEDERATION OF TELEVISION AND RADIO ARTISTS
## IN SUPPORT OF PLAINTIFFS-APPELLEES

ROBERT S. MEITUS
  *Attorney of Record*
JOHN P. STROHM
MEGAN L. WHEELER
Meitus Strohm LLP
121 E. Kirkwood Avenue, Suite 300
Bloomington, IN 47408

June 20, 2025              *Counsel for Amici Curiae*

# SUPPLEMENTAL STATEMENT OF INTERESTED PERSONS

## No. 25-30108, *Vetter v. Resnik*

The undersigned counsel of record certifies that, the following listed persons and entities as described in the fourth sentence of Fifth Circuit Rules 28.2.1 have an interest in the outcome of this case. These representations are made in order that the judges of this Court may evaluate possible disqualification or recusal.

| Plaintiffs-Appellees: | Counsel for Plaintiff-Appellees: |
|---|---|
| Cyril E. Vetter | Timothy Kappel |
| Vetter Communications Corporation | WELLS & KAPPEL, L.L.P. New Orleans, LA |

| Defendants-Appellants: | Counsel for Defendants-Appellants |
|---|---|
| Robert Resnik | Edgar Gankendorff and Christophe Szapary PROVOSTY & GANKENDORFF, L.L.C. New Orleans, LA |
| | Robert Clarida and Brian Caplan REITLER KAILAS & ROSENBLATT, L.L.P. New York, NY |
| Resnik Music Group | Edgar Gankendorff and Christophe Szapary PROVOSTY & GANKENDORFF, L.L.C. New Orleans, LA |
| | Robert Clarida and Brian Caplan REITLER KAILAS & ROSENBLATT, L.L.P. New York, NY |

| Other Interested Parties: | Counsel for Interested Parties: |
|---|---|
| American Association of Independent Music | Collin Wedel and Rollin Ransom SIDLEY AUSTIN, L.L.P Los Angeles, CA |
| | Manuel Valle SIDLEY AUSTIN, L.L.P Washington, D.C. |

| | |
|---|---|
| Motion Picture Association, Incorporated | Jonathan Hacker<br>O'MELVENY & MYERS, L.L.P.<br>Washington, D.C. |
| | Danielle Feuer<br>O'MELVENY & MYERS, L.L.P.<br>New York, NY |
| | Daniel Petrocelli and Molly Lens<br>O'MELVENY & MYERS, L.L.P.<br>Los Angeles, CA |
| National Music Publisher's Association, Incorporated | Collin Wedel and Rollin Ransom<br>SIDLEY AUSTIN, L.L.P<br>Los Angeles, CA |
| | Manuel Valle<br>SIDLEY AUSTIN, L.L.P<br>Washington, D.C. |
| Recording Industry Association of America | Collin Wedel and Rollin Ransom<br>SIDLEY AUSTIN, L.L.P<br>Los Angeles, CA |
| | Manuel Valle<br>SIDLEY AUSTIN, L.L.P<br>Washington, D.C. |
| Music Artists Coalition | Robert S. Meitus<br>MEITUS STROHM LLP<br>Bloomington, IN |
| | John P. Strohm, and Megan L. Wheeler<br>MEITUS STROHM LLP<br>Nashville, TN |
| Black Music Action Coalition | Robert S. Meitus<br>MEITUS STROHM LLP<br>Bloomington, IN |
| | John P. Strohm, and Megan L. Wheeler<br>MEITUS STROHM LLP<br>Nashville, TN |
| Artist Rights Alliance | Robert S. Meitus<br>MEITUS STROHM LLP<br>Bloomington, IN |
| | John P. Strohm, and Megan L. Wheeler<br>MEITUS STROHM LLP<br>Nashville, TN |

| | |
|---|---|
| Songwriters of North America | Robert S. Meitus<br>MEITUS STROHM LLP<br>Bloomington, IN |
| | John P. Strohm, and Megan L. Wheeler<br>MEITUS STROHM LLP<br>Nashville, TN |
| Screen Actors Guild-American Federation of Television and Radio Artists | Robert S. Meitus<br>MEITUS STROHM LLP<br>Bloomington, IN |
| | John P. Strohm, and Megan L. Wheeler<br>MEITUS STROHM LLP<br>Nashville, TN |

*/s/ Robert S. Meitus*

*Attorney of Record for Amici Curiae*

# TABLE OF CONTENTS

SUPPLEMENTAL STATEMENT OF INTERESTED PERSONS ......................... I

TABLE OF CONTENTS ......................................................... IV

TABLE OF AUTHORITIES ....................................................... V

STATEMENT OF INTEREST OF AMICI CURIAE ................................ 1

INTRODUCTION ................................................................. 5

ARGUMENT ..................................................................... 7

I. THE FUNDAMENTAL POLICY SUPPORTING TERMINATION RIGHT SUPPORTS A FULL RENEGOTIATION WITH GRANTEES ................... 7

   A. The Termination Right Is Inalienable So Authors Can Recapture the Full Value of Their Works .................................................. 7

   B. Congress Intended Authors to Capture the Realized Value of Their Works 9

   C. The Copyright Act's Fundamental Policy to Incentivize Authors Has Led to Author-Protective Revisions to the Law ................................ 10

II. A FULL TERMINATION RIGHT IS NECESSARY TO MUSIC CREATORS TO ADDRESS A POWER IMBALANCE .............................. 12

   A. Labels and Publishers Often Require Worldwide, Perpetual Grants ......... 12

   B. Music Dissemination Is Now Almost Immediately Global ...................... 15

III. THE LACK OF BURDEN IN CONNECTION WITH POTENTIALLY ENFORCING A WORLDWIDE TERMINATION ...................................... 17

   A. Publishers and Labels Know that Copyright Terminations Exist and Factor This Into Their Agreements ................................................. 17

   B. Foreign Works Are Protected Under the U.S. Copyright Act And Authors Do Not Have Privity With Foreign Entities ................................ 18

   C. The Music Industry Is Equipped to Implement a Worldwide Termination 20

   D. The Incentive of a Worldwide Termination Right Benefits All Stakeholders ................................................................. 22

CONCLUSION ................................................................... 23

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICES

# TABLE OF AUTHORITIES

## Cases

*Corcovado Music Corp. v. Hollis Music, Inc.*,
    981 F. 2d 679 (2d Cir. 1993) )…………………………………………… 19

*Mills Music, Inc. v. Snyder*,
    469 U.S. 153, 172 (1985)…………………………………………… 6, 8

*Stewart v. Abend*,
    495 U.S. 207 (1990)………………………………………………….. 5, 10

*Vetter et al. v. Resnik*,
    No. CV 23-1369-SDD-EWD, 2024 WL 3405556 (M.D. La.
    July 12, 2024), *motion to certify appeal denied*, No.
    CV 23-1369-SDD-EWD, 2024 WL 4913616 (M.D. La.
    Nov. 13, 2024) …..………………………………….................... 5

## Statutes

17 U.S.C. § 104……………………………………………………….. 19

17 U.S.C. § 114(g)(2)……………………………………………….. 11

17 U.S.C. § 115(d)(3)(J)(iv) ……………………………………….. 11

17 U.S.C. § 203……………………………………………… 7, 17, 19

17 U.S.C. § 304……………………………………… 5, 7, 8, 17, 19

## Other Authorities

5 Nimmer on Copyright § 17.10[B][2]……………………………….. 18

Brief for Defendants-Appellants, *Vetter v. Resnik*, No. 24-30108, (5th Cir. Apr. 22,
    2025)………………………………………………………….......... 4

Brief for Motion Picture Association, Inc. as Amici Curiae Supporting Defendants-
    Appellants, *Vetter v. Resnik*, No. 25-30108 (5th Cir. Apr. 29, 2025) …………18

Hagen, Anja Nylund, *Datafication, Literacy, and Democratization in the Music
    Industry*, 45 Pop. Music & Soc'ty 184 (2021) ……………………… 12, 13, 20

H.R. Rep. No. 94-1476 (1976) ………………………………………… 5, 6, 7, 8

INTERNATIONAL FEDERATION OF THE PHONOGRAPHIC INDUSTRY, IFPI GLOBAL MUSIC REPORT 2025, (2025), https://www.ifpi.org/wp-content/uploads/2024/03/GMR2025_SOTI.pdf (last visited June 17, 2025)……………………………………….................................................. 15

Leight, Elias, *How Licensing Deals Are Changing the Major Label World — And the Industry's Future*, BILLBOARD (Mar. 10, 2025), https://www.billboard.com/pro/major-label-licensing-deals/ …………… 14, 15

Lieberman, David, *Sony/ATV Becomes Top Music Publisher With Acquisition of EMI Catalog*, Deadline (June 29, 2012), https://deadline.com/2012/06/sonyatv-becomes-top-music-publisher-with-acquisition-of-emi-catalog-294363/ ....... 21

Passman, Donald, EVERYTHING YOU NEED TO KNOW ABOUT THE MUSIC BUSINESS, 109 (Simon & Schuster 11th ed.) (2023) ………………………………… 8, 13

Richard Arnold & Jane C. Ginsburg, *Comment: Foreign Contracts and U.S. Copyright Termination Rights: What Law Applies?* 43 Colum. J. L. & Arts 437 (2020) ……………………………………………………………………… 6, 8

Tencer, Daniel, *U.S. Court Says Copyright Termination Applies Globally, Potentially Causing 'Chaos" for Rightsholders*, MUSIC BUSINESS WORLDWIDE (Feb. 4, 2025), https://www.musicbusinessworldwide.com/us-court-says-copyright-termination-applies-globally-potentially-causing-chaos-for-rightsholders/ …………………………….................................................... 20

U.S. Constitution of the United States of America, Art. 1, § 8, cl. 8 …………… 11

## STATEMENT OF INTEREST OF AMICI CURIAE

The Amici Curiae consists of five organizations dedicated to advocating for music creators: Music Artists Coalition ("MAC"), Black Music Action Coalition ("BMAC"), Artist Rights Alliance ("ARA"), Songwriters of North America ("SONA"), and the Screen Actors Guild-American Federation of Television and Radio Artists ("SAG-AFTRA"). Though each has a unique focus, all five Amici Curiae share a common, fundamental mission. They fight for the rights of musicians, songwriters, and performers to ensure that they are treated with respect and compensated fairly for their work.

This *amici* filing is authorized by Federal Rule of Appellate Procedure 29, because all parties have consented. No party or party's counsel authored this brief in whole or in part or contributed money to fund its preparation or submission, nor did any other person apart from the current Amici Curiae and its members and counsel.

MAC exists to champion the rights, compensation, and well-being of the people who create music. Both music industry executives and music creators created MAC to ensure that musicians have a seat at the table, driving the strategy and conversation about the legal issues that shape their lives and livelihoods. MAC's membership includes recording artists, songwriters, and music creators

whose work has shaped musical history and drives the music business today. Members of MAC include chart-topping songwriters, Grammy-winning artists, Rock and Roll Hall of Fame inductees, as well as music creators at all points of career development. MAC's Board consists of Ali Harnell, Anderson .Paak, Coran Capshaw, Dave Matthews, Don Henley, Elliot Groffman, Irving Azoff, Jim Cicconi, John Silva, Jordan Bromley, Kristen Foster, Maren Morris, Meghan Trainor, Shane McAnally, Susan Genco, and Verdine White, all of whom are beloved musicians and leaders in the music industry. MAC advocates on behalf of its constituents for appropriate compensation and for better terms regarding creative control of their works.

ARA is an artist-run, non-profit. ARA aims to empower musicians to advocate for their own interests and ensure that artists can participate in the process when decisions are made on policies that impact their lives and their livelihood. ARA's Artists' Bill of Rights outlines fundamental principles for a healthy creative economy, chief among them being the musician's right to control their work. ARA believes that a sound and just copyright system requires, above all, respect for creators and their art.

BMAC is a non-profit organization composed of musicians, industry professionals, and allies committed to advancing equity and justice in the music industry through core initiatives focused on accountability, opportunity, and

advocacy. BMAC strives to ensure that music creators have the power and the platform to defend their creative rights in both institutional and legislative landscapes. BMAC's work advocates for the belief that creative freedom and fair treatment are essential to a just music economy.

SONA is a membership-based advocacy organization which was formed in 2015 by and for professional songwriters. SONA advocates on behalf of songwriters' interests before legislative bodies, administrative agencies, and the courts. SONA is a diverse community that unites enthusiastic music creators and thoughtful business leaders to create a unified voice to protect artistic expression, compensation, and the rights of songwriters in North America. SONA advocates for and firmly believes in the copyright termination process, which has empowered many songwriters to reclaim their works.

SAG-AFTRA is the world's largest labor union representing working media artists. SAG-AFTRA represents more than 160,000 actors, announcers, broadcasters, journalists, dancers, DJs, news writers, news editors, program hosts, puppeteers, recording artists, singers, stunt performers, voiceover artists, influencers and other media professionals — who are the faces and voices that entertain and inform America and the world. SAG-AFTRA exists to secure the strongest protections for media artists in the 21st century and beyond.

The members and constituents of each of these entities includes music creators who have an interest in the outcome of this case because they have often granted broad, worldwide rights to labels and/or publishers. The potential for termination of foreign exploitation rights under Section 304(c) and 203 of the Copyright Act means that they could receive the full benefit of their labor.

Each of the Amici regularly advocate for music creators before Congress, the Copyright Office, and other legislative bodies. Most relevant to this case, SONA, MAC, and BMAC recently acted in concert before the U.S. Copyright Office, filing comments and participating in hearings regarding the very termination rights at issue in this appeal. This long-standing, unified advocacy on behalf of creators underscores our direct and vital interest in the outcome of this case.

This case before the Court underscores precisely why these organizations exist—to act as an advocate for creators against certain arguments by corporate music interests. Major industry trade organizations have filed amicus briefs opposing the district court's pro-creator ruling. They argue that expanding artists' termination right would "unsettle bedrock understanding of foreign exploitation rights against which tens of thousands of agreements respecting recorded music and music publishing copyrights have been drafted" in the music industry. Brief for Defendant's, *Vetter v. Resnik*, No. 25-30108, at n. 21 (5th Cir. Apr. 22, 2025).

But whose "bedrock understanding" are they protecting? Certainly not the creators who signed those agreements as unknown artists for minimal compensation, only to watch their musical creations generate millions of dollars for others. The "settled norms and expectations," *id*. at 3, that these industry groups seek to preserve are exactly what Congress intended the termination right to disrupt: unremunerative transfers that leave creators behind while their works create fortunes for others. *See* H.R. Rep. No. 94-1476, at 124 (1976).

When industry giants line up against expanded creator protections, artists need an advocate. That is the Amici's role, and that is why we are filing this brief.

## INTRODUCTION

This case presents a fundamental question about the right Congress has provided to music creators: when the Copyright Act grants an author a "second chance to control and benefit from his work," *Stewart v. Abend*, 495 U.S. 207, 218 (1990), through termination, does that protection extend worldwide or stop at the United States' borders? The district court understood this and correctly held that when Cyril Vetter terminated his 1963 assignment of worldwide rights under 304(c) of the Copyright Act, he recaptured worldwide rights. *Vetter et al. v. Resnik*, 2024 WL 3405556, at *3, *11, *18 (M.D. La. July 12, 2024). If Vetter signed away his worldwide rights, then his termination should recapture those same worldwide rights.

This Court should affirm that decision and ensure that music creators receive the full protection that Congress intended.  *See* Part I.  An industry's defense that "this will disrupt the status quo" is not a sufficient rationale and misrepresents how truly disruptive this would be to the music industry.

The decision in this case matters to every songwriter, every composer, and every music creator who has ever signed away their rights before understanding their works' true value.  In every iteration of the Copyright Act, Congress has created 'reversion rights' for authors. Richard Arnold & Jane C. Ginsburg, *Foreign Contracts and U.S. Copyright Termination Rights*, 43 Colum. J.L. & Arts 437, 439 (2020).  These rights, since their incorporation, have existed for an essential reason: to protect creators from the consequences of early, unremunerative deals made when they had little bargaining power and no crystal ball to predict their future success.  H.R. Rep. No. 94-1476, at 124; *see also Mills Music, Inc. v. Snyder*, 469 U.S. 153, 172 (1985).  For music creators in today's global marketplace, limiting these protections to domestic recapture alone has flown in the face of Congress's intent in enacting the right of renewal and termination.

**ARGUMENT**

## I. THE FUNDAMENTAL POLICY SUPPORTING TERMINATION RIGHT SUPPORTS A FULL RENEGOTIATION WITH GRANTEES

When an artist signs away "exclusive rights to the Song throughout the world," *Vetter*, 2024 WL 3405556, at 2, for minimal compensation, meaningful recapture must be worldwide too. Otherwise, Congress's intent becomes a half-hearted gesture. The Copyright Act's legislative history supports this interpretation.

### A. The Termination Right Is Inalienable So Authors Can Recapture the Full Value of Their Works

The termination right is inalienable. *See* 17 U.S.C. § 203(a)(5); 17 U.S.C. § 304(c)(5) ("Termination of the grant may be effected notwithstanding any agreement to the contrary, including an agreement to make a will or to make any future grant."). Congress insulated the termination right from foreseeable industry pressures and contractual workarounds. This reflects Congress's determination to restructure the renewal right to provide creators with genuine protection that cannot be negotiated away. Congress's desire to protect authors from unremunerative transfers, H.R. Rep. No. 94-1476, at 124, should be paramount to the Court's decision.

Congress's intent in creating the termination right was clear. The purpose of the provision was to protect authors from unremunerative transfers that may be

7

given because of an author's "unequal bargaining position… resulting in part from the impossibility of determining a work's value until it has been exploited." H.R. Rep. No. 94-1476, at 124; *see also Mills Music, Inc. v. Snyder*, 469 U.S. 153, 172 (1985) ("to relieve authors of the consequences of ill-advised and unremunerative grants that had been made before the author had a fair opportunity to appreciate the true value of his work product."). The Copyright Act has protected recapture rights from its very first iterations including, specifically, in the termination right's predecessor, the renewal term. Richard & Ginsburg, 43 Colum. J.L. & Arts at 439; *see generally* 17 U.S.C. 304. In amending the Copyright Act to provide for a termination right as opposed to renewals terms, Congress sought to provide a more balanced approach that recognized the unequal bargaining power between authors and their publishers and distributors. H.R. Rep. No. 94-1476, at 124. The vestiges of the unequal bargaining power that Congress attempted to address in enacting the 1976 Act continue to be evident in publishing and recording agreements: provisions for the grant of rights in these agreements continue to include the language, "including all renewals and extensions of copyright."[1] This

---

[1] Other provisions that cover practices that have largely disappeared but continue to be addressed in record deals include "Reserve Limitations" (which allows a record label to holdback a pool of revenue for physical CD returns), "Mid-Price Records" (which allows a record label to reduce the artist's royalty AND the price of a 'catalogue' album), "Budget Records" (which allows a record label to *further* reduce the price and royalty); "Greatest Hits Albums" and "Ringtones and Ringbacks." Passman, Donald, EVERYTHING YOU NEED TO KNOW ABOUT THE MUSIC BUSINESS, 167-72 (Simon & Schuster 11th ed.) (2023).

demonstrates that even when a right no longer exists, labels and publisher will still include as broad of a grant (and hypothetical grants) in their standard terms.

The trade-off of broadening the scope of the author's rights of termination includes the following concessions: (1) affirmative action by the author or the author's heirs needs to be taken to effectuate the termination; and (2) the author or their heirs may only terminate *inter vivos* transfers. *Id.*, at 124-25. Despite the changes in the mechanism, the policy behind the new version of the reversion right has remained the same: authors deserve "a second bite at the apple."

This was sound economic policy recognizing a market failure. When authors lack bargaining power, they often bargain away their rights, whether or not they can predict their works' future value. In amending the U.S. Copyright Act to move from renewal terms to the termination right, Congress worked to correct this failure by giving authors a second opportunity to exploit their works when their works' value was revealed and their bargaining position improved—as opposed to providing a right solely to the author's heirs if and when the author died before the expiration of the first copyright term.

## B. Congress Intended Authors to Capture the Realized Value of Their Works

When Congress spoke of giving authors the benefit of renegotiating, it meant a real chance at fair compensation for their works' full value—not a

symbolic gesture that leaves creators with a small fraction of the monetary value of what they created.  In discussing renewal rights under the prior Copyright Act, the Supreme Court recognized that Congress's intent surrounding the recapture of rights under copyright law's policy is to provide authors with the right to realize the full value of their efforts:

> If the work proves to be a great success and lives beyond the term of twenty-eight years, . . . it should be the exclusive right of the author to take the renewal term, and the law should be framed . . . so that [the author] could not be deprived of that right.

*Stewart*, 495 U.S. at 219 (quoting H.R. Rep. No. 2222, 60th Cong., 2d Sess., 14 (1909)).  This statement implies that it is the exclusive right of the author to realize the "great success" of the work, and not just success from U.S. rights, but in its entirety.  Notably, there is a tone of gratitude in this statement to authors whose works are so successful that they live beyond twenty-eight years.  It suggests that authors should enjoy the exclusive benefit to control a work after it has been proven successful.

### C. The Copyright Act's Fundamental Policy to Incentivize Authors Has Led to Author-Protective Revisions to the Law

The Supreme Court has said that "[t]he Copyright Act creates a balance between the artist's right to control the work during the term of the copyright protection and the public's need for access to creative works." *Stewart*, 495 U.S. at

228. This is a fundamental policy taught in copyright classes on day one. There is a quid pro quo for a limited monopoly sanctioned by Congress. U.S. Const. Art. 1, § 8, cl. 8 ("To promote the Progress of Science and useful Arts, by securing for *limited Times* to Authors and Inventors *the exclusive Right to their respective Writings and Discoveries*." (emphasis added)).

The Copyright Act has also undergone changes which suggest that Congress recognizes that this limited monopoly is often granted away by the authors it seeks to incentivize. Just to list a couple of examples of these reforms, the Copyright Act protects artists from interested third parties by: (1) establishing mandatory royalty rates for non-exempt transmissions (i.e. streaming) of sound recordings between all parties; 17 U.S.C. § 114(g)(2) ("(A) 50% of the receipts shall be paid to the copyright owner… (B) 2 ½ percent of the receipts shall be deposited in an escrow account…to be distributed to nonfeatured musicians… (C) 2 ½ percent of the receipts shall be deposited in an escrow account … to be distributed to nonfeatured vocalists… [and] (D) 45 percent of the receipts shall be paid … to the recording artist or artists featured on such sound recording."); and (2) demanding that payments of distributions from the Mechanical Licensing Collective be paid to songwriters. 17 U.S.C. § 115(d)(3)(J)(iv). These laws are important to ensure that corporate, non-author copyright owners share royalties in an equitable manner with the songwriters and recording artists. These laws also indicate Congress's desire

for creators to be adequately incentivized, which applies to the underlying policy of the termination right as well.

## II.  A FULL TERMINATION RIGHT IS NECESSARY TO MUSIC CREATORS TO ADDRESS A POWER IMBALANCE

The music industry often operates on a fundamental power imbalance that the termination right was designed to address.[2]  The termination right represents one of the few tools available to musicians to address a growing disparity between traditional grants of perpetual, worldwide rights and potentially lucrative global revenues.  However, the termination right can only fulfill its intended protection from remunerative grants if it encompasses the global scope of modern music exploitation.

### A. Labels and Publishers Often Require Worldwide, Perpetual Grants

Young, unknown artists (often teenagers or young adults) have traditionally signed away all rights to their creative works in perpetuity for minimal upfront payments.  These artists typically lack music industry knowledge, meaningful

---

[2] The digitalization of music has not led to the 'democratization' of the music industry that was anticipated and, instead, may have created further barriers to a musician's business decision-making, *see generally* Hagen, Anja Nylund, *Datafication, Literacy, and Democratization in the Music Industry*, 45 Pop. Music & Soc'ty 184 (2021), *available at* https://doi.org/10.1080/03007766.2021.1989558 (stating "The industry's inherent and structural limitations upon certain stakeholders' abilities to be data-literate – to access, analyze, act on, and produce using data – instead confirm that the music industry remains an oligopolistic field dominated by a few large firms producing differentiated products under market conditions whose entry barriers are substantial." *Id.*)

bargaining power, or skilled legal representation. For example, Donald Passman recounts an anecdote in his book, <u>Everything You Need to Know About the Music Industry</u>, where his friend was "jubilant" about a "ten album deal" where she gave ten options to Capitol Records not understanding that "options are only good for the record company. If you're a flop, you'll never see the money; if you're a success, it'll probably be less than you're worth." Passman, *supra* note 1. Additionally, resources that would allow artists to scale, such as commercial systems for music exploitation and audience data, continue to be controlled by music and tech industry stakeholders. *See generally* Hagen, *supra* note 2.

As such, for many artists, these deals become an important source of short-term income. On the other side of these deals sit established publishers and record labels with teams of lawyers, decades of experience, and leverage. These stakeholders also have the technology, data, and financial resources to better insulate themselves from financial risk. For them, these deals become an important source of long-term income. Thirty-five years is sufficient time for the major labels and publishers to earn a fair return on their investment and, conversely, long enough for musicians to wait before they can more fairly share in the income generated by their music's popularity.

The traditional industry practice routinely meant demanding all rights throughout the world in perpetuity in their standard agreements. This practice

compounds this imbalance.  Artists, desperate for any recognition or income, believe that they have little choice but to sign these "standard terms."  As a result, creators transfer away their most valuable assets for a fraction of its potential worth.  Consider the real-world impact: a songwriter might receive a few thousand dollars as an advance on future royalties for a worldwide assignment, only to watch that song generate millions in revenue as it gains popularity across global markets.  Not to mention that the artist will not be paid anything until the musician's share of royalties recoups all, or a substantial portion of, any advances paid by the label or publisher.  Under the industry's preferred interpretation of copyright law, that creator could never reclaim those worldwide rights, leaving them perpetually disadvantaged by a deal made before anyone understood their works' true value.

More recently, the industry has shifted towards offering exclusive license deals as opposed to the traditional broad transfer of rights.  Leight, Elias, *How Licensing Deals Are Changing the Major Label World — And the Industry's Future*, BILLBOARD (Mar. 10, 2025).  Author, Elias Leight, suggests that "Record companies have been forced to offer artists license deals because these acts can build fan bases and accomplish so much today on their own."  *Id.*  Alternatively, this shift could be due to competition between the record labels to obtain high-streaming artists.  Nonetheless, these license deals typically are not as beneficial to

the artist as one would immediately believe. Leight explains that "This usually does not mean that the artist gets to sign a license deal and strut away, recordings in hand, a decade later. The license period often kicks in nine to 12 [sic.] months *after* the act releases their final album under the agreement." *Id.* (emphasis in original). While it is a step in the right direction by record labels towards avoiding unremunerative grants, it is clear that a termination right is not only still necessary, but also in line with the trend that the industry is acknowledging in dealmaking.

### B. Music Dissemination Is Now Almost Immediately Global

Streaming platforms have made international exploitation the norm rather than the exception. INTERNATIONAL FEDERATION OF THE PHONOGRAPHIC INDUSTRY, IFPI GLOBAL MUSIC REPORT 2025, (2025), https://www.ifpi.org/wp-content/uploads/2024/03/GMR2025_SOTI.pdf (last visited June 17, 2025). Streaming platforms and subscription-based music listening continues to grow with an increase of 9.5% in revenues last year and a global revenue growth of 4.8%. *Id.* Record labels and publishers can instantaneously put out a song and sound recording worldwide, which become a global hit on Spotify, Apple Music, or YouTube. These works can quickly generate revenue from almost every territory around the globe simultaneously. Additionally, the greatest value of a creative work could easily be in a non-U.S. territory.

In this highly connected, worldwide, media environment, limiting the termination right solely to domestic exploitation would provide creators with only a fraction of the benefit they deserve.  It appears this fraction is also decreasing as other countries recorded music revenues grow.  For example, the Middle East and North African region saw revenues increase by 22.8% and the Sub-Saharan African region grew 22.6% last year.  *Id.*  An artist might successfully recapture U.S. rights to their works while watching such works generate increasing revenue in dozens of foreign countries.  The primary benefit of the increased revenues will be paid to the record labels and publishers that originally paid very little for the works.  Limiting copyright termination to a domestic territory leaves creators locked out of a significant amount (possibly a majority) of their works' earning potential, bound by deals made when they had no leverage and no understanding of the global marketplace their music would enter.

Yet, despite this technological revolution and trends towards exclusive licensing, the fundamental structure of agreements with musicians remains largely unchanged from the analog era.  Artists still routinely sign away all rights throughout the world in perpetuity for minimal upfront payments, just as they did when global distribution required physical manufacturing and expensive international marketing campaigns.  The continued disconnect between

technological advancement and legal protection has left creators with more unrealized value for themselves and higher gains for publishers and record labels.

## III. THE LACK OF BURDEN IN CONNECTION WITH POTENTIALLY ENFORCING A WORLDWIDE TERMINATION

There is *not* an insurmountable burden in holding that Sections 203 and 304(c) of the Copyright Act provide for termination of a grant of worldwide rights. The following clarifies how: (1) grantees account for the U.S. termination right in its dealmaking with creators; (2) foreign music-makers would not be harmed; and (3) the industry is already capable of implementing a worldwide termination right without disruption.

### A. Publishers and Labels Know that Copyright Terminations Exist and Factor This Into Their Agreements

Publishers and labels negotiate their agreements knowing that U.S. copyright law includes termination provisions. They could negotiate domestic-only assignments if they wanted certainty about foreign rights. Instead, they frequently choose to acquire worldwide rights while paying prices that assumed modest future value. Having obtained those rights relatively cheaply, they cannot now claim surprise that termination laws might affect the full scope of the transfer. If record labels, publishers, and other media entities are aware that the termination right is worldwide, they will simply negotiate with this economic reality in mind.

### B. Foreign Works Are Protected Under the U.S. Copyright Act And Authors Do Not Have Privity With Foreign Entities

The Amicus for the Defendants-Appellants, The Motion Picture Association, Inc., point to a difference between renewal and termination proffered by Nimmer: they argue that it may be more appropriate to vest copyright with the heirs where an author did not survive the renewal vesting. Brief for Motion Picture Association, Inc. as Amicus Curiae Supporting Defendants-Appellants, *Vetter v. Resnik*, No. 25-30108, 22-23 (5th Cir. Apr. 29, 2025) (citing 5 Nimmer on Copyright § 17.10[B][2]). Nimmer explains that if authors separately granted copyright in their works for "U.S. rights, …Congolese rights, …Ceylonese rights, and… Czech rights, etc." then the rights in the later three contracts would be unaffected due to a U.S. termination right. *Id.*

Nimmer continues to argue that "[t]here is no reason to alter this result simply because all of the rights in question happened to be granted in a single instrument." *Id.* There seem to be at least a few reasons, however. Namely, it fails to recognize that foreign copyrights have protection under the Copyright Act, independent of the Berne Convention. Foreign copyrights "are subject to protection under this title if [it is published] … [and] one or more of the authors is

a national or domiciliary of the United States, or is a national, domiciliary, or sovereign authority of a treaty party, or is a stateless person, wherever that person may be domiciled." 17 U.S.C. § 104(b)(1). Additionally, foreign copyrights have protection under the Copyright Act if "the work is first published in the United States or in a foreign nation that, on the date of first publication, is a treaty party." 17 U.S.C. § 104(b)(2). If the work is unpublished, "[t]he works… are subject to protection under this title without regard to the nationality or domicile of the author." 17 U.S.C. § 104(a). The rights conferred by these provisions arise under the U.S. Copyright Act. So, then, why would "those rights covered by the grants that arise under this title," § 203(b)(5); § 304(c)(5), be limited to domestic territories? These rights are not given to foreign works simply because the U.S. is a signatory to the Berne Convention—although that may have been the impetus for including such provisions. Rather, these rights arise out of the U.S. Copyright Act and should be affected by a termination notice and filing.

Additionally, the Second Circuit has held that under U.S. law, the Brazilian composer, Antonio Carlos Jobim, could exercise his renewal right within the United States even though, under Brazilian law, there is not a renewal right. *Corcovado Music Corp. v. Hollis Music, Inc.*, 981 F. 2d 679 (2d Cir. 1993). The Second Circuit recognized that the renewal right reflected a "vital policy of United States copyright law." *Id.* at 685.

This begs the question: if foreign authors and entities benefit from the protections of U.S. copyright law (either automatically for unpublished works or by publication based on authorial nationality or location of initial publication) and if foreign authors may exercise a U.S. recapture right, then why would that protection not extend to the protection of all authors to claw back their works?

### C. The Music Industry Is Equipped to Implement a Worldwide Termination

Industry groups paint apocalyptic scenarios of chaos and uncertainty, *see e.g.,* Tencer, Daniel, *U.S. Court Says Copyright Termination Applies Globally, Potentially Causing 'Chaos" for Rightsholders*, MUSIC BUSINESS WORLDWIDE (Feb. 4, 2025), https://www.musicbusinessworldwide.com/us-court-says-copyright-termination-applies-globally-potentially-causing-chaos-for-rightsholders/, but markets consistently adapt to legal changes, often in beneficial ways. A stronger termination right would likely encourage more equitable initial deals, as assignees would know they cannot rely on perpetual control obtained through unequal bargaining. *See* Hagen, *supra* note 2. Additionally, determining a subsequent copyright holder is already common practice for artists exercising their termination right.

The industry's adaptability over U.S. terminations is already evident domestically and, clearly, it has not destroyed the music industry. Publishers and

labels regularly negotiate with artists whose termination right has been exercised, often reaching new agreements that better reflect the works' proven value. Particularly when it comes to record labels, it has still not yet been determined whether sound recordings are "works made for hire," but it is common practice for labels to negotiate better royalty splits, pay further advances, and/or forgive past advances so that artists can see royalties for the first time on their works. On the publishing side, it is quite common to have co-administration of a song, but often the termination notice allows the publisher to have a two year right of first negotiation for U.S. rights.

Additionally, terminations (for publishers and labels) often require an author to know the successor-in-interest in their catalogue. The termination of subsequent parties of interest have not posed an issue for the industry. As an example, let's say a songwriter signed a co-publishing deal with EMI in 2008. Sony Music (formerly Sony/ATV) then acquires EMI in 2012 for a total value of $2.2 billion. Lieberman, David, *Sony/ATV Becomes Top Music Publisher With Acquisition of EMI Catalog*, DEADLINE (June 29, 2012), https://deadline.com/2012/06/sonyatv-becomes-top-music-publisher-with-acquisition-of-emi-catalog-294363/. If, in 2041, the songwriter sends a termination notice with a termination date in 2043 and files the notice with the Copyright Office, then they would have to address the termination notice to Sony Music, as successor-in-interest to EMI. The consolidation of the

labels and publishers are commonplace, and artists and their teams are able to terminate the grant of rights with the correct parties. This is similar to how worldwide terminations should be viewed. A foreign sub-publisher is merely a successor-in-interest to a segment of the rights granted to the U.S. publisher. They are readily identifiable and downstream rights of subsequent publishers are terminated all the time in the United States without issue.

Lastly, the music industry has successfully navigated numerous major changes: from vinyl to digital, from physical sales to streaming, from domestic to global distribution. The industry's resilience and adaptability are among its greatest strengths. Claims that recognizing a worldwide termination right would somehow prove uniquely catastrophic lack credibility.

### D. The Incentive of a Worldwide Termination Right Benefits All Stakeholders

A strong termination right benefits the entire music ecosystem, not just individual creators. When creators can benefit meaningfully from successful works, they have greater incentive to continue creating. When publishers and labels know they cannot rely on perpetual control obtained through unequal bargaining, they have incentive to offer fairer initial terms and maintain better ongoing relationships with creators. This dynamic encourages innovation and risk-taking throughout the industry. Creators are more willing to experiment and push

boundaries when they know successful works can provide long-term financial security.  Publishers and labels benefit from a larger pool of high-quality creative works and more collaborative relationships with creators.

Conversely, a system that allows assignees to retain most global value from early, unremunerative deals discourages creativity and breeds resentment that undermines industry relationships.  Creators become reluctant to license their works when they see little prospect of fair compensation, while assignees become overly dependent on exploiting old acquisitions rather than fostering new creativity.

## CONCLUSION

This case presents a choice between two visions of U.S. copyright law.  One vision treats the termination right as meaningful protection for creators in the global marketplace where creators have the opportunity to recapture their works' value.  The other treats these rights as domestic-only consolation prizes that leave creators excluded from much of their works' earning potential.

The district court chose correctly.  When Congress enacted the inalienable termination right for authors to have a second opportunity to benefit from their works' actual value, it meant to incentivize authors to distribute works and provide them with a fair opportunity.  When creators sign away worldwide rights in U.S. deals for minimal compensation, meaningful recapture must be worldwide too.

Publishers and labels profit from cherry-picking by inconsistently applying U.S. copyright law applies—only when it benefits them.  The industry giants arguing against the district court's decision have teams of lawyers, massive financial resources, and decades of accumulated advantages.  By contrast, music creators have advocacy organizations like MAC, ARA, SONA, BMAC, and SAG-AFTRA and the hope that courts will interpret copyright law to serve the intent of Congress and fundamental policies of copyright law stated from its inception: to incentivize authorship in the United States by securing exclusive rights for authors and inventors for limited times.

This Court should affirm the district court's judgment and ensure that America's music creators receive the full protection Congress intended.

Respectfully submitted,

ROBERT S. MEITUS
MEITUS STROHM LLP
121 East Kirkwood Avenue, Suite 300
Bloomington, IN 47408
(317) 464-5311
*Counsel for Amici Curiae*

# CERTIFICATE OF COMPLIANCE

Undersigned counsel certifies that the attached brief complies with the type-volume limitations in Federal Rule of Appellate Procedure 29(a)(5) because this brief contains 4,297 words, less than the amount allowed for a party's principal brief under Federal Rule of Appellate Procedure 32(a)(&)(B)(i), excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(f) and Fifth Circuit Rule 32.2.

Undersigned counsel further certifies that this brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and Fifth Circuit Rule 32.1 and the type style requirements of Federal Rule of Appellate Procedure 32(a)(6), because this brief has been prepared in a proportionally spaced 14-point Times New Roman typeface using Microsoft Word.

*/s/ Robert S. Meitus*
Robert S. Meitus

*Attorney of Record for Amici Curiae*

**CERTIFICATE OF SERVICES**

I hereby certify that on June 20, 2025, I electronically filed the foregoing

Brief of Music Artists Coalition, Black Music Action Coalition, Artist Rights

Alliance, Songwriters of North America, and the Screen Actors Guild-American

Federation of Television and Radio Artists as Amici Curiae in Support of Plaintiffs-

Appellees with the Clerk of the Court for the U.S. Court of Appeals for the Fifth

Circuit by using the appellate CM/ECF system.  All case participants are registered

CM/ECF users and will be served by the appellate CM/ECF system.

*/s/ Robert S. Meitus*
Robert S. Meitus

*Attorney of Record for Amici Curiae*