## No. 25-30108

# United States Court of Appeals

### for the

# Fifth Circuit

————◆()◆————

CYRIL E. VETTER; VETTER COMMUNICATIONS CORPORATION,
*Plaintiff-Appellees,*

– v. –

ROBERT RESNIK; RESNIK MUSIC GROUP,
*Defendant-Appellants.*

———————————

ON APPEAL FROM THE UNITED STATES DISTRICT
COURT FOR THE MIDDLE DISTRICT OF LOUISIANA
NO. 3:23-CV-1369-SDD-EWD

---

**BRIEF FOR *AMICI CURIAE***
**THE AUTHORS GUILD, INC.,**
**DRAMATISTS LEGAL DEFENSE FUND, INC.,**
**NOVELISTS, INC.,**
**ROMANCE WRITERS OF AMERICA, INC.,**
**SOCIETY OF COMPOSERS & LYRICISTS, INC. AND**
**SONGWRITERS GUILD OF AMERICA, INC.**
**IN SUPPORT OF PLAINTIFF-APPELLEES**

---

Joshua Graubart
LAW OFFICES OF JOSHUA
   GRAUBART, P.C.
295 Madison Ave., 22nd Fl.
New York, NY 10017-6356
(646) 781-9321
jggraubart@graubartlaw.com

Jordan Greenberger
FIRESTONE GREENBERGER
   PLLC
104 West 40th St., 4th Fl.
New York, NY 10018
(212) 597-2255
jg@firegreenlaw.com

June 20, 2025

## CERTIFICATE OF INTERESTED PERSONS

Undersigned counsel certifies that the following listed persons and entities as described in the fourth sentence of Fifth Circuit Rule 28.2.1 have an interest in the outcome of this case. These representations are made in order that the judges of this Court may evaluate possible disqualification or recusal.

**A. Plaintiff-Appellees**

> Cyril E. Vetter
> Vetter Communications Corporation

**B. Attorneys for Plaintiff-Appellees**

> Timothy R. W. Kappel
> WELLS & KAPPEL LLP

**C. Defendant-Appellants**

> Robert Resnik
> Resnik Music Group

**D. Attorneys for Defendant-Appellants**

> Robert W. Clarida
> Brian D. Caplan
> REITLER KAILAS & ROSENBLATT LLP
>
> Edgar D. Gankendorff
> Christophe Bela Szapary
> PROVOSTY & GANKENDORFF LLC

### E. *Amici Curiae*

Recording Industry Association of America
National Music Publishers' Association American
Association of Independent Music

Motion Picture Association, Inc.

National Society of Entertainment & Arts Lawyers

Music Artists Coalition
Black Music Action Coalition
Artists Rights Alliance
Songwriters of North America
Screen Actors Guild – American Federation of
    Television & Radio Artists (SAG-AFTRA)

The Authors Guild, Inc.
Dramatists Legal Defense Fund, Inc.
Novelists, Inc.
Romance Writers of America, Inc.
Society of Composers & Lyricists, Inc.
Songwriters Guild of America, Inc.

### F. **Attorneys for** *Amici Curiae*

Rollin A. Ransom
Collin P. Wedel
Manuel Valle
    SIDLEY AUSTIN LLP

Jonathan Hacker
Daniel M. Petrocelli
Molly M. Lens
Danielle R. Feuer
    O'MELVENY & MYERS LLP

Scott Alan Burroughs
    DONIGER / BURROUGHS
Steven T. Lowe
    LOWE & ASSOCIATES

Robert S. Meitus
John P. Strohm
Megan L. Wheeler
  MEITUS STROHM LLP

Joshua Graubart
  LAW OFFICES OF JOSHUA GRAUBART, P.C.
Jordan Greenberger
  FIRESTONE GREENBERGER PLLC

## G. Federal Rule of Appellate Procedure 26.1

*Amici* The Authors Guild, Inc., Novelists, Inc., Romance Writers of America, Inc., Society of Composers & Lyricists, Inc., and Songwriters Guild of America, Inc. are all nonprofit corporations, do not have parent corporations, and no publicly held corporation owns 10% or more of any of their stock.  None are government entities.

*Amicus* Dramatists Legal Defense Fund, Inc. is a nonprofit corporation under the control of the Dramatists Guild of America, Inc., itself a nonprofit membership organization classified under § 501(c)(6) of the Internal Revenue Code.  No publicly held corporation owns 10% or more of Dramatists Legal Defense Fund, Inc., nor is it a government entity.

June 20, 2025          */s/ Joshua Graubart*          */s/ Jordan Greenberger*
                          Joshua Graubart          Jordan Greenberger
                              *Counsel for Amici Curiae*

# TABLE OF CONTENTS

CERTIFICATE OF INTERESTED PERSONS ……………………………… i

TABLE OF AUTHORITIES ………………………………………………... v

IDENTITY AND INTEREST OF AMICI CURIAE,

AND AUTHORITY TO FILE ……………………………………………... 1

    1. The Authors Guild, Inc. ………………………………………..... 1

    2. Dramatists Legal Defense Fund, Inc. …………………………… 1

    3. Novelists, Inc. ………………………………………………….. 2

    4. Romance Writers of America, Inc. ……………………………..…… 2

    5. Society of Composers & Lyricists, Inc. ……………...……………… 3

    6. Songwriters Guild of America, Inc. …………………………… 3

PRELIMINARY STATEMENT ………………………………………… 4

ARGUMENT …………………………………………………………… 10

    1. U.S. copyright law exists explicitly to benefit *authors* ……………… 10

    2. Initial ownership of copyright may not, of itself, substantially benefit authors with little bargaining power …………………………… 11

    3. Congress designed the 1909 and 1976 Acts to allow copyrights to revert to authors or their heirs …………………………………….. 12

    4. The statutory language does not contain a geographical limitation … 18

    5. A geographical limitation would have deleterious consequences for authors ……………………………………………………… 19

CONCLUSION …………………………………………………………….. 22

CERTIFICATE OF SERVICE ……………………………………………... 24

CERTIFICATE OF COMPLIANCE ………………………………………. 25

# TABLE OF AUTHORITIES

**Cases**                                                                          **Page(s)**

*Clancy v. Jack Ryan Enters., Ltd.*, 2021 U.S. Dist. LEXIS 26553,
    2021 WL 488683 (D. Md. Feb. 10, 2021) ……………………..  8-9

*Fred Fisher Music Publishing Co. v. M. Witmark & Sons*,
    318 U.S. 643, 63 S. Ct. 773, 87 L. Ed. 1055 (1943) ……………...  5, 14

*Kirtsaeng v. John Wiley & Sons, Inc.*,
    568 U.S. 519, 133 S. Ct. 1351, 185 L. Ed. 2d 392 (2013) ………..  8, 9, 18-21

*Kirtsaeng v. John Wiley & Sons, Inc.*,
    579 U.S. 197, 136 S. Ct. 1979, 195 L. Ed. 2d 365 (2016)………...  9

*Korman v. HBC Fla., Inc.*, 182 F.3d 1291 (11th Cir. 1999) ………….  17

*Mills Music, Inc. v. Snyder*,
    469 U.S. 153, 105 S. Ct. 638, 87 L. Ed. 1055 (1985) …………….  17

*Quality King Distributors v. L'anza Research Int'l*,
    523 U.S. 135, 118 S. Ct. 1125, 140 L. Ed. 2d 254 (1998) ………..  21

*Siegel v. Warner Bros. Entm't, Inc.*,
    496 F. Supp. 2d 1036 (C.D. Cal. 2009) …………………………  8, 10

*Waite v UMG Recordings, Inc.*,
    450 F. Supp. 3d 430 (S.D.N.Y. 2020) ……………………………  12

*White-Smith Music Pub. Co. v. Goff*,
    187 F. 247 (1st Cir. 1911)…………………………………………  14

*Woods v. Bourne Co.*,
    60 F.3d 978 (2d Cir. 1995)………………………………………..  14

**Treaties, Statutes & Rules**

"Statute of Anne", 8 Ann. c.19 (1710)………………………………  11

    8 Ann. c.19 § 11…………………………………………………...  12-13

U.S. Const. art. I, § 8, cl. 8……………………………………….... 6, 10

Copyright Act (U.S.) of 1790, 1 Stat. 124……………………….. 13

Copyright Act (U.S.) of 1831, 4 Stat. 436……………………….. 13

Copyright Act (U.S.) of 1909, 35 Stat. 1075……………………... *passim*

    Copyright Act (U.S.) of 1909, § 15…………………………… 18, 21

    Copyright Act (U.S.) of 1909, § 42…………………………… 10

Copyright Act (U.S.) of 1976, Pub. L. No. 94-553, 90 Stat. 2541…. *passim*

    17 U.S.C. §§ 101…………………………………………….. 6

    17 U.S.C. § 109…………………………………………….. 19, 20

    17 U.S.C. § 201…………………………………………….. 6, 10

    17 U.S.C. §§ 203 & 304…………………………………….... *passim*

    17 U.S.C. § 204…………………………………………….. 6

    17 U.S.C. § 602…………………………………………….. 19

(Imperial) Copyright Act (U.K.), 1 & 2 Geo. 5, C. 46 (1911)…….. 15

Copyright Act (Canada), R.S.C. ch. C-43 (1985)………………... 16

**Legislative History**

H.R. Rep. No. 28192 (1909)…………………………………….. 13

H.R. Rep. No. 94-1476 (1976)…………………………………... 11, 16

S. Rep. No. 94-473 (1976)……………………………………… 11, 16

**Other Authorities**

Lionel Bently & Jane C. Ginsburg, *"The Sole Right … Shall
    Return to the Authors": Anglo-American Authors' Reversion
    Rights from the Statute of Anne to Contemporary U.S. Copyright*,
    25 Berkeley Tech. L.J. 1475 (2010)……………………………... 15

Orin Bracha, *The Adventures of the Statute of Anne in the Land of Unlimited Possibilities: The Life of a Legal Transplant*, 25 BERKELEY TECH. L.J. 1427 (2010)…………………………………… 13, 15

Andrew Leyshon, Peter Webb & Shaun French, *On the reproduction of the musical economy after the Internet*, 27 MEDIA CULTURE & SOCIETY 177 (2005)…………………………………. 17

Melville B. Nimmer & David Nimmer, NIMMER ON COPYRIGHT… 9, 10

Record Industry Association of America (RIAA), *U.S. Recorded Music Revenues by Format*………………………………….. 17

Deane L. Root, *The "Mythtory" of Stephen C. Foster or Why His True Story Remains Untold*, 1 AMER. RESEARCH CENT. J. 20 (1991)……………………………………………………………… 5

Maurice Waller & Anthony Calabrese, FATS WALLER (1977)……. 5

## IDENTITY AND INTEREST OF *AMICI CURIAE,*
## AND AUTHORITY TO FILE

1.    **The Authors Guild, Inc**. Founded in 1912, *amicus* The Authors Guild, Inc.

is a national non-profit association of over 16,000 professional published writers

of all genres including periodicals and other composite works. The Authors

Guild works to promote the rights and professional interests of authors in

various areas, including copyright, freedom of expression, and fair pay. Many

Authors Guild members earn their livelihoods through their writing. Their work

covers important issues in history, biography, science, politics, medicine,

business, and other areas; they are frequent contributors to the most influential

and well-respected publications in every field. Authors Guild members are

creators on the front line, fighting for their constitutional rights under copyright

law to reap financial benefits from their labors.

2.    **Dramatists Legal Defense Fund, Inc**. The Dramatists Guild of America,

Inc. is a century-old trade association with a governing board of playwrights and

musical theatre authors. The Dramatists Guild formed *amicus* the Dramatist

Legal Defense Fund, Inc. ("DLDF") in 2009 to advocate for free expression in the

dramatic arts while advancing the interests of theatre writers. DLDF is governed

by an elected Board of Directors that currently includes renowned dramatists,

several lawyers well-established within the theatre industry and noted actor Raul

1

Esparza (*Law & Order: Special Victims Unit*). The rights of dramatists to own their copyrights and to control their work are the founding principles on which both the Dramatists Guild and DLDF are based, and dramatists have forgone unionization, accepting an economically disadvantaged labor status, in order to preserve these rights. Like many other authors, dramatists have been vulnerable to long-term contracts that expand beyond U.S. borders, including without limitation production agreements extending to territories around the world, global publishing agreements (including the music publishing rights of composers and lyricists), and motion picture adaptations requiring worldwide release.

3.      **Novelists, Inc**. Founded in 1989, *amicus* Novelists, Inc. ("NINC") is a nonprofit organization focusing on networking, education, and advocacy for professional authors of book-length fiction. NINC members include traditionally-published novelists, indie or self-published authors, and writers whose careers combine both traditional and indie publication. Many NINC members also write professionally in other fields, such as journalism, screenwriting, comics, drama, short fiction, and nonfiction.

4.      **Romance Writers of America, Inc**. *Amicus* Romance Writers of America, Inc. is a nonprofit trade association whose mission is to advance the professional and common business interests of career-focused romance writers through

networking and advocacy and by increasing public awareness of the romance genre.

5.    **Society of Composers & Lyricists, Inc**. The Society of Composers & Lyricists, Inc. ("SCL") is the leading U.S. organization for professional composers, lyricists, and songwriters working in visual media, including film, television, streaming, and emerging platforms. For more than eight decades, the SCL has advocated for the creative, legal, and economic interests of music creators, particularly in matters involving copyright, authorship, performance rights, and fair compensation.  SCL members, numbering in excess of 4,000, are directly affected by the laws and practices governing the ownership, licensing, and enforcement of musical works.

6.    **Songwriters Guild of America, Inc**. Founded in 1931, *amicus* the Songwriters Guild of America, Inc. ("SGA") is the longest established and largest advocacy and copyright administrative organization for music creators in the United States run solely by and for songwriters, composers, and their heirs. Its positions are reasoned and formulated independently and solely in the interests of music creators and their estates.  SGA was a leader among those organizations that worked longest and hardest to ensure the inclusion of termination rights for authors and estates in the Copyright Act of 1976, and it has likely filed more notices of termination than any other single entity since the Act went into effect

3

in 1978.  SGA has for over 94 years successfully operated with a two-word

mission statement: "Protect Songwriters," and continues to do so throughout the

United States and the world. Its organizational membership stands at

approximately 5,000 members.

Each of the a*mici* above (collectively, the "*Amici*") comprises and represents

literary or musical authors whose rights to a reversion of copyright are at stake in

the present appeal.

All parties to the present appeal have consented to the submission of this

brief pursuant to Rule 29(a)(2) of the Federal Rules of Appellate Procedure.  No

counsel for any such party authored this brief in whole or in part, and no person

or entity besides *Amici* and their counsel funded this brief's preparation or

submission.

## PRELIMINARY STATEMENT

Legend has it that the author Herman Melville, prior to the publication of

*Moby Dick*, sold his rights to a publisher for five dollars and never earned another

cent on the best-selling work.  While that story may be apocryphal, others are

not.

Stephen Foster, America's first, home-grown musical superstar, toward the

end of his life survived in penury by selling new songs outright to publishers

and died with thirty-eight cents in his pocket.[1]  In the 1920s, African-American jazz genius Thomas "Fats" Waller "picked up a habit he would live to regret: selling his material – for whatever he could get – when he needed some [cash]." His son Maurice asserts that Waller sold his rights (and his credit) to the massive hits "On the Sunny Side of the Street" and "I Can't Give You Anything But Love, Baby," for "a few bucks when he was broke …."[2]

As the Supreme Court has noted, America's first international literary luminary, Samuel Langhorne Clemens ("Mark Twain"), told Rep. Frank Currier, chairman of the House Patents Committee from 1903 through 1911, that "he sold the copyright for *Innocents Abroad* [1869] for a very small sum, and he got very little out of the *Innocents Abroad*" from his initial publishing agreement.  *Fred Fisher Music Co. v. M. Witmark & Sons*, 318 U.S. 643, 653 (1943).

There are countless such stories, and Congress, like legislators around the world, has grappled with this problem for – literally – centuries: how to ensure to that authors receive a fair return on their creations.

---

[1] Deane L. Root, *The "Mythtory" of Stephen C. Foster or Why His True Story Remains Untold*, 1 AMER. RESEARCH CENT. J. 20, 23 & 34 (1991), available online at https://www.colorado.edu/amrc/sites/default/files/attached-files/0506-1991-001-00-000002.pdf.

[2] Maurice Waller and Anthony Calabrese, FATS WALLER 52, 164 (1977).

Copyright ownership initially vests with the author of the work.  17 U.S.C. § 201(a).  That rule follows directly from copyright's Constitutional mandate, which authorizes Congress "to promote the Progress of Science and useful Arts by securing for limited Times to Authors … the exclusive Right to their … writings…."  U.S. CONST. art. I, § 8, cl. 8.

Most authors, however, do not have the practical ability to commercially exploit their works themselves; if they want their works to see the light of day, they contract with a publisher.[3]  The publisher, in exchange, acquires all or part of author's copyright interest in the work through an assignment or exclusive license.  17 U.S.C. §§ 101 (defining "transfer of copyright ownership"), 201(d) and 204.  That transfer of copyright ownership may have geographical limitations, or it may cover the entire world.

As a practical matter, however, most authors grant their copyright interests to a publisher *before anyone knows the work's commercial value* in the United States or elsewhere.  Consequently, authors of what prove to be commercially successful works often sell or license their rights for small remuneration.  The

---

[3] Here and throughout, the term "publisher" includes periodical publishers, book publishers, music publishers, theatrical producers, record companies, film studios, software developers, and anyone else whose business is acquiring or licensing copyright from authors with the intent of making the works, or derivative works, available to the public.

paradigm case is an author in the beginning of their career who sells their rights in exchange for a small (or no) advance and / or a low royalty rate. If there were a method by which the parties could accurately predict that those rights – like the rights to Twain's *Innocents Abroad* referenced above – would prove quite valuable, that same author could have demanded and received a large advance and high royalty rate. Instead, absent a legislative remedy, the author remains locked in a contract inked in ignorance of the value of the rights sold.

Of course, ignorance of market value poses a risk for publishers, too. What if the work is a commercial flop? Congress was not unmindful of this risk, and both the 1909 Act and the 1976 Act allow the publisher a free hand *for decades* to recoup and profit from its investment on whatever terms it is able to obtain at the outset before reversion can take effect. Pity not, therefore, the poor publisher robbed by statute of its investment.

Throughout the history of modern copyright law, various methods have been attempted to allow authors to obtain greater financial rewards once the market value of the rights to their work has been established. Though differing in detail, those methods broadly allow the rights to "revert" to the author or the author's heirs years after a grant is made. In this brief, *Amici* refer to all such methods collectively as "reversion".

The United States has experimented with two methods of reversion:

(i)     a two-term system, where the author is granted both terms: an initial and ultimately a renewal term (as embodied in the Copyright Act of 1909, 35 Stat. 1075 (repealed 1976)) (the "1909 Act"); and

(ii)    an affirmative termination system, where the author (or certain heirs) can terminate any grant approximately thirty-five years after the grant is made (as embodied in the Copyright Act of 1976, Pub. L. No. 94-553, 90 Stat. 2541 (codified at 17 U.S.C. § 101 *et seq*.) (the "1976 Act").

Both of these reversion methods are at issue in this case: (i) whether Appellees' predecessor-in-interest, co-author Don Smith's heirs, acquired rights to the work outside the United States when the renewal term reverted to them following Smith's death; and (ii) whether Appellees acquired rights to the work outside of the United States when Appellee Cyril Vetter exercised his own termination rights under 17 U.S.C. § 304. Appellants' Br. 1.

Appellants interpret the reversion provisions of both the 1909 Act and the 1976 Act as having a geographical limitation. According to Appellants and a handful of district court decisions (mostly[4]) pre-dating the Supreme Court's

---

[4] The exception is *Clancy v. Jack Ryan Enters., Ltd.*, 2021 U.S. Dist. LEXIS 26553, 2021 WL 488683 (D. Md. Feb. 10, 2021), which cites only to *Siegel v. Warner Bros. Entm't, Inc.*, 496 F. Supp. 2d 1036 (C.D. Cal. 2009), which pre-dates *Kirtsaeng I* (see

decision in *Kirtsaeng v. John Wiley & Sons, Inc.* (568 U.S. 519 (2013))[5], an author who exercises their reversion right recaptures *only* the right to exploit the work within the United States.  Under this interpretation, where an author grants a publisher rights for both (i) the United States, and (ii) all or some foreign territories (which authors commonly do), then the author is able to regain their rights *within the United States only*, leaving rights in all foreign territories to the publisher-grantee (or its successors and assigns).  That interpretation does little to protect authors, despite Congress's clear intent to do so.

Appellees and the district court below, by contrast, following the Supreme Court's lead in *Kirtsaeng I*, do not interpret the reversion provisions of the 1909 Act and the 1976 Act as having a geographical limitation.  Nor do *Amici.*  Instead, under their interpretation, when an author or their heirs exercises their right of reversion, the author or their heirs recapture the right to exploit their work *both* in the United States and around the world.  That interpretation protects authors.

Granting authors the broadest possible termination right, unlimited in geographical scope, is consistent with the Constitution, the statutory text of

---

following footnote), and to Professor Nimmer (3 NIMMER ON COPYRIGHT § 11.02[B]).  The *Clancy* court did not address *Kirtsaeng I*.

[5] Often, and herein, referred to as "*Kirtsaeng I*", to distinguish it from *Kirtsaeng v. John Wiley & Sons, Inc.*, 579 U.S. 197 (2016), often referred to as "*Kirtsaeng II*", in which the Supreme Court addressed an award of attorneys' fees.

sections 203 and 304, and the intent of the Framers and of Congress. Copyright exists to benefit the public by ensuring that *authors* are sufficiently compensated financially to incentivize them to keep creating. Putting a geographical limitation on the right of reversion is contrary to the very purpose of copyright law. The district court should be affirmed.

## ARGUMENT

### 1. U.S. copyright law exists explicitly to benefit *authors*.

American copyright law is designed to benefit *authors*. This is enshrined in the Constitution and in the country's copyright statutes.

Copyright in the United States exists to promote the progress of knowledge "by securing … to *authors* … the exclusive right to their respective writings…." U.S. CONST. art. I, § 8, cl. 8 (emphasis added).

Rights vest first in the work's author, regardless of the type of work or its method of creation. 17 U.S.C. § 201(a).[6] The author then has the right to assign or exclusively license some or all of their bundle of rights. 17 U.S.C. § 201(d); 1909 Act § 42.

---

[6] Unlike the 1976 Act, the 1909 Act did not grant statutory copyright – to the author or to anyone else – from the moment of creation. Rather, on publication with notice of copyright, the 1909 Act in effect converted to statutory copyright the already-subsisting common law copyright in unpublished works. Common law copyright initially vested in the author. *Siegel v. Warner Bros. Entm't, Inc.*, 496 F. Supp. 2d 1036, 1084 (C.D. Cal. 2009), *quoting* 1 NIMMER ON COPYRIGHT § 5.01[B].

**2. Initial ownership of copyright may not, of itself, substantially benefit authors with little bargaining power.**

Beginning with the British Statute of Anne (8 Ann. c.19 (1710)), the first modern copyright act, there arrived the vexing issue attending all copyright regimes designed to benefit authors: how to ensure that the *author*, as distinct from the publisher, receives sufficient remuneration to stimulate the production of creative works.

Authors – and especially authors at the outset of their careers, with no established track records – hold very poor bargaining positions as against publishers. Congress has long recognized that authors commonly grant their copyright interests in a work before anyone knows the work's true market value. As the legislative history of the 1976 Act notes:

> The provisions of section 203 are based on the premise that the [1976 Act] should [provide] a provision safeguarding authors against unremunerative transfers. A provision of this sort is needed because of the unequal bargaining position of authors, resulting in part from the impossibility of determining a work's value until it has been exploited.

H.R. REP. NO. 94-1476 at 124 (1976); S. Rep. No. 94-473 at 123 (1976) at 108.

When an author grants (*i.e.*, assigns or exclusively licenses) their work to a publisher, and that work proves to be a "hit," the publisher can reap

substantially greater financial benefits than the author.  As one court has

explained,

> Aspiring singers, musicians, authors and other artists – sometimes
> young and inexperienced and often not well known – tend to have
> little bargaining power in negotiating financial arrangements with
> recording companies, publishers, and others who promote and
> commercialize the artists' work. They often grant copyright in that
> work as part of the bargain they strike for promotion and
> commercialization. Accordingly, when an artistic work turns out to be
> a 'hit,' the lion's share of the economic returns often goes to those who
> commercialized the works rather than to the artist who created them.

*Waite v UMG Recordings, Inc.*, 450 F. Supp. 3d 430, 432 (S.D.N.Y. 2020).

## 3.  Congress designed the 1909 and 1976 Acts to allow copyrights to revert to authors or their heirs.

### 3.1. The two-term approach: the 1909 Act and its predecessors.

Legislators have historically attempted to address this vexing issue by

giving authors an opportunity to recapture their rights after the initial grantee

has had decades to exploit the work.  The Statute of Anne did so by affording to

the author two terms of copyright, each of fourteen years.  8 Ann. c.19 § 11

(1710).  The author might grant the first term to a publisher, and during that

term, a measure of its value in the marketplace would be established.  Provided

the author was still alive at the end of the first fourteen-year term, the Statute of

Anne returned to the author all rights for a second fourteen-year term, which the

author could then re-grant on terms reflecting the work's established value in the market.  *Id.*

The fledgling United States adopted the two fourteen-year term structure of the Statute of Anne in its first Copyright Act of 1790.[7]  Orin Bracha, *The Adventures of the Statute of Anne in the Land of Unlimited Possibilities: The Life of a Legal Transplant*, 25 BERKELEY TECH. L.J. 1427, 1471 (2010).

The 1909 Act kept the renewal structure in place.  The House Committee on Patents, in referring the 1909 Act to the full House, was explicit about the purpose of the renewal term:

> It not infrequently happens that the author sells his copyright outright to a publisher for a comparatively small sum. If the work proves to be a great success and lives beyond the term of twenty-eight years, your committee felt that it should be the exclusive right of the author to take the renewal term, and the law should be framed as is the existing law, so that he could not be deprived of that right.

HON. FRANK D. CURRIER on behalf of the House Committee on Patents, REPORT ACCOMPANYING H.R. 28192 (60th Congress, Feb. 1909).[8] There is no question that

---

[7] 1 Stat. 124.  Congress later extended the original term from 14 to 28 years. Copyright Act of 1831, 4 Stat. 436.

[8] Available at https://ipmall.law.unh.edu/sites/default/files/hosted_resources/lipa/copyrights/The%20House%20Report%201%20on%20the%20Copyright%20Act%20of%201909.pdf  (unpaginated).

from the dawn of the Republic, Congress intended to give authors a second bite at the apple.[9]

The two-term structure, however, was not an unqualified success because the author's reversion right was not inalienable – publishers could simply contract around the law's intent.  From at least the 1870s, publishers insisted that authors convey *both* terms of copyright as a prerequisite to publication; in that event, the author never enjoyed the benefit of negotiating a better bargain for the second term.  *See* Lionel Bently & Jane C. Ginsburg, *"The Sole Right … Shall Return to the Authors": Anglo-American Authors' Reversion Rights from the Statute of Anne to Contemporary U.S. Copyright*, 25 BERKELEY TECH. L.J. 1475, 1471, 1554 (2010) ("Bently & Ginsburg").   In 1943, the Supreme Court held that, so long as the author was still alive at the time the second term began, renewal rights were assignable along with original term rights in a work.  *Fred Fisher Music Publishing Co.* v. *M. Witmark & Sons*, 318 U.S. 643, 63 S. Ct. 773 (1943).[10]  Thus, the intent of

_____

[9] Courts likewise understood Congress's purpose in enacting reversion.  *See*, *e.g.*, *White-Smith Music Pub. Co. v. Goff*, 187 F. 247, 251 (1st Cir. 1911); *Woods v. Bourne Co.*, 60 F.3d 978, 982 (2d Cir. 1995) ("The reason for including a renewal term in the [1909 Act] was to permit an author who sold the rights in their work for little consideration, when measured against the work's subsequent success, to enjoy a second opportunity with more bargaining power to reap the full value of the work.")

[10] Even where the author died prior to the advent of the second term, it was not a guarantee that the heirs would receive rights in the second term.  "Not surprisingly, it became industry practice in some sectors to condition payment

the two-term regime was eroded by the ability of publishers to obtain rights for the renewal term by contract.

Other countries, including Britain, dispensed with the two-term structure, but the United States retained it until the adoption of the 1976 Act. Bracha, 25 BERKELEY TECH. L.J. at 1472.

### 3.2. Affirmative termination: §§ 203 & 304 of the 1976 Act.

In the post-World War II boom of American media and culture, Congress recognized that it needed to confront what had become the industry standard: authors waiving, by contract, rights for the renewal term.

Other countries had previously attempted to solve the vexing issue, most notably the British empire, which in 1911 conveyed a single term of protection initially vesting in the author, but any grant made by the author *automatically* terminated twenty-five years after an author's death "notwithstanding any agreement to the contrary." (Imperial) Copyright Act (UK), 1 & 2 Geo. 5, C. 46 §

---

for the author's grant of copyright on the author's obtaining assignments to the publisher of her statutory heirs' contingent interests in the renewal term." Bently & Ginsburg at 1563.

5(2). Automatic reversion remains the law in Canada. Copyright Act (Canada), R.S.C. ch. C-43, § 14(1) (1985).

In this country, though Congress considered British-style automatic reversion, when it framed the 1976 Act, Congress opted instead to permit authors, or certain statutory heirs, to terminate grants of copyright thirty-five years after the date of the grant, "notwithstanding any agreement to the contrary." 17 U.S.C. §§ 203 & 304. The termination right would be unalienable and unwaivable; all the author had to do was follow certain procedural mechanisms and that author (or their statutory heirs) could recapture their rights even if the contract by which they granted their rights said otherwise.

In enacting the 1976 Act, Congress was explicit about its reasoning: "[T]he extended term [created by sect. 304 of the 1976 Act] represents a completely new property right, and there are strong reasons for giving *the author, who is the fundamental beneficiary of copyright under the Constitution*, an opportunity to share in it." H.R. Rep. No. 94-1476 (1976) at 124, 140 (1976); S. Rep. No. 94-473 at 123 (1976) (emphasis added). The Supreme Court has endorsed this reading, noting that:

> The principal purpose of … § 304 was to provide added benefits to authors. The extension of the duration of existing copyrights to 75 years, the provision of a longer term … for new copyrights, and the concept of a termination right itself, were all obviously intended to make the rewards for the creativity of authors more substantial.

> More particularly, the termination right was expressly intended to relieve authors of the consequences of ill-advised and unremunerative grants that had been made before the author had a fair opportunity to appreciate the true value of his work product.

*Mills Music, Inc. v. Snyder*, 469 U.S. 153, 172–73, 105 S. Ct. 638, 649–50 (1985).  *See also*, *Korman v. HBC Fla., Inc.*, 182 F.3d 1291, 1296 (11th Cir. 1999) (discussing how section 203 protects authors).

Thus, sections 203 and 304 were intended to remedy industry norms that effectively required authors to sign away their reversionary rights at the outset. Congress explicitly sought instead to benefit *authors* by giving them an unalienable and unwaivable termination right.  17 U.S.C. § 203(a)(5), § 304(c)(5). Thus, it would be strange if Congress intended to limit the termination right solely to exploitations in the United States.

This is especially true given that when Congress passed the 1976 Act, a large segment of industry revenue came from outside the United States.  In 1978, for example, the year the 1976 Act went into effect, approximately 60% of recorded music revenue arose abroad.[11]

---

[11] Andrew Leyshon, Peter Webb & Shaun French, *On the reproduction of the musical economy after the Internet*, 27 MEDIA CULTURE & SOCIETY 177 (2005); Record Industry Association of America (RIAA), *U.S. Recorded Music Revenues by Format*, available at https://www.riaa.com/u-s-sales-database/. Proportions were similar throughout the 1970s.  *Id.*

**4.  The statutory language does not contain a geographical limitation.**

The current statutory language is consistent with this legislative intent of granting authors broad rights of termination, without geographical limitation. Neither the 1909 Act nor the 1976 Act state that the rights recaptured by an author are limited to domestic exploitation.

When Congress did want to limit authors' reversion rights, it explicitly did so.[12]  First, sections 203 and 304 of the 1976 Act both contain a derivative works exception that allows "[a] derivative work prepared under authority of the grant before its termination may continue to be utilized under the terms of the grant after its termination..."  17 U.S.C. § 203(b)(1) and § 304(c)(6)(A).  And second, those same sections 203 and 304 explicitly carve-out works made for hire.  17 U.S.C. § 203(a) and § 304(c).

If Congress intended to limit reversion to exploitation in the United States, surely Congress would have said so explicitly as it did when it excluded derivative works and works made for hire.  But Congress did not do so.

---

[12] In addition to the examples in this paragraph, *Amici* direct the Court's attention to n. 14 *infra*, discussing § 15 of the 1909 Act, in which Congress set out an explicit geographical limitation: "within the limits of the United States."

5.  **A geographical limitation would have deleterious consequences for authors.**

At least three anomalous situations arise if the termination right is limited to only the United States.  None benefits authors.

First, in *Kirtsaeng I*, the Supreme Court held that, while the copyright holder's exclusive distribution right extends to the authority to bar importation of goods acquired abroad (17 U.S.C. § 602), that authority is limited by the first sale doctrine (17 U.S.C. § 109).  Accordingly, a copyright holder may not bar the importation into the United States of goods lawfully made and sold abroad.

If, as Appellants urge, the Court limits the authors' reversion right solely to the geographical territory of the United States, it creates a loophole large enough to drive a truck through: specifically, a truck filled with copies legally manufactured abroad and imported into the United States to compete with those authorized by the author.  It would eviscerate the terminating author's exclusive domestic rights.

*Amici* urge the Court to consider the following scenario.  An American author assigns – as did Appellee Cyril Vetter – global rights to a publisher, then terminates that grant pursuant to 17 U.S.C. § 304.  If the Court sides with Appellants, and the author recaptures *only* the right to manufacture and distribute copies of works in the United States, following *Kirtsaeng I*, what is to

19

stop the legal manufacture of copies by a Canadian rightsholder (derived from the author's original worldwide grant to his publisher) and their importation into the United States for sale in the U.S. market?  Answer: nothing.  With a very little legwork by savvy publishers,[13] those copies can quickly be imported into and then sold in the United States.

 And not only Canadian imports.  Licensees in any or all territories can do so; the defendant in *Kirtsaeng I* imported English language books from Thailand. Now the American market – meant to belong exclusively to the author who exercises their termination right – becomes a free-for-all of competing grey market import copies.  Should that occur, the author's exclusive domestic rights have drastically diminished value because the author is now competing in the United States with copies manufactured abroad under license from a competing rightsholder.

To be sure, the majority in *Kirtsaeng I* accepted that a non-geographical reading of "lawfully made under this title" in § 109 would "make it difficult,

---

[13] For example, a U.S. grantee's Canadian licensee could establish a subsidiary (NewCo.), manufacture the works in Canada and then sell them in Canada to NewCo.; and having been lawfully sold abroad, NewCo could then sell all of those copies into the United States.  The author who has recaptured their American rights is powerless under *Kirtsaeng I* to stop NewCo from exporting those copies into the United States to compete with the author or the author's subsequent grantee.

perhaps impossible, for publishers (and other copyright holders) to divide foreign and domestic markets." *Kirtsaeng I* at 552. But, the Court continued, discounting that argument, "we can find no basic principle of copyright law that suggests that *publishers* are especially entitled to such rights." *Id*. (emphasis added).

However, the situation here is different. *Amici* submit that while the Supreme Court may have been willing to countenance such inconvenience for *publishers*, whose economic welfare was not the special concern of Congress, neither Congress nor this Court nor the Supreme Court should be willing to permit the same harm to befall *authors*. Should this Court reverse the ruling below, it will undermine the reversion right which Congress went out of its way to confer on authors for their benefit.

Second, and relatedly, as the United States has argued before – as *amicus curiae* in *Quality King Distributors v. L'anza Research International*, 523 U.S. 135 (1998) – it is "'distinctly unlikely' that Congress would have provided an incentive for overseas manufacturing." *Kirtsaeng I*, 568 U.S. at 553, *quoting brief for* amicus curiae *United States* in *Quality King*.[14] But the divided market that

---

[14] This is especially true with respect to works created under the 1909 Act, like the one at issue in the case at bar, which required that, to be eligible for protection, a book or periodical must have been typeset, printed and bound "within the limits of the United States." 1909 Act, § 15.

would necessarily result from Appellants' reading would create precisely such an incentive for foreign manufacture:  the initial publisher-grantee, left in possession of foreign rights, has every incentive to encourage the manufacture and sale of copies abroad to be imported into the United States to compete in the domestic market.  *Amici* share the United States' skepticism that this was Congress's intent, and submit that this Court should do so too.

Third and finally, reversion serves an additional purpose for authors, one not necessarily wholly economic, but wholly consistent with the Constitutional mandate "to promote the Progress of Science and useful Arts."  Reversion allows an author to take back rights from a publisher who, though having received them, has chosen not to exploit them, leaving the work to languish.  A universal reversion would allow an author either to self-publish or license an alternative publisher who *will* exploit the work in any territories where, for whatever reason, a publisher has ceased exploiting that author's work.

## CONCLUSION

Reversion, without geographical limitations, benefits authors.  There is little likelihood that Congress intended a geographical limit on reversion solely to the territorial United States. To have done so would have been to undermine thereby the Constitution's mandate for an "exclusive right" for authors.

The ruling of the district court should be affirmed.

June 20, 2025                     /s/ Joshua Graubart         /s/ Jordan Greenberger
                                 Joshua Graubart           Jordan Greenberger

*Counsel for Amici Curiae The Authors*
*Guild, Inc., Dramatists Legal Defense Fund,*
*Inc., Novelists, Inc., Romance Writers of*
*America, Inc., Society of Composers &*
*Lyricists, Inc., and Songwriters Guild of*
*America, Inc.*

**CERTIFICATE OF SERVICE**

I certify that the foregoing was electronically filed with the Clerk of the

Court for the United States Court of Appeals for the Fifth Circuit by using

the appellate CM/ECF system. I further certify that all participants in the

case are registered CM/ECF users and that service will be accomplished by

the appellate CM/ECF system.


        /s/ Joshua Graubart        /s/ Jordan Greenberger
        Joshua Graubart            Jordan Greenberger

## CERTIFICATE OF COMPLIANCE

This brief complies with Rules 29(a)(5) and 32(a)(7)(B) of the Federal Rules of Appellate Procedure because it contains 5,045 words, excluding the parts of the document exempted by Federal Rule of Appellate Procedure 32(f).

The brief complies with the typeface and typestyle requirements of Rules 32(a)(5)–(6) of the Federal Rules of Appellate Procedure because it has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Book Antiqua font.

*/s/ Joshua Graubart*     */s/ Jordan Greenberger*
Joshua Graubart     Jordan Greenberger
