# No. 25-30108

# IN THE
# UNITED STATES COURT OF APPEALS
# FOR THE FIFTH CIRCUIT

---

Cyril E. Vetter; Vetter Communications Corporation,

Plaintiffs - Appellees

v.

Robert Resnik; Resnik Music Group,

Defendants - Appellants

---

## On Appeal from
United States District Court for the Middle District of Louisiana

3:23-CV-1369

---

## REPLY BRIEF OF APPELLANTS ROBERT RESNIK AND RESNIK MUSIC GROUP

SUBMITTED BY:

Robert W. Clarida
Reitler Kailas & Rosenblatt LLP
885 Third Avenue
New York, NY 10022

Edgar Dean Gankendorff
Provosty & Gankendorff, L.L.C.
650 Poydras Street
New Orleans, LA 70130

## TABLE OF CONTENTS

INTRODUCTION ...........................................................................................................1

ARGUMENT ................................................................................................................1

   I.   THE DISTRICT COURT'S STATUTORY INTERPRETATION OF
       17 U.S.C. § 304(c)(6)(E) CONSTITUTES REVERSIBLE ERROR ...............................1

      A.  UNDER 17 U.S.C. § 304(c), ONLY U.S. RIGHTS ARE
          "SUBJECT TO TERMINATION" ...............................................................................5

      B.  *KIRTSAENG* DOES NOT SUPPORT THE DISTRICT COURT'S
          INTERPRETATION OF § 304(c)(6)(E) ...................................................................7

          1.  The Statutory Text of § 304(c)(6)(E) Differs Materially
             From the Statutory Provision Interpreted in *Kirtsaeng* ...........................................7

          2.  The Statutory Context of § 304(c)(6)(E) Differs Materially
             From That of the Statutory Provision Interpreted in *Kirtsaeng* ...........................9

          3.  The History of § 304(c)(6)(E) Differs Materially
             From That of the Statutory Provision Interpreted in *Kirtsaeng* ...........................10

      C.  THIS CASE TURNS ON STATUTORY INTERPRETATION,
          NOT CHOICE-OF-LAW ANALYSIS ......................................................................23

          1.  *Itar-Tass* Is Inapplicable Because It Only Concerns Initial Ownership ...............24

          2.  *Canadian Standards* Is Inapplicable For the Same Reason .................................25

          3.  *Creazioni Artistiche Musicali* Is Inapplicable Because
             It Only Concerns Interpretation of a Contract, Not Statutory Interpretation ........26

          4.  *Corcovado Music* Refutes the District Court's "Master Copyright" Theory ........27

  II.  THE DISTRICT COURT'S INTERPRETATION OF *STEWART v. ABEND*
      IGNORED THE TEXT OF THE 1909 COPYRIGHT ACT AND CONSTITUTES
      REVERSIBLE ERROR ......................................................................................29

 III. THE DISTRICT COURT'S INTERPRETATIONS OF § 304(c)(6)(E) AND THE
      1909 ACT ARE NOT "PURELY DOMESTIC" AND WILL CAUSE WORLDWIDE
      DISRUPTION IN ALL COPYRIGHT-INTENSIVE INDUSTRIES ..............................32

CONCLUSION...........................................................................................................33

## TABLE OF AUTHORITIES

## Cases

*Abraugh v. Altimis,*
   26 F.4th 298 (5th Cir. 2022) ........................................................ 25, 31

*Accord, Douglass v. Nippon Yusen Kabushiki Kaisha,*
   996 F.3d 289 (5th Cir. 2021) ............................................................. 29

*Accord, Rohauer v. Killiam Shows, Inc.,*
   379 F. Supp. 723 (S.D.N.Y. 1974) ..................................................... 28

*Alameda Films SA de CV v. Authors Rights Restoration Corp.,*
   331 F.3d 472 (5th Cir. 2003) .............................................................. 26

*Amer. Express Co. v. Italian Colors Restaurant,*
   570 U.S. 228 (2013) ............................................................................ 19

*Architettura, Inc. v. DBSI Cumberland at Granbury LP,*
   652 F.Supp.2d 775 (N.D. Tex. 2009) ................................................ 15

*Ardestani v. INS,*
   502 U.S. 129 (1991) .............................................................................. 9

*Arizona v. California,*
   283 U.S. 423 (1931) ............................................................................ 19

*Broadcast Music, Inc. v. Roger Miller Music, Inc.,*
   396 F.3d 762 (6th Cir. 2005) .............................................................. 15

*Canadian Standards Assoc. v. P.S. Knight Co., Ltd,*
   112 F.4th 298 (5th Cir. 2024) ...................................................... 25, 31

*Clancy v. Jack Ryan Enterprises, Ltd.,*
   2021 WL 488683 (D. Md. 2021) ......................................................... 3

*Community for Creative Non-Violence v. Reid,*
   490 U.S. 730 (1989) ............................................................................ 15

*Corbello v. DeVito,*
   844 F. Supp. 2d 1136 (D. Nev. 2012) ............................................... 32

*Corcovado Music Corp. v. Hollis Music Inc.,*
   981 F.2d 679 (2d Cir. 1993) ................................................... 27, 28, 29

*Cosmair, Inc. v. Dynamite Enterprises, Inc.*
   6 ITRD 243, No. 85-0615-CIV (S.D. Fla. 1985) .............................. 15

*Creazioni Artistiche Musicali, S.R.L. v. Carlin America, Inc.,*
   2016 WL 7507757 (S.D.N.Y. Dec. 30, 2016) ................................... 26

*Ennio Morricone Music, Inc. v. Bixio Music Grp. Ltd*,
    936 F.3d 69 (2d Cir. 2019) ................................................. 26

*Fred Ahlert Music Corp. v. Warner Chappell Music, Inc.*,
    155 F.3d 17 (2d Cir. 1998) ................................................... 3

*Geophysical Service, Inc. v. TGS-NOPEC Geophysical Co.*,
    850 F.3d 785 (5th Cir. 2017) ............................................ 3, 4

*Goldman v. Breitbart News Network, LLC*,
    302 F.Supp.3d 585 (S.D.N.Y. 2018) ................................... 15

*Greenberg v. Nat'l Geographic Soc.*,
    533 F.3d 1244 (11th Cir. 2008) .......................................... 15

*Harry Fox Agency, Inc. v. Mills Music, Inc.*,
    720 F.2d 733 (1983) ........................................................... 18

*Henson v. Santander Consumer USA Inc.*,
    582 U.S. 79 (2017) ............................................................. 21

*Horror Inc. v. Miller*,
    335 F.Supp.3d 273 (D. Conn. 2018) ................................... 15

*Illinois v. Lidster*,
    540 U.S. 419 (2004) ........................................................... 25

*Itar-Tass Russian News Agency v. Russian Kurier, Inc.*,
    153 F.3d 82 (2d Cir. 1998) ........................................... passim

*Kirtsaeng v. John Wiley & Sons*,
    568 U.S. 519 (2013) .................................................... passim

*Kucana v. Holder*,
    558 U.S. 233 (2010) ............................................................. 8

*Los Angeles News Serv. v. Reuters Tv. Intern.*,
    340 F.3d 926 (9th Cir. 2003) ............................................... 3

*Mapp v. UMG Recordings*,
    208 F. Supp. 3d 776 (M.D. La. 2016) ................................. 27

*Martin v. U.S.*,
    2025 WL 1657418 (2025)(Gorsuch, J.) ............................... 19

*Matthews v. Barr*,
    927 F.3d 606 (2d Cir. 2019) .............................................. 29

*McDonald v. City of Chicago, Ill.*,
    561 U.S. 742 (2010) ........................................................... 18

*Mills Music, Inc. v. Snyder,*
  469 U.S. 153 (1985) ........................................................................... 15

*Milner v. Dep't of Navy,*
  562 U.S. 562 (2011) ........................................................................... 19

*Murray v. Schooner Charming Betsy,*
  6 U.S. (2 Cranch) 64, 118 (1804) ...................................................... 4

*Peretti v. Authentic Brands Grp. LLC,*
  33 F.4th 131 (2d Cir. 2022) .............................................................. 21

*Playboy Enterprises, Inc. v. Dumas,*
  53 F.3d 549 (2d Cir. 1995) ............................................................... 15

*Saragema India Ltd v. Mosley,*
  635 F.3d 1284 (11th Cir. 2011) ........................................................ 26

*Siegel v. Warner Bros. Entertainment, Inc.,*
  542 F. Supp. 2d 1098 (C.D. Cal. 2008) ......................................... 2, 3

*Sony Corp. of Amer. v. Universal City Studios, Inc.,*
  464 U.S. 417 (1984) ........................................................................... 15

*Stewart v. Abend,*
  495 U.S. 207 (1990) ................................................................... passim

*United States v. Gill,*
  748 F.3d 491 (2d Cir. 2014) .............................................................. 35

*United States v. O'Brien,*
  391 U.S. 367 (1968) ........................................................................... 19

*United States v. Wilkerson,*
  361 F.3d 717 (2d Cir. 2004) .............................................................. 29

*Weissmann v. Freeman,*
  868 F.2d 1313 (1989) ......................................................................... 15

**Statutes**

17 U.S.C. § 109(a) (1976) .................................................................. 8, 9

17 U.S.C. § 304(c) (1976) ........................................................... passim

17 U.S.C. § 24 (1909) ........................................................... 6, 30, 31

## Other Authorities

Berne Convention for the Protection of Literary and Artistic Works ....................................... 3, 4

Copyright Law Revision Discussion and Comments on Report of the Register of Copyrights on the General Revision of the U.S. Copyright Law,
88th Cong. 1st Sess. (1963) .......................................................................................... 14

Copyright Law Revision, 1964 Revision Bill with Discussion and Comments,
89th Cong. 1st Sess. (1965) .......................................................................................... 14

H.R. Rep. 94-1476 (1976).................................................................................................. 20

Supplementary Report of the Register of Copyrights on the General Revision of the U.S. Copyright Law,
1965 Revision Bill, 89th Cong. 1st Sess. (1965) .................................................... 2, 13

Universal Copyright Convention ....................................................................................... 3, 4

U.S. Copyright Office,
*General Guide to the Copyright Act of 1976* (1977) ................................................ 14

William Patry, *Choice of Law and International Copyright*,
48 Am. J. Comp. L. (2000) ..................................................................................... 5, 12

# INTRODUCTION

This case presents two principal issues: (1) the interpretation of a provision in the Copyright Act of 1976 that expressly limits the geographic effect of the statutory terminations allowed under 17 U.S.C. § 304(c); and (2) the effect of § 24 of the Copyright Act of 1909 with respect to non-U.S. rights in a copyrighted work, under the decision of the U.S. Supreme Court in *Stewart v. Abend*, 495 U.S. 207 (1990). Appellees (collectively "Vetter") all but ignore these issues in their June 12 brief, Doc. No. 59 ("Vetter Brief"), and instead divert the Court's attention with irrelevant discussions of *other* statutes, lengthy digressions into facially inapplicable choice-of-law theories and many pages of rhetoric about the broad motives that prompted Congress to enact the statutory termination right.

The relevant statutes are clear, and by applying the statutory text as written this Court must necessarily conclude that the decision of the District Court should be reversed in all respects.

# ARGUMENT

## I.     THE DISTRICT COURT'S STATUTORY INTERPRETATION OF 17 U.S.C. § 304(c)(6)(E) CONSTITUTES REVERSIBLE ERROR.

As set forth in Resnik's opening brief, Doc. No. 21, termination of a copyright grant under 17 U.S.C. § 304(c) "affects only those rights covered by the grant that

arise under this title, and in no way affects rights arising under any other Federal, State, or foreign laws." *See id.,* § 304(c)(6)(E). Therefore, Mr. Vetter's Termination Notice does not affect foreign rights. The District Court erred by accepting Vetter's admittedly "novel" contention to the contrary. (ROA.250).

When enacting § 304(c) Congress explicitly understood that the language regarding rights "arising under . . . foreign laws" would preclude the result reached by the District Court here. The 1965 <u>Supplementary Report of the Register of Copyrights on the General Revision of the U.S. Copyright Law</u>, 1965 Revision Bill, 89th Congress, 1st Sess. ("1965 Report") explains that this "foreign laws" language meant that "termination affects only those rights *arising under* the U.S. copyright statute and has no effect, for example, *on foreign rights that are covered by the same contract*" (*id.* at 75, emphasis added). The Court's interpretation of Section 304(c) effectively re-writes the statutory text to make it say the opposite of what Congress in fact provided. Section 304(c)(6)(E) of the Copyright Act cannot fairly be read to allow for the termination of a grant of non-U.S. rights in a work.

The Court's reading of the statute contradicts that of every other court that has addressed the effect of statutory termination on foreign rights. In *Siegel v. Warner Bros. Entertainment, Inc.,* 542 F. Supp. 2d 1098 (C.D. Cal. 2008), *rev'd on other grounds*, 504 Fed. App'x 586 (9th Cir. 2013), for example, the Central District of California held as a matter of law that the statutory termination of a copyright grant

2

in the Superman comic character did *not* result in the recapture of any foreign rights, stating that "the statutory text could not be any clearer on this subject," *id.* at 1140.

The *Siegel* court recognized that "such an open effort to extend the reach of U.S. copyright law overseas, as plaintiffs' reading of the statute avows, would be in direct contradiction to not only the plain terms of the statute" but would stand "in stark juxtaposition to the longstanding rule 'that the copyright laws [of this country] have no application beyond the U.S. border.'" *Id.* (citing *Los Angeles News Serv. v. Reuters Tv. Intern.*, 340 F.3d 926, 931 (9th Cir. 2003)); *accord, Geophysical Service, Inc. v. TGS-NOPEC Geophysical Co.*, 850 F.3d 785, 797 (5th Cir. 2017)(Copyright Act "does not apply extraterritorially").

Every other court that has addressed the issue has reached the same conclusion, including the Second Circuit in *Fred Ahlert Music Corp. v. Warner Chappell Music, Inc.*, 155 F.3d 17 (2d Cir. 1998) and the District of Maryland in *Clancy v. Jack Ryan Enterprises, Ltd.,* 2021 WL 488683 (D. Md. 2021).

The District Court's statutory interpretation must also be rejected because it would conflict with U.S. treaty obligations under the Berne Convention for the Protection of Literary and Artistic Works  ("Berne") and the Universal Copyright Convention ("UCC").  Courts should interpret domestic statutes harmoniously with international obligations of the U.S. whenever possible.   The Supreme Court

recognized this principle over two hundred years ago, when Chief Justice Marshall wrote that "an act of Congress ought never to be construed to violate the law of nations, if any other possible construction remains." *Murray v. Schooner Charming Betsy,* 6 U.S. (2 Cranch) 64, 118 (1804).

If not reversed, the District Court's holding would contradict the principle of national treatment under Art. 5, § 1 of Berne and Art. II of the UCC, because it would grant U.S. authors *greater* rights than the authors of other Berne and UCC members are entitled to receive under U.S. law. That is, U.S. authors would have an opportunity to recapture their rights worldwide, under § 304(c), but the authors of those other countries would not be given any opportunity to do so, even in the U.S., because according to the District Court those authors' rights did not arise under U.S. law, as § 304(c) requires.

The District Court, however, ignored the plain meaning of the statutory text in § 304(c)(6)(E) and the long-settled maxim that U.S. copyright law has no extraterritorial application. It offered only a terse and conclusory statutory analysis of its own, and created a novel "master copyright" theory that would place the U.S. in violation of international treaty obligations. Accordingly, the District Court's interpretation of the termination provisions in § 304(c) must be reversed.

4

**A.    UNDER 17 U.S.C. § 304(c), ONLY U.S. RIGHTS ARE "SUBJECT TO TERMINATION".**

The entire text of the termination right under § 304(c) is explicitly limited to U.S. rights. The first clause of § 304(c), defining which grants are "subject to termination," does not broadly authorize termination of any grant of "copyright," but only permits termination of any "grant of a transfer or license of *the renewal copyright* or any right under it," 17 U.S.C. § 304(c) (emphasis added).  Only the U.S. has a "renewal copyright," as Vetter has not disputed.[1]   And it is only this renewal copyright – "*the* renewal copyright" – that is "subject to termination" under the statute.   Grants of rights other than "*the* renewal copyright" are simply not terminable, by the plain meaning of the first section of § 304(c).  Whatever rights an author may enjoy outside the U.S., those rights are not "*the* renewal copyright" to which § 304(c) termination pertains.  Thus, even beyond the explicit recognition of the geographical limitation on the termination right in § 304(c)(6)(E), the right itself only permits the termination of "the renewal copyright," which only exists in the U.S.

---

[1]  *See, e.g.* William Patry, *Choice of Law and International Copyright*, 48 Am. J. Comp. L. 383, 442 (2000): "As a result of our 20th century adherence to the 18th British renewal anachronism [which had been abandoned in 1814], the United States was the only country in the world tying term of protection to a formality, *i.e.*, not measuring term from the life of the author plus a set number of years post mortem."

Section 24 of the 1909 Act strongly supports this conclusion. Vetter and its
*amici* acknowledge, as they must, that the termination provisions in Section 304(c)
and Section 203(a) were created largely as a substitute for, and improvement on, the
1909 Act's bifurcated copyright term. S*ee* House Rep. 94-1476 at 124.    That
bifurcated term was created by Section 24, which reads as follows:

> The copyright *secured by this title* shall endure for twenty-eight years from
> the date of first publication . . . the author of such work, if still living, or the
> widow, widower, or children of the author, if the author be not living, or if
> such author, widow, widower, or children be not living, then the author's
> executors, or in the absence of a will, his next of kin *shall be entitled to a*
> *renewal and extension of the copyright in such work for a further term of*
> *twenty-eight years* when application for such renewal and extension shall have
> been made to *the copyright office* and duly registered therein within one year
> prior to the expiration of the original term of copyright: And provided further,
> That in default of the registration of such application for renewal and
> extension, *the copyright* in any work shall determine at the expiration of
> twenty-eight years from first publication.

1909 Act, § 24 (Emphasis added).

The statutory reference to the "renewal and extension of *the copyright* … for
a further term of twenty-eight years" can only refer to the U.S. copyright in the work,
because (a) that was "the copyright" that was "secured by this title" and (b) no other
country had a term, or "further term," of 28 years.  Nor did any country other than
the U.S. have a copyright office, much less "*the* copyright office," in which a
copyright owner could file a claim to such "further term of twenty-eight years."
Accordingly, when Congress spoke of a 28-year "renewal and extension" of
copyright under the 1909 Act, the statutory language was explicitly geographic in

nature, as it remains today in references to "*the* renewal copyright" in § 304(c) of the 1976 Act. Accordingly, the District Court erred as a matter of law when it concluded that the statutory termination of "the renewal copyright" under § 304(c) had worldwide effect.

### B.    *KIRTSAENG* DOES NOT SUPPORT THE DISTRICT COURT'S INTERPRETATION OF § 304(c)(6)(E).

The Vetter brief does not substantively address the many flaws of the District Court's statutory analysis, but instead focuses on a tortured analogy between this case and *Kirtsaeng v. John Wiley & Sons*, 568 U.S. 519 (2013), a precedent on which the District Court expressly declined to rely. *See* ROA.275-280. Vetter here repeatedly cites *Kirtsaeng* as the principal support for Vetter's proposed "non-geographic" reading of "arising under…foreign laws" in § 304(c)(6)(E). Vetter Brief at 15, 16, 18, 46, 47, 48, 50, 54, 56, 60, 73. In fact, *Kirtsaeng* offers no support whatsoever to Vetter's position, and in many respects refutes the District Court's incorrect reading of § 304(c)(6)(E).

### 1.    The Statutory Text of § 304(c)(6)(E) Differs Materially From the Statutory Provision Interpreted in *Kirtsaeng.*

Interpreting the first-sale defense codified at 17 U.S.C. § 109(a) – not the statute before this Court – *Kirtsaeng* looked to the statutory "language, its context and its common-law history," 568 U.S. at 530. Each of those considerations compels a different result when applied to the statute at issue here.

7

First, *Kirtsaeng* interprets different statutory language. Vetter continues to argue that the U.S. Supreme Court's interpretation of the phrase "*lawfully made under this title*" as used in 17 U.S.C. § 109(a) in *Kirtsaeng* is somehow probative of the geographical meaning of the phrase "*arise under* this title" as used in 17 U.S.C. § 304(c). *See, e.g.,* Vetter Brief at 15. The Court below correctly rejected this argument, noting that *Kirtsaeng* "did not have occasion to address the meaning of '*arise* under this title' under § 304(c)(6)(E)." ROA.280 (emphasis original).

*Kirtsaeng* itself repeatedly emphasizes that its sole focus is the meaning of the five-word phrase, "lawfully made under this title," not any individual word or sub-phrase within it. See, *e.g., id.* at 524 ("the five words 'lawfully made under this title"); at 530 ("the five-word phrase"); at 533 ("those five words"); at 535 ("the five words here at issue"). The statutory provision before this Court does not include the phrase "lawfully made under this title," or any equivalent thereof.

Moreover, *Kirtsaeng*'s interpretive approach is the opposite of the superficial linguistic cherry-picking Vetter urges this Court to apply. Ignoring statutory context and common-law history, which were decisive in *Kirtsaeng*, Vetter's entire rationale for invoking *Kirtsaeng* is that the words "under this title" appear in both § 109(a) and § 304(c)(6)(E), *see e.g.* Vetter Brief at 47. But *Kirtsaeng* itself notes that the word "under" in isolation "evades a uniform, consistent meaning," and "must draw its meaning from its context." *Id.* at 1359 (citing *Kucana v. Holder*, 558 U.S. 233,

245 (2010) ("'under' is chameleon"); *Ardestani v. INS*, 502 U.S. 129, 135 (1991) ("under" has "many dictionary definitions" and "must draw its meaning from its context"). So the mere presence of "under this title" in § 109(a) and § 304(c)(6)(E) establishes nothing.

Even as to the *five* words "lawfully made under this title" in § 109(a), *Kirtsaeng* rejects the notion that they must carry "the same meaning when they appear in different but related sections." 568 U.S. at 537. Vetter's entire argument is that the words "under this title" must have a non-geographic meaning in § 304(c) because they allegedly have such a meaning in § 109(a), but *Kirtsaeng* itself flatly rejects this reasoning.

## 2. The Statutory Context of § 304(c)(6)(E) Differs Materially From That of the Statutory Provision Interpreted in *Kirtsaeng.*

As to context, the two statutory provisions could not be more different. In Section 109(a), at issue in *Kirtsaeng*, the sub-phrase "under this title" establishes a "standard of lawfulness" for manufacturing copies of copyrighted works. *Id.* at 530. In Section 304(c)(6)(E), at issue here, the words "under this title" do nothing of the sort, but instead identify the body of law under which an author's copyright protection "arises" – either "under this title" or under "foreign laws." While the first-sale provision in *Kirtsaeng* "says nothing explicitly about" geography, *id.* at 539, the termination provision in § 304(c)(6)(E) very explicitly does so, by

distinguishing between "this title" and "foreign laws." That distinction is geographic. This Court must therefore reject Vetter's argument that the termination provision contains "no express territorial limits." Vetter Brief at 17. As discussed in section I.A. *supra*, the statutory language of § 304(c) is explicitly territorial because it only permits authors to terminate grants of "the renewal copyright," and "the renewal copyright" exists only in the U.S.[2]

Further, the *Kirtsaeng* decision's own articulation of the principle of copyright territoriality refutes the District Court's novel "master copyright theory." *See Kirtsaeng,* 568 U.S. at 1359 ("[W]here, precisely, is the Copyright Act 'applicable'? *The Act does not instantly protect an American copyright holder from unauthorized piracy taking place abroad*." (Emphasis added). That flatly contradicts the District Court's erroneous view, urged by Vetter here, that worldwide copyright "arises under" U.S. law at the moment of creation. ROA.282-283.

### 3. The History of § 304(c)(6)(E) Differs Materially From That of the Statutory Provision Interpreted in *Kirtsaeng.*

In interpreting § 109(a) *Kirtsaeng* placed great emphasis on remaining true to the traditional common-law origins of the first-sale doctrine: "When a statute covers an issue previously governed by the common law, we must presume that Congress

---

[2] This same reasoning is also dispositive with respect to Count I of the Complaint under Section 24 of the 1909 Act, see discussion *infra* at 29-32.

intended to retain the substance of the common law." 568 U.S. at 538. At common law, the first sale doctrine "ma[de] no geographical distinctions" and the Supreme Court noted that "we can find no language, context, purpose, or history that would rebut a [non-geographic] application" of it following codification in § 109(a) of the 1976 Act. *Id.* at 539-540.

The termination provisions of the 1976 Act, however, have no such common-law pedigree, but are purely statutory, and in fact appear to run counter to the common-law history relied on by the *Kirtsaeng* Court. *See* 568 U.S. at 538 (quoting Lord Coke: "If a man . . . give or sell his whole interest . . . he hath no possibility of a Reverter"). Therefore, unlike in *Kirtsaeng*, there is no history of "non-geographic" common-law doctrine for this Court to consider when interpreting the text of the termination statute at issue here.

Finally, in considering the degree to which its statutory reading might disrupt settled law, *Kirtsaeng* noted that "the law has not been settled for long" regarding first sale, given the conflicting statutory interpretations of § 109(a) in the Circuits leading up to the grant of *certiorari* from the "first Court of Appeals to adopt a purely geographical interpretation." 568 U.S. at 544. Here, by contrast, the law has been settled for half a century. Until the District Court's erroneous ruling in this case,

*every* court, *every* scholarly treatise[3] and *every* line of legislative history that has addressed the question has reached one conclusion: statutory termination does not affect grants of non-U.S. rights.  Here, in contrast to *Kirtsaeng*, the law has not been *un*settled for long, and this Court should not allow the District Court's novel and destabilizing decision to wreak further havoc.

In sum, the statute interpreted by *Kirtsaeng* is distinguishable in every material respect from the statute before this Court – language, context and history: "[i]n our view, § 109(a)'s language, its context, and the common-law history of the first sale doctrine, *taken together,* favor a non-geographical interpretation." 568 U.S. at 530 (emphasis added).  None of these factors, individually or together, favor a

---

[3] Vetter consistently disparages the leading copyright treatises by Prof. Nimmer and Prof. Patry, which have been relied on countless times by courts at every level, including with respect to the interpretation of § 304(c)(6)(E). Vetter's criticisms would perhaps carry more weight if they were accurate, however.  As one example, Vetter claims that Patry has flip-flopped on the questions presented by this case, Vetter Brief at 23, n.25, but in reality, Patry states in the very article Vetter cites that: "One provision is quite clear, however: termination only affects U.S. rights. Sections 203(b)(5) and 304(c)(6)(E) both state, in relevant part, that termination affects only those rights covered by the grants that arise under this title [17 U.S.C.], and in no way affects rights under . . . foreign laws.  Accordingly, where a U.S. author conveys worldwide rights and terminates under either section, grants in all other countries remain valid according to their terms or provisions in other countries' laws."  William Patry, *Choice of Law and International Copyright*, 48 Am. J. Comp. L. 383, 447 (2000).

non-geographic reading of the termination statute. Accordingly, *Kirtsaeng*'s reading of § 109(a) cannot be imposed upon the "foreign laws" language in § 304(c)(6)(E).

Significantly, *Kirtsaeng* also relied on legislative history to inform its statutory analysis, and specifically cited and quoted the <u>Supplementary Report of the Register of Copyrights on the General Revision of the U.S. Copyright Law</u>, 1965 Revision Bill, 89th Cong. 1st Sess. (1965)("1965 Report"). *See Kirtsaeng* at 535. As noted in Resnik's opening brief, the 1965 Report was prepared at the request of Congress by then-Register of Copyrights Abraham Kaminstein and published by the House Judiciary Committee in connection with the legislative process that led ultimately to the 1976 Copyright Act.

As relevant here, it explains that the "foreign laws" language in § 304(c)(6)(E) – *i.e.,* termination "affects only those rights covered by the grant that arise under this title, and in no way affects rights arising under any other Federal, State, or foreign laws" – was included in the Act to confirm that "termination affects only those rights *arising under* the U.S. copyright statute and has no effect, for example, *on foreign rights that are covered by the same contract*" (*id.* at 75, emphasis added). See Resnik's Opening Brief, Doc. 21 at 8.

It is undisputed that (a) this statutory history speaks directly to the facts presented in this case, *i.e.* grants of both U.S. and non-U.S. rights "covered by the

same contract," and (b) the statutory text has remained materially identical since the issuance of the 1965 Report.  See U.S. Copyright Office, *General Guide to the Copyright Act of 1976* (1977), at 6:1 ("In 1965 representatives of publishers and authors met and agreed on a proposal which became, in essence, section 203 of the new law.  This agreement essentially ended debate on the subject.").

Vetter nonetheless attempts to discredit this legislative history, apparently because Vetter believes legislative history is categorically untrustworthy.  Vetter's attempt should be rejected for four main reasons.  *First*, this precise House Judiciary Committee publication, the 1965 Report, was quoted and relied on by the U.S. Supreme Court in *Kirtsaeng*, the very ruling that Vetter urges this Court to adopt as its model for interpreting § 304(c).[4]  If the 1965 Report was helpful to the Supreme Court's analysis of the Copyright Act in *Kirtsaeng*,[5] and if this Court should emulate *Kirtsaeng*'s analysis, as Vetter urges, Vetter offers no reason, much less a persuasive

---

[4] *Kirtsaeng* also quotes extensively from then-Register Kaminstein's two other reports in the same series, Copyright Law Revision Discussion and Comments on Report of the Register of Copyrights on the General Revision of the U.S. Copyright Law, 88th Cong., 1st Sess. (1963), and Copyright Law Revision, 1964 Revision Bill with Discussions and Comments, 89th Cong., 1st Sess. (1965).

[5] The majority opinion in *Kirtsaeng* was authored by Justice Breyer and joined by Chief Justice Roberts and Justices Thomas, Alito, Sotomayor and Kagan.

reason, that this Court should peremptorily exclude the 1965 Report's highly targeted statement concerning the meaning of the precise statutory language at issue.

*Second*, federal courts at every level have consistently relied on the 1965 Report for over half a century for insight into the meaning of the 1976 Copyright Act, including four significant Supreme Court copyright rulings (*Kirtsaeng, supra; Mills Music, Inc. v. Snyder,* 469 U.S. 153 (1985); *Community for Creative Non-Violence v. Reid*, 490 U.S. 730 (1989); *Sony Corp. of Amer. v. Universal City Studios, Inc.*, 464 U.S. 417 (1984)); numerous decisions in the Second,[6] Sixth[7] and Eleventh[8] Circuits; and district court rulings in Texas,[9] Florida,[10] New York[11] and Connecticut[12].  Our research reveals no case in which any court has ever expressly

---

[6]*Playboy Enterprises, Inc. v. Dumas,* 53 F.3d 549 (2d Cir. 1995); *Weissmann v. Freeman,* 868 F.2d 1313 (1989); *Harry Fox Agency, Inc. v. Mills Music, Inc.,*720 F.2d 733 (1983).

[7]*Broadcast Music, Inc. v. Roger Miller Music, Inc.,* 396 F.3d 762 (6th Cir. 2005).

[8] *Greenberg v. Nat'l Geographic Soc.*, 533 F.3d 1244 (11th Cir. 2008).

[9] *Architettura, Inc. v. DBSI Cumberland at Granbury LP,* 652 F.Supp.2d 775 (N.D. Tex. 2009).

[10] *Cosmair, Inc. v. Dynamite Enterprises, Inc.,* 6 ITRD 243, No. 85-0615-CIV (S.D. Fla. 1985).

[11] *See, e.g., Goldman v. Breitbart News Network, LLC,* 302 F.Supp.3d 585 (S.D.N.Y. 2018).

[12]*Horror Inc. v. Miller,* 335 F.Supp.3d 273 (D. Conn. 2018).

declined to consider the 1965 Report, for any reason.  If this Court refuses even to consider the 1965 Report in its analysis of the meaning of the 1976 Act, as Vetter urges, it may be the first court ever to do so.

*Third*, the widespread judicial reliance on the 1965 Report as an authoritative guide to statutory interpretation of the 1976 Copyright Act recognizes that this Report thoughtfully articulated the compromises reached by authors, publishers, and other diverse stakeholders involved in the decades-long process of replacing the 1909 Act; it was not merely a wish list submitted by a lobbyist or legislator to advance the agenda of a particular interest group.  The Foreword and Preface of the 1965 Report make this abundantly clear. The Foreword, for example, *see* 1965 Report at v, confirms that the 1965 Report was submitted *before* hearings on the 1965 bill; thus it is not a random collection of interest-driven policy reactions to the statutory proposal that was then before Congress.  It explains the language of the bill before the lobbyists got to it. And as noted, that language did not in any event change materially between the introduction of the 1965 bill and final passage of the Act.

As the Preface confirms (at viii) the 1965 Report was "an effort to state, as frankly as we can, the thinking behind the *language* of the 1965 bill and, in many cases, the arguments for and against particular provisions" (emphasis added).  *See also id.* at x ("it is imperative that we remain detached from the conflicts" between stakeholder interests); *id.* at xii ("we have had to explore every question, analyze

every argument, discuss, consult, confer, and look for workable compromises on issues that some people claimed were irreconcilable.").

The 1965 Report makes clear that the Copyright Office was tasked by Congress with "the actual drafting of the bill… without direct consultation with anyone outside of Government." *Id.*  And the express purpose of the 1965 Report was to "explain the thinking that went into the 1965 bill and to illuminate some of its language." *Id.* at xiii.  That is exactly what the 1965 Report does with its statement regarding the "foreign laws" language now codified in § 304(c)(6)(E).  To illustrate the meaning of the phrase "arising under foreign laws," the 1965 Report provided an example, stating that "termination affects only those rights arising under the U.S. copyright statute and has no effect, *for example*, on *foreign rights that are covered by the same contract.*"

The example chosen by the 1965 Report as an illustration of rights the bill did *not* allow to be terminated – "foreign rights that are covered by the same contract" – precisely matches the factual scenario presented by this case. It is difficult to imagine a stronger or more targeted case for considering legislative history when construing a statute, if legislative history is even deemed necessary.[13]

---

[13] The accusations Vetter levels against legislative history generally, see Vetter Brief at 52, do not apply to this passage of the 1965 Report.  The "foreign laws" passage of the 1965 Report on which Resnik relies is not "murky, ambiguous and

To be clear, Appellants believe the statutory text of § 304(c)(6)(E) is unambiguous and that no recourse to legislative history *is* necessary. However, Vetter and its *amici* have deluged this Court with references to Congress' general motive of mitigating the effects of "unremunerative" transfers for authors, *see e.g.*, Vetter Brief at 3, 6, 11, 34, 42, 49, 51 – yet this language appears nowhere in the statute but is only contained in the Act's legislative history. If legislative history is categorically off-limits, then this Court should also disregard every reference to the broad Congressional motive of mitigating the effects of unremunerative grants.

*Fourth,* even jurists who approach legislative history with great skepticism have recognized that it can be relevant to understanding the meaning of a particular word or phrase. *See, e.g., McDonald v. City of Chicago, Ill.,* 561 U.S. 742, 828–29 (2010) (Thomas, J., concurring) ("Statements by legislators can assist in this process to the extent they demonstrate the manner in which the public used or understood a particular word or phrase.... In other words, this evidence is useful not because it demonstrates what the draftsmen of the text may have been thinking, but only insofar as it illuminates what the public understood the words chosen by the draftsmen to mean.").

---

contradictory" – Vetter does not even directly contend that it is – nor was it prepared by Congressional "staffers and lobbyists" with their own agendas.

Applying that approach here, the 1965 Report can illuminate, even to a legislative-history skeptic, that the statutory phrase "in no way affects rights arising under . . . foreign laws" was understood at the time to include "in no way affects foreign rights that are covered by the same contract."

Vetter's repeated reliance on the general legislative *motive* behind termination, *i.e.* to mitigate the effects of certain "unremunerative transfers" made by authors, does not fulfill this function. As the Supreme Court has often recognized, inquiries into legislative motives "are a hazardous matter." *United States v. O'Brien*, 391 U.S. 367, 383 (1968); *Arizona v. California*, 283 U.S. 423, 455 (1931) (collecting cases).

At most, the "unremunerative transfers" language in the history of § 304(c) may point to a broad Congressional motive, but it sheds no light on the specific meaning of any particular word or phrase of the statutory text, either to the general public or to the enacting legislature. The overall purpose of a statute, even if expressed clearly in legislative history, cannot be allowed to substitute for the plain meaning of its text. *See, e.g., Milner v. Dep't of Navy*, 562 U.S. 562, 572 (2011) (legislative history cannot "muddy clear statutory language").

A unanimous Supreme Court explained on June 12, 2025 in *Martin v. U.S.*, 2025 WL 1657418 (2025)(Gorsuch, J.), that "[f]ew pieces of legislation pursue any single purpose at all costs" (quoting *Amer. Express Co. v. Italian Colors Restaurant*,

570 U.S. 228 (2013)). That observation is certainly true with respect to the termination sections of the 1976 Act. They were, as Vetter does not dispute, a compromise among publishers, authors, and other interests in which no faction obtained everything it sought. See H.R. Rep. 94-1476 (1976) at 124 ("Section 203 reflects a practical compromise that will further the objectives of the copyright law while recognizing the problems and legitimate needs of all interests involved."). Accordingly, the plain text of the termination provisions both *created* a termination right and also placed *limits* on that right.

Authors obtained the ability to recapture certain of their rights, but only subject to finely-calibrated statutory compromises regarding which rights could be terminated, at what time, by whom, and through what notice and recordation mechanisms. Authors did not, for example, obtain the right to terminate grants of derivative-work rights, *see* § 304(c)(6)(A),[14] despite the fact that such derivative-work grants may have been unremunerative.[15] Neither did authors obtain the right

---

[14] Section 304(c)(6)(A) states "[i]n all cases the reversion of rights is subject to the following limitations: (A) A derivative work prepared under authority of the grant before its termination may continue to be utilized under the terms of the grant after its termination, but this privilege does not extend to the preparation after the termination of other derivative works based upon the copyrighted work covered by the terminated grant."

[15] For the same reason, the Court must reject Vetter's argument that foreign rights should be terminable here because they were "covered by" the initial grant. Vetter Brief at 54, quoting ROA.280. In other words, Vetter argues that if any part of a

to terminate work-made-for-hire agreements, no matter how unremunerative they may have been.[16]   Section 304(c) cannot therefore be interpreted as though it permits termination of *all* unremunerative grants "at all costs." *See, e.g., Henson v. Santander Consumer USA Inc.*, 582 U.S. 79, 89 (2017) (cleaned up): "it is quite mistaken to assume . . . that whatever might appear to further the statute's primary objective must be the law."   Specifically with regard to the Copyright Act's termination provisions, courts have understood that an overall Congressional motive "to benefit authors and their heirs" does not require "interpreting every provision relating to termination rights in whatever way would best favor the interests of heirs, regardless of the clarity of statutory language to the contrary." *Peretti v. Authentic Brands Grp. LLC*, 33 F.4th 131, 142 (2d Cir. 2022).   Accordingly, the broad motive

---

grant is terminable, the entire grant must be terminable.  The statutory text refutes this argument.  Nothing in the statute makes grants of derivative-work rights terminable, for example, whether they were "covered by" the author's overall grant of rights or were separately conveyed; they simply are not terminable. Nor does the text of the "foreign laws" limitation in § 304(c)(6)(E) permit such a distinction; *all* of the limitations in § 304(c)(6), including the derivative work limitation and the "foreign laws" limitation, apply "[i]n *all cases*" according to the statute – not merely where transfer of that particular right was (or was not) "covered by" a broader grant. The 1965 Report, *supra*, expressly contradicts Vetter's position, stating in so many words that grants of foreign rights "covered by" an author's grant are *not* terminable (termination "has no effect, for example, on foreign rights that are covered by the same contract.").

[16] 17 U.S.C. § 304(c): "In the case of any copyright subsisting in either its first or renewal term on January 1, 1978, *other than a copyright in a work made for hire*, the exclusive or nonexclusive grant of a transfer or license of the renewal copyright or any right under it . . . is subject to termination" (emphasis added).

of undoing "unremunerative transfers" for the benefit of authors, repeatedly urged by Vetter and its *amici* as the ultimate guide to interpreting the "foreign laws" limitation in § 304(c)(6)(E), actually provides no guidance at all.

Vetter's other principal citation to legislative history, Vetter Brief at 53, is equally unavailing. Referring to its "own friends in the crowd," Vetter Brief at 53, Vetter quotes language in the 1976 House Report that states "termination means that ownership of the *rights covered by the terminated grant* reverts to everyone who owns a termination interest" (emphasis Vetter's). But as explained *supra* at 7-9, the first section of § 304(c)(permitting termination of any "grant of a transfer or license of *the renewal copyright* or any right under it")(emphasis added), states explicitly that the only rights "subject to termination" are grants of "*the* renewal copyright," *i.e.* the post-28-year *U.S.* copyright. As noted above, no other country had a renewal copyright, much less a 28-year renewal copyright. So "the rights covered by the terminated grant" are U.S. renewal-term rights, and even Vetter's cited "friend in the crowd" fails to support Vetter's position. Moreover, Vetter takes this passage of legislative history completely out of context. It was not talking about the scope of rights that revert, but only referring to *whom* the rights revert (specifically, confirming that a person who does not sign onto a termination notice is nonetheless bound by it, if it was effectuated by a majority). In sum, the history of § 304(c)

generally, and § 304(c)(6)(E) specifically, strongly support reversal of the District Court's statutory interpretation.

### C. **This Case Turns On Statutory Interpretation, Not Choice-of-Law Analysis.**

Vetter and its *amici* rely heavily on the Second Circuit's decision in *Itar-Tass Russian News Agency v. Russian Kurier, Inc.,* 153 F.3d 82 (2d Cir. 1998) and its progeny to argue that the ownership of copyright in a work of authorship is determined worldwide, and for all purposes, by the law of the country having the most significant relationship to the work. *See, e.g.* Vetter Brief at 63-69. As a threshold matter, this is a statutory interpretation case, not a choice of law case. The statutory language, context and history make clear that foreign rights "covered by" a publishing contract are not subject to termination under § 304(c).

Moreover, the District Court did not apply or follow *Itar-Tass*, see ROA.265-267, but merely referenced it in connection with several arguments "leading back to" its admittedly novel ruling that *all worldwide rights* in a work "arise under" the law of the country having such relationship to the work, and do not "arise under" the laws of the various countries in which the work may be exploited. ROA.267. The District Court's unprecedented conclusion was erroneous and must be reversed, for the reasons set forth above and in Appellants' opening brief, Doc. No. 21. For the sake of clarity, however, we address below specific errors and distortions of the law

presented to this Court by the briefs of Vetter and its *amici* with regard the choice-of-law analysis in *Itar-Tass* and its progeny.

### 1. *Itar-Tass Is Inapplicable Because It Only Concerns Initial Ownership.*

As an initial matter, *Itar-Tass* was not a termination case under § 304(c), or under its cognate provision, § 203(a). *Itar-Tass* did not therefore interpret, or purport to interpret, the language of those statutory provisions regarding the termination of grants of rights "arising under … foreign laws." Accordingly, it has no relevance whatsoever to the claims in this case concerning the geographic scope of Resnik's rights following Vetter's termination of the 1963 grant under § 304(c). Those rights are determined solely by statute. This is a case about statutory interpretation, not choice of law. Perhaps for this reason, the District Court did not analyze the facts of this case under *Itar-Tass,* nor should it have done so.

Vetter and its *amici* nonetheless urge this Court to apply the choice-of-law analysis set forth in *Itar-Tass* to this statutory analysis, because they contend that the present case concerns an issue of international copyright "ownership," as did *Itar-Tass.* They neglect to inform this Court, however, that *Itar-Tass* explicitly limited its discussion and analysis to questions of *initial* ownership of copyright, and affirmatively disavowed any consideration of choice-of-law issues "concerning assignment of rights." *Id.* at 91, n.11 ("In deciding that the law of the country of

origin determines the ownership of copyright, we consider only initial ownership, and have no occasion to consider choice of law issues concerning assignments of rights.").

The case before this Court not only "concern[s] assignments of rights," it concerns the termination of those assignments and the statutory limits on those terminations, placing this case several significant doctrinal steps beyond the scope of any analysis the Second Circuit conducted in *Itar-Tass*. As this Court recently held in *Abraugh v. Altimis,* 26 F.4th 298, 305 (5th Cir. 2022) a court decision "cannot be invoked as a precedent" for issues it did not discuss, and *Itar-Tass* manifestly did not discuss the issues now before this Court. Vetter cannot therefore invoke it as precedent. The mere fact that *Itar-Tass* used the general word "ownership" when describing its choice-of-laws analysis does not expand the scope of its holding. *See Illinois v. Lidster*, 540 U.S. 419, 424 (2004)(it is improper to interpret general language in opinions as "referring to quite different circumstances that the Court was not then considering.").

### 2. Canadian Standards Is Inapplicable For the Same Reason.

Vetter compounds its lapse of candor regarding the scope of *Itar-Tass* by citing to this Court's ruling in *Canadian Standards Assoc. v. P.S. Knight Co., Ltd,* 112 F.4th 298 (5th Cir. 2024). But *Canadian Standards* made no mention of any transfers of ownership, and set forth no analysis of its own; it merely cited to *Itar-*

*Tass* with a *see also* citation to three other initial-ownership cases: *Alameda Films SA de CV v. Authors Rights Restoration Corp.*, 331 F.3d 472 (5th Cir. 2003)(ownership of films by Mexican production studio); *Ennio Morricone Music, Inc. v. Bixio Music Grp. Ltd*, 936 F.3d 69 (2d Cir. 2019)(ownership of film music by composer; parties agreed to apply Italian law, no choice-of-law issues considered); *Saragema India Ltd v. Mosley*, 635 F.3d 1284 (11th Cir. 2011)("Initial ownership of a copyrighted work is determined by the laws of the work's country of origin"). Accordingly, neither *Canadian Standards* nor any of its cited authorities are in any way helpful to this Court.[17]

### 3. *Creazioni Artistiche Musicali Is Inapplicable Because It Only Concerns Interpretation of a Contract, Not Statutory Interpretation.*

The New York District Court in *Creazioni Artistiche Musicali, S.R.L. v. Carlin America, Inc.*, 2016 WL 7507757 (S.D.N.Y. Dec. 30, 2016) cited in the Vetter Brief at 65, recognized that *Itar-Tass* was limited to resolving questions of initial ownership. Writing on what it perceived to be a blank slate, however (2016

---

[17] Vetter appears to argue, Vetter Brief at 30, that *Canadian Standards* somehow expanded the *Itar-Tass* analysis because it referred to the law of the country where the copyrights at issue were "held" – rather than "owned" or "created" – but any distinction between "held," "owned" and "created" is purely conjectural on Vetter's part, the cases do not discuss it. Neither *Canadian Standards* nor any of its cited authorities support making any distinction between the terms "held," "owned" and "created." In any event the principal issue in this case is the meaning of "arising under … foreign laws" in 17 U.S.C. § 304(c)(6)(E), as to which none of the alternative terms shed any light.

WL 7507757 at *3), the *Creazioni* District Court proposed that the choice of law

analysis "in contractual disputes" (*id.*) might best be determined by consideration of

certain aspects of the contract at issue. But because the appeal before this Court does

not involve the interpretation of a contract, and instead requires the construction of

a *statute* that permits certain limited terminations of an otherwise-valid contract,

*Creazioni* is of no assistance.[18]

### 4. *Corcovado Music Refutes the District Court's "Master Copyright" Theory.*

Further refuting Vetter's attempt to shoehorn this termination case into an

*Itar-Tass* conflict-of-laws analysis, which even the District Court did not apply, the

narrow holding of the Second Circuit in *Itar-Tass* had no occasion to address the

earlier ruling of that same Court in *Corcovado Music Corp. v. Hollis Music Inc.*, 981

F.2d 679 (2d Cir. 1993), because the contexts of the cases were so different.

*Corcovado* involved a claim about U.S. renewal-term rights in bossa nova songs by

---

[18] The Vetter Brief, at 63-64, also cites to *Corbello v. DeVito*, 844 F. Supp. 2d 1136 (D. Nev. 2012) and *Mapp v. UMG Recordings,* 208 F. Supp. 3d 776 (M.D. La. 2016) in the context of its *Itar-Tass* discussion. Neither case has any bearing on the issues before this Court. *Corbello*, which was reversed on other grounds by the Ninth Circuit, 777 F.3d 1058 (9th Cir. 2015), involved an infringement claim by an author's widow, against which defendants asserted that they had obtained a license to use the work at issue. The Court concluded that there was no actual conflict of laws regarding the license because the result would be the same under U.S., U.K., Canadian and Australian law. *Mapp* concerned an asserted license defense by one of the co-authors of a work; the Court refused to consider foreign law about the rights of co-authors to issue licenses, as it rejected plaintiff's infringement claim.

a noted Brazilian composer, Antonio Carlos Jobim. Both parties to the original
publishing agreement were Brazilian, the songs were first published in Brazil, and
the agreement was written in Portuguese and executed in Brazil, with a Brazilian
forum-selection clause. *Id.* at 680-681.

Despite these extensive Brazilian points of contact, when a conflict arose
about whether the Brazilian publishing agreement conveyed U.S. renewal-term
rights in the songs, the Second Circuit held that *U.S.* law must govern. *Id.* at 683.
The "most significant relationship" inquiry that *Itar-Tass* would later apply to
resolve issues of *initial* ownership was of no moment when interpreting the effect of
a contract for exploitation of the work in the U.S.[19]

The same result should apply here:  protection of "Double Shot of My Baby's
Love" in territories outside the U.S. must and should be evaluated pursuant to, and
deemed to "arise under," the law of those territories, not the U.S.  In each of those

---

[19] *Corcovado* thus further vitiates the fundamental premise of the District Court's
ruling, which was that a copyrighted work is protected by a single worldwide
copyright, arising under the law of the source country of the work and merely
"recognized" in other territories. *Corcovado* expressly held that the parties' dispute
as to ownership of rights in the U.S. arose under U.S. law, *Corcovado* at 681-682,
even though Brazil was the source country of the work and had the most significant
contacts with it. *Accord, Rohauer v. Killiam Shows, Inc.*, 379 F. Supp. 723 (S.D.N.Y.
1974)(ownership of renewal rights in U.S. determined under U.S. law, even though
work and author were from U.K.) Vetter offers no explanation as to why the author's
"master copyright" from the U.K. did not control ownership of U.S. rights in the
work at issue in *Rohauer*.  See Vetter Brief at 38.

countries, the right of exploitation must not be subject to U.S. laws regarding ownership and reversion of rights, any more than Antonio Carlos Jobim's rights in the U.S. were subject to Brazilian law in *Corcovado*. To the extent that *Corcovado* is in tension with *Itar-Tass*, *Corcovado* controls because it is the earlier of the two Second Circuit panel decisions.[20]

## II.     THE DISTRICT COURT'S INTERPRETATION OF *STEWART v. ABEND* IGNORED THE TEXT OF THE 1909 COPYRIGHT ACT AND CONSTITUTES REVERSIBLE ERROR.

The above analysis also compels reversal of the District Court's ruling on Count I of the Complaint, concerning the extraterritorial effect of Section 24 of the 1909 Act, as applied in the Supreme Court's *Stewart v. Abend* decision. Under *Stewart*, the Court below held that Resnik's loss of U.S. renewal-term rights in the Smith Interest, occasioned by the death of co-writer Don Smith prior to the start of the renewal period, also resulted in Resnik's loss of non-U.S. rights during the U.S. renewal period.

---

[20] *See Matthews v. Barr*, 927 F.3d 606, 614 (2d Cir. 2019)("In our Circuit, panels are 'bound by the decisions of prior panels until such time as they are overruled either by an en banc panel of our Court or by the Supreme Court.' *United States v. Gill*, 748 F.3d 491, 502 n.8 (2d Cir. 2014) (quoting *United States v. Wilkerson*, 361 F.3d 717, 732 (2d Cir. 2004)"). *Accord, Douglass v. Nippon Yusen Kabushiki Kaisha*, 996 F.3d 289, 297 (5th Cir. 2021)("It is well-settled in this circuit that the rule of orderliness prevents one panel of the court from overturning another panel's decision, absent an intervening change in the law.").

The Court's ruling cannot be reconciled with the text of Section 24, which reads in pertinent part as follows, as noted *supra* at page 6:

> *The copyright* secured by this title shall endure for twenty-eight years from the date of first publication . . . the author of such work . . . *shall be entitled to a renewal and extension of the copyright in such work for a further term of twenty-eight years* when application for such renewal and extension shall have been made to *the copyright office* and duly registered therein within one year prior to the expiration of the original term of copyright: And provided further, That in default of the registration of such application for renewal and extension, *the copyright* in any work shall determine at the expiration of twenty-eight years from first publication.

1909 Act, § 24 (Emphasis added).

The statutory reference to "the copyright secured by this title" can only refer to the *U.S.* copyright, because only the U.S. copyright had a term of twenty-eight years; only the U.S. copyright was entitled to a renewal for a "*further* term of 28 years"; and such further term could only be obtained by making the proper filing in "the copyright office," i.e. the *U.S.* Copyright Office.  The undisputed statutory text compels the conclusion that the lowercase term "copyright" in § 24 referred, and still refers, to U.S. copyright.

Therefore, when *Stewart v. Abend* analyzes the effect of the author's death on the ownership of "the renewal copyright," expressly quoting and applying this statutory language, *see Stewart* at 219 ("[i]f the author dies before that time, the next of kin obtain *the renewal copyright* free of any claim founded upon an assignment made by the author in his lifetime"), it necessarily means the *U.S.* renewal copyright.

*That* is the "new estate" that Congress created in § 24, see *Stewart, id.* at 220, and *that* is what passes to the author's heirs if the author does not survive into the renewal period. To assert otherwise would be to speculate, with no evidentiary support, that the Supreme Court had *sub silentio* adopted a different definition of the term "copyright" than Congress used in the statute on which the Court based its analysis.

And in the next sentence following the discussion of this "new estate," the Court in *Stewart* observes "[a]n author holds a bundle of exclusive rights in the copyrighted work, among them the right to copy and the right to incorporate the work into derivative works." *Id.* Again, the Court is referring to the "bundle of rights" that is "secured by" the Copyright Act, namely, U.S. rights. This is the context in which the Court's next two sentences occur:

> By assigning the renewal copyright in the work without limitation, as in *Miller Music,* the author assigns all of these rights. After *Miller Music,* if the author dies before the commencement of the renewal period, the assignee holds nothing.

*Id.*

The District Court below, at Vetter's urging, seized on the word "nothing," shorn of its context, to find a "plausible" meaning relating to non-U.S. rights. This was reversible error. There is not even a passing reference to foreign rights or territories in *Stewart,* or in § 24, much less did the parties present the Court with a dispute concerning such rights. Again, as this Court recognized in *Abraugh v. Altimis,* 26 F.4th 298, 305 (5th Cir. 2022) no court decision can be "invoked as a

precedent" with respect to an issue it did not discuss. *Stewart* did not discuss foreign rights, either expressly or by implication. Therefore, in addition to the reasons and authorities cited in Resnik's opening brief, the plain meaning of Section 24 of the 1909 Act, as applied in *Stewart v. Abend*, requires reversal of the District Court's decision as to Count I of the Complaint.

## III. THE DISTRICT COURT'S INTERPRETATIONS OF § 304(c)(6)(E) AND THE 1909 ACT ARE NOT "PURELY DOMESTIC" AND WILL CAUSE WORLDWIDE DISRUPTION IN ALL COPYRIGHT-INTENSIVE INDUSTRIES.

The Vetter Brief raises a desperate argument in its final pages, asserting that this case, in which Vetter explicitly seeks a declaration of worldwide rights, is "purely domestic":

> [A] foreign court is as free today as it ever was to reject the district court's legal conclusions on the nature of international copyright and the effect of renewal and termination rights within their respective sovereign jurisdictions. The reality is, whether one copyright or many, the interests at stake here are purely domestic: an American citizen's right to claim ownership of copyright from an American jurisdiction.

Vetter Brief at 71.

This argument is absurd on its face, and conspicuously neglects to mention that the "ownership of copyright" being claimed by Vetter covers the entire world. If a foreign court is indeed not bound by this ruling, the result would be the very chaos that Resnik and its *amici* are asking this Court to prevent. To cite just one example, if this Court affirms a ruling that Vetter owns the U.K. rights in the Song, but a U.K. court could blithely reject that ruling as if it never happened and deem

Resnik the owner of U.K. rights, then no party can ever realistically exploit the rights in the U.K., because each party would be deemed an infringer by a different court. In the face of such uncertainty, all exploitation outside the U.S. would grind to a halt, for *both* parties. Vetter dismisses the possibility of an "unseemly conflict" between jurisdictions, but nothing in the record of this case supports such a cavalier assessment. The District Court's decision threatens to open a Pandora's box of unintended consequences worldwide, and to close it as Congress intended this Court should apply the Copyright Act as written and reverse the decision below.

## CONCLUSION

Based on the reasons and authorities set forth above, the Judgment of the District Court should be reversed in all respects and judgment entered for Appellants.

SUBMITTED BY:
*/s/Robert W. Clarida*
Reitler Kailas & Rosenblatt LLP
885 Third Avenue
New York, NY 10022

# CERTIFICATE OF SERVICE

I hereby certify that on July 10, 2025, I electronically filed the foregoing Reply Brief of Appellants with the Clerk of the Court for the U.S. Court of Appeals for the Fifth Circuit by using the appellate CM/ECF system.  All case participants are registered CM/ECF users, and will be served by the appellate CM/ECF system.

/s/ Robert W. Clarida
Robert W. Clarida
Reitler Kailas & Rosenblatt LLP

*Attorney of Record for Appellants*

# CERTIFICATE OF COMPLIANCE

Undersigned counsel certifies that the attached brief complies with the type-volume limitations in Federal Rule of Appellate Procedure 29(a)(5) because this brief contains 8444 words, which is more than the amount allowed for a party's reply brief under Federal Rule of Appellate Procedure 32(a)(7)(B)(i), excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(f) and Fifth Circuit Rule 32.2, but less than the amount authorized by the Court in the Order dated June 25, 2025.

Undersigned counsel further certifies that this brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and Fifth Circuit Rule 32.1 and the type style requirements of Federal Rule of Appellate Procedure 32(a)(6), because this brief has been prepared in a proportionally spaced 14-point Times New Roman typeface using Microsoft Word.

*/s/ Robert W. Clarida*
Robert W. Clarida
Reitler Kailas & Rosenblatt LLP

*Attorney of Record for Appellants*