# United States Court of Appeals for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**

January 12, 2026

Lyle W. Cayce
Clerk

No. 25-30108

---

Cyril E. Vetter; Vetter Communications Corporation,

*Plaintiffs—Appellees,*

*versus*

Robert Resnik; Resnik Music Group,

*Defendants—Appellants.*

---

Appeal from the United States District Court
for the Middle District of Louisiana
USDC No. 3:23-CV-1369

---

Before Smith, Stewart, and Ramirez, *Circuit Judges.*

Carl E. Stewart, *Circuit Judge*:

Cyril E. Vetter and Vetter Communications Corporation (collectively, the "Vetter Plaintiffs") brought this lawsuit against Robert Resnik and Resnik Music Group (collectively, "Resnik") seeking a declaration that they are the sole owners of the copyright rights to the song "Double Shot (Of My Baby's Love)" ("Double Shot") throughout the world. Vetter and Donald Smith wrote Double Shot. Vetter then assigned his copyright rights to Double Shot to a music publisher and, years later, terminated the assignment and recaptured his rights ("Vetter's Recaptured Copyright Interest"). After Smith died, Vetter Communications

No. 25-30108

Corporation purchased the renewal copyright rights held by Smith's heirs ("VCC's Renewal Copyright Interest"). The Vetter Plaintiffs filed a complaint in the Middle District of Louisiana, alleging that they are the exclusive owners of the copyright rights to Double Shot, and that they may exploit it in the United States and abroad. The district court denied Resnik's motion to dismiss and granted the Vetter Plaintiffs' motion for summary judgment. It declared the Vetter Plaintiffs to be the sole owners of the copyright rights to Double Shot throughout the world. Thereafter, Resnik appealed. Because the district court's declaration is supported by statutory text, context, and purpose, we AFFIRM the district court's judgment in full.

## I

### A. Factual Background

In the summer of 1962, Vetter and Smith wrote Double Shot in Baton Rouge, Louisiana. The following year, they transferred in an assignment agreement (the "1963 Assignment") one hundred percent of their respective copyright interests in Double Shot to Windsong Music Publishers, Inc. ("Windsong") in exchange for one dollar. The 1963 Assignment included "a transfer of the exclusive rights to Double Shot throughout the world for the full term of copyright protection, including a contingent assignment of all renewal period rights under the [Copyright Act of 1909]." After Double Shot was released and received airplay across the country, Windsong filed for a copyright registration for it with the U.S. Copyright Office in 1966. This registration provided Windsong with federal copyright protection under the Copyright Act of 1909 for an initial term of twenty-eight years with a possible renewal term of an additional twenty-eight years.

In 1972, Smith tragically died in a plane crash. Following Smith's death, his heirs and Vetter renewed the original copyright for Double Shot

No. 25-30108

when its original term ended in 1994 (the "Renewal Copyright"). It is undisputed that the transfer of Vetter and Smith's renewal rights to Windsong in the 1963 Assignment was contingent on Vetter and Smith surviving the original term of the copyright and being alive during the renewal term.[1] Because Vetter was alive during the renewal term, his renewal rights transferred to Windsong under the 1963 Assignment. Because Smith died before the start of the renewal term, his heirs obtained his renewal rights rather than Windsong under the 1963 Assignment. Therefore, Windsong owned fifty percent of the Renewal Copyright given the transfer of Vetter's renewal rights, and Smith's heirs owned the remaining fifty percent of the Renewal Copyright in 1994.

In the spring of 1996, Vetter Communications Corporation purchased the renewal rights held by Smith's heirs.[2] Later that year, Windsong assigned fifty percent of its interest in the Renewal Copyright to Lyresong Music, Inc. ("Lyresong"). At this point, Vetter Communications Corporation owned fifty percent of the Renewal Copyright given its purchase from Smith's heirs, and Windsong and Lyresong each owned twenty-five percent of the Renewal

---

[1] *See Stewart v. Abend*, 495 U.S. 207, 219 (1990) (citing *Miller Music Corp. v. Charles N. Daniels, Inc.*, 362 U.S. 373, 374–75 (1960)) ("[W]hen an author dies before the renewal period arrives, his executor is entitled to the renewal rights, even though the author previously assigned his renewal rights to another party.").

[2] These rights are referred to as "VCC's Renewal Copyright Interest." In 1996, Windsong also executed an assignment agreement that "reduce[d] to writing" Vetter's transfer of his fifty-percent interest in the Renewal Copyright to Windsong. In their complaint, the Vetter Plaintiffs allege that "[t]here appears to be no legitimate basis" for this assignment because "per the [*Fred Fisher Music Co. v. M. Witmark & Sons*, 318 U.S. 643 (1943)] decision, the transfer of [Vetter's] interest in the renewal term was accomplished through the 1963 Assignment and did not need to be 'reduced to writing' again." The district court did not address this argument because it determined that "the parties appear to agree upon the ultimate fact that Vetter's renewal interest went to Windsong." *See Vetter v. Resnik*, No. 23-CV-1369, 2024 WL 3405556, at *1 n.16 (M.D. La. July 12, 2024). We agree with the district court that this assignment is not at issue.

No. 25-30108

Copyright.

In March 2019, Vetter sent Windsong and Lyresong a notice of termination under 17 U.S.C. § 304(c). The notice of termination informed Windsong and Lyresong that Vetter was terminating "all authorship/ownership rights originally granted and conveyed by [Vetter] to [Windsong]" under the 1963 Assignment as of May 3, 2022.[3] In August 2019, Windsong's owner informed Vetter that the company had been sold to Resnik.

In 2022, American Broadcasting Companies, Inc. ("ABC") approached the Vetter Plaintiffs and requested an expanded license to use Double Shot in a television episode. Although that television episode had previously aired, "ABC was seeking to expand the original music license to include *inter alia* worldwide digital broadcasts and on-demand streams." The Vetter Plaintiffs provided ABC with a quote, indicating that they were the sole and exclusive owners of Double Shot throughout the world. However, Resnik continued to claim twenty-five percent ownership of Double Shot even after receiving a copy of Vetter's notice of termination.

### B. Procedural History

On September 27, 2023, the Vetter Plaintiffs filed a complaint in the Middle District of Louisiana, urging the district court to declare them the sole owners of Double Shot. Resnik moved to dismiss the complaint under Federal Rule of Civil Procedure 12(b)(6), and the district court denied the motion. The Vetter Plaintiffs then moved for summary judgment, and the district court granted the motion. In doing so, the district court declared Vetter to be the sole owner of Double Shot's copyright throughout the world

---

[3] These rights are referred to as "Vetter's Recaptured Copyright Interest."

No. 25-30108

in Vetter's Recaptured Copyright Interest and declared Vetter Communications Corporation to be the sole owner of Double Shot's copyright throughout the world in VCC's Renewal Copyright Interest. In other words, it determined that the Vetter Plaintiffs are collectively the sole owners of Double Shot. Resnik timely appealed.

## II

This court has jurisdiction under 28 U.S.C. § 1291 because the district court entered a final order and judgment. It granted summary judgment in favor of the Vetter Plaintiffs on January 29, 2025.

We review a district court's ruling on a motion for summary judgment de novo. *Sanders v. Christwood*, 970 F.3d 558, 561 (5th Cir. 2020) (citing *Burell v. Prudential Ins. Co. of Am.*, 820 F.3d 132, 136 (5th Cir. 2016)). "Summary judgment is proper 'if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'" *Id.* (quoting Fed. R. Civ. P. 56(a)). Because Resnik does not argue that there is a genuine dispute of material fact, we focus on whether the Vetter Plaintiffs are entitled to judgment as a matter of law.

## III

On appeal, Resnik argues that the district court erred by declaring Vetter to be the sole owner of Double Shot's copyright throughout the world in Vetter's Recaptured Copyright Interest for three main reasons. First, he asserts that Vetter's notice of termination does not affect foreign rights based on the plain language of 17 U.S.C. § 304(c). Second, he contends that the district court's interpretation of the statute contradicts case law on the statutory termination of foreign rights. And third, he maintains that the district court's holding conflicts with U.S. treaty obligations under the Berne Convention and Universal Copyright Convention. We address each of these arguments in turn.

*A. Statutory Interpretation*

We begin with the text of the statute in cases of statutory interpretation. *Matter of Durand-Day*, 134 F.4th 846, 851 (5th Cir. 2025) (citing *Matter of Imperial Petroleum Recovery Corp.*, 84 F.4th 264, 271 (5th Cir. 2023) (per curiam)). We seek the statute's "ordinary meaning." *Id.* (quoting *Niz-Chavez v. Garland*, 593 U.S. 155, 169 (2021)). "If the text of the statute is clear and unambiguous, [the] inquiry ends, and [this court] give[s] effect to the plain language." *Id.* (citing *Carpenters Dist. Council of New Orleans & Vicinity v. Dillard Dep't Stores, Inc.*, 15 F.3d 1275, 1282–83 (5th Cir. 1994)).

Section 304(c) of the Copyright Act of 1976 enables authors and artists to terminate transfers of their copyright rights covering an extended renewal term:

> In the case of any copyright subsisting in either its first or renewal term on January 1, 1978, other than a copyright in a work made for hire, the exclusive or nonexclusive grant of a transfer or license of the renewal copyright or any right under it, executed before January 1, 1978, by any of the persons designated by subsection (a)(1)(C) of this section, otherwise than by will, is subject to termination.

17 U.S.C. § 304(c). Critically, section 304(c)(6)(E) provides that "[t]ermination of a grant under this subsection affects only those rights covered by the grant that arise under this title, and in no way affects rights arising under any other Federal, State, or foreign laws." 17 U.S.C. § 304(c)(6)(E).

Resnik first points to the plain language of section 304(c)(6)(E), contending that it shows that Vetter's notice of termination does not affect foreign rights. He asserts that this interpretation is consistent with congressional intent. He quotes Staff of House Committee on the Judiciary, 89th Congress, Supplementary Report of the Register of Copyrights on the

General Revision of the U.S. Copyright Law (Committee Print 1965), explaining that the language "arising under . . . foreign laws" was meant "to ensure that 'termination affects only those rights *arising under* the U.S. copyright statute and has no effect, for example, *on foreign rights that are covered by the same contract.*'"

The Vetter Plaintiffs respond that the phrase "under this title" is ambiguous, so its meaning should be determined from context. They cite *Kirtsaeng v. John Wiley & Sons, Inc.* ("*Kirtsaeng*"), 568 U.S. 519 (2013), for the proposition that "there is a presumption that 'under this title' *lacks* geographical significance when used in the Copyright Act." For evidence of Congress's intent from legislative history, the Vetter Plaintiffs cite House Report No. 94-1476, at 127 (1976), which states that "[u]nder the bill, termination means that ownership of the rights covered by the terminated grant reverts to everyone who owns termination interests on the date the notice of termination was served."

The district court correctly determined that Vetter is the sole owner of Double Shot's copyright throughout the world in Vetter's Recaptured Copyright Interest. The district court's holding is supported by statutory text and context as well as statutory purpose.

### i. Statutory Text and Context

The district court's holding is supported by the text of section 304(c)(6)(E). Section 304(c)(6)(E) states that "[t]ermination of a grant under this subsection affects only those rights covered by the grant that arise under this title, and in no way affects rights arising under any other Federal, State, or foreign laws." 17 U.S.C. § 304(c)(6)(E). On appeal, Resnik argues that the notice of termination under section 304(c) only affects domestic rights, not foreign rights. However, this interpretation is unpersuasive. According to Merriam Webster, "arise" means "to originate from a

source."[4] Black's Law Dictionary similarly defines "arise" as "[t]o originate; to stem (from)."[5] Based on the plain language of "arise under this title," termination covers copyrights that were granted under Title 17 of the U.S. Code, which includes the U.S. Copyright Act, and excludes copyrights that were granted under "any other Federal, State, or foreign laws." In other words, because termination affects rights that "arise under" the U.S. Copyright Act, and because Vetter's rights arose under the U.S. Copyright Act, the plain language of section 304(c)(6)(E) dictates that his termination would be effective as to all of his rights—including his copyright to the extent that it extends internationally. There is no explicit geographical limitation in section 304(c)(6)(E) that restricts the exploitation of Vetter's rights to uses within the United States. Therefore, based on the plain language of the statute, the district court's holding is correct.

While Resnik argues that the district court ignored the legal definition of "arise under," this argument fails as well. He cites a test under *T.B. Harms Co. v. Eliscu*, 339 F.2d 823, 824 (2d Cir. 1964):

> [A]n action "arises under" the Copyright Act if and only if the complaint is for a remedy expressly granted by the Act . . . or asserts a claim requiring construct[ion] of the Act, . . . or, at the very least and perhaps more doubtfully, presents a case where a distinctive policy of the Act requires that federal principles control the disposition of the claim.

*Goodman v. Lee*, 815 F.2d 1030, 1031 (5th Cir. 1987) (citation modified) (quoting *T.B. Harms Co.*, 339 F.2d at 828). As the Vetter Plaintiffs observe, even under this test, this case "arises under" the Copyright Act because it involves "a claim requiring construct[ion] of the Act,"—namely, the

---

[4] *Arise*, *Merriam Webster*, https://www.merriam-webster.com/dictionary/arise.

[5] *Arise*, *Black's Law Dictionary* (12th ed. 2024).

ownership claim that requires the interpretation of section 304(c). *Id.* The Vetter Plaintiffs are also correct that "termination rights—and the second chance to control and benefit from a work provided by those rights—undoubtedly reflect a 'distinctive policy' of the Copyright Act that requires domestic principles to control the determination of [Double Shot's] ownership."

Even if the meaning of "arise under this title" is ambiguous, the district court still did not err. On appeal, Vetter argues that the phrase "under this title" is ambiguous, so its meaning should be determined from context. The Supreme Court "has acknowledged that the word 'under' is a 'chameleon' that 'must draw its meaning from its context.'" *Nat'l Ass'n of Mfrs. v. Dep't of Def.*, 583 U.S. 109, 124 (2018) (quoting *Kucana v. Holder*, 558 U.S. 233, 245 (2010) (internal quotation marks omitted)). Moreover, "[i]t is necessary and required that an interpretation of a phrase of uncertain reach is not confined to a single sentence when the text of the whole statute gives instruction as to its meaning." *Maracich v. Spears*, 570 U.S. 48, 65 (2013) (citing *U.S. Nat'l Bank of Or. v. Indep. Ins. Agents of Am., Inc.*, 508 U.S. 439, 455 (1993)). "Within a statute, 'the same term usually has the same meaning.'" *Matter of Durand-Day*, 134 F.4th at 852 (quoting *Pulsifer v. United States*, 601 U.S. 124, 149 (2024)). As such, this court may consult other sections of the Copyright Act of 1976 with the same or similar terms to interpret section 304(c)(6)(E).

The Supreme Court's interpretation of section 109(a) of the Copyright Act of 1976 in *Kirtsaeng* is helpful for understanding whether section 304(c)(6)(E) affects domestic and foreign rights. *Kirtsaeng* involved a lawsuit brought by John Wiley & Sons, Inc. ("Wiley"), a textbook publisher. *Id.* at 525. Wiley sued Kirtsaeng, a citizen of Thailand studying in the United States, for copyright infringement because Kirtsaeng imported and resold textbooks from Thailand without Wiley's permission. *Id.* at 527. Kirtsaeng

argued that the "first sale" doctrine, which enables owners of a particular copy of a work to resell it without permission from the copyright holder, permitted him to resell the textbooks without permission from Wiley. *Id.*; 17 U.S.C. § 109(a). The Court considered whether the phrase "lawfully made under this title" in section 109(a) of the Copyright Act of 1976 restricts the geographical scope of the "first sale" doctrine. 568 U.S. at 528. It ultimately held that "[section] 109(a)'s language, its context, and the common-law history of the 'first sale' doctrine, taken together, favor a *non*-geographical interpretation." *Id.* at 530. It reasoned that section 109(a) "favors Kirtsaeng's nongeographical interpretation, namely, that 'lawfully made under this title' means made 'in accordance with' or 'in compliance with' the Copyright Act." *Id.* It also noted that section 109(a) "says nothing about geography." *Id.* The Court concluded that "the nongeographical reading is simple, it promotes a traditional copyright objective (combatting piracy), and it makes word-by-word linguistic sense." *Id.*

Because "arise under this title" in section 304(c)(6)(E) contains some of the same terms as "lawfully made under this title" in section 109(a), the former phrase likely also means "in accordance with" or "in compliance with" the Copyright Act. *See Matter of Durand-Day*, 134 F.4th at 852 (quoting *Pulsifer*, 601 U.S. at 149). Therefore, the termination provision applies to copyrights that were granted in accordance with the Copyright Act of 1976 and excludes copyrights that were granted in accordance with "any other Federal, State, or foreign laws." That the Court in *Kirtsaeng* also adopted a nongeographical interpretation suggests that the district court did not err in similarly adopting a nongeographical reading of section 304(c)(6)(E). For these reasons, we conclude that the district court's holding that Vetter is the sole owner of Double Shot's copyright throughout the world in Vetter's Recaptured Copyright Interest is supported by statutory text and context.

*ii. Statutory Purpose*

No. 25-30108

The district court's holding is also consistent with the purpose of the Copyright Act of 1976. The Copyright Act of 1976 enables authors and artists to recapture their copyrights in works they may have assigned or transferred through its termination provision. 17 U.S.C. § 203.[6] Congress has explained that "[t]he provisions of section 203 are based on the premise that the reversionary provisions of the present section on copyright renewal [17 U.S.C. § 24] should be eliminated, and that the proposed law should substitute for them a provision safeguarding authors against unremunerative transfers." H.R. Rep. No. 94-1476, at 124 (1976). Congress continued:

> A provision of this sort is needed because of the unequal bargaining position of authors, resulting from the impossibility of determining a work's value until it has been exploited. Section 203 reflects a practical compromise that will further the objectives of the copyright law while recognizing the problems and legitimate needs of all interests involved.

H.R. Rep. No. 94-1476, at 124 (1976).

The district court's holding that Vetter is the sole owner of Double Shot's copyright throughout the world in Vetter's Recaptured Copyright Interest conforms with this purpose. Interpreting section 304(c)(6)(E) as enabling Vetter to recapture the exclusive rights to Double Shot throughout the world that he transferred to Windsong in the 1963 Assignment would safeguard against an unremunerative transfer and help correct for the unequal bargaining power between Vetter and Windsong. Resnik's interpretation of the statute would deprive Vetter of the full set of rights he originally conveyed to Windsong, which is counter to the purpose of the

---

[6] Section 203 outlines the conditions for and effect of terminations of transfers in general. Section 304(c) provides for the termination of transfers covering an extended renewal period. *See* 17 U.S.C. §§ 203, 304(c).

No. 25-30108

statute. As the Artists Rights Institute observes, "[d]enying terminating authors the full return of a worldwide grant leaves them with only half of the apple—the opposite of [c]ongressional intent."

Authors and artists' rights organizations illustrate how the district court's nongeographical interpretation of section 304(c)(6)(E) is consistent with statutory purpose as well as public policy and industry norms. *Amici curiae* explain that "a return of *all* rights is common in contractual reversions," that the music publishing industry routinely manages the contractual transfer of foreign rights due to statutory termination, and that the district court's decision is consistent with industry norms. That contractual reversions of all rights are common practice in the music industry suggests that Congress did not intend for statutory reversions under section 304(c)(6)(E) to apply only to U.S. rights. Moreover, they note that "[t]he industry's adaptability over U.S. terminations is already evident domestically and, clearly, it has not destroyed the music industry." For these reasons, the district court's holding is supported by statutory purpose as well as public policy and industry norms.

*B. Existing Case Law*

On appeal, Resnik argues that the district court's interpretation of the statute contradicts case law on the statutory termination of foreign rights. He cites *Siegel v. Warner Bros. Entertainment, Inc.* ("*Siegel*"), 542 F. Supp. 2d 1098 (C.D. Cal. 2008), *rev'd in part on other grounds*, 504 F. App'x 586 (9th Cir. 2013), *Fred Ahlert Music Corp. v. Warner/Chappell Music, Inc.*, 155 F.3d 17 (2d Cir. 1998), and *Clancy v. Jack Ryan Enterprises, Ltd.*, No. 17-CV-3371, 2021 WL 488683 (D. Md. Feb. 10, 2021), for the proposition that termination under section 304(c) only recaptures *domestic* rights in a work. However, we decline to follow these cases.

No. 25-30108

First, Resnik cites *Siegel*. In *Siegel*, the widow and daughter of Jerome Siegel sought a declaration from the court that they had terminated Siegel's and Joseph Shuster's 1938 copyright grant in the comic book superhero "Superman" under 17 U.S.C. § 304(c). 542 F. Supp. 2d at 1102. Siegel and Shuster had previously executed an assignment agreement in which they assigned the exclusive, worldwide rights to Superman to Detective Comics. *Id.* at 1107. Siegel's widow and daughter later served a termination notice under section 304(c) to recapture Siegel's rights. *Id.* at 1114. The district court considered the issue of which rights were recaptured through the termination notice, "namely, . . . whether plaintiffs have a right to defendants' post-termination foreign profits from the exploitation of the Superman copyright." *Id.* at 1116. The court ultimately held that the termination notice only affected the domestic part of the original assignment. *Id.* at 1142. It reasoned that

> Congress expressly limited the reach of what was *gained* by the terminating party through exercise of the termination right; specifically, the terminating party only recaptured the *domestic* rights (that is, the rights arising under title 17 to the United States Code) of the grant to the copyright in question. Left expressly intact and undisturbed were any of the rights the original grantee or its successors in interest had gained over the years from the copyright through other sources of law, notably the right to exploit the work abroad that would be governed by the copyright laws of foreign nations. Thus, the statute explains that termination "in no way affects rights" the grantee or its successors gained "under foreign laws."

*Id.* at 1140.

*Siegel* is an out-of-circuit case that relies heavily on secondary treatises, which are nonbinding. The district court in *Siegel* cites Professor David Nimmer's treatise: "A grant of copyright 'throughout the world' is

No. 25-30108

terminable only with respect to uses within the geographic limits of the United States. Because copyright has no extraterritorial operation, American law arguably is precluded from causing the termination of rights based on foreign copyright laws." 3 *Nimmer on Copyright* § 11.02[B][2] (2025). To support his view, Nimmer cites another section of his treatise, which discusses the territorial limitations of the U.S. Copyright Act. *See* 3 Nimmer, *supra*, § 11.02[B][2] (citing 5 Nimmer on Copyright § 17.02[A]). It states that "[f]or the most part, acts of infringement that occur outside of the jurisdiction of the United States are not actionable under the United States Copyright Act. This [is] for the reason that copyright laws do not have any extraterritorial operation." 5 Nimmer, *supra*, § 17.02[A] (citing cases). The remainder of this section primarily discusses the presumption against extraterritoriality in the context of copyright and patent infringement. However, this section does not discuss copyright ownership, assignment, and termination, which are at issue in this case. Additionally, the termination of rights in this case was based on the U.S. Copyright Act rather than foreign copyright laws. Further, even Professor Nimmer admits that "a different conclusion is possible." 3 Nimmer, *supra*, § 11.02[B][2] (providing an example). Indeed, we hold that Professor Nimmer's view is contrary to statutory text, context, and purpose.

The district court in *Siegel* also references Professor William Patry's treatise:

> One provision is quite clear, however: termination only affects U.S. rights. Sections 203(b)(5) and 304(c)(6)(E) both state, in relevant part, that termination "in no way affects rights under . . . foreign laws." Accordingly, where a U.S. author conveys worldwide rights and terminates under either section, grants in all other countries remain valid according to their terms or provisions in other countries' laws.

7 *Patry on Copyright* § 25:74 (2025). Notably, Professor Patry omits key language from the statute: "any other Federal, State, or foreign laws." 17 U.S.C. § 304(c)(6)(E). His interpretation can be reconciled with the district court's holding because the grant of worldwide rights at issue in this case arose under U.S. copyright law rather than "other . . . foreign laws." As such, the district court did not err in declining to follow *Siegel* and its reliance on Professor Nimmer and Professor Patry's treatises because these authorities are nonbinding and contradict the plain text and purpose of section 304(c)(6)(E).

Second, Resnik references *Clancy v. Jack Ryan Enterprises, Ltd.*, 2021 WL 488683. There, the surviving spouse of author Tom Clancy, Jr. filed a declaratory judgment action to resolve questions of ownership of her husband's character Jack Ryan. *Clancy*, 2021 WL 488683, at *1. The surviving spouse and her daughter filed a termination notice to recapture rights to one of Clancy's literary works. *Id.* at *45. The district court ultimately held that the termination notice could only apply to the domestic copyright in the literary work, explaining that "the worldwide grant of copyright is only subject to termination insofar as its U.S. component is concerned, but not subject to termination in the rest of the world." *Id.* at *46 (citing *Siegel*, 542 F. Supp. 2d at 1142). In its unpublished decision, the district court primarily relied on *Siegel* and Professor Nimmer's treatise, which are both flawed as discussed above.

Third, Resnik discusses *Fred Ahlert Music Corp. v. Warner/Chappell Music, Inc.*, 155 F.3d 17. He relies on this case for the proposition that the Second Circuit "recognized that the statutory termination of rights in a musical composition used in the film *Sleepless in Seattle* only resulted in the recapture of the 'domestic rights in the [s]ong.'" In that case, the Second Circuit considered the question of "whether the author or the publisher has the authority to license new uses of a pre-termination derivative work after

termination." *Fred Ahlert Music Corp.*, 155 F.3d at 23. However, it did not consider the precise question of the geographical scope of termination under section 304(c)(6)(E). It only noted that "domestic rights" reverted to heirs when they served a termination notice, citing 17 U.S.C. § 304(c)(6) with no further support. *Id.* at 20. Therefore, this case also provides shaky support for Resnik's argument that termination under section 304 only enables Vetter to exploit Double Shot within the United States.

For these reasons, existing case law provides weak support for Resnik's argument, and this court declines to follow it.

### C. International Treaty Principles

Resnik asserts that the district court's holding conflicts with the principles of national treatment and territoriality under two international treaties: the Berne Convention and the Universal Copyright Convention. Resnik explains that the principle of territoriality would be violated under the district court's interpretation "[b]ecause the foreign rights in [Double Shot] do not arise under Title 17 of the U.S. Code, but under the domestic laws of each member country," so "the termination of U.S. rights under [s]ection 304 'in no way affects' those foreign rights." He asserts that the principle of national treatment would be violated because "it would grant U.S. authors *greater* rights than the authors of other Berne and [Universal Copyright Convention] members are entitled to receive under U.S. law." Resnik's arguments are premised on the following theory: "[T]he U.S. Copyright Act, together with the implementing legislation of each other member country, creates multiple and separate copyright interests in each country, rather than a single overarching international master copyright that each country is required to honor."

The Vetter Plaintiffs respond that Resnik "continue[s] to overstate the effect of the presumption against extraterritoriality in relation to United

No. 25-30108

States copyright law." They argue that this case is about "*ownership* of an intangible property asset" rather than copyright infringement, so "it is reasonable to conclude that, to the extent that the presumption plays a role in this appeal, it does not carry the same weight as it would in a case involving the application of domestic law to foreign parties engaged in foreign conduct." They further contend that courts generally resolve cases about copyright ownership with a choice-of-law analysis, citing *Itar-Tass Russian News Agency v. Russian Kurier, Inc.* ("*Itar-Tass Russian News Agency*"), 153 F.3d 82, 90 (2d Cir. 1998). Finally, the Vetter Plaintiffs argue that the district court's decision does not violate international treaties.

Resnik does not provide sufficient support for his theory, and the district court's interpretation of section 304(c) may be reconciled with the principles of national treatment and territoriality.

The Supreme Court has observed that "[t]he Berne Convention for the Protection of Literary and Artistic Works . . ., which took effect in 1886, is the principal accord governing international copyright relations." *Golan v. Holder*, 565 U.S. 302, 306–07 (2012). "Members of the Berne Union agree to treat authors from other member countries as well as they treat their own." *Id.* at 308 (citing Berne Convention for the Protection of Literary and Artistic Works, Sept. 9, 1886, as revised at Stockholm on July 14, 1967, arts. 1, 5(1), 828 U.N.T.S. 221, 225, 231–33). Therefore, "[n]ationals of a member country, as well as any author who publishes in one of Berne's 164 member states . . . enjoy copyright protection in nations across the globe." *Id.* (citing Berne Convention for the Protection of Literary and Artistic Works, Sept. 9, 1886, as revised at Stockholm on July 14, 1967, arts. 2(6), 3, 828 U.N.T.S. 221).

Both the Berne Convention and Universal Copyright Convention subscribe to the principle of national treatment. Under the Berne

No. 25-30108

Convention, the principle of national treatment states that "when the author is not a national of the country of origin of the work for which he is protected under this Convention, he shall enjoy in that country the same rights as national authors." Berne Convention for the Protection of Literary and Artistic Works, art. 5(3) (Paris Text 1971). The Universal Copyright Convention has a similar provision. *See* Universal Copyright Convention, as revised at Paris on July 24, 1971, art. II. The Southern District of New York has recognized that "[i]n view of the United States' accession to the Berne Convention and the Universal Copyright Convention . . . a foreign national [of a treaty member state] may seek copyright protection under the Copyright Act although the source of its rights lies abroad." *Bridgeman Art Libr., Ltd. v. Corel Corp.*, 25 F. Supp. 2d 421, 425 (S.D.N.Y. 1998) (footnote omitted).

The Southern District of New York's understanding of these treaties is consistent with the notion that a copyright may be granted under the laws of one country and still be recognized by other member countries to the Berne Convention and Universal Copyright Convention. This reading contradicts Resnik's theory that there are "multiple and separate copyright interests in each country, rather than a single overarching international copyright that each country is required to honor." For support, Resnik only cites 17 U.S.C. § 104(c), which states that "[n]o right or interest in a work eligible for protection under this title may be claimed by virtue of, or in reliance upon, the provisions of the Berne Convention, or the adherence of the United States thereto." 17 U.S.C. § 104(c). Given the statutory text, context, and purpose of section 304(c) as well as the public policy and industry norms discussed *supra*, it is more likely that a copyright is better understood as being granted under the U.S. Copyright Act and recognized by member countries pursuant to the Berne Convention and Universal Copyright Convention.

In this case, Vetter transferred his exclusive rights to Double Shot throughout the world to Windsong in the 1963 Assignment. Copyright

protection for these rights was granted under the U.S. Copyright Act and, in accordance with the Berne Convention and Universal Copyright Convention, was to be recognized by other member countries across the globe. Therefore, these rights would continue to be recognized across the globe consistent with the principle of national treatment when Vetter recaptured them upon termination.

Resnik further argues that the district court's decision conflicts with the principle of territoriality. According to this principle, copyright protections do not have extraterritorial effect. *See Impression Prods., Inc. v. Lexmark Intern, Inc.*, 581 U.S. 360, 379 (2017). This court has observed that "[t]he Copyright Act does not express its limit on territorial reach. That limit arises from the background presumption that legislation reaches only domestic conduct." *Geophysical Serv., Inc. v. TGS-NOPEC Geophysical Co.*, 850 F.3d 785, 791 (5th Cir. 2017) (citing *Subafilms, Ltd. v. MGM-Pathe Commc'ns Co.*, 24 F.3d 1088, 1095–96 (9th Cir. 1994)). Courts have applied the presumption against extraterritoriality in the context of copyright and patent infringement. *See, e.g., id.* at 789 ("[T]he inapplicability of the Copyright Act to extraterritorial conduct bars a contributory infringement claim based on the domestic authorization of entirely extraterritorial conduct."); *Subafilms, Ltd.*, 24 F.3d at 1098 ("[W]e reaffirm that the United States copyright laws do not reach acts of infringement that take place entirely abroad.").

The Vetter Plaintiffs' argument that Resnik overstates the role of the presumption against extraterritoriality is persuasive. They are correct that this case is about ownership rather than infringement. The National Society of Entertainment & Arts Lawyers points out that both *Impression Products, Inc.*, 581 U.S. 360 and *Geophysical Serv., Inc.*, 850 F.3d 785, concern patent infringement rather than ownership, so they provide minimal support for Resnik's argument. Additionally, Professor Nimmer's discussion of the

No. 25-30108

presumption against extraterritoriality centers on cases of copyright and patent infringement, which are not at issue in this case. 5 Nimmer, *supra*, § 17.02[A] (citing cases). Because Resnik has not shown that the presumption against extraterritoriality should be applied in the context of ownership, assignment, and termination, we hold that the district court did not err.

The Vetter Plaintiffs' argument that this court should apply a choice-of-law analysis under *Itar-Tass Russian News Agency* rather than the presumption against extraterritoriality is unpersuasive. While Resnik may have overstated the role of the presumption against extraterritoriality in this case, he is correct that *Itar-Tass Russian News Agency* is inapposite. There, the Second Circuit considered the choice of law in copyright ownership and infringement cases. 153 F.3d at 84. The threshold issue was the choice of law for resolving the copyright infringement dispute. *Id.* at 88. The Second Circuit held that "[s]ince the works at issue were created by Russian nationals and first published in Russia, Russian law [was] the appropriate source of law to determine issues of ownership of rights." *Id.* at 90. It reasoned that "[c]opyright is a form of property, and the usual rule is that the interests of the parties in property are determined by the law of the state with 'the most significant relationship' to the property and the parties." *Id.* at 90. However, it qualified its analysis, writing: "In deciding that the law of the country of origin determines the ownership of copyright, we consider only initial ownership, and have no occasion to consider choice of law issues concerning assignments of rights." 153 F.3d at 91 n.11. Therefore, *Itar-Tass Russian News Agency* is inapplicable here because this case involves the assignment of rights.

In sum, the district court did not err by holding that Vetter is the sole owner of Double Shot's copyright throughout the world in Vetter's Recaptured Copyright Interest based on statutory text, context, and purpose. We decline to follow the nonbinding cases Resnik cites. Moreover, the district court's holding is reconcilable with the principles of national

treatment and territoriality. Therefore, Vetter is entitled to judgment as a matter of law. *See Sanders*, 970 F.3d at 561 (quoting Fed. R. Civ. P. 56(a)).

## IV

On appeal, Resnik argues that the district court erred by declaring Vetter Communications Corporation to be the sole owner of Double Shot's copyright throughout the world in VCC's Renewal Copyright Interest. First, he asserts that the district court's holding cannot be reconciled with the plain text of section 24 of the Copyright Act of 1909. Second, he presses that the district court expanded *Stewart v. Abend* ("*Stewart*"), 495 U.S. 207 (1990), which he asserts limits the recapture of copyright rights to U.S. rights. And third, he maintains that the district court's reading of *Stewart* would violate the principles of territoriality and national treatment. We address each argument in turn.

### A. Statutory Interpretation

Under the Copyright Act of 1909, copyright ownership comprised an original term and a renewal term. *Stewart*, 495 U.S. at 217. The Copyright Act of 1909 provided authors with copyright protection for an original term of twenty-eight years. *Id.* at 212 (citing 35 Stat. 1075, 17 U.S.C. § 1 *et seq.* (1976 ed.)). At the end of the original term, authors could then renew their copyright for an additional twenty-eight years. *Id.* "[W]hen an author dies before the renewal period arrives, his executor is entitled to the renewal rights, even though the author previously assigned his renewal rights to another party." *Id.* at 219 (citing *Miller Music Corp. v. Charles N. Daniels, Inc.*, 362 U.S. 373, 374–75 (1960)). The Supreme Court has observed that "[t]he renewal term permits the author, originally in a poor bargaining position, to renegotiate the terms of the grant once the value of the work has been tested." *Id.* at 218–19. The renewal provision of the Copyright Act of 1909 states:

No. 25-30108

> [T]he copyright secured by this title shall endure for twenty-eight years from the date of first publication . . . the author of such work, if still living, or the widow, widower, or children of the author, if the author be not living, or if such author, widow, widower, or children be not living, then the author's executors, or in the absence of a will, his next of kin shall be entitled to a renewal and extension of the copyright in such work for a further term of twenty-eight years when application for such renewal and extension shall have been made to the copyright office and duly registered therein within one year prior to the expiration of the original term of copyright.

17 U.S.C. § 24 (1909).

Resnik argues that the district court's holding cannot be reconciled with the plain language of the Copyright Act of 1909. He asserts that the language "renewal and extension of the copyright . . . for a further term of twenty-eight years" only refers to the U.S. copyright because only the United States had this renewal term. The Vetter Plaintiffs contend that the district court correctly determined that VCC's Renewal Copyright Interest "represents a completely new estate clear of *any rights* that [Smith] granted to Windsong during the original copyright term." They point to the plain language of the renewal provision, observing that "[t]he right to obtain a renewal copyright is absolute and unrestricted in the text of the [Copyright Act of 1909]." We agree.

The text and purpose of the renewal provision in the Copyright Act of 1909 support the district court's holding. As discussed *supra*, this court starts with the text of the statute. *Matter of Durand-Day*, 134 F.4th at 851 (citing *Matter of Imperial Petroleum Recovery Corp.*, 84 F.4th at 271). "If the text of the statute is clear and unambiguous, [the] inquiry ends, and [this court] give[s] effect to the plain language." *Id.* (citing *Carpenters Dist. Council of*

No. 25-30108

*New Orleans & Vicinity*, 15 F.3d at 1282–83). Here, the renewal provision makes no mention of geographical limitations to the scope of renewal rights, and the provision itself does not contain any ambiguity. Therefore, the district court did not err based on the plain language of the provision.

Moreover, the Supreme Court has described the purpose of the Copyright Act of 1909, which was "to give the author a second chance to obtain fair remuneration for his creative efforts and to provide the author's family a 'new estate' if the author died before the renewal period arrived." *Stewart*, 495 U.S. at 220. This purpose is consistent with the Vetter Plaintiff's argument and the district court's holding that Vetter Communications Corporation is the sole owner of Double Shot's copyright throughout the world in VCC's Renewal Copyright Interest. Only by recapturing the exclusive rights to Double Shot throughout the world rather than recapturing U.S. rights alone would Vetter Communications Corporation receive fair remuneration consistent with the purpose of the Copyright Act of 1909. Thus, the district court did not err based on the statutory text and purpose.

Writing in support of Resnik, the Motion Picture Association cites Professor Nimmer's treatise for the proposition that only U.S. renewal rights revert to the author's heirs when the author dies before the rights have vested. Professor Nimmer considers the example of an American author who grants an American publisher "worldwide" rights in his work for both the original and renewal terms and dies before the renewal term begins. 5 Nimmer, *supra*, § 17.10[B][2]. He asks whether the publisher has "the right to exploit the work outside of the United States," answering that

> the issue here under consideration arises not under contract law, but instead as a matter of legal rights under copyright. In the U.S., the publisher's rights lapsed not because the contract so provided; after all, that contract itself purported to grant renewal rights. Rather, the publisher's rights ceased by

> operation of the copyright law in that the author, by not surviving to renewal vesting, possessed no copyright in the renewal term that he was able to grant by contract. Given that copyright laws exert no extraterritorial impact, it is no more appropriate to apply the renewal aspect of U.S. copyright law in other jurisdictions than it is to apply any other aspect of U.S. law abroad.

5 Nimmer, *supra*, § 17.10[B][2]. For support, Professor Nimmer again cites to another section of his treatise on the territorial limitations of the U.S. Copyright Act. *See* 3 Nimmer, *supra*, § 17.10[B][2] (citing 5 Nimmer, *supra*, § 17.02). This section discusses the presumption against extraterritoriality in the context of copyright and patent infringement rather than copyright ownership and renewal. Additionally, Professor Nimmer acknowledges that "there is dearth of foreign authority on this issue, such that it remains possible for a foreign court to construe its own domestic copyright law as defeasing the publisher's rights when the U.S. renewal period commences." 5 Nimmer, *supra*, § 17.10[B][2]. He further admits that "several eminent authorities support that view, opposed by equally imminent authorities." 5 Nimmer, *supra*, § 17.10[B][2]. Overall, Professor Nimmer's reading is inconsistent with the plain text and purpose of the statute, so it provides shaky support for Resnik's argument that the district court's holding cannot be reconciled with the plain text of the Copyright Act of 1909.

The district court ultimately did not err by holding that Vetter Communications Corporation is the sole owner of Double Shot's copyright throughout the world in VCC's Renewal Copyright Interest.

### B. Existing Case Law

Resnik also argues that the district court expanded *Stewart* by holding that Smith's heirs gained worldwide copyright rights during the renewal term

24

of the copyright. He maintains that only U.S. renewal rights revert under *Stewart*. He explains:

> As to the U.S. renewal term, however—and *only* as to the U.S. renewal term—*Stewart* holds that it is only a grant of an unfulfilled expectancy. As to all other rights conveyed by the author, *i.e.*, foreign rights in countries without a bifurcated copyright term, the effect of the grant remains unchanged, because the foreign rights granted are *not mere expectancies* but valid full-term rights under the copyright laws of other countries, fully vested in the author for their entire duration *ab initio*.

Citing *Rohauer v. Killiam Shows, Inc.* ("*Rohauer*"), 379 F. Supp. 723 (S.D.N.Y. 1974), Resnik concludes that "as to these non-U.S. rights . . . the author has more than 'only an expectancy to assign' at the time the assignment is made, and the result of *Stewart* will not extend beyond the 'contingent' U.S. renewal rights." The Vetter Plaintiffs respond that *Stewart* does not support Resnik's argument that the renewal of the copyright did not affect foreign rights. Moreover, they assert that *Rohauer* is inapposite because, among other reasons, Resnik relies on dicta. We agree.

While case law on the geographical scope of the Copyright Act of 1909's renewal provision is scant, *Stewart* contains a similar fact pattern in the context of derivative works. In *Stewart*, an author assigned the rights to make movies of his stories to a film production company and agreed to renew the copyright. 495 U.S. at 212. However, the author died before he could obtain the renewal rights for the petitioners. *Id.* The executor of the author's trust renewed the copyright in the story and assigned the rights to the respondent. *Id.* After the movie was broadcast on ABC, the respondent notified the petitioners that he owned renewal rights in the copyright and that their distribution of the movie violated his copyright. *Id.* Subsequently, the respondent sued, alleging that the re-release of the movie "infringe[d] his

copyright in the story because petitioners' right to use the story during the renewal term lapsed when [the author] died before he could register for the renewal term and transfer his renewal rights to them." *Id.* at 213.

> Citing *Miller Music Corp.*, 362 U.S. 373, the Court explained that
>
> if the author dies before the commencement of the renewal period, the assignee holds nothing. If the assignee of all of the renewal rights holds nothing upon the death of the assignor before arrival of the renewal period, then, *a fortiori*, the assignee of a portion of the renewal rights, *e.g.*, the right to produce a derivative work, must also hold nothing.

*Id.* at 220–21. "Therefore, if the author dies before the renewal period, then the assignee may continue to use the original work only if the author's successor transfers the renewal rights to the assignee." *Id.* at 221. The Court concluded that because the author died before the start of the renewal period, the petitioners "[held] only an unfulfilled expectancy." *Id.*

Resnik argues that the recapture of renewal rights is limited to U.S. rights under *Stewart*, but his argument fails. The *Stewart* Court did not discuss the geographical scope of renewal rights. While the Court explained that the transfer of renewal rights is contingent on the author's survival during the renewal period, the Court did not distinguish between U.S. rights and foreign rights. *See id.* at 219–20. Rather, the Court was silent on that issue.

Resnik also cites *Rohauer* for the proposition that "foreign rights do not revert to the author's estate under the principle articulated in *Stewart*," but *Rohauer* provides minimal support. In *Rohauer*, a British citizen wrote a novel that was published in the United States and registered by the U.S. Copyright Office. 379 F. Supp. at 725. The author assigned the movie rights to the novel and agreed to obtain the renewal of the copyright prior to its expiration; the author then assigned the movie rights for the renewal term to

No. 25-30108

Moskowitz. *Id.* After the author died, the author's heir renewed the copyright in 1952 and assigned the rights to Rohauer in 1965. *Id.* A movie based on the novel was released, and Rohauer brought a copyright infringement lawsuit. *Id.* at 726. Discussing the assignment of the renewal rights in 1965, the district court wrote that at the moment of the assignment, Rohauer was "vested only with rights to the work in the United States; in other countries, the motion picture rights would not have reverted to [the author's heir] for at least three more years." *Id.* at 735. Resnik relies on this statement in his brief, but it is not as instructive as he claims. Contrary to Resnik's argument, the district court was not saying that the motion picture rights could never revert to the author's heir. And like *Stewart*, *Rohauer* does not discuss the geographical scope of renewal rights under the Copyright Act of 1909.

Therefore, the district court did not err by holding that Vetter Communications Corporation is the sole owner of Double Shot's copyright throughout the world in VCC's Renewal Copyright Interest.

### C. International Treaty Principles

Resnik further contends that the district court's interpretation of *Stewart* conflicts with the principle of territoriality because "it would impose the downstream effects of the U.S. renewal system on every country in the world—requiring that foreign publishers surrender their rights in a U.S. work simply because the author happened to die too soon." Resnik presses that the district court's interpretation of *Stewart* violates the principle of national treatment because "U.S. authors would have an opportunity to recapture their rights worldwide after year twenty-eight, but the authors in other countries would not be given that opportunity, either in the U.S. or elsewhere, because the laws of their countries do not create a contingent 'new estate' partway through the copyright term."

The Vetter Plaintiffs respond that the presumption against

No. 25-30108

extraterritoriality is arguably inapplicable to the renewal provision. *See EEOC v. Arabian Am. Oil Co.*, 499 U.S. 244, 248 (1991). Even if the principle of territoriality applies, they argue that "the district court's [j]udgment in favor of [them] reflects a permissible domestic application of the renewal provisions in the [Copyright Act of 1909]."

While Resnik maintains that the district court's decision regarding VCC's Renewal Copyright Interest would violate the principles of territoriality and national treatment, he does not provide sufficient support for his argument. As discussed *supra*, his argument is premised on the theory that there are "multiple and separate copyright interests in each country, rather than a single overarching international master copyright that each country is required to honor." However, he does not cite sufficient support in his analysis of this issue. For example, he does not articulate the "downstream effects" he describes as a result of the district court's decision. The Vetter Plaintiffs' argument that the renewal provisions are "inherently non-geographical" is more persuasive given the statutory text and purpose of the renewal provision. Therefore, the Vetter Plaintiffs have the stronger argument on this issue as well.

Overall, the district court did not err by holding that Vetter Communications Corporation is the sole owner of Double Shot's copyright throughout the world in VCC's Renewal Copyright Interest. This holding is supported by statutory text and purpose.

## V

For the foregoing reasons, we AFFIRM the district court's judgment in full.